IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - -X
IN RE: ASBESTOS LITIGATION:           :
                                      :
FREDERICK SEITZ and                   :
MARY LOUISE SEITZ, his wife           :     C.A. No. 08-CV-0351 GMS
                                      :     C.A. No. 08-CV-0353 GMS
          Plaintiffs,                 :
                                      :
              v.                      :
                                      :
ADEL WIGGINS GROUP, et al.,           :
                                      :
          Defendants.                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - -X


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION TO REMAND**


LAW OFFICE OF JOSEPH J. RHOADES
1225 King Street, 12th Floor
Wilmington, Delaware 19801
302-427-9500

-and-

LEVY PHILLIPS & KONIGSBERG, LLP
800 Third Avenue, 13th Floor
New York, New York 10022
Phone: (212) 605-6200
Fax: (212) 605-6290

*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………....ii

INTRODUCTION……………………………………………………………...1

FACTS………………………………………………………………………...3

    A.    Military Specifications……………………………………………...........3

    B.    Dr. Barry I. Castleman……………………………………….............5

ARGUMENT…………………………………………………………………...6

    A.    Requirements for Jurisdiction Under 28 U.S.C. § 1442(a)(1)………………………6

    B.    There Is A Strong Presumption Against Removal Jurisdiction…………………...........7

    C.    Northrop Grumman and Bell Were Not Acting Under a Federal Officer……………9

        I.    The Government Did Not Specify Asbestos Components……………………10

        II.    The Products at Issue Were Not Specifically Designed for the U.S. Military…..12

    D.    Neither Northrop Grumman Nor Bell Can Establish a "Causal Connection" Between Their Failure to Provide Asbestos Warnings and Any Military Order or Specification…………………………………………………....13

    E.    Neither Northrop Grumman Nor Bell Has Raised a "Colorable" Federal Defense to Plaintiffs' State Law Failure to Warn Claim………………………………17

    F.    The Interests of Justice Support Prompt Remand To State Court………………..19

CONCLUSION………………………………………………………………..20

## **TABLE OF AUTHORITIES**

### Cases

Arness v. Boeing North America, Inc., 997 F. Supp. 1268 (C.D. Ca. 1998)…………………………9

Batoff v. State Farm Ins. Co., 977 F.2d 848 (3rd Cir. 1992)……………………………………7, 8

Boyer v. Snap-On Tools Corp., 913 F.2d 108 (3rd Cir. 1990)………………………………………..7

Boyle v. United Technologies Corp., 478 U.S. 500 (1988)…………………………………...2, 12, 17

Desenberger v. United Technologies Corp., 297 F.3d 66 (2nd Cir. 2002)…………………………..18

Duncan v. Stuetzle, 76 F. 3d 1480 (9th Cir. 1996)…………………………………………………..7

Faulk v. Owens-Corning Fiberglass Corp., 48 F. Supp.2d 653 (E.D.Tex. 1999)……………15, 18, 19

Fortier v. Ampco-Pittsburgh Corp. et al., 3:07-cv-00005 (D.Conn. Mar. 5, 2007)…………………15

Freiberg v. Swinerton & Walberg Prop. Servs, Inc., 245 F. Supp. 2d 1144 (D.Colo. 2002)……...8, 14

Gaus v. Miles, Inc., 980 F. 2d 564 (9th Cir. 1992)…………………………………………………..7

Good v. Armstrong World Industries, Inc., 914 F. Supp. 1125 (E.D. Pa. 1996)…………..8, 9, 10, 11

Green v. A.W. Chesterton, 366 F. Supp.2d 149 (D.Me. 2005)……………………………………10, 11

Grispo v. Eagle-Pitcher Industries, Inc., 897 F.2d 626 (1990)……………………………………..18

In Re: Hawaii Federal Asbestos Cases, 960 F.2d 806 (9th Cir. 1992)…………………………....12, 18

Hilbert v. McDonnell Douglas Corp., 529 F. Supp.2d 187 (D. Mass. 2008)………………........passim

Jackson v. Metropolitan Edison Co., 419 U.S. 345 (1974)…………………………………………..9

In Re Joint E. & S. Dist. New York Asbestos Lit., 897 F.2d 626 (2nd Cir. 1990)…………………...17

Laughlin v. Kmart Corp., 50 F.3d 871 (10th Cir. 1995)……………………………………………...7

In re Maine Asbestos Cases, 44 F. Supp.2d 368 (D.Me. 1999)………………………………3, 19, 20

Megill v. Worthington Pump, Inc., 1999 U.S.Dist. LEXIS 4433 (D. Del. Mar. 26, 1999)…..13, 15, 17

Mesa v. California, 489 U.S. 121 (1989)…………………………………………………………6, 7, 19

In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation v.
Atlantic Richfield Company, 488 F.3d 112 (2d Cir. 2007)……………………………………13

N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., 381 F. Supp. 2d 398 (D.N.J. 2005)…………..8, 13

Nguyen v. Allied Signal, Inc., 1998 U.S. Dist. LEXIS 15517 (N.D. Cal. Sept. 28, 1998)……….15, 16

Overly v. Raybestos-Manhattan, 1996 U.S. Dist. LEXIS 13535 (N.D. Cal. Sept. 6, 1996)…………19

In Re Related Asbestos Cases, 453 F. Supp. 1142 (N.D.Cal. 1982)……………………………...12

Rendell-Baker v Kohn, 457 U.S. 830 (1942)……………………………………………………10

Ryan v. Dow Chemical Co., 781 F. Supp. 934 (E.D.N.Y. 1992)…………………………………8, 9

Sales v. Weyerhaeuser Co., 138 Wash.App. 222 (2007)…………………………………………20

Screws v. United States, 325 U.S. 91 (1945)……………………………………………………...8

Steel Valley Auth. v. Union Switch and Signal Div., 809 F.2d 1006 (3d Cir. 1987)…………………7

St. Francis Hospital and Medical Center v. Blue Cross & Blue Shield of
Connecticut, Inc., 776 F. Supp. 659 (D. Conn. 1991)………………………………………………..7-8

Vanouwerkerk v. Owens-Corning Fiberglass Corp., 1999 WL 335960
(E.D.Tex. May 26, 1999)…………………………………………………………………………..15

Weese v. Union Carbide Corporation, 2007 U.S. Dist. LEXIS 73970
(S.D.Ill. Oct. 3, 2007)………………………………………………………………........14, 15, 19

Westmiller v. IMO Industries, Inc., 2005 U.S. Dist. LEXIS 29371
(W.D.Wash Oct. 20, 2005)……………………………………………………………………14, 19

Williams v. General Electric Co., 418 F. Supp.2d 610 (M.D. Pa. 2005)…………………………...7, 8

## Statutes and Regulations

28 U.S.C. § 1441(a)………………………………………………………………………8

28 U.S.C. § 1442(a)(1)…………………………………………………………………...passim

28 U.S.C. § 1447(c)………………………………………………………………………8

## <u>INTRODUCTION</u>

Plaintiffs Frederick and Mary Louise Seitz filed this asbestos lawsuit on April 25, 2008 in the Superior Court of the State of Delaware for New Castle County. [See Complaint attached as **Exhibit A** to the Declaration of Jerome H. Block ("Block Decl.")]. Mr. Seitz is dying of malignant mesothelioma, a fatal cancer caused by asbestos exposure. [See Correspondence from Dr. Timothy Bresnahan attached as **Exhibit B** to the Block Decl.]

Mr. Seitz was exposed to asbestos while serving as a mechanic and pilot in the United States Marine Corp from 1946 through 1967. [See Plaintiffs' Responses to Standard Interrogatories and all exhibits thereto, attached as **Exhibit C** to the Block Decl.] Defendant Northrop Grumman ("Northrop Grumman") and Defendant Bell Helicopter Textron, Inc. ("Bell") manufactured and supplied aircraft that Mr. Seitz both maintained and piloted during his service in the Marines. Northrop Grumman's and Bell's aircraft had asbestos-containing components and utilized asbestos insulation.

Plaintiffs' sole claim against Northrop Grumman and Bell is that the companies failed to warn Mr. Seitz and his fellow servicemen about the hazards of asbestos[1]

Bell removed this case on June 11, 2008. Grumman removed this case on June 12, 2008. Both defendants alleged federal officer removal grounds. Northrop Grumman's and Bell's Notices of Removal assert, in general terms, that the any inclusion of asbestos-containing components in the manufacture of their aircraft were required by the United States military. Neither Notice of Removal identifies any discretionary decision by a federal officer which caused decedent to be exposed to asbestos. Neither Northrop Grumman nor Bell has provided copies of any government contracts, aircraft specifications or like information in support of its Removal. It has provided no affidavit or other evidence to establish this alleged federal control, or to explain how it was exercised. Indeed,

---

[1] Although Plaintiffs' Complaint sets forth various theories of design defect and manufacturing defect, Plaintiffs filed a Withdrawal of Claims on July 2, 2008, limiting the scope of its case to a state law failure to warn claim.

neither Defendant even identifies which federal officer was supposedly giving it directions. In summary, Northrop Grumman's and Bell's Notices of Removal contain only very general recitals concerning federal control.

This case should be remanded because (1) neither Northrop Grumman nor Bell has established that they were acting under a federal officer; (2) neither Northrop Grumman nor Bell has satisfied their burden of establishing the causal connection require by the federal officer removal statute, 28 U.S.C. § 1442(a)(1), i.e. that a federal officer <u>caused</u> defendants' failure to warn; and (3) neither Northrop Grumman nor Bell demonstrated that is has even a colorable claim to its sole alleged federal defense – the government contractor defense pursuant to <u>Boyle v. United Technologies Corp.</u>, 478 U.S. 500 (1988).

Indeed, Northrop Grumman's and Bell's Notices of Removal contain absolutely no evidence to substantiate their claim that their failure to warn Mr. Seitz and other servicemen about the hazards of asbestos was compelled by direction of the United States Military. The following facts are undisputed and compel remand:

- There is no evidence that the United States military required that Northrop Grumman and Bell use asbestos in their products

- There is no evidence that Northrop Grumman or Bell <u>ever</u> made any effort to warn military servicemen, such as Mr. Seitz, about the hazards of asbestos and asbestos-containing components associated with their aircraft

- There is no evidence that the United States military had any involvement in the decision by Northrop Grumman or Bell (or any other company) to not issue warnings about asbestos.

- The relevant military specifications required manufacturers to issue warnings in technical manuals about the hazards associated with the use of their aircraft, with no exemption for asbestos-related hazards

Mr. Seitz is a very sick man. His case has already been set for trial in Delaware State Court. If this case is not promptly remanded, it will be transferred to the federal asbestos MDL ("MDL-875"), and will encounter significant delay. In re Maine Asbestos Cases, 44 F. Supp.2d 368 (D.Me. 1999) ("If these claims return to state court, they will proceed to resolution. If they remain in federal court, they will encounter significant delay upon their transfer through the Panel on Multidistrict Litigation to the Eastern District of Pennsylvania").

Based on the evidence set forth below, Plaintiffs respectfully request that the Court remand this case to state court and grant Plaintiffs all other relief deemed just and proper.

## FACTS

### A.    Military Specifications

The United States military did not prohibit manufacturers from placing warnings on products. For example, attached as **Exhibit D** to the Block Decl. is the Military Specification for Aircraft Wheel and Brake Assemblies (MIL-W-5013D). Nowhere in this specification does it say that the brake linings are to contain asbestos. Likewise, nowhere in the specification does it instruct a manufacturer not to warn about asbestos or any other hazard. In fact, section 2.1 lists the specifications and standards that form a part of MIL-W-5013D. One of those standards is MIL-STD-129 "Marking for Shipment or Storage," which is attached as **Exhibit E** to the Block Decl. MIL-STD-129 states, at section 5.5.15.1 on page 35, that "[s]pecial handling instructions, marking, and warnings shall be shown as required…" It goes on to list a number of statutes and regulations, and ends with a reference to "by statute" in general. This clearly shows the military's intent to make sure that warnings that were required by law were included. Thus, not only did Northrop

Grumman's and Bell's contracts with the military not prohibit them from warning about asbestos, they specifically required them to include any warnings required by statute, such as state law imposing liability for failure to warn.

Furthermore, MIL-STD-129 incorporates, at section 2.2, "Manual L-1, Guide to Precautionary Labeling of Hazardous Chemicals." [**Exhibit E**, page 4]. According to Manual L-1, attached hereto as **Exhibit F**:

> Individual statutes, regulations or ordinances may require that particular information be included on a label or that a specific label be affixed to a container. In each case, the requirements of these laws should also be studied. *The warning labels suggested in the Manual should be used in addition to, or in combination with, any label required by law.*

[**Exhibit F**, page 1 (emphasis original)].

Manual L-1 also specifically provides that exposures to "harmful dust" should be warned by affixing a caution label stating in pertinent part: "CAUTION! HARMFUL DUST. Avoid repeated breathing or skin contact. . . ." [Manual L-1, **Exhibit F**, p. 7, ¶ VI]. Manual L-1 also states in pertinent part:

> The education of employees regarding chemical hazards is, and must remain, the direct responsibility of their employers. However, such hazards are not confined to employees alone, <u>and information concerning them should</u>, as far as practical, <u>reach every person using</u>, transporting, or storing chemicals. <u>The most practical means for the seller</u> to disseminate this information appears to be <u>by labels affixed</u> to containers of hazardous chemicals, <u>bearing appropriate precautionary statements</u> and instructions stated as simply and as briefly as circumstances permit.

[Manual L-1, **Exhibit F**, p. 1, ¶ 2 (emphasis added)]. Manual L-1 also provides that warnings provided on commercial products should be given. [Manual L-1, Schedule 4 (last page of **Exhibit F**) ("1. Sample of a product already on the market should carry the same warning label as a commercial shipment.")].

4

Finally, the Secretary of the Navy, in an Instruction to the heads of the Navy's departments, including the Chief of the Bureau of Aeronautics, has specifically acknowledged that state law warnings should be issued by manufacturers:

> 2. <u>Scope</u>.  This Instruction applies to the labeling of all hazardous materials throughout the Naval Establishment wherever distribution of hazardous chemicals and materials is made to the actual consumer (shop, office, or unit).  It applies to materials received from any supply source, provided that the material is intended for ultimate use at the local activity.  In this regard it refers to labeling of the original container, as well as any other container to which the material may subsequently be transferred.  This Instruction is <u>not</u> intended to govern:
>
> > a.  The type of labels to be affixed by the manufacturer. (These are governed by State and Federal Laws and regulations depending on the nature of the material…)

[SECNAV Instruction 5160.8, attached as **Exhibit G** to the Block Decl. (emphasis in original)].

Therefore, contrary to Northrop Grumman's and Bell's assertion, the military did not prevent manufacturers from warning about asbestos hazards, but it instead specifically required that state law warnings regarding hazardous materials be included.

**B.    Dr. Barry I. Castleman**

Plaintiffs have submitted the Declaration of Dr. Barry I. Castleman, an expert on the history of the hazards of asbestos and corporate conduct relating to the same. [See Declaration of Barry I. Castleman, attached as **Exhibit H** to Block Decl.].  Dr. Castleman has examined files, unpublished information available from the U.S. government archives, the archives of scientists and the archives of institutions that had worked for and with asbestos companies. [**Exhibit H**, ¶ 5].   In addition he is familiar with unpublished information obtained in legal discovery, including trade association minutes, corporate documents, and testimony of corporate officials who were associated with asbestos hazards over the years - doctors, plant managers, executives, and other people who were aware of events that transpired. [Id.].

Dr. Castleman's doctoral thesis was, "Asbestos: An Historical Case Study of Corporate Response to an Industrial Health Hazard", and is largely identical to a book published in 1984 by Prentice Hall Law and Business called *Asbestos: Medical and Legal Aspects* (now in its 5th Edition, 2005). [**Exhibit H**, ¶ 4].   Dr. Castleman's textbook contains a section on 38 companies and/or industry groups that were involved with the manufacture, sale or use of asbestos-containing materials.  He has reviewed industry documents and testimony regarding all of these entities as well as many additional companies involved in the asbestos industry. [Id., ¶ 7].

In his extensive research of the above described source materials, Dr. Castleman has never seen any document that discusses or suggests that the United States military prohibited any manufacturer or seller from warning about asbestos or that the United States military interfered, in any way, with a company's decision regarding whether to issue such warnings. [Id.].  Dr. Castleman has also studied and written about the historical use of asbestos warnings on products and in product manuals. [**Exhibit H**, ¶ 8]. Once companies began to issue asbestos warnings to product users, there is no evidence that the United States military required the removal or alteration of such warnings for products sold to the military.  [Id.].

## ARGUMENT

### A.    Requirements for Jurisdiction Under 28 U.S.C. § 1442(a)(1).

The Supreme Court of the United States has stated that section 1442(a) is "a pure jurisdictional statute, seeking to do nothing more than grant district court jurisdiction over cases in which a federal officer is a defendant. Section 1442(a), therefore, cannot independently support Art. III 'arising under' jurisdiction." Mesa v. California, 489 U.S. 121, 136 (1989).  For this Court to have subject matter jurisdiction over this action pursuant to §1442(a)(1) (often referred to as "federal officer removal"), Northrop Grumman and Bell have the burden to establish the following: "1) the removing defendant must be a federal officer or a 'person' acting under a federal officer; 2) the

removing defendant was acting at the direction of an officer of the United States and that a causal nexus exists between the defendant's actions under color of federal office and the plaintiffs' claims; and 3) the removing defendant asserts a colorable federal defense." Id. at 129. In this case, as will be shown, neither Northrop Grumman nor Bell has met its burden as they have provided no evidence that they were acting under the direction of an officer of the United States, no evidence that a causal nexus exists between its actions and the plaintiffs' claims, and no evidence of a colorable federal defense.

### B.     There Is A Strong Presumption Against Removal Jurisdiction

When a case is removed to federal court, there is a "strong presumption" against federal court removal jurisdiction. Gaus v. Miles, Inc., 980 F. 2d 564, 566 (9th Cir. 1992). The defendant, who was the removing party, bears the burden of proving the propriety of removal, including jurisdiction. Boyer v. Snap-On Tools Corp., 913 F.2d 108, 111 (3rd Cir. 1990); Gaus, 980 F.2d at 566-67; Laughlin v. Kmart Corp., 50 F.3d 871, 873 (10th Cir. 1995); Williams v. General Electric Co., 418 F. Supp.2d 610, 614 (M.D. Pa. 2005). "The removal statutes 'are to be strictly construed against removal and all doubts should be resolved in favor of remand.'" Boyer, 913 F.2d at 111 (quoting Steel Valley Auth. v. Union Switch and Signal Div., 809 F.2d 1006, 1010 (3d Cir. 1987); see also Batoff v. State Farm Ins. Co., 977 F.2d 848, 851 (3rd Cir. 1992) ("[R]emoval statutes 'are to be strictly construed against removal . . .'") (quoting Steel Valley Author., 809 F.2d at 1010); Gaus, 980 F. 2d at 566; Duncan v. Stuetzle, 76 F. 3d 1480, 1485 (9th Cir. 1996). Federal jurisdiction "must be rejected if there is *any doubt* as to the right of removal in the first instance." Duncan, 76 F. 3d at 1485 (emphasis added). In determining whether to remand a removed civil action due to lack of subject matter jurisdiction, "any doubt should be resolved in favor of remand." St. Francis Hospital and Medical Center v. Blue Cross & Blue Shield of Connecticut, Inc., 776 F. Supp. 659, 661 (D. Conn.

7

1991); see also 28 U.S.C. §§1441(a), 1447(c); Batoff, 977 F.2d at 851; Ryan v. Dow Chemical Co., 781 F. Supp. 934 (E.D.N.Y. 1992).

The purpose of §1442 is to prevent state courts from interfering with the implementation of federal law. Freiberg v. Swinerton & Walberg Prop. Servs, Inc., 245 F. Supp. 2d 1144, 1150 (D.Colo. 2002). "[B]ecause the federal officer removal statute is predicated 'on the protection of *federal* activity and an anachronistic mistrust of state courts' ability to protect and enforce *federal* interests and immunities from suit, private actors seeking the benefit from its provisions bear a special burden of establishing the official nature of their activities.'" Williams, 418 F. Supp.2d at 614 (quoting Freiberg, 245 F. Supp.2d at 1150) (emphasis in original); see also N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., 381 F. Supp. 2d 398, 403 (D.N.J. 2005). Thus, a private company such as Northrop Grumman or Bell faces an even tougher standard for removal than would a government employee or entity. "[T]he government contract defense by a corporation raises straightforward common law issues that state courts are as adept at handling as the federal judiciary." Good v. Armstrong World Industries, Inc., 914 F. Supp. 1125, 1130 (E.D. Pa. 1996). Not to be taken lightly, removal under §1442 is "an exceptional procedure which wrests from state courts the power to try [cases under] their own laws. Thus the requirements of the showing necessary for removal are strict." Screws v. United States, 325 U.S. 91, 111-112 (1945).

The rationale behind a strict interpretation of §1442(a)(1) removal was explained in Good:

> The Supreme Court fashioned the government contract defense to displace state law because there exists a unique federal interest in civil liability arising out of the performance of federal procurement contracts. [citation omitted] I question whether that federal interest exists in this case. The impact of this personal injury action on the federal interest in protecting future defense procurement – the fundamental point of the government contract defense -- is speculative. It is common knowledge that asbestos is no longer used in the design and manufacture of equipment, so that this lawsuit cannot interfere with a federal program involving products that contain asbestos. Therefore, the adjudication of this personal injury action in state court does not threaten the enforcement of a federal policy sufficient to warrant removal.

> Even assuming that the federal interest underlying the government contractor defense is present, simply noting the presence of a federal interest does not provide a sufficient or necessary basis to allow removal. . . . When enacting the federal officer removal statute, Congress sought to distinguish lawsuits on the basis of their susceptibility to state court manipulation. The government contractor defense is not subject to such manipulation. Unlike a federal officer's defense of immunity, the government contract defense by a corporation raises straightforward common law issues that state courts are as adept at handling as the federal judiciary.

Good, 914 F. Supp. at 1131.

### C.    Northrop Grumman and Bell Were Not Acting Under a Federal Officer

Northrop Grumman and Bell have not demonstrated that they were acting at the direction of an officer of the United States.  Establishing this element requires more than merely alleging that the acts in question were generally carried-out under federal auspices. See Ryan, 781 F. Supp. at 947 ("a person or corporation establishing only that the relevant acts occurred under the general auspices of a federal office or officer is not entitled to section 1442(a)(1) removal"); see also Good, 914 F. Supp. at 1129 ("if the corporation establishes only that the relevant acts occurred under the general auspices of federal direction then it is not entitled to §1442(a)(1) removal"); Arness v. Boeing North America, Inc., 997 F. Supp. 1268, 1273 (C.D. Ca. 1998).  Rather, "removal must be predicated upon a showing that the acts that form the basis for the state [civil suit] were performed pursuant to [a federal] officer's direct orders or to comprehensive and detailed regulations." Ryan, 781 F. Supp. at 947; see also Good, 914 F. Supp. at 1129 ("removal must be predicated upon a showing that the acts forming the basis of the state suit were performed pursuant to an officers direct orders or comprehensive and detailed regulations").  A civilian person or company acts under color of federal law only when its action "may be fairly treated as that of the [government] itself." Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350 (1974). The fact that a corporation is performing under government contracts whose specifications it must meet does not automatically transform that corporation's conduct into government action. "Many private corporations[']…business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government. Acts

9

of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." <u>Rendell-Baker v Kohn</u>, 457 U.S. 830, 841 (1942).

Northrop Grumman and Bell's Notices of Removal, in this case, are clearly insufficient in this regard.  They do not allege (much less establish) that any federal officer expressly required them to use asbestos-containing brake, clamp or gasket materials in manufacturing military aircraft. <u>See Good</u>, 914 F. Supp. at 1129 ("[defendant] must set forth evidence showing that it did, in fact, act under a federal officer, a burden that [defendant] has not satisfied").  They do not identify any contract, agreements, regulations or specifications requiring that asbestos be used.  It merely makes the unsupported allegation that its aircraft were built under the direction of several government entities. This is not sufficient to meet the first prong of the <u>Mesa</u> test.

## I.    The Government Did Not Specify Asbestos Components.

In order to demonstrate "acting under," the defendant is required to show that the government specifications specifically required the use of asbestos itself, rather than merely specifying a performance specification that would require the use of asbestos. <u>Green v. A.W. Chesterton</u>, 366 F. Supp.2d 149, 157 (D.Me. 2005). This distinction is important. A performance specification may require that a brake lining have a certain size, dimension, stopping power, fade resistance, and the like. This is entirely different than a specification that says that *asbestos* must be used as an ingredient. Even if a manufacturer concludes that a performance specification could only be met by the use of an asbestos-containing brake lining, it does not satisfy the requirement. The government officer must have specified that asbestos be used. <u>Id</u>.

In <u>Green</u>, the Plaintiff filed a suit alleging state law claims stemming from the death of her husband from asbestos exposure. In that case, one of the defendants, Viacom (formerly Westinghouse), removed the case to federal court on the basis of the government contractor

10

defense, claiming that the asbestos-containing turbines to which the plaintiff's decedent were exposed were constructed and supplied to the United States Navy in accordance with United States government regulations and specifications (much like the allegations here). <u>Green</u>, 366 F. Supp.2d at 152. Judge Kravchuk, for the United States District Court for the District of Maine, held that Viacom failed to meet its burden of proving that it was "acting under" a federal officer or agency when it incorporated asbestos into its products. <u>Id</u>. at 157. Viacom provided two affidavits in order to attempt to prove the high degree of control the Navy exercised over the construction of all military vessels. Judge Kravchuk, in reviewing the affidavits, determined that although the affidavits conveyed the "…high degree of control and oversight that the US Navy exercises over the construction and maintenance of all military vessels," the documents were not enough to meet the burden of "acting under" since *they did not show conclusively that the Navy specified the use of asbestos in the turbines*. <u>Id</u>. Similarly, in <u>Good</u>, (a case involving exposure from turbine generators on Naval vessels), the court remanded the case because the defendant had failed to "prove that it constructed the [item in question] according to the direct and detailed control of an officer of the United States, rather than at the general direction of an agency or other governmental department." 914 F. Supp. at 1129. As the <u>Good</u> court explained:

> Acting under the direction of the Navy…is not the same as acting under the direct and detailed control of the federal officer…[¶] Westinghouse's poor showing of the causal connection between the allegations of plaintiffs and the conduct taken under direction of a federal officer is also evidence by its failure to set forth the substance of the regulations and specifications. The complaint alleges personal injury based upon exposure to asbestos. Neither the notice nor the affidavit establishes that the Secretary of the Navy specified the use of asbestos in the design and manufacture of the turbine generators.

<u>Id</u>. at 1129-1130.

In this case, Defendants Northrop Grumman and Bell have submitted no evidence to support their contentions that the government controlled their decisions to use asbestos in their products.

## II.    The Products at Issue Were Not Specifically Designed for the U.S. Military.

Even if some federal agency did require Northrop Grumman and Bell to incorporate asbestos containing components into their aircraft, the components themselves were nothing more than standard, stock equipment (brake linings, hose clamps, and gaskets). See Boyle v. United Tech. Corp, 487 U.S. 500, 509 (government contractor defense does not apply to injury caused by "stock" item or "standard equipment"); see also In Re Related Asbestos Cases, 453 F. Supp. 1142, 1151-1152 (N.D.Cal. 1982) (government contractor defense may not be applicable if defendants merely supplied Navy with same products supplied for non-military use and had not specifically manufactured asbestos products pursuant to government specifications); In Re: Hawaii Federal Asbestos Cases, 960 F.2d 806, 812 (9th Cir. 1992) (government contractor defense not applicable when the product is a stock item that was not ". . . manufactured with the special needs of the military in mind"). The mere selection of such standard components by the government does not provide the supplier or contractor with a basis for removal. These products were general items that were used on civilian aircraft as well as military aircraft. They were not specially designed or manufactured for a military use or purpose. The mere selection of such stock components by the government does not cloak the supplier or contractor with immunity from suit. As the Court explained in Boyle:

> If, for example, the United States contracts for the purchase and installation of an air conditioning-unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary.

487 U.S. at 509.

The asbestos materials that caused Mr. Seitz's injury would have been the same standard asbestos products available in the private sector market. They were made of the same materials from

12

which automobile brake linings and gaskets were made. There was nothing special or unique about them. By supplying the government with aircraft that contained the same asbestos containing components as were being used in non-military aircraft, Northrop Grumman and Bell were not acting at the direction of an officer of the United States. Defendants have failed this prong of the Mesa test.

> **D.    Neither Northrop Grumman Nor Bell Can Establish a "Causal Connection" Between Their Failure to Provide Asbestos Warnings and Any Military Order or Specification.**

A corporation, such as Northrop Grumman or Bell, that removes a case under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), must establish, inter alia, "that it was 'acting under' a federal officer, which subsumes the existence of a 'causal connection' between the charged conduct [here, failure to warn] and asserted official authority." In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation v. Atlantic Richfield Company, 488 F.3d 112, 124 (2d Cir. 2007) (reversing district court's decision permitting federal officer removal, and concluding that defendants failed to demonstrate that the federal government compelled them to use MTBE in gasoline; or that federal regulatory scheme made it "impossible for them to use other less, polluting additives"); see also Exxon Mobil, 381 F. Supp. 2d at 403, n.7 (noting that many courts combine the analysis of whether the removing party was acting under the direction of a federal officer and whether there is a causal connection between the actions under the federal officer and the plaintiffs' claims, and opting to do the same).

In the context of an asbestos lawsuit based on a failure to warn claim, the defendant must show either that asbestos warnings were prohibited by the military or that the military directly interfered with the defendant's ability to fulfill its state law obligation to warn. See, e.g., Megill v. Worthington Pump, Inc., 1999 U.S.Dist. LEXIS 4433, *8 (D. Del. Mar. 26, 1999) ("[T]here is no evidence of record that the U.S. Navy prohibited defendant from, or otherwise directed defendant

in, issuing warnings or researching and effecting product safety.  Under these circumstances, the court concludes that there is no causal connection between plaintiffs' claims and the conduct performed under color of a federal office. . ."); Weese v. Union Carbide Corporation, 2007 U.S. Dist. LEXIS 73970, *19 (S.D.Ill. Oct. 3, 2007) ("defendant must show that the government prevented it from issuing adequate warnings regarding exposure to asbestos"); Westmiller v. IMO Industries, Inc., 2005 U.S. Dist. LEXIS 29371, *7 (W.D.Wash Oct. 20, 2005) ("requires a showing by defendant that the government specifically prohibited it from placing warnings on its products"); Freiberg v. Swinterton & Walberg Property Services, Inc. et al., 245 F. Supp.2d 1144, 1155 (D.Colo. 2002) (defendants "must establish [that the government's] direction and control of their activities directly interfered with their ability to fulfill their state law obligation to warn").  Moreover, if the defendants could have "simultaneously complied with the [Navy] contractual obligations and the state law duty to warn", then "the plaintiff's harms were not _caused_ by the defendants' contractual responsibilities."  Hilbert v. McDonnell Douglas Corp., 529 F. Supp.2d 187, 203 (D. Mass. 2008) (emphasis added).

        The factual record presented to this Court is one-sided.  Northrop Grumman and Bell fail to present a scintilla of evidence of any order or regulation that prohibited asbestos warnings or interfered with their ability to issue such warnings.  See, supra, FACTS §§A-B.  Plaintiffs, on the other hand, present substantial proof that no such order or regulation was ever in existence.  Id. Plaintiffs also present substantial proof that the applicable military specification not only did not prohibit asbestos warnings but generally required equipment manufacturers to warn about safety hazards, with no exemption for asbestos.  Id., §A.

        Northrop Grumman and Bell have not – and cannot – demonstrate that the military prohibited or directly interfered with their state law obligation to warn.  Therefore, the "causal connection" required by 28 U.S.C. §1442(a)(1) has not been established and this case must be

remanded.  Accord, Megill, 1999 U.S.Dist. LEXIS 4433, *8 (case remanded; "there is no casual

connection between plaintiffs' claims and the conduct performed under color of a federal office.");

Hilbert, 529 F. Supp.2d at 203 (case remanded; "defendants failed to show causal nexus between

their contractual obligations and the plaintiffs' alleged injury"); Weese, 2007 U.S. Dist. LEXIS 73970

at *23 (case remanded; defendant "adduced no evidence that a federal officer prevented it from

furnishing adequate warnings about the dangers of exposure to asbestos"); Fortier v. Ampco-

Pittsburgh Corp. et al., 3:07-cv-00005 (D.Conn. Mar. 5, 2007) (**Exhibit I**) (case remanded;

"Defendants... were free to include warning not dictated by the Navy"); Faulk v. Owens-Corning

Fiberglass Corp., 48 F. Supp.2d 653, 663 (E.D.Tex. 1999) (case remanded; "The federal officer

remained completely silent as whether to warn about the use of asbestos; this silence is fatal to the

'causal nexus' necessary for the second prong") (emphasis in original); Vanouwerkerk v. Owens-

Corning Fiberglass Corp., 1999 WL 335960, *7 (E.D.Tex. May 26, 1999) (case remanded; "the

federal government provided no direction or control on warnings when using asbestos").

        In the Nguyen case, the removing Defendants failed to show such a causal connection in

circumstances very similar to the case at hand. Nguyen v. Allied Signal, Inc., 1998 U.S. Dist. LEXIS

15517 (N.D. Cal. Sept. 28, 1998).  In Nguyen, the Plaintiff pursued a failure to warn case against

Defendants after being exposed to asbestos while working on an Air Force base in Vietnam and

subsequently developing mesothelioma. Nguyen, 1998 U.S. Dist. LEXIS 15517 at *1, *4.  The

Nguyen court explained:

> Here, defendants have produced no evidence that their contracts with the United
> States government contained contractual obligations specifically prohibiting them
> from placing warnings on their products. Instead, they produce evidence regarding
> government control of the specification for manufacturing the aircraft, not
> specifications regarding warnings. They also rely upon the affidavit of Alvin F.
> Meyer, which indicates only that the government approved all warnings placed in
> technical manuals for United States Air Force aircraft. Meyer Decl. P 26. They offer
> no evidence that they attempted to include such warnings, or that the government
> specifications and contractual provisions explicitly directed them not to place
> warnings on their products. Therefore, the Ninth Circuit's holding in Hawaii Federal

15

controls, and the government contractor defense cannot be the basis for federal jurisdiction in the failure to warn case here.

\* \* \*

The third prong of the <u>Mesa</u> test requires a causal nexus between the rules imposed by United States on the federal contractor and the liability asserted by the plaintiff. [citation omitted].  Although defendants include evidence regarding the control of the federal government over the manufacture of its products, again, this evidence does not demonstrate that the federal government directed defendants not to place warnings on their products. Therefore, there is no causal connection between the control exercised by the United States over defendants and plaintiffs' legal theory of failure to warn consumers of the hazards of asbestos.

<u>Id.</u> at \*5-8.  Similarly, Northrop Grumman and other aircraft and aircraft part manufacturing defendants recently failed in their attempts to remove the <u>Hilbert</u> case in Massachusetts under similar facts. <u>Hilbert v. McDonnell Douglas Corp.</u>, 529 F. Supp. 2d 187 (D.Mass. 2008).  After discussing the affidavits and other proofs offered by Defendants in support of remand, the Court held:

On review of the evidence, there is simply no basis upon which the Court can conclude that a conflict existed between the federal contracts and the defendants' state-law duty to warn. The defendants do not submit any non-testimonial evidence, i.e. citations to regulations or contracts, of the government's alleged control over the warnings. Indeed, despite the affiants' claim to have "reviewed numerous . . . government contracts during the time period of 1955 through the present," [citations omitted], the defendants fail to cite any- contractual or regulatory language supporting their position, or to provide any military specifications bearing on the substance of the warnings to be provided. [citation omitted]. Although they claim that the government dictated the text of non-asbestos warnings, they do not offer proof of that process.

\* \* \*

Nor do the defendants rebut the obvious inference: that they never tried to warn about asbestos at all. Their argument thus boils down to a bald, unsupported assertion that if they had attempted to warn about the hazards of asbestos, the government would have exercised its discretion to bar the warning. At least on this record, that sort of speculation is not remotely adequate. It does not come close to demonstrating -- even colorably -- that the government exercised its discretion to issue "reasonably precise specification" as to health and safety warnings.

\* \* \*

16

> Thus, having concluded that the defendants have not shown reasonably precise specifications as to the warnings, the Court also finds that the defendants have not shown a causal nexus between their contractual obligations and the plaintiffs' alleged injury.

Hilbert, 529 F. Supp. 2d at 202-203.

Northrop Grumman and Bell suffer from the same lack of proof that was fatal to the Nguyen and Hilbert defendants' attempt to utilize the government contractor defense: they have offered no evidence that they attempted to include warnings on their products nor that the government in any way directed them not to place warnings on their products. Rather, as Plaintiffs have shown, the U.S. Military specifically directed suppliers to include on their products the necessary warnings required by law. [Facts §A].

Northrop Grumman and Bell's failure to establish the requisite "causal connection" element for federal officer removal, in and of itself, mandates that this case be remanded.

### E.    Neither Northrop Grumman Nor Bell Has Raised a "Colorable" Federal Defense to Plaintiffs' State Law Failure to Warn Claim.

The government contractor defense was first articulated in a state law design defect case, Boyle v. United Technologies Corp., 478 U.S. 500, 108 S.Ct. 2510 (1988). A Delaware District Court has articulated the way in which Boyle applies in failure to warn cases "[I]n order to establish that Boyle displaces any state law duty to warn, defendant 'must show that the applicable federal contract includes warning requirements that significantly conflict with those that might be imposed by state law. . . The contractor must show that whatever warnings accompanied a product resulted from a determination of a government official, . . . and  thus that the Government itself 'dictated' the content of the warnings meant to accompany the product.'" Megill v. Worthington Pump, Inc., 1999 U.S.Dist. LEXIS 4433, *10 (D. Del. Mar. 26, 1999) (quoting In Re Joint E. & S. Dist. New York Asbestos Lit., 897 F.2d 626, 630 (2nd Cir. 1990)).

Similar to the <u>Megill</u> court, in the <u>Desenberger</u> case, the Second Circuit Court of Appeals explained, "[t]he affirmative defense applies only if the government exercised significant control over the relevant actions of the contractor.  In failure to warn cases, this means that the ultimate product users cannot sue the contractor for failure to warn if the government controlled which warnings the contractor was allowed to provide to those users and <u>thereby precluded the warnings at issue from being given</u>." <u>Desenberger v. United Technologies Corp.</u>, 297 F.3d 66, 75 (2nd Cir. 2002) (emphasis added) (citing <u>Grispo v. Eagle-Pitcher Industries, Inc.</u>, 897 F.2d 626, 630-631 (1990).

Further, the Ninth Circuit Court of Appeals, in the <u>Hawaii Federal Asbestos</u> case, held:

> "[S]tripped to its essentials, the military contractor's defense under *Boyle* is to claim, 'The Government made me do it.' *Boyle* displaces state law only when the Government, making a discretionary, safety-related military procurement decision contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion." Here, the Government did not require Fibreboard or Owens-Illinois to do anything with respect to the placement of warnings on their products. Nothing in *Boyle* suggests preemption of a state law duty to warn under such circumstances.

<u>In re Hawaii Federal Asbestos Cases</u>, 960 F.2d 806, 813 (9th Cir. 1992).

In light of the complete failure of Northrop Grumman and Bell to offer any proof that the military precluded or interfered with the effort they (or any other company) made to provide asbestos warnings, and in light of the proofs offered by Plaintiffs that unequivocally establish that there was no such prohibition or interference (and indeed that the U.S. Military required equipment manufacturers to warn about product hazards), Defendants have failed to raise a federal defense that is colorable.  While no precise meaning has apparently been given to the term "colorable", "Defendants must do more than simply <u>plead a federal defense</u>".  <u>Faulk v. Owens-Corning Fiberglass Corp.</u>, 48 F. Supp.2d at 664-665 (emphasis added).  Where, as here, no admissible evidence is submitted, the federal defense has merely been plead and the defense is not "colorable". <u>Id.</u>, at 665-666.

Based on the foregoing, Northrop Grumman and Bell have not asserted a "colorable" federal defense as required pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). Accord, Hilbert, 529 F. Supp.2d at 202-203; Weese, 2007 U.S. Dist. LEXIS 73970 at *31 (no colorable federal defense; defendant "failed to point to any government action either mandating a warning or prohibiting a warning that deprived [defendant] of the power to determine an appropriate warning"); Westmiller, 2005 U.S. Dist. LEXIS 29371 at *10 ("While it is true that Mesa[11] requires only a 'colorable' federal defense. [Defendant] has not produced any evidence that would meet even that minimum standard."); Faulk v. Owens-Corning Fiberglass Corp., 48 F. Supp.2d at 664-665; Overly v. Raybestos-Manhattan, 1996 U.S. Dist. LEXIS 13535, *11-12 (N.D. Cal. Sept. 6, 1996).

## F.    The Interests of Justice Support Prompt Remand To State Court.

Mr. Seitz is in the advanced stage of an incurable cancer. Mr. Seitz's case has already been scheduled for trial in the Superior Court of the State of Delaware in and for New Castle County and pretrial discovery and motion practice is scheduled to be carried out over the next several months. [See Delaware Asbestos Litigation Master Trial Scheduling Order and Table of Trial Schedule Abstracts (Amended on June 26, 2008) attached as **Exhibit J** to Block Decl.]. In addition, if this case is not remanded, it will be transferred to MDL-875, and will encounter significant delay. In re Maine Asbestos Cases, 44 F. Supp.2d 368, 374 n.2 (D.Me. 1999) ("If these claims return to state court, they will proceed to resolution. If they remain in federal court, they will encounter significant delay upon their transfer through the Panel on Multidistrict Litigation to the Eastern District of Pennsylvania"); see also Hilbert, 529 F. Supp.2d 187, 190 (D.Mass. 2008) (noting that if removal was upheld and the case was transferred to the MDL, "the matter will likely be substantially delayed.").

The delays inherent in MDL-875 are well documented:

---

[11] The full cite is: Mesa v. California, 489 U.S. 121, 109 S.Ct. 959 (1989)].

> In 2002, the Rand Institute for Civil Justice issued a study on the current status of asbestos litigation in the United States. The Rand study stated that, as of 2002, approximately 73,000 of the 95,994 asbestos suits transferred to the Eastern District of Pennsylvania had been closed. But the study showed that of those 95,994 cases, the MDL panel remanded only 265 to their filing district for trial.

Sales v. Weyerhaeuser Co., 138 Wash.App. 222, 233 (2007). Thus, according to the Rand study, less than 1% of all asbestos cases transferred to MDL-875 will be remanded to the transferor district court for a trial date.

It is, therefore, not surprising that Northrop Grumman and Bell removed this case from its scheduled trial setting in the Delaware state court in the hopes that the case will ultimately be transferred to MDL-875. See In re Maine Asbestos Cases, 44 F. Supp.2d 368, 374 n.2 (D.Me. 1999) ("This delay [in MDL-875] is of economic benefit to the defendants and imposes costs on the plaintiffs. In all likelihood, this economic reality is driving the behavior of the parties in this matter.").

In light of the complete lack of admissible evidence to support Northrop Grumman and Bell's removal of this case, Plaintiffs respectfully request that this case be remanded promptly so that Plaintiffs may continue this case in state court without delay.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs Frederick and Mary Louise Seitz respectfully requests that the Court remand this case to State Court (Superior Court of Delaware, New Castle County) and grant Plaintiffs all other relief deemed just and proper.

[SIGNATURE ON NEXT PAGE]

Respectfully submitted,

LAW OFFICE OF JOSEPH J. RHOADES

/s/    A. Dale Bowers
Joseph J. Rhoades, Esquire (I.D. 2064)
A. Dale Bowers, Esquire (I.D. 3932)
1225 King Street, 12th Floor
Wilmington, Delaware 19801
302-427-9500
Attorneys for Plaintiffs

-and-

LEVY PHILLIPS & KONIGSBERG, LLP
Jerome H. Block, Esq. (NY Id. No. 3997245)
Sharon J. Zinns, Esq. (CA Id. No. 241476)
Amber R. Long, Esq. (NY Id. No. 4397188)
800 Third Avenue, 13th Floor
New York, New York 10022
Phone: (212) 605-6200
Fax: (212) 605-6290

Dated: July 29, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X
IN RE: ASBESTOS LITIGATION:             :
                                        :
FREDERICK SEITZ and                     :
MARY LOUISE SEITZ, his wife             :     C.A. No. 08-CV-0351 GMS
                                        :     C.A. No. 08-CV-0353 GMS
          Plaintiffs,                   :
                                        :
          v.                            :
                                        :
ADEL WIGGINS GROUP, et al.,             :
                                        :
          Defendants.                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**AFFIDAVIT OF JEROME H. BLOCK SUBMITTED IN SUPPORT
OF PLAINTIFFS' MOTION FOR REMAND**

JEROME H. BLOCK, being duly sworn, deposes and says:

1.      I am counsel for Plaintiffs and I submit this Affidavit in Support of Plaintiffs'
Motion fro Remand.  The purpose of this Affidavit is to identify the following annexed exhibits,
each of which is a true and accurate copy of original exhibits to which reference will be made in
Plaintiffs' moving papers.

2.      Attached as Exhibit A is Plaintiffs' Complaint in the instant action.

3.      Attached as Exhibit B is the letter of Capt. Timothy Bresnahan to Sharon Zinns,
dated June 27, 2008.

4.      Attached as Exhibit C are Plaintiffs' Answers to Interrogatories Directed to Plaintiffs
by all Defendants and Response to Request for Production, and Exhibits attached thereto, served in
the instant action.

5.      Attached as Exhibit D is the Military Specification for Aircraft Wheel and Brake
Assemblies (MIL-W-5013D).

{00121675.DOC}

6.      Attached as Exhibit E is the military standard, Marking for Shipment or Storage (MIL-STD-129).

7.      Attached as Exhibit F is Manual L-1, Guide to Precautionary Labeling of Hazardous Chemicals.

8.      Attached as Exhibit G is Instruction 5160.8 from the Department of the Navy, Office of the Secretary.

9.      Attached as Exhibit H is the Declaration of Barry I. Castleman, dated July 18, 2008.

10.     Attached as Exhibit I is a copy of Fortier v. Ampco-Pittsburgh Corp. et al., 3:07-cv-00005 (D.Conn. Mar. 5, 2007).

11.     Attached as Exhibit J is Delaware Asbestos Litigation Master Trial Scheduling Order and Table of Trial Schedule Abstracts (Amended on June 26, 2008).


/s/  Jerome H. Block

JEROME H. BLOCK

Dated: July 29, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 29, 2008, I caused service of a copy of the foregoing

Plaintiffs' Motion for Remand on the following counsel of record and parties in the

corresponding state court action, by U.S. Mail and/or e-file:

Christian J. Singewald, Esquire  (E-FILE)
White & Williams
824 Market Street, Suite 902
Wilmington, Delaware 19801-4938

Beth Valocchi, Esquire (U.S. MAIL)
Swartz Campbell LLC
300 Delaware Avenue, Suite 1130
Wilmington, Delaware 19801

Loreto P. Rufo, Esquire (U.S. MAIL)
Rufo Associates, P.A.
7217 Lancaster Pike, Suite 4
Hockessin, Delaware 19701

Gary H. Kaplan, Esquire (E-FILE)
Armand J. Della Porta, Esquire
Ana Marina McCann, Esquire
Marshall Dennehey Warner
Coleman & Goggin
1220 North Market Street, 5th Floor
Post Office Box 8888
Wilmington, Delaware 19899-8888

Lynne M. Parker, Esquire  (E-FILE)
Holistein, Keating, Cattell,
Johnson & Goldstein
One Commerce Center, Suite 730
1201 North Orange Street
Wilmington, Delaware 19801

Daniel M. Silver, Esquire (E-FILE)
Noriss E. Cosgrove, Esquire
McCarter & English, LLP
405 North King Street, 8th Floor
Post Office Box 111
Wilmington, Delaware 19899

J. Michael Johnson, Esquire (U.S. MAIL)
Rawle & Henderson LLP
300 Delaware Avenue, Suite 1015
Post Office Box 588
Wilmington, Delaware 19899-0588

Jeffrey S. Marlin, Esquire (E-FILE)
Megan T. Mantzavinos, Esquire
Marks O'Neill O'Brien & Courtney, P.C.
913 North Market Street, Suite 800
Wilmington, Delaware 19801

Penelope B. O'Connell, Esquire (E-FILE)
Elzufon Austin Reardon Tarlov
& Mondell, P.A.
300 Delaware Avenue, Suite 1700
Post Office Box 1630
Wilmington, Delaware 19899-1630

Robert K. Beste, III, Esquire (E-FILE)
Smith, Katzenstein & Furlow
P.O. Box 410
Wilmington, DE  19899

Air Cooled Motors (U.S. MAIL)
94 Hale Dr.
Walterboro, SC  29488

CURTIS-Wright Corporation (U.S. MAIL)
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801

Goodrich Corporation. (U.S. MAIL)
c/o Corporation Service Company
2711 Centerville Road, Suite
Wilmington, Delaware 19808

Paul A. Bradley, Esquire (E-FILE)
Maron Marvel Bradley & Anderson, P.A.
1201 North Market Street, Suite 900
Post Office Box 288
Wilmington, Delaware 19899

Adel Wiggins Group (U.S. MAIL)

Attn: Officer/Agent
5000 Triggs Street
Los Angeles, California 90022

Aerojet General Corporation (U.S. MAIL)
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801

Fletch Air, Inc. (U.S. MAIL)
118 FM 1621
Comfort, TX  78013-3425

Franklin Aircraft Engines, Inc. (U.S. MAIL)
136 Racquette Dr.
Ft. Collis, CO  80524

Rolls Royce North America, Inc. (U.S. MAIL)
c/o Corporation Service Co.
2711 Centerville Rd., Suite 400
Wilmington, DE  19808

/s/A. Dale Bowers

_____
Joseph J. Rhoades, Esquire (Bar ID No. 2064)
A. Dale Bowers, Esquire (Bar ID No. 3932)
1225 King Street, 12th Flr.
P.O. Box 874
Wilmington, DE  19899
302-427-9500
Attorneys for Plaintiff

LEVY PHILLIPS & KONIGSBERG, LLP
Jerome H. Block, Esquire (NY ID No. 3997246)
Sharon J. Zinns, Esquire (CA ID No. 241476)
Amber R. Long, Esquire (NY ID No. 4397188)
800 Third Ave., 13th Flr.
New York, NY  10022

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
IN RE: ASBESTOS LITIGATION:          :
                                      :
FREDERICK SEITZ and                   :
MARY LOUISE SEITZ, his wife           :      C.A. No. 08-CV-0351 GMS
                                      :      C.A. No. 08-CV-0353 GMS
        Plaintiffs,                   :
                                      :
            v.                        :
                                      :
ADEL WIGGINS GROUP, et al.,           :
                                      :
        Defendants.                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## NOTICE OF MOTION TO REMAND

PLEASE TAKE NOTICE that based upon, and for the reasons set forth in, Plaintiff's

Memorandum of Law in Support of Plaintiffs' Motion to Remand, and the Declarations of Jerome

H. Block, and the Exhibits thereto, all of which are filed simultaneously herewith and adopted and

incorporated herein, Plaintiffs Frederick and Mary Louise Seitz hereby moves this Court, pursuant

to 28 U.S.C. § 1447 (c) for an Order remanding this case to State court (Supreme Court of New

Castle County, Delaware) and for all other relief deemed just and proper.

Respectfully submitted,

LAW OFFICE OF JOSEPH J. RHOADES

/s/    A. Dale Bowers
Joseph J. Rhoades, Esquire (I.D. 2064)
A. Dale Bowers, Esquire (I.D. 3932)
1225 King Street, 12th Floor
Wilmington, Delaware 19801
302-427-9500
Attorneys for Plaintiffs

-and-

{00121675.DOC}

LEVY PHILLIPS & KONIGSBERG, LLP
Jerome H. Block, Esq. (NY Id. No. 3997245)
Sharon J. Zinns, Esq. (CA Id. No. 241476)
Amber R. Long, Esq. (NY Id. No. 4397188)
800 Third Avenue, 13th Floor
New York, New York 10022
Phone: (212) 605-6200
Fax: (212) 605-6290

Dated: July 29, 2008

EFiled: Apr 25 2008 4:06PM EDT
Transaction ID 19576189
Case No. 08C-04-247 ASB

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| IN RE: ASBESTOS LITIGATION: | : |
| | : |
| FREDERICK SEITZ and | :   C.A. No. |
| MARY LOUISE SEITZ, his wife | : |
| | :   COMPLAINT |
| Plaintiffs, | : |
| | :   ASBESTOS |
| v. | : |
| | :   JURY TRIAL DEMANDED |
| ADEL WIGGINS GROUP; | : |
| | : |
| AEROJET-GENERAL CORPORATION; | : |
| | : |
| AIR COOLED MOTORS; | : |
| | : |
| BELL HELICOPTER TEXTRON INC.; | : |
| | : |
| THE BOEING COMPANY; | : |
| | : |
| CBS CORPORATION (f/k/a Viacom Inc., | : |
| successor by merger to CBS Corporation, | : |
| f/k/a Westinghouse Electric Corporation); | : |
| | : |
| CESSNA AIRCRAFT RHODE ISLAND | : |
| INC.; | : |
| | : |
| CURTISS-WRIGHT CORPORATION; | : |
| | : |
| FLETCHAIR, INC.; | : |
| | : |
| FRANKLIN AIRCRAFT ENGINES, INC.; | : |
| | : |
| GARLOCK SEALING TECHNOLOGIES | : |
| LLC (successor by merger to Garlock, Inc.); | : |
| | : |
| GENERAL ELECTRIC COMPANY; | : |
| | : |
| GENERAL MOTORS CORPORATION; | : |
| | : |
| GOODRICH CORPORATION, A NEW | : |
| YORK CORPORATION (f/k/a B.F. | : |
| Goodrich Company); | : |
| | : |
| THE GOODYEAR TIRE & RUBBER | : |

{00115286.DOC}

COMPANY;                                             :

HAWKER BEECHCRAFT, INC.                              :
(f/k/a Raytheon Aircraft Company);                   :
                                                     :
HONEYWELL INTERNATIONAL INC.                         :
(f/k/a Alliedsignal, Inc., as successor-in-          :
interest to The Bendix Corporation);                 :
                                                     :
IMO INDUSTRIES INC.;                                 :
                                                     :
LYCOMING ENGINES;                                    :
                                                     :
NORTHROP GRUMMAN                                     :
CORPORATION;                                         :
                                                     :
PARKER-HANNIFIN CORPORATION;                         :
                                                     :
PRATT & WHITNEY                                      :
ROCKETDYNE, INC. (f/k/a Pratt &                      :
Whitney Aircraft Company);                           :
                                                     :
RAYTHEON COMPANY;                                    :
                                                     :
ROLLS-ROYCE NORTH AMERICA INC; :
                                                     :
SIKORSKY AIRCRAFT CORPORATION; :
                                                     :
TELEDYNE CONTINENTAL MOTORS,                         :
INC.,                                                :
                                                     :
TEXTRON INC.;                                        :
                                                     :
UNION CARBIDE CORPORATION;                           :
                                                     :
UNITED TECHNOLOGIES                                  :
CORPORATION;                                         :
                                                     :
VOUGHT AIRCRAFT                                      :
INDUSTRIES, INC.;                                    :
                                                     :
              Defendants.                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Come now Plaintiffs, FREDERICK SEITZ and MARY LOUISE SEITZ, by and through their attorneys, THE LAW OFFICE OF JOSEPH J. RHOADES and LEVY PHILLIPS & KONIGSBERG LLP, and in support of their claims against the Defendants, state as follows:

1.      Plaintiff FREDERICK SEITZ's full name is FREDERICK HENRY SEITZ.  He was born on ████████ and his Social Security number is ████████

2.      Plaintiff FREDERICK SEITZ and his wife MARY LOUISE SEITZ have resided at 2815 Sage Street, Colorado Springs, Colorado 80907 since approximately 1985. FREDERICK SEITZ's former residences include but are not limited to: 15190 E. Coachman, Colorado Springs, Colorado from approximately 1977 to 1985; in or around Fargo, North Dakota in approximately 1975; in or around Jamestown, North Dakota from approximately 1974 to 1975; 306 Lake Shore Drive, Lakeville, Minnesota from approximately 1969 to 1974; in or around Kansas City, Missouri from approximately 1967 to 1969; Palo Circle, Arbutus, Maryland from approximately 1966 to 1967; Marine Corps Air Base, New River, North Carolina in approximately 1965; Marine Corps Air Base, Cherry Point, North Carolina from approximately 1961 to 1964; in or around Quantico, Virginia in approximately 1961; Wellham Avenue, Glen Burnie, Maryland from approximately 1960 to 1961; Marine Corps Air Base, New River, North Carolina from approximately 1957 to 1959; Ellyson Field, Florida in approximately 1957; Marine Corps Air Base, Cherry Point, North Carolina from approximately 1955 to 1957; in or around Pensacola, Florida from approximately 1952 to 1955; 239 Meadow Road, Baltimore, Maryland from approximately 1951 to 1952; Marine Corps Air Base, Cherry Point, North Carolina from approximately 1950 to 1951; in or around Pensacola, Florida from approximately 1949 to 1950; Marine Corps Air Base, Cherry Point, North Carolina from approximately 1947 to

1948; in or around Woodbridge, Virginia from approximately 1946 to 1947; in or around Paris Island, South Carolina in approximately 1946; 317 Edison Street, Brooklyn Park, Maryland from approximately 1936 to 1946; in or around Brooklyn, Maryland from approximately 1934 to 1936; East of Patterson Park, Baltimore, Maryland  from approximately 1931 to 1934; and Bradley Alley, Baltimore, Maryland from approximately 1929 to 1931. Additionally, FREDERICK SEITZ was deployed to various locations overseas during the Korean and Vietnam wars.

3.     FREDERICK SEITZ was employed at Central Arizona Aviation, located at Falcon Field, Mesa, Arizona,  as a Supervisor and Manager from approximately 1986 to 1988; at IDS, located at 2345 N. Academy, Colorado Springs, Colorado, as an Investment Advisor from approximately 1977 to 1981; at Dakota Bake and Serve, located in Jamestown, North Dakota, as an Executive Staff Chief Pilot, Aircraft Maintenance and Support from approximately 1974 to 1976; at Imperial Airways, located in St. Paul, Minnesota as an Executive Vice President from approximately 1969 to 1973; at Bell Helicopter, located in Kansas City, Missouri as a Commercial Regional Marketing Manager, from approximately 1967 to 1969; in the United States Marine Corps, at the various previously listed locations, as a Mechanic and Pilot, from approximately 1946 to 1967; and in the United States Coast Guard, located at the Curtis Bay Coast Guard Station, Baltimore, Maryland as an Electrician Apprentice in approximately 1944.

4.     Plaintiff FREDERICK SEITZ attended Aviation Mechanical School training program, Quantico, Virginia in approximately 1946. Plaintiff's Aviation and Mechanical training included complete maintenance and repair of United States Marine Corps aircrafts, including but not limited to replacing and repairing brakes, gaskets, wiring, engines and fire sleeving.

5.      One or more defendants are citizens of the State of Delaware, and this action is not properly removable on any jurisdictional basis.

6.      Defendant Adel Wiggins Group is a foreign business entity doing business in the State of Delaware and subject to service of process pursuant to 10 Del. C. § 3104(c) by service upon the Secretary of State of the State of Delaware.  Adel Wiggins Group's address for receipt of process is Attn: Officer/Agent, 5000 Triggs Street, Los Angeles, CA 90022.

7.      Defendant Aerojet – General Corporation is a foreign business entity doing business in the State of Delaware.  Its registered agent for service of process within the State of Delaware is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

8.      Defendant Air Cooled Motors is a foreign business entity doing business in the State of Delaware and subject to service of process pursuant to 10 Del. C. § 3104(c) by service upon the Secretary of State of the State of Delaware.  Air Cooled Motor's address for receipt of process is 94 Hale Drive, Walterboro, SC 29488.

9.      Defendant Bell Helicopter Textron Inc., is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

10.      Defendant The Boeing Company is a Delaware corporation whose registered agent for service of process is Corporation Service Company located at 2711 Centerville Road Suite 400, Wilmington, DE 19808.

11.      Defendant CBS Corporation (f/k/a Viacom Inc., successor by merger to CBS Corporation, f/k/a Westinghouse Electric Corporation) is a Delaware corporation whose

registered agent for service of process is Corporation Service Company located at 2711 Centerville Road Suite 400, Wilmington, DE 19808.

12.    Defendant Cessna Aircraft Rhode Island Inc., is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

13.    Defendant Curtiss-Wright Corporation a Delaware Corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

14.    Defendant FletchAir, Inc., is a foreign business entity doing business in the State of Delaware and subject to service of process pursuant to 10 Del. C. § 3104(c) by service upon the Secretary of State of the State of Delaware.  FletchAir, Inc.'s address for receipt of process is Attn: Officer/Agent, 118 FM 1621, Comfort, TX 78013-3425.

15.    Defendant Franklin Aircraft Engines, Inc. is a foreign business entity doing business in the State of Delaware and subject to service of process pursuant to 10 Del. C. § 3104(c) by service upon the Secretary of State of the State of Delaware.  Franklin Aircraft Engines, Inc.'s address for receipt of process is Attn: Officer/Agent, Ft. Collins, CO 80524.

16.    Defendant Garlock Sealing Technologies LLC (successor by merger to Garlock, Inc.) is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

17.    Defendant General Electric Company is a foreign business entity doing business in the State of Delaware.  Its registered agent for service of process within the State of Delaware

is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

18.    Defendant General Motors Corporation is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

19.    Defendant Goodrich Corporation, A New York Corporation, (f/k/a B.F. Goodrich Company) is a foreign business entity doing business in the State of Delaware. Its registered agent for service of process within the State of Delaware is Corporation Service Company located at 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

20.    Defendant The Goodyear Tire & Rubber Company is a foreign business entity doing business in the State of Delaware.  Its registered agent for service of process within the State of Delaware is Corporation Service Company located at 2711 Centerville Road Suite 400, Wilmington, DE 19808.

21.    Defendant Hawker Beechcraft, Inc. (f/k/a Raytheon Aircraft Company) is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

22.    Defendant Honeywell International Inc. (f/k/a Alliedsignal, Inc., as successor-in-interest to The Bendix Corporation) is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

23.    Defendant IMO Industries Inc., is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

24.     Defendant Lycoming Engines is a foreign business entity doing business in the State of Delaware and subject to service of process pursuant to 10 Del. C. § 3104(c) by service upon the Secretary of State of the State of Delaware. Lycoming Engines' address for receipt of process is Attn: Officer/Agent, 652 Oliver Street, Williamsport, PA 17701.

25.     Defendant Northrop Grumman Corporation is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

26.     Defendant Parker-Hannifin Corporation is a foreign business entity doing business in the State of Delaware.  Its registered agent for service of process within the State of Delaware The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

27.     Defendant Pratt & Whitney RocketDyne, Inc. (f/k/a Pratt & Whitney Aircraft Company) is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

28.     Defendant Raytheon Company is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

29.     Defendant Rolls-Royce North America Inc. is a Delaware Corporation whose registered agent for service of process is Corporation Service Company located at 2711 Centerville Road Suite 400, Wilmington, DE 19808.

30.     Defendant Sikorsky Aircraft Corporation is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

31.     Defendant Teledyne Continental Motors, Inc. is a Delaware corporation whose registered agent for service of process is National Corporate Research, Ltd. located at 615 South DuPont Highway, Dover, DE 19901.

32.     Defendant Textron Inc., is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

33.     Defendant Union Carbide Corporation is a foreign business entity doing business in the State of Delaware.  Its registered agent for service of process within the State of Delaware is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

34.     Defendant United Technologies Corporation is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

35.     Defendant Vought Aircraft Industries, Inc. is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

36.     All Defendants herein were at all times pertinent, directly or indirectly engaged in the specification, mining, manufacturing, distribution, sales, licensing, leasing, installation, removal or use of asbestos and asbestos-containing products.[1]  They were also engaged in the

---

[1] Throughout this Complaint, Plaintiff's references to "asbestos containing products" includes asbestos, asbestos-

development, manufacture, distribution, sales, licensing or leasing of equipment, procedures, or

technology necessary to mine, manufacture, sell, distribute, install, remove and use asbestos and

asbestos-containing products.

37.    FREDERICK SEITZ was wrongfully exposed to and inhaled, ingested or

otherwise absorbed asbestos fibers, an inherently dangerous toxic substance, emanating from

certain products he was working with and around, as described below:

a.    FREDERICK SEITZ was exposed to asbestos occupationally in the course of his
employment as an electrician apprentice, mechanic, and a pilot at the above listed
locations from approximately 1944 to 1970. He was exposed to asbestos from a
variety of aircraft mechanical asbestos containing products including but not limited
to: brakes, clamps, engines and engine parts, and gaskets.

b.    FREDERICK SEITZ was exposed to asbestos non-occupationally (i.e. household
exposure) while performing maintenance and repair work on his own personal
aircrafts throughout his life. He was exposed to asbestos from a variety of aircraft
mechanical asbestos containing products including but not limited to: brakes, clamps,
engines and engine parts, and gaskets.

c.    FREDERICK SEITZ may have been further exposed to asbestos in such a manner as
further investigation and/or discovery may uncover.

FREDERICK SEITZ was exposed to asbestos and asbestos-containing products which

were manufactured, sold, distributed, or installed by the Defendants: ADEL WIGGINS GROUP;

AEROJET-GENERAL CORPORATION; AIR COOLED MOTORS; BELL HELICOPTER

TEXTRON INC.; THE BOEING COMPANY; CBS CORPORATION (f/k/a Viacom Inc.,

successor by merger to CBS Corporation, f/k/a Westinghouse Electric Corporation); CESSNA

AIRCRAFT RHODE ISLAND INC.; CURTISS-WRIGHT CORPORATION; FLETCHAIR,

INC.; FRANKLIN AIRCRAFT ENGINES, INC.; GARLOCK SEALING TECHNOLOGIES

LLC (successor by merger to Garlock, Inc.); GENERAL ELECTRIC COMPANY; GENERAL

---

containing products, products designed to be used with asbestos-containing products, and/or products that it was
foreseeable would be used with asbestos-containing products.

{00115286.DOC}

MOTORS CORPORATION; GENUINE PARTS COMPANY; GOODRICH CORPORATION, A NEW YORK CORPORATION (f/k/a B.F. Goodrich Company); THE GOODYEAR TIRE & RUBBER COMPANY; HAWKER BEECHCRAFT, INC. (f/k/a Raytheon Aircraft Company); HONEYWELL INTERNATIONAL INC. (f/k/a Alliedsignal, Inc., as successor-in-interest to The Bendix Corporation); IMO INDUSTRIES INC.; LYCOMING ENGINES; NORTHROP GRUMMAN CORPORATION; PARKER-HANNIFIN CORPORATION; PRATT & WHITNEY ROCKETDYNE, INC. (f/k/a Pratt & Whitney Aircraft Company); RAYTHEON COMPANY; ROLLS-ROYCE NORTH AMERICA INC; SIKORSKY AIRCRAFT CORPORATION; TELEDYNE CONTINENTAL MOTORS, INC.; TEXTRON INC.; UNION CARBIDE CORPORATION; UNITED TECHNOLOGIES CORPORATION; and VOUGHT AIRCRAFT INDUSTRIES, INC.

38.     At all times herein set forth, the Defendants' products were being employed in the manner and for the purposes for which they were intended.

39.     FREDERICK SEITZ's exposure to and inhalation, ingestion or absorption of asbestos fibers emanating from the use of the above-mentioned products was completely foreseeable and could or should have been anticipated by the Defendants.

40.     The Defendants knew or should have known that the asbestos fibers contained in their products and/or the products with which their products were designed to be used had a toxic, poisonous, and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them.

41.     FREDERICK SEITZ suffers from an asbestos-related disease(s), including but not limited to mesothelioma.  FREDERICK SEITZ first became aware that he suffered from said disease(s) in approximately March of 2008 and subsequently thereto, became aware that the

same was wrongfully caused.  As a result of developing mesothelioma, FREDERICK SEITZ has

endured and continues to endure great physical pain and suffering, mental anguish and emotional

pain and suffering.  Further, as a result of Defendants' wrongful conduct, FREDERICK SEITZ is

required to receive and receives medical treatment to mitigate his asbestos related disease,

incurring reasonable and necessary costs for medical care, diagnosis and treatment.

## COUNT I

## NEGLIGENCE

42.    The allegations in paragraphs One (1) through Forty One (41) above are realleged

and incorporated by reference within this Count.  Plaintiffs' recovery herein is predicated upon

the substantive law of the State of North Carolina or such law as the Court holds to be

applicable.

43.    At all times herein relevant, the Defendants had a duty to exercise reasonable care

and caution for the safety of FREDERICK SEITZ and others working with and around the

Defendants' asbestos containing products.

44.    The Defendants knew or should have known that the asbestos fibers contained in

their products had a toxic, poisonous, and highly deleterious effect upon the health of persons

inhaling, ingesting or otherwise absorbing them.

45.    The Defendants were negligent in that they failed to exercise ordinary care and

caution for the safety of FREDERICK SEITZ in one or more of the following respects:

a.    Included asbestos in their products, even though it was completely
foreseeable and could or should have been anticipated that persons such as
FREDERICK SEITZ, working with and around them would inhale, ingest
or otherwise absorb asbestos;

b.    Included asbestos in their products when the Defendants knew or should
have known that said asbestos would have a toxic, poisonous and highly

deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them;

c.      Included asbestos in their products when adequate substitutes for the asbestos in them were available;

d.      Failed to provide any or adequate warnings to persons working with and around their products of the dangers of inhaling, ingesting or otherwise absorbing the asbestos fibers contained in them;

e.      Failed to provide any or adequate instructions concerning the safe methods of working with and around the products, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers in them;

f.      Failed to conduct tests on the asbestos containing products manufactured, sold, delivered or installed by the Defendants in order to determine the hazards to which persons such as FREDERICK SEITZ might be exposed while working with or around the products; and,

g.      Designed, manufactured and sold equipment, vehicles, machinery, technologies and systems that included asbestos-containing components and required and/or specified the use of asbestos-containing replacement components.

46.     As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions on the part of the Defendants, FREDERICK SEITZ was exposed to and inhaled, ingested or otherwise absorbed asbestos fibers causing FREDERICK SEITZ to develop the asbestos disease aforesaid, which has disabled and disfigured FREDERICK SEITZ; FREDERICK SEITZ has in the past and will in the future be compelled to expend and become liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of his asbestos-induced disease and conditions; and FREDERICK SEITZ has in the past and will in the future experience great physical pain and mental anguish as a result of his asbestos-induced disease and conditions.

## COUNT II

## WILLFUL AND WANTON CONDUCT

47.     The allegations in paragraphs One (1) through Forty Six (46) above are realleged and incorporated by reference within this Count. Plaintiffs' recovery herein is predicated upon the substantive law of the State of North Carolina or such law as the Court holds to be applicable.

48.     The Defendants had a duty to refrain from willful and wanton acts or omissions which would harm FREDERICK SEITZ.

49.     Defendants are guilty of one or more of the following acts or omissions amounting to willful and wanton misconduct:

    a.     Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, included asbestos in their products, even though it was completely foreseeable and could or should have been anticipated that persons such as FREDERICK SEITZ working with or around their products, would inhale, ingest or otherwise absorb asbestos;

    b.     Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, included asbestos in their products when the Defendants knew or should have known that said asbestos fibers would have a toxic, poisonous and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them;

    c.     Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, included asbestos in their products when adequate substitutes for the asbestos in them was available;

    d.     Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, failed to provide any or adequate warnings to persons working with and around their products of the dangers of inhaling, ingesting or otherwise absorbing asbestos fibers in them;

    e.     Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, failed to provide any or adequate instructions concerning the safe methods of working with and around their products, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers in them;

     f.      Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, failed to conduct tests on the asbestos-containing products manufactured, sold, delivered or installed by the Defendants in order to determine the hazards to which persons such as FREDERICK SEITZ might be exposed while working with and around the products;

     g.     Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, failed to adequately label, warn, package, market, distribute, install, remove, or use asbestos in a reasonable manner which would minimize or eliminate the escape of asbestos dust fibers, therefore adding to the exposure of FREDERICK SEITZ and others similarly situated;

     h.     Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, failed to take adequate steps to remedy the above failures, including but not limited to (1) failure to recall or require removal of asbestos and asbestos products, coupled with (2) ongoing failure to conduct research as to how to cure or minimize asbestos injuries and how to use, install, or distribute asbestos so as to render it safe, and (3) failure to promptly and safely remove the asbestos now in place; and,

     i.      Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, designed, manufactured and sold equipment, vehicles, machinery, technologies and systems that included asbestos-containing components and required and/or specified the use of asbestos-containing replacement components.

50.    As a direct and proximate result of one or more of the foregoing actions and/or omissions of Defendants, FREDERICK SEITZ was exposed to asbestos and was injured as described herein.

51.    In addition to compensatory damages, an award of punitive damages is appropriate and necessary in order to punish Defendants for their willful, wanton, intentional and/or reckless misconduct and to deter each Defendant and others similarly situated from engaging in like misconduct in the future.

## COUNT III

## STRICT PRODUCT LIABILITY

52.     The allegations in paragraphs One (1) through Fifty One (51) above are realleged and incorporated by reference within this Count.  Plaintiffs' recovery herein is predicated upon the substantive law of the State of North Carolina or such law as the Court holds to be applicable.

53.     The Defendants placed their asbestos and asbestos-containing products on the market and knew or should have known they would be used without inspection for defects.

54.     When their asbestos and asbestos-containing products left the Defendants' possession and were placed on the market they were defective in that, when used in the intended or reasonably foreseeable manner, they were not reasonably safe for their intended use, they failed to perform as safely as would be expected by an ordinary user or consumer and/or created a risk of harm beyond that which would be contemplated by the ordinary user or consumer.

55.     As a direct and proximate result of using Defendants' asbestos and asbestos containing products for the general purpose for which they were designed and intended, FREDERICK SEITZ was exposed to asbestos and was injured as described herein.

## COUNT IV

## LOSS OF CONSORTIUM

56.     The allegations in paragraphs One (1) through Fifty Five (55) above are realleged and incorporated by reference within this Count.  Plaintiffs' recovery herein is predicated upon the substantive law of the State of North Carolina or such law as the Court holds to be applicable.

{00115286.DOC}

57.     Plaintiff FREDERICK SEITZ is married to Plaintiff MARY LOUISE SEITZ.  As a result of Defendants' wrongful conduct which caused her husband's above stated asbestos-related disease and problems, Plaintiff MARY LOUISE SEITZ has suffered and will continue in the future to suffer a loss of the support, consortium and society of her husband, together with related mental anguish and pain and suffering.

**WHEREFORE**, Plaintiffs FREDERICK SEITZ and MARY LOUISE SEITZ pray this Court to enter judgment against Defendants and to award: compensatory damages in an amount to be proved at trial, but believed to exceed $100,000; and punitive damages in an amount sufficient to punish Defendants for their misconduct and to deter similarly situated parties from committing like acts of misconduct in the future; and for such other and further relief that this Court deems appropriate.

Respectfully submitted,

LAW OFFICE OF JOSEPH J. RHOADES

By: /s/ A. Dale Bowers
Joseph J. Rhoades, Esquire (I.D. 2064)
A. Dale Bowers, Esquire (I.D. 3932)
1225 North King Street, 12th Floor
Wilmington, Delaware 19801
302-427-9500
Attorneys for Plaintiff

-and-

LEVY PHILLIPS & KONIGSBERG, LLP
Jerome H. Block, Esq. (NY Id. No.3997145)
Sharon Zinns, Esq. (CA Id. No. 241476)
Amber R. Long, Esq. (NY Id. No.4397188)
800 Third Avenue, 13th Floor
New York, NY 10022
Phone: (212) 605-6200
Fax: (212) 605-6290

Dated: April 25, 2008



**DEPARTMENT OF THE AIR FORCE**
10TH MEDICAL GROUP/SGOMI
4102 Pinion Dr.
USAF Academy, CO 80840

June 27, 2008

Capt Timothy Bresnahan
Staff Internist
4102 Pinion Dr.
USAF Academy, CO 80840

Levy Phillips and Konigsberg, LLP
800 Third Ave.
13ᵗʰ Floor
New York, NY 10022

Dear Ms. Zinns:

Per your request, I am writing this letter in order to give relevant details for Mr. Frederick Seitz and his diagnosis of malignant mesothelioma. Mr. Seitz has been a patient under my care for the past two years. On 12 February, 2008 I evaluated him for follow-up of community-acquired pneumonia that had been diagnosed one week prior by one of my partners. At that time, Mr. Seitz was complaining of significant orthopnea and I diagnosed him with a pleural effusion. Over the next few weeks and after several attempts at drainage and diagnosis, Mr. Seitz was referred for a pleural biopsy and pleurodesis. This procedure, performed in late March of 2008, was diagnostic of malignant mesothelioma. Thorough evaluation by an oncologist, Dr. Burke, confirmed the terminal nature of this disease and Mr. Seitz was given a prognosis of approximately six months from time of diagnosis.

Mr. Seitz has authorized me to release this information to you—I hope that it will be helpful.

Sincerely,

Timothy M. Bresnahan, Capt, USAF, MC

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

- - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                        :
IN RE: ASBESTOS LITIGATION:             :     C.A. No.
                                        :
FREDERICK SEITZ and                     :
MARY LOUISE SEITZ, his wife             :
                                        :     ASBESTOS
        Plaintiffs,                     :
                                        :     JURY TRIAL DEMANDED
            v.                          :
                                        :
ADEL WIGGINS GROUP, et al.,             :
                                        :
        Defendants.                     :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - -X

## PLAINTIFFS' ANSWERS TO INTERROGATORIES DIRECTED TO PLAINTIFFS BY ALL DEFENDANTS AND RESPONSE TO REQUEST FOR PRODUCTION

### Preamble

Counsel for Plaintiff have provided and/or will provide all Documents and Exhibits to Defense Coordinating Counsel pursuant to Standing Order No. 1. These Documents and Exhibits are also available for review at Plaintiff's Counsel's office.

**A.     Personal History**

Q1.    State all names by which you have been known; the date and place of your birth; occupation; social security number; height; weight; color of hair and eyes; and the number of any motor vehicle operator's license held in the State of Delaware or any other state.

A1:    Name:                  Frederick Seitz
       Date of Birth:         May 20, 1929
       Occupation:            Retired
       Soc. Sec. No:          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
       Height:                5' 7"
       Weight:                143 lbs
       Hair Color:            Blond
       Eye Color:             Blue
       Mot. Veh. Lic. No.:    922098246 (Colorado)

1

A2.    State the address of each place of residence that you have occupied from 1936 to date.

A2:    Approx 1985 – present:      2815 Sage Street
                                   Colorado Springs, CO 80907

       Approx 1977-1985:          15190 E. Coachman
                                   Colorado Springs, CO

       Approx 1975-1977:          Fargo, ND

       Approx 1974-1975:          Jamestown, ND

       Approx 1969-1974:          306 Lake Shore Drive
                                   Lakeville, MN

       Approx 1967-1969:          Kansas City, MO

       Approx 1966-1967:          Palo Circle
                                   Arbutus, MD

       Approx 1965-1966:          Marine Corp Air Station New River
                                   Jacksonville, NC

       Approx 1961-1965:          Marine Corp Air Station
                                   Cherry Point, NC

       Approx 1961:               Quantico, VA

       Approx 1960-1961:          Welham Avenue
                                   Glenburnie, MD

       Approx 1957-1960:          Marine Corp Air Station New River
                                   Jacksonville, NC

       Approx 1957:               Ellyson Field, FL

       Approx 1955-1957:          Marine Corp Air Station
                                   Cherry Point, NC

       Approx 1952-1955:          Pensacola, FL

       Approx 1951-1952:          239 Meadow Road
                                   Baltimore, MD

2

| Approx 1950-1951: | Marine Corp Air Station<br>Cherry Point, NC |
| Approx 1949-1950: | Pensacola, FL |
| Approx 1947-1949: | Marine Corp Air Station<br>Cherry Point, NC |
| Approx 1946-1947: | ~~Woodbridge, VA~~ — *Quantico, VA* |
| Approx 1946: | Paris Island, SC |
| Approx 1936-1946: | 317 Edison Street<br>Brooklyn Park, MD |

Q3.  Are you married?  If yes, please state the name and present address of your spouse.

A3:  Mary Louise Seitz
2815 Sage Street
Colorado Springs, CO 80907

Q4.  If you have had any previous marriages, please state the name of any former spouse, and state the date, place and circumstances under which the marriage or marriages were dissolved or terminated.

A4:  Not Applicable

Q5.  Please state the name, ages and present address of your children.

A5:  Name:      Frederick Henry Seitz III
Age:        54
Address:    6530 Bull Hill Court
Colorado Springs, CO 80919

Name:      Teresa Ann Mongillo
Age:        53
Address:    2917 Center Drive
Ellicott City, MD 21042

Name:      Walter Ashley Seitz
Age:        52
Address:    6535 Mesedge Drive
Colorado Springs, CO 80919

3

Name:        Mathew Thomas Seitz
Age:         50
Address:     98-837 Leialii
             Aiea, HI 96701

Name:        Elizabeth Catherine Seitz
Age:         44
Address:     506 E. Liberty Street
             Charlestown, WV 25154

Q6.    If you have ever been a member of the Armed Forces of the United States, state the
       following:
       (a)    The branch of service, serial number, and highest rank held;
       (b)    The beginning and ending dates of your military service;
       (c)    The type of discharge you received;
       (d)    Whether you were given a physical examination which included x-rays
              prior to the time you entered service;
       (e)    Whether you received any injury while in the military services; and
       (f)    Whether you have claimed disability for any injury or physical condition
              arising out of your military service.

A6:    (a)    Branch:      United States Marine Corp
              Serial No.:   Officer No. 051463, Enlisted No. 616442
              Highest Rank: Major
       (b)    May 28, 1946 – October 1, 1967
       (c)    Honorable Discharge
       (d)    To the best of Plaintiff's recollection, No.
       (e)    No.
       (f)    Plaintiff objects to this interrogatory as being beyond the scope of discovery,
              irrelevant and not reasonably calculated to lead to the discovery of admissible
              evidence.  Subject to, and without waiving these objections, Yes.

Q7.    If you have had a claim arising out of your military service, state the date on which the
       claim was made, the nature of the claim, the claimed disability and the disability rating, if
       any, which you were given.

A7:    Plaintiff objects to this interrogatory as being beyond the scope of discovery, irrelevant
       and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to,
       and without waiving these objections, Plaintiff made a claim to the Veterans
       Administration for mustard gas exposure which occurred in approximately 1951.  The
       claim was made in the early 1990s around the time Plaintiff was diagnosed with having
       a skin melanoma in his arm. The Veterans Administration denied the claim.

Q8.    If you have ever been convicted of a felony or a crime involving dishonesty, state fully
       and in detail the date, place and nature of each such felony conviction.

4

A8:   Plaintiff objects to this interrogatory as being beyond the scope of discovery, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Subject to, and without waiving these objections, Plaintiff's criminal history, if any, does not include any conviction that would be admissible under Delaware Uniform Rules of Evidence 609.

Q9.   Give a brief summary of your education, including schools attended and the last year completed.

A9:   Glen Burnie Junior High School
      Graduated: 1944

      Glen Burnie High School
      Last Year Attended: 1946
      Received GED in approximately 1947/1948

      East Carolina Teachers College
      Last Year Attended: Approximately 1961

## B.   Employment Background

Q10.  State the names and address of each employer for whom you worked during the years 1936 to date, state as to each such employer the beginning and ending dates of employment, the nature of the business, the name and address of your direct supervisor, and your particular job function.

A10:  Plaintiff objects to providing the name and address of every direct supervisor at each site where Plaintiff worked as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to, and without waiving these objections, see Plaintiff's Work History, attached as Exhibit A, as well as Plaintiff's Social Security earnings records (Documents SE 003-006), which Plaintiff will provide to Defense Coordinating Counsel. Plaintiff reserves the right to amend or supplement his answers to this Interrogatory as investigation, discovery and preparation for trial continues.

## C.   Product I.D. and Exposure History

Q11.  With respect to any products containing asbestos manufactured, packaged, furnished, supplied, or sold by each defendant named in this action that you claimed to have worked with or around, state the following for each defendant.
      (a)   The name of the product or products;
      (b)   The name of your employer at the time you worked with or around such product;
      (c)   The name and address of the plant where you worked with or around such products;

5

(d)     The name and last known address of your immediate supervisor or job
        superintendent on such job;

(e)     The name and last known address of all persons with whom you worked on such
        jobs; and,

(f)     The approximate length of time that you worked on each such job.

A11:    Plaintiff objects to providing the name and address of every direct supervisor at each site
        where Plaintiff worked as overly broad, unduly burdensome and not reasonably
        calculated to lead to the discovery of admissible evidence. Subject to, and without
        waiving these objections, see Plaintiff's Work History, attached as Exhibit A, Plaintiff's
        Non-Occupational Exposure History, attached as Exhibit C, as well as Plaintiff's Social
        Security earnings records (Documents SE 003-006). Plaintiff reserves the right to amend
        or supplement his answers to this Interrogatory as investigation, discovery and
        preparation for trial continues.

Q12.    State fully and in detail each and every evidentiary fact upon which the alleged
        negligence or alleged liability of each defendant is based. As to each such fact, state:

(a)     The identities, including names, business addresses, residential address, of each
        individual having knowledge of those facts;

(b)     Identify each document which supports or tends to support the existence of such
        fact. Identify the document by briefly describing it, and by stating its present
        location and the name and full business address of the present custodian of the
        document.

A12:    Plaintiff objects to this Interrogatory as being overly broad and unduly burdensome.
        Subject to, and without waiving these objections, Plaintiff does not attempt to list "each
        and every evidentiary fact" establishing Defendants' liability, but rather generally sets
        forth those facts ascertained to date.

        Upon information and belief, Plaintiff was exposed to Defendants' asbestos-containing
        products while working as an airplane and helicopter mechanic and pilot in the United
        States Marine Corps,  private industry, and on personal aircraft. Plaintiff will give
        testimony concerning Plaintiff's use of Defendants' asbestos containing products,
        including the conditions under which the products were used, the types of work that were
        done with Defendants' asbestos containing products, Plaintiff's work practices while
        using the products, the lack of a mask or other safety devices for asbestos, and the lack of
        precautions to reduce or eliminate exposure to asbestos. Plaintiff may use documents
        showing the sale or shipment of Defendants asbestos containing products in order to
        further establish Plaintiff's exposure to such products.

        Upon information and belief, Defendants failed to warn or inadequately warned Plaintiff
        about the hazards of exposure to Defendants' asbestos-containing products despite
        Defendants knowledge of the hazards of asbestos exposure. Plaintiff will introduce facts,
        through testimony, documents and prior court decisions, regarding the state of
        Defendants' knowledge of the dangers of asbestos exposure.

Further, Defendants engaged in willful, wanton, and reckless behavior. Plaintiff will introduce facts concerning the Defendant's ability to manufacture their products without asbestos. Plaintiff will introduce testimony and documents regarding safety precautions and practices of Defendants at their own plants and work sites at the time Defendants were failing to warn Plaintiff of the hazards of asbestos.

(a)     Plaintiff objects to this Interrogatory as overly broad and unduly burdensome. Subject to, and without waiving these objections, Plaintiff's family and treating physicians may have knowledge of facts relevant to this lawsuit. See also Plaintiff's Work History, attached as Exhibit A, Plaintiff's Non-Occupational Exposure History, attached as Exhibit C, and Plaintiff's Witness Lists, including any amendments or supplements thereto. Plaintiff reserves the right to supplement or amend this response as investigation, discovery and preparation for trial continues.

(b)     Plaintiff has provided Defense Coordinating Counsel with authorizations to obtain Plaintiff's medical records. In addition, Plaintiff has provided Defense Coordinating Counsel with Plaintiff's medical records in Plaintiff's possession. See also Plaintiff's Exhibit Lists, including all amendments or supplements thereto. Plaintiff may also use any documents produced by Defendant in this matter. Additional exhibits will continue to be added to the existing exhibit lists. Plaintiff's counsel intends to use all the documents filed in the past, as well as subsequent new documents that will be filed in all other cases against the Defendants in this case, unless advised otherwise prior to trial. For discovery purposes, Defendants should be aware of all documents.

Q13.    For each asbestos containing product, material or mineral, manufactured, produced, prepared, distributed or sold by each defendant, state in detail for each such defendant:

(a)     Which such product, material compound, etc. (hereinafter referred to as "product") you claimed to have come into contact with at any time from 1936 to the present;

(b)     Describe separately and in detail each such product as fully as possible including the trade name, product type and product contents;

(c)     The dates on which you came into contact with each such product, as listed in your answer to subpart (a) of this interrogatory, and state with which product or products you came into contact with on each such date;

(d)     The name, address and telephone number of your employer and each date listed in subpart (c) above;

(e)     The name, address and location of your place of employment or job site on each date listed in subpart (c) above;

(f)     The address of your residence on each date listed in subpart (c) above;

(g)     The type of work you were performing on each such date set forth in subpart (c) above;

(h)     The present name, business address and telephone number, and residence address and telephone number of each person who witnessed you work on each date set forth in subpart (c) above;

(i)      All instructions, recommendations or warnings of any kind regarding each product listed in your answer to subpart (a) above that accompanied the product, i.e., printed on tag, tag covering or instructions sheet accompanying the product, etc., in verbatim or with as complete and accurate detail as is possible;

(j)      Any and all instructions or recommendations given to you regarding each product listed in your answer to subpart (a) above given by your employer or superior at any time, in verbatim or with as complete and accurate detail as is possible;

(k)      For what purpose you used each such product listed in your answer to subpart (a) above; and,

(l)      All literature that you, your attorneys, agents, or anyone acting in your behalf have received regarding each product listed in your answer to subpart (a) above to this interrogatory. Include in your answer the subject matter, document title and publication date of all such literature.

A13:   (a)      See Plaintiff's answers to Interrogatories 10-12 as well as any depositions to be taken in this matter.

(b)      See Plaintiff's answers to Interrogatories 10-12 as well as any depositions to be taken in this matter.

(c)      See Plaintiff's answers to Interrogatories 10-12 as well as any depositions to be taken in this matter.

(d)      See Plaintiff's answers to Interrogatories 10-12 as well as any depositions to be taken in this matter.

(e)      See Plaintiff's answers to Interrogatories 10-12 as well as any depositions to be taken in this matter.

(f)      See Plaintiff's answers to Interrogatories 2 and 10-12.

(g)      See Plaintiff's answers to Interrogatories 10-12 as well as any depositions to be taken in this matter.

(h)      See Plaintiff's answers to Interrogatories 10-12.

(i)      Unknown at this time.

(j)      To the best of plaintiffs knowledge, none.

(k)      See Plaintiff's answers to Interrogatories 10-12 as well as any depositions to be taken in this matter.

(l)      Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, vague, ambiguous and not reasonably calculated to lead to the discovery of admissible evidence. Additionally, Plaintiff objects to the extent this Interrogatory calls for matters protected by the attorney work product privilege. Subject to, and without waiving these objections, see Plaintiff's Exhibit Lists and any supplements or amendments thereto.

Q14.   In regard to each and every other defendant named or to be named in this lawsuit, answer and provide all the information requested in Interrogatory No. 13 accordingly.

A14:   See Plaintiff's answer to Interrogatory 13.

Q15.    Did you ever work with or come in contact with asbestos products manufactured, sold, etc., by any other entity not named as a defendant in this lawsuit?  If yes, identify each such entity and, with regard to same, answer fully and provide the information requested in Interrogatory No. 13 accordingly.

A15:    To the best of Plaintiff's knowledge and belief, Plaintiff did not work with or around asbestos products manufactured by companies who are not named as defendants in this suit, other than possibly certain entities that have sought protection under the United States bankruptcy laws.  However, investigation continues and Plaintiff reserves the right to amend this response accordingly.

Q16.    With respect to each job on which you worked with or around asbestos products, state separately the following as to each such job:
  (a)    The name and address of the employer for whom you worked;
  (b)    The location of each job (stating the plant site, city, county and state);
  (c)    The beginning and ending dates of the job; and product containing asbestos with which you worked on the particular job and a general description of each such product.

A16:    See Plaintiff's Work History, attached as Exhibit A, Plaintiff's Non-Occupational Exposure History, attached as Exhibit C, Plaintiff's Social Security earnings records (SE 003-006), as well as any depositions to be taken in this matter.

Q17.    Are you able to state that you have not worked with or around asbestos products manufactured by companies who are not named defendants in this suit?

A17:    To the best of Plaintiff's knowledge and belief, Plaintiff did not work with or around asbestos products manufactured by companies who are not named as defendants in this suit, other than possibly certain entities that have sought protection under the United States bankruptcy laws.  However, investigation continues and Plaintiff reserves the right to amend this response accordingly.

Q18.    Please list all past employers in whose employ you came into contact with asbestos or asbestos-containing materials.  Include in you answer for each such employer:
  (a)    Name, address and telephone number;
  (b)    Job title and work description;
  (c)    Type and identity of each such asbestos material with which you had contact;
  (d)    Whether employer provided safety equipment so as to reduce or prevent harmful exposure to asbestos materials;
  (e)    Whether employer required that employees use safety equipment of the type referred to in subpart (d) above;
  (f)    Whether employer ever recommended that such safety equipment be used by its employees;
  (g)    Whether employer provided showers for employees;

9

(h) Whether employer provided separate lockers for both work and personal clothing; and,

(i) If company-sponsored physical examinations were required or made available. If so, please state:

    (i) Whether required or optional;

    (ii) Frequency of examination;

    (iii) Nature and extent of examination;

    (iv) Whether x-ray examination or respiratory or pulmonary examinations were included;

    (v) Frequency with which you submitted to such examination when required or made available;

    (vi) Your detailed reason for failing to submit to such examination when required or made available;

    (vii) Results of each such examination; and,

    (viii) Name, address and telephone number of examining physician, nurse or technician.

A18: See Plaintiff's Work History, attached as Exhibit A, Plaintiff's Social Security earnings records (SE 003-006), as well as any depositions to be taken in this matter.

Q19. Were you ever employed where your duties involved the tearing out of insulation which contained asbestos? If your answer is in the affirmative, please state for each such employment:

(a) Name, address and telephone number of employer;

(b) Name and location of job site;

(c) Dates of such employment period;

(d) Detailed job description and description of work methods and techniques; and,

(e) Whether or not respiratory safety equipment was:

    (i) Required;

    (ii) Made available to you; or

    (iii) Recommended by employer.

A19: Upon information and belief, No.

Q20. Have you at any time during your lifetime ever used any device to reduce your possible exposure to, or inhalation of, asbestos dust or fiber? If your answer is in the affirmative, please state for each such device:

(a) The make, model and type;

(b) From whom it was received;

(c) Company or employer requirements regarding the use of such device;

(d) Company or employer recommendations regarding use of such device;

(e) Name, address and telephone number of document title, date and description of the source of such requirement or recommendation;

(f) Date and time of each period of use of such device; and,

(g)    If you will do so without a motion to produce, please attach a copy of each writing evidences the requirements or recommendations referred to in subparts (c) and (d) of this interrogatory.

A20:  No.

Q21.  Did any of your employers ever suggest or recommend that you might or should use any device to reduce your possible exposure to or inhalation of asbestos dust or fibers? If your answer is in the affirmative, please state for each and every such employer:

(a)    Name, address and telephone number;

(b)    The date, time and place when each such suggestion or recommendation was made;

(c)    The name, address and telephone number of each person present when such suggestion or recommendation was made to or received by you;

(d)    The name, address and telephone number of each person receiving same or similar suggestion or recommendation;

(e)    The exact wording and content of such suggestion or recommendation;

(f)    Whether such suggestion or recommendation was written or oral, and;

     (i)    If written, please identify in detail each such writing; and,

     (ii)   If oral, please set forth all persons involved and details as to the manner in which each such suggestion or recommendation was presented.

(g)    The type, make and model of each device referred to in each such suggestion or recommendation;

(h)    The nature of any action , if any, taken by you in response to each such suggestion; and,

     (i)    Describe in detail your reasons for any response to such suggestions or recommendations other than full compliance thereto.

A21:  To the best of Plaintiff's recollection, No.

Q22.  At any time, did you receive, have knowledge of, or possess any advice, publication, warning, order, directive, requirement or recommendation, written or oral, which purported to:

(a)    Warn or advise you of the possible harmful effects of exposure to, or inhalation of, asbestos or asbestos-containing products; or

(b)    Advise or recommend as to techniques, methods or equipment which would serve to reduce or guard against such potentially harmful exposure?

A22:  No.

Q23.  If your answer to any part of Interrogatory No. 22 is in the affirmative, please state:

(a)    The nature and exact wording of such advice, warning or recommendation;

(b)    The complete identity of each source of such advice, warning or recommendation;

(c)    The date, time, place , manner and circumstances when each such advice, warning or recommendation was given;

(d)    The name business address and telephone number, job title, residence address and telephone number of each and every witness to the plaintiff's reception of such advice, warning or recommendation; and,

(e)    The name, business address and telephone number, job title, residence address and telephone number of each and every co-worker or similar member of your trade and occupation who also received the same or similar advice, warning or recommendation.

A23:   Not applicable.

**D.**    **Smoking History**

Q24.   Do you smoke cigarettes, cigars or a pipe?

A24.   No.

Q25.   Have you ever smoked tobacco products of any type?

A25.   Yes.

Q26.   If your answer to Interrogatory No. 24 and/or 25 is in the affirmative, please state fully and in detail:

(a)    The type of tobacco products which you smoke or have smoked, that is, cigarettes, cigars, pipes, etc., stating whether you inhaled the smoke or not;

(b)    The daily frequency with which you smoke or have smoked same, e.g., two packages of cigarette daily, two pipefulls daily, etc.;

(c)    The dates and time periods during which you have smoked;

(d)    For any time periods during which you have ceased smoking tobacco products, your reasons for stopping;

(e)    For any time period when you have commenced smoking tobacco products after a period of having stopped smoking, your reasons for restarting;

(f)    If you smoke cigarettes, please state the average number of packs per day so consumed in each of the following five year periods of 1935 to the present time:

    (i)    1935 - 1940;

    (ii)   1941 - 1945;

    (iii)  1946 - 1950;

    (iv)  1951 - 1955;

    (v)   1956 - 1960;

    (vi)  1961 - 1965;

    (vii)  1966 - 1970;

    (viii) 1971 - 1975;

    (ix)  1976 - present;

(g)    Whether you were ever advised by any physician to stop smoking. If your answer is yes, give the date and name and address of each physician who gave you any such advice, and also state whether you followed that advice; and,

12

(h)    State the brand of tobacco used by plaintiff.

A26:  (a)    Cigarettes
      (b)    Plaintiff smoked approximately one pack of cigarettes per day between 1946 and 1967
      (c)    Plaintiff smoked approximately one pack of cigarettes per day between 1946 and 1967
      (d)    Plaintiff quit smoking because of health concerns.
      (e)    Not applicable
      (f)    Plaintiff smoked approximately one pack of cigarettes per day between 1946 and 1967
      (g)    Plaintiff objects to this Interrogatory as outside the scope of discovery and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving these objections, Plaintiff states that he was advised during his annual military physical to quit smoking. Plaintiff eventually quit smoking because of health concerns.
      (h)    Plaintiff smoked many different kinds of cigarettes over the course of his smoking history, including Lucky Strikes, Chesterfields, Pall Malls, Kents, and many others, the brands of which Plaintiff is unable to recall at this time.

Q27.  Are you aware of the United States Surgeon General's warning placed on all cigarettes packages and advertisements?

A27:  Plaintiff objects to this interrogatory as vague, ambiguous and not reasonably calculated to lead to the discovery of admissible evidence.

Q28.  Have you ever read the warning referred to in Interrogatory No. 27? If so, state the date you first read it.

A28:  Plaintiff objects to this interrogatory as vague, ambiguous and not reasonably calculated to lead to the discovery of admissible evidence.

Q29.  Have you ever smoked cigarettes subsequent to being aware of or reading the warning referred to in Interrogatory No. 27?

A29:  Plaintiff objects to this interrogatory as vague, ambiguous and not reasonably calculated to lead to the discovery of admissible evidence.

Q30.  Have you ever smoked tobacco products other than cigarettes subsequent to being aware of or reading the warning referred to in Interrogatory No. 27? If so, what products and when?

A30:  Plaintiff objects to this interrogatory as vague, ambiguous and not reasonably calculated to lead to the discovery of admissible evidence.

**E.    Medical History**

Q31.   Have you ever been discharged or voluntarily left a position or changed residence due to health reasons?  If yes, please state in detail the times, places and circumstances.

A31:   Plaintiff objects to this Interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to, and without waiving these objections, No.

Q32.   Have you ever been hospitalized, operated upon, or confined to an institution?  If yes, please state:
       (a)    The names and address of all hospitals or institutions involved;
       (b)    The beginning and ending dates of each period of hospitalization;
       (c)    The nature of the illness, injury or complaint for which you were admitted to the hospital;
       (d)    The names, addresses and relationships to you of all persons who treated or examined you;
       (e)    The nature and extent of any permanent disabilities or residual effects; and,
       (f)    The nature, source, and amount of any disability benefits, pensions or other remunerations received.

A32:   Plaintiff objects to this Interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to, and without waiving these objections, see Plaintiff's Medical History, attached as Exhibit B, Plaintiff's medical records, authorizations for which have been and/or will be provided to Defense Coordinating Counsel, Plaintiff's medical experts' reports, which will be provided to Defense Coordinating Counsel, and Documents SE 001-002.

Q33.   If you have ever suffered any personal injuries or illness other than those involved in this lawsuit, state for each such injury or illness:
       (a)    The date, place, names of persons involved, and circumstances surrounding each such injury or illness;
       (b)    The nature and extent of the injuries or illnesses, including all ill effects or disabilities remaining at the time of the last treatment or examination;
       (c)    The nature and extent of the injuries or illnesses including all ill effects or disabilities remaining at the time of answering these interrogatories;
       (d)    The names and addresses of all persons who treated or examined you, together with the date of the last treatment or examination; and,
       (e)    The nature, source, and amount of any disability benefits, pensions, or other remunerations for such injuries or illnesses.

A33:   Plaintiff objects to this Interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to, and without waiving these objections, see Plaintiff's Medical History, attached as Exhibit B, Plaintiff's medical records, authorizations for which have been and/or will be provided to

14

Defense Coordinating Counsel, Plaintiff's medical experts' reports, which will be provided to Defense Coordinating Counsel, and Documents SE 001-002.

Q34.  With respect to each doctor who has examined or treated you from the year 1936 to date, state the following:
    (a)    The name and address of each such doctor;
    (b)    The complaint that you had which caused you to see the particular doctor;
    (c)    The type of examination and treatment that each doctor gave you; and,
    (d)    The date or dates on which you were examined and treated by each particular doctor.

A34:  Plaintiff objects to this Interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects on the ground that the identities and opinions of any and all consulting experts are protected from disclosure by the consulting expert and work product privileges. Subject to, and without waiving these objections, see Plaintiff's Medical History, attached as Exhibit B, Plaintiff's medical records, authorizations for which have been and/or will be provided to Defense Coordinating Counsel, Plaintiff's medical experts' reports, which will be provided to Defense Coordinating Counsel, and Documents SE 001-002.

Q35.  Have you ever had chest x-rays taken? If so, state the following for each set of x-rays taken:
    (a)    The name and address of the office or hospital where the x-rays were taken;
    (b)    The reason why such x-rays were taken;
    (c)    The date or dates on which the x-rays were taken; and,
    (d)    The x-ray diagnosis that was reported to you.

A35:  Plaintiff objects to this Interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects on the ground that the identities and opinions of any and all consulting experts are protected from disclosure by the consulting expert and work product privileges. Subject to, and without waiving these objections, see Plaintiff's Medical History, attached as Exhibit B, Plaintiff's medical records, authorizations for which have been and/or will be provided to Defense Coordinating Counsel, Plaintiff's medical experts' reports, which will be provided to Defense Coordinating Counsel, and Documents SE 001-002.

Q36.  Do you or your attorneys have any medical reports from any persons, hospitals, doctors or medical practitioners, or institutions that have ever treated or examined you at any time? If so, please attach copies of the reports to your answers to these interrogatories. If you will not voluntarily attach copies of the reports to your answers to these interrogatories, then please state fully and in detail:
    (a)    The identity of the report or reports by date, subject matter, name address, job title or capacity of the person(s) to whom addressed or directed, and the job title or capacity of the person or persons who prepared the same; and,
    (b)    The name, address, and present whereabouts of the person who has custody or control of the medical records and the purpose of said preparation.

A36:    Plaintiff objects to this Interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects on the ground that the identities and opinions of any and all consulting experts are protected from disclosure by the consulting expert and work product privileges. Subject to, and without waiving these objections, see Plaintiff's Medical History, attached as Exhibit B, Plaintiff's medical records, authorizations for which have been and/or will be provided to Defense Coordinating Counsel, Plaintiff's medical experts' reports, which will be provided to Defense Coordinating Counsel, and Documents SE 001-002.

Q37.    Have you ever received any nursing care or housekeeping services for or because of any injury sustained or any other physical condition? If yes, please state fully and in detail:
    (a)    The names, addresses and the relationship to you of the person(s) administering such care or services;
    (b)    The dates during which such care or services were received; and,
    (c)    The injury or illness or physical condition necessitating such care or services.

A37:    Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, vague and ambiguous. Subject to, and without waiving these objections, with respect to the injuries complained of herein, see Plaintiff's Medical History attached as Exhibit B, Plaintiff's medical records, authorizations for which have been or will be provided to Defense Coordinating Counsel, and Documents SE 001-002.

Q38.    Have you ever been confined to bed or home as a result of any illness, injury, or emotional or psychological illness or distress you may have sustained at any time? If yes, please state fully and in detail:
    (a)    The dates during which you were confined to your bed or home; and,
    (b)    The address where each confinement took place.

A38:    Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, vague and ambiguous. Subject to, and without waiving these objections, with respect to the injuries complained of herein, see Plaintiff's Medical History attached as Exhibit B, Plaintiff's medical records, authorizations for which have been or will be provided to Defense Coordinating Counsel, and Documents SE 001-002.

Q39.    Have you ever had to wear any medical support, cast, brace, or other device or garment, or use any other type of medical aid at any time? If yes, please state fully and in detail:
    (a)    A description of the item;
    (b)    Whether it was rented or purchased;
    (c)    The name and address of the supplier;
    (d)    The cost of the item; and,
    (e)    The period of time it was used.

16

A39:  Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, vague and ambiguous. Subject to, and without waiving these objections, with respect to the injuries complained of herein, see Plaintiff's Medical History attached as Exhibit B, Plaintiff's medical records, authorizations for which have been or will be provided to Defense Coordinating Counsel, and Documents SE 001-002.

Q40.  State the dates, places and circumstances and results including any interpretative or diagnostic conclusions or possibilities of each and every x-ray or radiological examination of your body during your lifetime.  Please include in you answer for each such examination, in addition to the above requested information:

  (a)  Name, address, and telephone number of each prescribing physician of each examination;

  (b)  Name, address, and telephone number of each examining physician in each examination;

  (c)  Name, address, and telephone number of the medical institution of laboratory, public or private, in which such examination was performed;

  (d)  The number of x-rays taken;

  (e)  Name, address, and telephone number of the present or last known custodian of each such x-ray;

  (f)  The specific areas of the body of which the x-ray examination was made;

  (g)  The interpretative or diagnostic results, conclusions, or possibilities derived from each such examination.  Include in your answer the date, time, place, source and nature of each such result, conclusions or possibility at the time same was made known to you, or anyone related to you or acting in your behalf; and,

  (h)  Any treatment, recommendation or prescribed therapy resulting from such examination.  Include in your answer:

    (i)  Purpose and objective of same;

    (ii)  Success or failure of same;

    (iii)  Date, time and duration of each such course of treatment or therapy;

    (iv)  Name of medication and the prescribed dosage;

    (v)  Accomplishments or degree of success of such treatment, therapy, or combination thereof; and,

    (vi)  Whether you cooperated completely, or in part, or ignored any such treatment, and the reasons for any such behavior on your part other than complete cooperation.

A40:  Plaintiff objects to this Interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to, and without waiving these objections, for information about x-rays and radiological examinations depicting Plaintiff's chest area see Plaintiff's Medical History, attached as Exhibit B, and Plaintiff's medical records, authorizations for which have been and/or will be provided to Defense Coordinating Counsel.

Q41.   State the dates, places, and circumstances of each and every cardiology examination, or examination related to the circulatory system in any fashion, conducted upon you during your lifetime. In addition, include in your answer for each and every such examination:
  (a)   Name, address and telephone number of each prescribing physician;
  (b)   Name, address and telephone number of each examining physician;
  (c)   Name, address and telephone number of each medical institution, office or laboratory, public or private, in which such examination was conducted;
  (d)   Name, address and telephone number of the present or last known custodian of any results of such examination;
  (e)   The interpretative or diagnostic results, conclusions or possibilities derived from each such examination. Include in you answer the date, time, place, source and nature of each such result, conclusion or possibility at the time that same was made known to you or anyone related to you or acting in you behalf; and,
  (f)   Any treatment, recommendation or prescribed therapy resulting from such examination. Include in your answer:
    (i)    Purpose or objective of same;
    (ii)   Success or failure of same;
    (iii)  Date, time and duration of each such course of treatment or therapy;
    (iv)   Name of medication and the prescribed dosage;
    (v)    Accomplishments or degree of success of such treatment, therapy, or combination thereof; and,
    (vi)   Whether you cooperated completely, or in part, or ignored any such treatment, recommendation, prescription, or course of therapy or treatment, and the reasons for any such behavior on you part other than complete cooperation.

A41:   Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, vague and ambiguous. Subject to, and without waiving these objections, with respect to the injuries complained of herein, see Plaintiff's Medical History attached as Exhibit B, Plaintiff's medical records, authorizations both of which have been or will be provided to Defense Coordinating Counsel, and Documents SE 001-002.

Q42.   State the dates, places and every pulmonary or respiratory system-related examination conducted upon you during your lifetime. In addition, include in you answer for each and every such examination the following:
  (a)   Name, address and telephone number of each examining physician;
  (b)   Name, address and telephone number of each medical institution, office, or laboratory, public or private in which such examination was made;
  (c)   Name, address and telephone number of the present or last known custodian of any results of such examination;
  (d)   The interpretative or diagnostic results, conclusions or possibilities derived from each such examination. Include in you answer the date, time, place, source and nature of each such result, conclusion or possibility at the time that same was made known to you or anyone related to you or acting in you behalf; and,

(e)    Any treatment, recommendation or prescribed therapy resulting from such examination. Include in your answer:

(i)    Name, address and telephone number of each prescribing physician;

(ii)    Purpose or objective of same;

(iii)    Success or failure of same;

(iv)    Date, time and duration of same;

(v)    Name and dosage of prescribed medication;

(vi)    Accomplishments or degree of success of such treatment, therapy, or combination thereof; and,

(vii)    Whether you cooperated completely or only in part or ignored each such recommendation, prescribed treatment, or therapy, and the reasons for any such behavior on your part other than complete cooperation.

A42:    Plaintiff objects to this Interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects on the ground that the identities and opinions of any and all consulting experts are protected from disclosure by the consulting expert and work product privileges. Subject to, and without waiving these objections, see Plaintiff's Medical History, attached as Exhibit B, Plaintiff's medical records, authorizations for which have been and/or will be provided to Defense Coordinating Counsel, and Plaintiff's medical experts' reports, which will be provided to Defense Coordinating Counsel.

Q43.    If you will do so without a motion to produce, please attach copies of any records, receipts or invoices related in any fashion to any or all of your answers to the above three interrogatories.

A43:    Plaintiff has or will provide Defense Coordinating Counsel with authorizations for Plaintiff's medical records, as well as Plaintiff's medical records currently in Plaintiff's possession.

**F.    Asbestos Related Injuries**

Q44.    For each and every present or past symptom, indication, malaise or effects which you contend to be directly or indirectly related to any disease, disability or physical condition or state of you body or health, and which you contend is relevant to this lawsuit, please state:

(a)    Nature and description of such symptoms;

(b)    The disease, disability or physical condition to which said symptom is related and the nature and extent of such relationship;

(c)    The date, time, place and manner in which such symptom first manifest itself or was made known to you, including all pertinent information as to the source of such knowledge;

(d)    Whether you contend such symptom is related in any fashion to asbestosis or pleuritis, or any other condition from which you allegedly suffer, and the nature and extent of such relationship;

19

    (e)      Whether you contend that such symptom is related in any fashion to the use or effect of any product manifested, sold or distributed, in whole or in part, by defendant or any subdivision or affiliate thereof. Include in you answer the nature and extent of said relationship and the name, description and identity of the product referred to in your answer;

    (f)      The facts, writings and publications, etc, upon which you base all or part of any of your above-stated contentions. If you will do so without a motion to produce, please attach copies of all such writings or publications; and,

    (g)      The name, business address and telephone number, job title, and resident address and telephone number of each and every witness who can testify in support of any or part of any of your above-stated conclusions.

A44:   (a)      Plaintiff suffers from lack of appetite, lack of energy, shortness of breath, and coughing. See also Plaintiff's medical records, authorizations for which have been and/or will be provided to Defense Coordinating Counsel.

    (b)      Plaintiff's symptoms are related to his mesothelioma and other asbestos caused lung conditions, or treatment therefore.

    (c)      Plaintiff's symptoms began to manifest in approximately 2006.

    (d)      Plaintiff's symptoms are related to his mesothelioma and other asbestos caused lung conditions, or treatment therefore.

    (e)      Yes. Plaintiff has come to understand that his contact with asbestos from various asbestos products, as described in response to these Interrogatories, in Plaintiff's Complaint and in any deposition testimony to be given, substantially contributed to the injuries complained of herein.

    (f)      Plaintiff objects to this Interrogatory as unduly burdensome. Plaintiff further objects to the extent this Interrogatory seeks material protected by the attorney work product privilege. Subject to, and without waiving these objections, to the extent not already provided, Plaintiff's counsel will provide Defendants with a list of medical articles describing the symptoms of asbestos-related diseases.

    (g)      Plaintiff objects to this Interrogatory as overly broad and unduly burdensome. Subject to, and without waiving these objections, see Plaintiff's Medical History, attached as Exhibit B, Plaintiff's medical records, authorizations for which have been and/or will be provided to Defense Coordinating Counsel, Plaintiff's medical experts' reports, which will be provided to Defense Coordinating Counsel. Also, Plaintiff's family has observed and can testify to Plaintiff's suffering of some or all of the above mentioned symptoms.

Q45.   Do you contend you are suffering from pleuritis?

A45:   Plaintiff objects to this Interrogatory as vague and ambiguous. Subject to and without waiving that objection, Plaintiff has provided Defense Coordinating Counsel with authorizations for Plaintiff's medical records. In addition, Plaintiff has provided Defense Coordinating Counsel with any of Plaintiff's medical records in Plaintiff's possession.

Q46.    If your answer to Interrogatory No. 45 is in the affirmative, please state:
   (a)    Date and time of such diagnosis;
   (b)    Name, address and telephone number of diagnosing physician and any concurring physicians;
   (c)    Method and information upon which such diagnosis was based;
   (d)    Name, address and telephone number of each and every hospital, medical institution, laboratory, physician, nurse, laboratory technician, etc., involved in any part of such diagnosis;
   (e)    Name, address and telephone number of each and every person, including your relatives, employer, or anyone acting in your behalf to whom such diagnosis was made known, including the date, time and place of such revelation, and the name, address and telephone number of anyone witnessing such revelation;
   (f)    Describe in detail the specific course of treatment or therapy, including any medication, prescribed as a result of such diagnosis, and the name, address and telephone number of each prescribing physician;
   (g)    Name, address and telephone number of plaintiff's employer at a time of diagnosis; and,
   (h)    If said diagnosis resulted in any prescribed or recommended change in your occupation, behavior, life-style or work habits or conditions, please state:
      (i)     Nature, extent and exact content of such prescription or recommendation;
      (ii)    Plaintiff's response to same and reasons for such response, particularly stating any reasons for failing to comply fully with such prescriptions or recommendations; and,
      (iii)   State all fact upon which you rely to support a contention that such pleuritis is related to exposure to asbestos.

A46:    Plaintiff objects to this Interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects on the ground that the identities and opinions of any and all consulting experts are protected from disclosure by the consulting expert and work product privileges. Subject to, and without waiving these objections, see Plaintiff's Medical History, attached as Exhibit B, Plaintiff's medical records, authorizations for which have been and/or will be provided to Defense Coordinating Counsel, and Plaintiff's medical experts' reports, which will be provided to Defense Coordinating Counsel.

Q47.    Do you contend that you are suffering from asbestosis?

A47:    No. Plaintiff's suffers from malignant mesothelioma.

21

Q48.  If your answer to Interrogatory No. 47 is in the affirmative, please state:
  (a)  Date and time of such diagnosis;
  (b)  Name, address and telephone number of diagnosing physician and any concurring physicians;
  (c)  Method and information upon which such diagnosis was based;
  (d)  Name, address and telephone number of each and every hospital, medical institution, laboratory, physician, nurse, laboratory technician, etc., involved in any part of such diagnosis;
  (e)  Name, address and telephone number of each and every person, including your relatives, employer, or anyone acting in your behalf, to whom such diagnosis was made known, including the date, time and place of such revelation, and the name, address and telephone number of anyone witnessing such revelation;
  (f)  Describe in detail the specific course of treatment or therapy, including any medication, prescribed as a result of such diagnosis, and the name, address and telephone number of each prescribing physician;
  (g)  Name, address and telephone number of plaintiff's employer at a time of diagnosis; and,
  (h)  If said diagnosis resulted in any prescribed or recommended change in your occupation, behavior, life-style or work habits or conditions, please state:
    (i)  Nature, extent and exact content of such prescription or recommendation; and,
    (ii)  Plaintiff's response to same and reasons for such response, particularly stating any reasons for failing to comply fully with such prescriptions or recommendations.

A48:  Not applicable.

Q49.  Do you contend you are suffering from any other pulmonary disease?

A49:  Plaintiff objects to this Interrogatory as vague and ambiguous. Subject to and without waiving that objection, Plaintiff has provided Defense Coordinating Counsel with authorizations for Plaintiff's medical records and any of Plaintiff's medical records in Plaintiff's possession.

Q50.  If your answer to Interrogatory No. 48 is in the affirmative, please state:
  (a)  Date and time of such diagnosis;
  (b)  Name, address and telephone number of diagnosing physician and any concurring physicians;
  (c)  Method and information upon which such diagnosis was based;
  (d)  Name, address and telephone number of each and every hospital, medical institution, laboratory, physician, nurse, laboratory technician, etc., involved in any part of such diagnosis;
  (e)  Name, address and telephone number of each and every person, including your relatives, employer, or anyone acting in your behalf, to whom such diagnosis was made known, including the date, time and place of such revelation, and the name, address and telephone number of anyone witnessing such revelation;

22

(f)     Describe in detail the specific course of treatment or therapy, including any medication, prescribed as a result of such diagnosis, and the name, address and telephone number of each prescribing physician;

(g)     Name, address and telephone number of plaintiff's employer at a time of diagnosis; and,

(h)     If said diagnosis resulted in any prescribed or recommended change in your occupation, behavior, life-style or work habits or conditions, please state:

    (i)     Nature, extent and exact content of such prescription or recommendation;

    (ii)    Plaintiff's response to same and reasons for such response, particularly stating any reasons for failing to comply fully with such prescriptions or recommendations; and,

    (iii)   State all fact upon which you rely to support a contention that such pulmonary disease is related to exposure to asbestos.

A50:   Plaintiff objects to this Interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff further objects on the ground that the identities and opinions of any and all consulting experts are protected from disclosure by the consulting expert and work product privileges.  Subject to, and without waiving these objections, see Plaintiff's Medical History, attached as Exhibit B, Plaintiff's medical records, authorizations for which have been and/or will be provided to Defense Coordinating Counsel, and Plaintiff's medical experts' reports, which will be provided to Defense Coordinating Counsel.

Q51.   Do you contend that you are suffering from any cancer, "incipient cancer", carcinoma or sarcoma?

A51:   Yes.

Q52.   If your answer to Interrogatory No. 51 is in the affirmative, please state:

(a)     Date and time of such diagnosis;

(b)     Name, address and telephone number of diagnosing physician and any concurring physicians;

(c)     Method and information upon which such diagnosis was based including biopsies, histological or cytology studies;

(d)     Name, address and telephone number of each and every hospital, medical institution, laboratory, physician, nurse, laboratory technician, etc., involved in any part of such diagnosis;

(e)     Name, address and telephone number of each and every person, including your relatives, employer, or anyone acting in your behalf to whom such diagnosis was made known, including the date, time and place of such revelation, and the name, address and telephone number of anyone witnessing such revelation;

(f)     Describe in detail the specific course of therapy or treatment, including any medication, prescribed as a result of such diagnosis, and the name, address and telephone number of each prescribing physician;

(g)     Name, address and telephone number of plaintiff's employer at a time of diagnosis; and,

(h)      If said diagnosis resulted in any prescribed or recommended change in your occupation, behavior, life-style or work habits or conditions, please state:

        (i)      Nature, extent and exact content of such prescription or recommendation;

        (ii)      Plaintiff's response to same and reasons for such response, particularly stating any reasons for failing to comply fully with such prescriptions or recommendations; and,

        (iii)      State all fact upon which you rely to support a contention that such pulmonary disease is related to exposure to asbestos.

A52:      Plaintiff was diagnosed with malignant mesothelioma in approximately March of 2008 at Penrose Hospital, Colorado Springs, Colorado. See Plaintiff's Medical History, attached as Exhibit B, Plaintiff's medical records, authorizations for which have been and/or will be provided to Defense Coordinating Counsel, and Documents SE 001-002.

Q53.      Are you aware that any adverse effects of exposure to asbestos and asbestos products may be cumulative in nature and that continued exposure to such materials by one suffering from asbestosis or a related illness might have significant adverse effects upon the extent and severity of such illness? If your answer is in the affirmative, please state:

(a)      The date, time and place that you first acquired such awareness;

(b)      Specific identity of such source of information providing or leading to such awareness; and,

(c)      Any change in your behavior, life-style, occupation, work habits, etc., prescribed by such awareness.

A53:      Plaintiff learned that asbestos is dangerous to health in approximately 1998. Plaintiff has no specific personal knowledge about the cumulative effect of asbestos exposure.

Q54.      After being informed that you were suffering from asbestosis, pleuritis, or any alleged asbestos-related illness, did you continue to engage in any activity or occupation in which you encountered subsequent exposure to asbestos or asbestos-containing materials? If your answer is in the affirmative, please state:

(a)      Nature and description of such activity or occupation;

(b)      Name, address and telephone number of your employer at the time and subsequent to the diagnosis of any of the ailments referred to in the above interrogatory. Include in your answer:

        (i)      Your job title and description of work and activities and duties; and

        (ii)      Manner and extent of resulting exposure to asbestos or asbestos-containing materials.

(c)      Your detailed reasons for engaging in such activity or occupation; and,

(d)      Whether your participation in such activity or occupation and consequential exposure to asbestos or asbestos-containing materials was contrary to competent medical or professional advice (including such advice from employers, union representatives, publications, etc.). If so, please state in detail:

        (i)      The identity, description, address, etc., of each source of such advice;

        (ii)      The date, time and place such advice was given;

        (iii)     The name, address and telephone number of each and every person present when such advice was given to you; and,

        (iv)     Your response to such advice and the reasons therefore.

A54:   No.

Q55.   Please list in chronological order by date of admission all hospitals, extended care centers or nursing homes in which you have been a patient or an out-patient during your lifetime. Please include in your answer the dates of admission and discharge.

A55:   Plaintiff objects to this Interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to, and without waiving these objections, see Plaintiff's Medical History, attached as Exhibit B, Plaintiff's medical records, authorizations for which have been and/or will be provided to Defense Coordinating Counsel, Plaintiff's medical experts' reports, which will be provided to Defense Coordinating Counsel, and Documents SE 001-002.

Q56.   For each such confinement or out-patient period listed in your answer to Interrogatory No. 55, please state separately:

        (a)     Condition treated for;

        (b)     Name, address and telephone number of each treating or prescribing physician;

        (c)     Type and date of any diagnostic or operating procedure;

        (d)     The date of recovery from such condition referred to in subpart (a) of this interrogatory; and,

        (e)     Extent and duration of any disability resulting from such condition referred to in subpart (a) of this interrogatory.

A56:   Plaintiff objects to this Interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to, and without waiving these objections, see Plaintiff's Medical History, attached as Exhibit B, Plaintiff's medical records, authorizations for which have been and/or will be provided to Defense Coordinating Counsel, Plaintiff's medical experts' reports, which will be provided to Defense Coordinating Counsel, and SE 001-002.

Q57.   State in detail such injuries, illnesses or types of ill health which you allege that you have suffered from during the one-year period immediately preceding the diagnosis of asbestosis, pleuritis and/or any other illness or disease alleged to be related to asbestos exposure. Set forth in detail such symptoms as were evident to you during that period, the date of their appearance, and the identity of all diagnosing and treating physicians.

A57:   Plaintiff objects to this Interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to, and without waiving these objections, see Plaintiff's Medical History, attached as Exhibit B, Plaintiff's medical records, authorizations for which have been and/or will be provided to Defense Coordinating Counsel, Plaintiff's medical experts' reports, which will be provided to Defense Coordinating Counsel, and Documents SE 001-002.

Q58.   State the name and address of your personal physician at the time of the incident(s) of which you complain in this lawsuit.

A58:   See Plaintiff's Medical History, attached as Exhibit B, Plaintiff's medical records, authorizations for which have been and/or will be provided to Defense Coordinating Counsel.

**G.    Claims History**

Q59.   Have you, at any time, ever made a claim for or received any health or accident insurance benefits, workmen's compensation payments, disability benefits, pensions, accident compensation payments or veterans' disability compensation awards? If so, state for each:
   (a)    The circumstances under which you received the benefits or awards or payments;
   (b)    The illness or injury for which you received the benefits or awards or payments;
   (c)    The names and addresses of your employer at the time of each injury or illness;
   (d)    The names and addresses of the examining doctors for each injury or illness;
   (e)    The names of the superiors or officers of boards or tribunals before which or to whom the claim or claims were made or filed; the dated made or filed;
   (f)    The amount of the benefits or wards or payments;
   (g)    The dates covering the times during which you received the benefits or wards or payments; and,
   (h)    The agencies or insurance companies from whom you received the benefits or awards or payments.

A59:   Plaintiff objects to this Interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to, and without waiving these objections except for health insurance claims and benefits for medical bills, Plaintiff has not yet made any such claims nor received any such benefits related to the injuries complained of herein.

Q60.   On what date did you first become aware that asbestosis was a compensable occupational disease under the State Workmen's Compensation Act?

A60:   Plaintiff has no knowledge of this.

Q61.   Have you ever filed a suit for damages for any personal injury? If yes, please state:
   (a)    The names and addresses of all plaintiffs, defendants, and other parties and their attorneys;

(b)     The court and place where each suit was filed and the date of filing;

(c)     The nature and extent of the injuries claimed; and,

(d)     The present status of each suit; and, if concluded, the final result including the amount of any settlement or judgment.

A61:    Plaintiff objects to this Interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.   Subject to, and without waiving these objections, other than this case, No.

Q62.    Have you ever been a party to any other litigation?  If so, describe:

(a)     The nature of the suit; and

(b)     The date, court and place where the suit was filed.

A62:    Plaintiff objects to this Interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to, and without waiving these objections, no.

**H.     Witnesses/Investigation**

Q63.    Do you or your attorneys know of any person or persons having knowledge of facts relevant to the allegations in this lawsuit, including witnesses to the injury, illnesses, etc. in question?  If yes, please state the names, addresses, home telephone numbers, places of employment, relationship to you, the present whereabouts of all such persons.

A63:    Plaintiff objects to this Interrogatory as overly broad and unduly burdensome.  Subject to, and without waiving these objections, Plaintiff's family and her treating physicians may have knowledge of facts relevant to this lawsuit.   See also Plaintiff's Work History, attached as Exhibit A, Plaintiff's Non-Occupational Exposure History, attached as Exhibit C, and Plaintiff's Witness Lists, including any amendments or supplements thereto. Plaintiff reserves the right to supplement or amend this response as investigation, discovery and preparation for trial continues.

Q64.    Do you or your attorneys have any written statements from any persons having knowledge of facts relevant to the subject matter of this lawsuit, including witnesses to the accident, injury, illnesses, etc. in question?  If yes, please state the names, addresses, home telephone numbers, places of employment, relationship to you and the present whereabouts of all such persons.

A64:    Plaintiff objects to this Interrogatory as overly broad and unduly burdensome.  Plaintiff further objects to the extent this Interrogatory calls for material protected by the attorney work product privilege.   Subject to, and without waiving these objections, Plaintiff's counsel is in possession of transcripts of deposition and trial testimony of plaintiffs, co-workers, defendants and other individuals taken in other asbestos cases.  These transcripts can be reviewed at Plaintiff's counsel's office.  In addition, Plaintiff will provide Defense Coordinating Counsel with any of Plaintiff's medical records in Plaintiff's possession.  See also Plaintiff's Exhibit Lists, including any amendments or supplements thereto.

Plaintiff reserves the right to supplement or amend this response as investigation, discovery and preparation for trial continues.

Q65.  Do you or your attorneys have any written statements or oral transcriptions of the statements of any defendant or agent, servant or employee of any defendant to this action?  If yes, state the name of such person, where and when the statement or statements were obtained, and who has custody of the statements or transcriptions.

A65:  See Plaintiff's answer to Interrogatory 64.

Q66.  As a result of the illnesses, relevant working conditions or other circumstances complained of in this action, or related to the subject matter of this lawsuit, were any photographs, charts, drawings, diagrams or other graphic representations made by you or on your behalf?  If yes, state fully and in detail:
   (a)     How many pictures were taken or documents prepared;
   (b)     On what dates they were taken or prepared;
   (c)     What views, scenes or objects they depict;
   (d)     What is the name, address, telephone number, job title, or capacity and present whereabouts of the persons who have custody and control thereof;
   (e)     Will the plaintiffs permit the defendants, through authorized representatives, to inspect the said photographs or other documents without the necessity of a motion of their production; and
   (f)     Will the plaintiffs furnish copies of designated photographs or other documents to the defendants at defendants' expense?

A66:  Plaintiff objects to this Interrogatory as overly broad and unduly burdensome. Further, Plaintiff objects to the extent this Interrogatory calls for material protected by the attorney-client or attorney work product privileges. Subject to, and without waiving these objections, see Plaintiff's experts' reports, which will be provided to Defense Coordinating Counsel, and Plaintiff's Exhibit Lists, including all amendments or supplements thereto.

Q67.  If your claim is based to any extent or nature upon expert opinion other than medical experts, please state the name, address, home telephone number, place of employment, relationship to you, and present whereabouts of all such experts.

A67:  Plaintiff objects to this Interrogatory on the ground that the identities and opinions of any and all consulting experts are protected from disclosure by the consulting expert and work product privileges.  Subject to, and without waiving these objections, this information will be provided at the appropriate time.

Q68.  Have you made any statement which was reduced to writing concerning the facts of this lawsuit and the damages claimed to any police or law officer, insurance company representative, investigator, state or federal agent or employee of any kind, or anyone else?  If yes, state the name and address of each and every such person or organization to whom these statements or reports were made and the purpose for which they were made.

28

A68:    Plaintiff objects to this Interrogatory as beyond the scope of discovery.  Plaintiff further objects to this Interrogatory to the extent it seeks material protected by the attorney-client or attorney work product privileges.  Subject to, and without waiving these objections, Plaintiff knows of no such statements or reports except those that may have been given to or done by Plaintiff's attorneys.

Q69.    Have any investigations or other reports been prepared, complied, submitted or made by you or on your behalf in this action?  If yes, state fully and in detail as to each such investigation or report:
(a)      The identity of same by date, subject matter, name, address, job title or capacity of the person or persons to whom addressed or directed;
(b)      The name, address, job title or capacity of the person or persons to whom addressed or directed; and,
(c)      The name, address, and present whereabouts of the person who has present custody or control thereof and the purpose of such preparation.

A69:    Plaintiff objects to this Interrogatory to the extent it seeks material protected by the attorney-client or attorney work product privileges.  Subject to, and without waiving these objections, any such investigations or reports were done by Plaintiff's attorneys only.

Q70.    Do you have any health, accident or life insurance policies which are currently in effect?  If yes, state the name, type, address of the insurance company, dates of commencement and expiration of coverage, policy limits, etc.

A70:    Plaintiff objects to this Interrogatory as irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Q71.    List the names, addresses and relationship to plaintiff of all persons who were witnesses to the accident, injuries or illnesses which are the subject matter of this lawsuit.

A71:    Plaintiff objects to this Interrogatory as overly broad and unduly burdensome.  Subject to, and without waiving these objections, see Plaintiff's Work History, attached as Exhibit A. See also Plaintiff's Medical History, attached as Exhibit B, Plaintiff's medical records, authorizations for which have been and/or will be provided to Defense Coordinating Counsel. Finally, see Plaintiff's Witness Lists, including any amendments or supplement thereto. Plaintiff reserves the right to supplement or amend this response as investigation, discovery and preparation for trial continues.

Q72.    Do your agents, employees and representatives know of any statement having been made by the defendants pertaining to any circumstances of the injuries or illnesses which are the subject of this lawsuit?

A72:    Plaintiff objects to this Interrogatory as overly broad, unduly burdensome, vague and ambiguous.  Subject to, and without waiving these objections, Plaintiff states as follows:

Yes, if the subject of asbestos related illness is included within the meaning of the Interrogatory.

Q73.   If your answer to Interrogatory No. 72 is in the affirmative, was any such statement in writing and, if so, in whose possession is such statement and when and where may it be inspected by defendants?

A73:   Such statements include depositions of Defendants' employees, documents of trade associations, letters between Defendants and each other, and Defendants' written discovery answers in this and other asbestos litigation. See also Plaintiff's answer to Interrogatory 64 and Plaintiff's Exhibit Lists, including any amendments or supplements thereto.

Q74.   If your answer to Interrogatory No. 72 is in the affirmative, and any such statement was oral, when and where was any such statement made, in whose presence was such statement made, and what was the substance of such statement?

A74:   See Plaintiff's answer to Interrogatory 73.

Q75.   Give the names and present addresses of all witnesses you intend to use at the trial of this case with respect to the occurrence and/or cause of your illness or with respect to claimed damages or with respect to the liability of these defendants.

A75:   Plaintiff objects to this Interrogatory as overly broad and unduly burdensome. Subject to, and without waiving these objections, Plaintiffs and their counsel have not yet decided which individuals will be called as witnesses at trial. However, for possible witnesses, see Plaintiff's Work History, attached as Exhibits A, Plaintiff's Medical History, attached as Exhibit B, Plaintiff's Witness Lists, and Plaintiff's Expert Witness List, including any amendment or supplements thereto. Plaintiff reserves the right to supplement or amend this response as investigation, discovery and preparation for trial continues.

Q76.   With reference to any expert you expect to call to testify as a witness at the trial, state the name and address of such expert and, as to each expert named, state:
(a)     The subject matter on which the expert is expected to testify;
(b)     The substance of the facts and opinions to which the expert is expected to testify; and
(c)     A summary of the grounds for each such opinion.

A76:   Plaintiff objects to this Interrogatory on the ground that the identities and opinions of any and all consulting experts are protected from disclosure by the consulting expert and work product privileges. Subject to, and without waiving these objections, this information will be provided at the appropriate time.

Q77.   State the name and present address of any expert witness who has been retained or specially employed by you or your attorneys in anticipation of litigation or preparation for trial by who is not expected to testify as a witness at the trial.

A77:   Plaintiff objects to this Interrogatory as beyond the scope of discovery.  Plaintiff further objects to the extent this Interrogatory seeks material protected by the attorney-client or attorney work product privileges.  Subject to, and without waiving these objections, the experts to be identified in Plaintiff's Expert Witness List, including any amendments or supplements thereto, as well as Plaintiff's treating physicians (See Plaintiff's Medical History, attached as Exhibit B) may testify for Plaintiff.  However, Plaintiffs and their counsel have not yet decided which individuals will be called as witnesses at trial, nor has the exact scope or subject matter of any witness' testimony been determined.

Q78.   Give an accurate statement of all medical, hospital and drug or other related costs incurred by you or on your behalf as a result of the illness alleged in the Complaint.

A78:   Plaintiff incurred medical expenses and related out-of-pocket costs as a result of hir asbestos related illness.  Plaintiff's counsel will provide a total sum as soon as one is ascertained.

Q79.   If you claim the right to recovery an "out-of-pocket" expenses, including, but not limited to, medical expenses, itemize each such expense and state:
   (a)    A specific description of each such expense;
   (b)    The date when such expense was incurred;
   (c)    To whom it was incurred; and,
   (d)    For what it was incurred.

A79:   See Plaintiff's Answer to Interrogatory 78.

**I.    Union Activity**

Q80.   Were you a member of any labor union at any time from 1936 to the present?  If your answer is in the affirmative, state for each such union membership:
   (a)    The name, address and telephone number; and,
   (b)    The dates and time periods during which you maintained membership in such union.

A80:   To the best of Plaintiff's knowledge, no. Upon information and belief, the Coast Guard attempted to enroll Plaintiff in a union and Plaintiff refused. The Coast Guard may have enrolled Plaintiff in a union without his knowledge and without his consent. Plaintiff has no information about which union, if any, this might have been.

Q81.   If you were a member of the International Association of Heat and Frost Insulators and Asbestos Workers, did you receive the publication known as The Asbestos Worker?

A81:   Not applicable.

31

Q82.   If your answer to Interrogatory 81 is in the affirmative, state in detail:

    (a)   The manner of receipt, e.g., subscription, provided by union or employer, purchase, etc.;

    (b)   Frequency of receipt, e.g., regularly, occasionally, rarely, etc.;

    (c)   The name, address and telephone number of each and every person or entity which provided this publication to you;

    (d)   Pertinent dates and time periods during which you received any issues of said publication:

    (e)   Publication date, issue and volume number of each issue of said publication received by you in any fashion; and,

    (f)   Whether you read such publication.

A82:   Not applicable.

Q83.   Did any of your employers or any union or other labor organization, group, representative or officer ever provide or make any copies of the publication The Asbestos Worker available to you at any time?

A83:   No.

Q84.   If your answer to Interrogatory 83 is in the affirmative, please state in detail:

    (a)   The name, address, telephone number and title of each and every such employer, union, representative, or officer referred to in your answer to the above interrogatory;

    (b)   The dates and time periods during which the publication was so provided or made available to you;

    (c)   The publication date, issue and volume of each issue of said publication so proved or made available; and,

    (d)   The terms, circumstances or requirements of such availability of provision or requirements of said publication, e.g., free, by subscription, mailed, to be picked up, distributed at meetings, etc.

A84:   Not applicable.

Q85.   If you were a member of a labor union other than the International Association of Heat and Frost Insulators and Asbestos Workers, did you receive any newspapers, newsletters or other publications from such union?

A85:   Not Applicable.

Q86.   If your answer to Interrogatory 85 is in the affirmative, please state:

    (a)   The type of each publication received;

    (b)   The frequency with which such publications were received; and,

    (c)   Whether you read such publications.

A86:    Not applicable.

Q87.    Have you ever attended any international or local union meetings, seminars, conferences or conventions where the subjects of occupational health and exposure to asbestos were discussed?

A87:    No.

Q88.    If your answer to Interrogatory 87 is in the affirmative, please state:
    (a)    The date and place of such meeting, seminar, conference or convention;
    (b)    The name and address of each speaker; and,
    (c)    A summary of such speech, presentation or discussion.

A88:    Not applicable.

Q89.    Please list together with places and dates all offices you have held or committees on which you have served in both your local and international union.

A89:    Not applicable.

Q90.    Have you ever been informed by any person in an official capacity in your local or international union of any possible hazards associated with the exposure to asbestos dust?

A90:    Not Applicable.

Q91.    If your answer to Interrogatory 90 is in the affirmative, please state:
    (a)    The name, address and official capacity of the individual or individuals who furnished you with such information;
    (b)    The date and place such information was furnished;
    (c)    The manner in which such information was communicated;
    (d)    The nature of the information furnished; and,
    (e)    What action, if any, you took in response to such information.

A91:    Not applicable.

Q92.    For what time periods, including dates, were you an apprentice in the insulation materials installation trade (or a related trade) hereinafter referred to as "the trade"?

A92:    Not applicable.

Q93.    For what time periods, including dates, were you a journeyman, or its equivalent, in the trade?

A93:    Not applicable.

Q94.  State the date, times and places during which you were:
    (a)    A member of the National Insulation Contractors Association (N.I.C.A.);
    (b)    Employed by an employer who is a member of the National Insulation Contractors Association (N.I.C.A.).  If so, please state the name, address and telephone number of said employer.
    (c)    Employed by an employer who is a member of the N.I.M.A.  If so, please state the name, address and telephone number of said employer.

A94:  Not applicable.

Q95.  Were you ever aware of, informed of, or advised in any fashion by the informational and educational campaigns conducted by N.I.C.A. and N.I.M.A., the purpose and goals of which were to promote awareness among asbestos materials workers as to potential hazards of asbestos exposure and to reduce such harmful exposure through recommendations regarding protective respiratory safety equipment and fabrication of asbestos products?

A95:  No.

Q96.  If your answer to the foregoing interrogatory is in the affirmative, state the date, times, places, names and circumstances under which such awareness, information or advice was received, and the name, address and telephone number of anyone present at the time you received such advice and/or who received the same or similar advice, information or awareness.

A96:  Not applicable.

**J.    Damages**

Q97.  State your average weekly or monthly earnings at the time of your last full-time employment.

A97:  To be provided.  See also Plaintiff's Social Security earnings records (SE 003-006).

Q98.  State fully and in detail your annual earnings for the past ten years:
    (a)    Do you or your attorneys have your W-2 forms and/or income tax returns (or copies thereof) for any of the past ten years?  If so, please state for which years you have such W-2 forms and/or income tax returns and/or copies thereof; and,
    (b)    If you will do so without a motion to produce, please attach copies of said W-2 forms and/or income tax returns to your answers to these interrogatories.

A98:  Plaintiff objects to this Interrogatory as unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and beyond the scope of discovery.  Subject to, and without waiving these objections, Plaintiff will provide Defense Coordinating Counsel with an authorization for Plaintiff's federal income tax records.

Q99.   If you claim that you have sustained any loss of income or earning power as a result of the incident which is the subject of this lawsuit, either in the past, present or in the future, state:
   (a)    The total value of the loss you claim was sustained;
   (b)    The inclusive dates when you claim you were unable to work as a result of the incident and the reason why you were unable to work on such dates;
   (c)    A specific description of the type or types of work you would have been performing or would have been able to perform during the period stated;
   (d)    The rate of income you would have been able to receive had the alleged incident not occurred, e.g., $1.00 per hour, $50.00 per week, etc.; and
   (e)    The name and address of the person, corporation or other entity which would have been your employer.

A99:   Plaintiff is not claiming a loss of income due to his asbestos-related injuries.

Q100.  Insofar as you intend to introduce into evidence any expert testimony concerning part of future loss [of] earning power or the present value of a sum of money concerning a future loss of expense and such evidence will be introduced through an expert economist or actuary, state the name and address of such expert and, as to each such person named, state:
   (a)    A specific description of the losses for which such future earnings, present value of the loss of future earnings, present value of second job earnings, present value of future medical expenses, etc.;
   (b)    Describe in detail precisely the manner in which the person reached her conclusions showing he mathematical calculations involved; and
   (c)    Insofar as such person has prepared any report or memoranda showing in whole or in part her conclusions or the facts on which such conclusions were based, state the date of such writing and the names and addresses of persons having copies of it.  If you will do so without a motion to produce, please attach a copy of any such report to these answers.

A100:  Not Applicable.

Q101.  State all facts upon which you base your claim concerning your potential earnings or earning power.

A101:  Not Applicable

Q102.  If you claim that, as a result of the negligence alleged in the Complaint, you experienced any conscious pain and suffering for which you claim the right to recover damages in this lawsuit, state:
   (a)    The inclusive times or dates when you claim such conscious pain and suffering was experience;
   (b)    The name and address of any person having knowledge that it was, in fact, experienced;

(c)    The specific acts which you claim the defendants performed which resulted in such pain and suffering; and

(d)    A description of the pain and suffering and the areas of the body effected so far as you are aware.

A102:  (a)    Plaintiff began experiencing pain and suffering symptoms in 2006.

(b)    Plaintiff's medical providers as reflected in Plaintiff's Medical History, attached as Exhibit B and in Plaintiff's medical records, for which Plaintiff has provided Defense Coordinating Counsel an authorization, as well as Plaintiff's family.

(c)    See Plaintiff's Complaint, including any amendments.

(d)    See Plaintiff's answer to Interrogatory 44, Plaintiff's deposition testimony, Plaintiff's family members' testimony, Plaintiff's medical records, for which Plaintiff has provided Defense Coordinating Counsel an authorization. In addition, Plaintiff will provide Defense Coordinating Counsel with any of Plaintiff's medical records in Plaintiff's possession.

Respectfully submitted,

LAW OFFICE OF JOSEPH J. RHOADES

By:  /s/ A. Dale Bowers
Joseph J. Rhoades, Esquire (I.D. 2064)
A. Dale Bowers, Esquire (I.D. 3932)
1225 North King Street, 12th Floor
Wilmington, Delaware 19801
302-427-9500
Attorneys for Plaintiff

-and-

LEVY PHILLIPS & KONIGSBERG, LLP
Jerome H. Block, Esq. (NY Id. No.3997145)
Sharon J. Zinns, Esq. (CA Id. No. 241476)
Amber R. Long, Esq. (NY Id. No.4397188)
800 Third Avenue, 13th Floor
New York, NY 10022
Phone: (212) 605-6200
Fax: (212) 605-6290

Dated: May 27, 2008

## CERTIFICATION

**FREDERICK SEITZ**, being duly sworn, deposes and says:

That he is the Plaintiff in the within action, that he has read the foregoing

**PLAINTIFFS' ANSWERS TO INTERROGATORIES DIRECTED TO PLAINTIFFS BY**

**ALL DEFENDANTS AND RESPONSE TO REQUEST FOR PRODUCTION,** and knows

the contents thereof, and that the same is true to the best of his own knowledge.


_____
**FREDERICK SEITZ**

Sworn to before me this
28th day of May, 2008

_____
**NOTARY PUBLIC**

YVONNE M. STEMPLE
NOTARY PUBLIC
STATE OF COLORADO
My Commission Expires 01/25/2012

00117929.WPD

**EXHIBIT A**

## WORK HISTORY – FRED SEITZ

| 1. | Employer: | United States Coast Guard |
| | Address: | Curtis Bay, MD |
| | Period of Employment: | Approx 1944-1945 |
| | Nature of Business: | Construction of coast guard cutters |
| | Job Function: | Electrician's Apprentice |
| | Products: | None |
| | Co-Workers: | Unknown |

2.    Employer:              United States Marine Corps
      Address:               Various
      Period of Employment:  Approx 1946-1967
      Nature of Business:    Military defense
      Job Function:          Airplane and helicopter mechanic/pilot
      Products:              Plaintiff worked on the following aircraft:

- F6 – Hellcat
- F4U – Corsair
- T-28 Trojan
- TBM/TBF – Avenger
- SNB 5 - Expeditor
- F7F-3 Tigercat
- F9F Panther/Cougar
- FJ-4 Fury
- F11F-1 Tiger
- Cessna 180
- Cessna L-19/ 0-1 Bird Dog
- F-4 Phantom
- Piasecki HUP-2 / UH-25B – Retriever (helicopter)
- Ch-46 Sea Knight (helicopter)
- SNJ 2/ SNJ 6

In the course of his work on these aircraft, Plaintiffs worked with a variety of asbestos-containing products including but not limited to: engines and engine components, brakes, brake linings, and other brake parts, clamps, and gaskets

      Co-Workers:            To Be Provided

3.  Employer:                   Bell Helicopter
    Address:                    Kansas City, MO
    Period of Employment:       Approx 1967-1969
    Nature of Business:         Sales and service of helicopters
    Job Function:               Regional Marketing Manager
    Products:                   Plaintiff worked on the following aircraft:
    - Bell 206 Jetranger
    - Bell 47
    - Bell 204
    - ~~Enstrom F28~~    NA
    - ~~Sykorsky S58E~~    NA
    - ~~Sykorsky S62A~~    NA

    In the course of his work on these aircraft,
    Plaintiffs worked with a variety of asbestos-
    containing products including but not
    limited to: engines and engine components,
    brakes, brake linings, and other brake parts,
    clamps, and gaskets

    Co-Workers:                 Unknown

4.  Employer:                   Imperial Airways
    Address:                    St. Paul, MN
    Period of Employment:       Approx 1969-1973
    Nature of Business:         Helicopter repair and conversion
    Job Function:               Executive Vice President
    Products:                   Plaintiff worked on the following aircraft:
    - Bell 206 Jetranger
    - Bell 47J
    - Enstrom F28
    - Sykorsky S58E
    - Sykorsky S62A

    In the course of his work on these aircraft,
    Plaintiffs worked with a variety of asbestos-
    containing products including but not
    limited to: engines and engine components,
    brakes, brake linings, and other brake parts,
    clamps, and gaskets

    Co-Workers:                 To Be Provided

5.  Employer:                   Self
    Period of Employment:       Approx 1973-1974
    Nature of Business:         Financial Consulting
    Job Function:               consultant
    Products:                   Not Applicable
    Coworkers:                  Unknown

6.  Employer:                Dakota Bake and Serve
    Address:                 Jamestown, ND
    Period of Employment:    Approx 1974-1976
    Nature of Business:      Manufacture and distribution of frozen bread products
    Job Function:            Pilot and aircraft maintenance
    Products:                Plaintiff worked on the following aircraft:
                             - Beechcraft B-58 Baron
                             - Beechcraft B60 Duke
                             - Cessna 210
                             - Aerocommander 690A
                             In the course of his work on these aircraft,
                             Plaintiffs worked with a variety of asbestos-
                             containing products including but not
                             limited to: engines and engine components,
                             brakes, brake linings, and other brake parts,
                             clamps, and gaskets
    Co-Workers:              Dwayne Wold — *CHAIRMAN OF THE BOARD*

7.  Employer:                Investors Diversified Service
    Address:                 2345 N. Academy
                             Colorado Springs, CO
    Period of Employment:    Approx 1977-1981
    Nature of Business:      Insurance & Investments
    Job Function:            Investment Advisor
    Products:                Not Applicable
    Co-Workers:              To Be Provided

8.  Employer:                Central Arizona Aviation
    Address:                 Falcon Field Airport, Mesa, AZ
    Period of Employment:    Approx 1986-1988
    Nature of Business:      Aircraft maintenance and repair
    Job Function:            Supervisor and Manager, *CEO*
    Products:                Plaintiff worked on the following aircraft:
                             - Many aircraft from various manufacturers
                             In the course of his work on these aircraft,
                             Plaintiffs worked with a variety of asbestos-
                             containing products including but not
                             limited to: engines and engine components,
                             brakes, brake linings, and other brake parts,
                             clamps, and gaskets
    Co-Workers:              Unknown

**EXHIBIT B**

## MEDICAL HISTORY – FRED SEITZ

1.  Dr. John Mehall
    Dr. Bogaran
    Dr. John ~~Berk~~ *BURKE*
    Penrose Hospital
    2222 N. Nevada Avenue
    Colorado Springs, CO 80907
    Related to diagnosis and/or treatment of mesothelioma
    Starting Approximately January 2007

2.  Dr. Tim ~~Breshahan~~ *BRESNAHAN*
    Air Force Academy Hospital
    Colorado Springs, CO
    Related to diagnosis and/or treatment of mesothelioma
    Starting Approximately late 2006/early 2007

3.  Dr. Sherry
    Memorial Hospital
    Colorado Springs, CO
    Unrelated to diagnosis and/or treatment of mesothelioma
    November 2007

4.  University of Colorado Hospital
    Denver, CO
    Related to diagnosis and/or treatment of mesothelioma
    Approximately January 2008

5.  Peterson Air Force Base Medical Clinic
    Colorado Springs, CO
    Unrelated to diagnosis and/or treatment of mesothelioma
    Approximately 1992/1993

**EXHIBIT C**

### NON-OCCUPATIONAL ASBESTOS EXPOSURE HISTORY – FRED SEITZ

| | | |
|---|---|---|
| 1. | Type of Project/Work: | Airplane mechanic work |
| | Approx Time Period of Exposure: | Throughout adult life |
| | Place of Exposure: | Various Airplane Hangers Near Homes |
| | Products: | Plaintiff worked on the following aircraft: |

- Piper J-3 Cub
- Piper PA-20
- Piper PA-22
- Piper PA-24
- Piper PA-28
- Piper PA-32
- Beechcraft Bonanza
- Navion
- Culver Cadet
- 177 R-G Cessna

In the course of his work on these aircraft, Plaintiffs worked with a variety of asbestos-containing products including but not limited to: engines and engine components, brakes, brake linings, and other brake parts, clamps, and gaskets

MIL-W-5013D(ASG)
6 MAY 1957

Superseding
MIL-W-5013C(ASG)
29 October 1954

MILITARY SPECIFICATION

WHEEL AND BRAKE ASSEMBLIES: AIRCRAFT

This specification has been approved by the Department
of the Air Force and by the Navy Bureau of Aeronautics.

1. SCOPE

1.1 Scope.- This specification covers main wheels, auxiliary wheels, brakes, and
wheel and brake assemblies for all types of military aircraft.

1.2 Classification.- Aircraft landing wheels and auxiliary wheels shall be
furnished in a range of sizes to accommodate the sizes and types of standard casings and
tubeless tires listed in Specification MIL-C-5041, and brakes shall be suitable for use
with the above wheels. Dimensions and other requirements of the wheels and brakes shall
be as specified herein or in accordance with the applicable Air Force design drawings.

2. APPLICABLE DOCUMENTS

2.1 The following specifications, standards, drawings, and publications, of the
issue in effect on date of invitation for bids, form a part of this specification to the
extent specified herein:

SPECIFICATIONS

Federal

| | |
|---|---|
| FF-B-186 | Bearings; Roller |
| NN-P-515 | Plywood, Container Grade |
| QQ-A-596 | Aluminum Alloy, Permanent and Semipermanent Mold Castings |
| QQ-A-601 | Aluminum Base Alloys; Sand Castings |
| QQ-C-320 | Chromium Plating (Electrodeposited) |
| QQ-M-40 | Magnesium Alloy Forgings |
| QQ-M-56 | Magnesium Alloy, Sand Castings |
| QQ-P-416 | Plating, Cadmium (Electrodeposited) |
| QQ-Z-325 | Zinc Plating (Electrodeposited) |
| TT-V-119 | Varnish, Spar, Phenolic-Resin |
| LLL-B-631 | Boxes; Fiber, Corrugated (for Domestic Shipment) |
| LLL-B-636 | Boxes, Fiber, Solid (for Domestic Shipment) |
| PPP-T-60 | Tape; Pressure-Sensitive Adhesive, Waterproof - for Packaging and Sealing |
| PPP-B-585 | Boxes; Wood, Wirebound |
| PPP-B-591 | Boxes, Fiberboard, Wood-Cleated |
| PPP-B-601 | Boxes, Wood, Cleated-Plywood |
| PPP-B-621 | Boxes, Wood, Nailed and Lock-Corner |
| PPP-C-843 | Cushioning Material, Cellulosic |

MIL-W-5013D(ASG)

Military

| | |
|---|---|
| JAN-P-100 | Packaging and Packing for Overseas Shipment - General Specification |
| JAN-P-108 | Packaging and Packing for Overseas Shipment - Boxes, Fiberboard (V-Board and W-Board), Exterior and Interior |
| MIL-P-116 | Preservation, Methods of |
| MIL-B-121 | Barrier-Material, Greaseproofed, Flexible (Waterproofed) |
| JAN-P-125 | Packaging and Packing for Overseas Shipment - Barrier-Materials, Waterproof, Flexible |
| MIL-B-130 | Barrier-Material, Paper, Noncorrosive |
| MIL-B-131 | Barrier Material; Water Vaporproof, Flexible |
| MIL-B-138 | Boxes, Wood, Fiberboard-Lined for Overseas Shipment (for Weight of Contents Not Exceeding 500 Pounds) |
| MIL-A-140 | Adhesive, Water-Resistant, Waterproof Barrier-Material |
| MIL-M-3171 | Magnesium Alloy; Processes for Corrosion Protection of |
| MIL-L-3545 | Lubricating Grease; High Temperature |
| MIL-C-5041 | Casings, Tire and Tubeless Tires; Aircraft Pneumatic |
| MIL-H-5440 | Hydraulic Systems; Design, Installation and Tests of Aircraft (General Specification for) |
| MIL-C-5502 | Couplings; Aircraft Hydraulic Self-Sealing |
| MIL-T-5544 | Thread Compound; Anti-Seize, Graphite-Petrolatum |
| MIL-E-5557 | Enamel; Heat-Resisting, Glyceryl-Phthalate, Black |
| MIL-O-6083 | Oil; Preservative, Hydraulic Equipment |
| MIL-H-6088 | Heat Treatment of Aluminum Alloys; Process for (Aircraft Application) |
| MIL-M-6857 | Magnesium Alloy Castings, Heat Treatment of |
| MIL-I-6868 | Inspection Process, Magnetic Particle |
| MIL-L-6880 | Lubrication of Aircraft, General Specification for |
| MIL-P-6889 | Primer; Zinc-Chromate, for Aircraft Use |
| MIL-V-6894 | Varnish, Oil Type, Gloss Finish, Glyceryl Phthalate Base |
| MIL-L-7178 | Lacquer, Cellulose Nitrate, Gloss, for Aircraft Use |
| MIL-E-7729 | Enamel, Gloss, for Aircraft Application |
| MIL-L-7870 | Lubricating Oil, General Purpose, Low Temperature |
| MIL-A-8625 | Anodic Coatings, for Aluminum and Aluminum Alloys |
| MIL-A-8629 | Airplane Strength and Rigidity |
| MIL-S-8698 | Structural Design Requirements, Helicopters |
| MIL-L-10547 | Liners, Case, Waterproof |
| MIL-C-11796 | Corrosion-Preventive, Petrolatum, Hot Application |
| MIL-C-16173 | Corrosion-Preventive, Solvent Cutback, Cold-Application |

STANDARDS

Military

| | |
|---|---|
| MIL-STD-105 | Sampling Procedures and Tables for Inspection by Attributes |
| MIL-STD-129 | Marking for Shipment and Storage |
| MS33586 | Metals, Definition of Dissimilar |

2

MIL-W-5013D(ASG)

### DRAWINGS

#### Air Force-Navy Aeronautical Standard Drawings

| | |
|---|---|
| AN775 | Bolt – Universal Fitting |
| AN818 | Nut, Coupling |
| AN819 | Sleeve – Coupling |
| AN901 | Gasket – Metal Tube Connection Seal |
| AN6204 | Valve, Hydraulic Bleeder |
| AND10050 | Bosses, Standard Dimensions for Gasket Seal Straight Thread |
| AND10067 | Valve Installation – Hydraulic Bleeder (Standard Dimensions for) |
| AND10598 | Chamfer or Radius – Valve Holes in Airplane Wheel Rims |
| AND10599 | Knurl Detail – Airplane Wheel Rim Flanges |

### PUBLICATIONS

#### Air Force-Navy Aeronautical Bulletins

| | |
|---|---|
| No. 143 | Specifications and Standards; Use of |
| No. 275 | Guide for the Use of Lubricants, Compounds, and Fluids in Aircraft |

#### Air Force-Navy Civil Bulletin

| | |
|---|---|
| ANC-2 | Ground Loads Handbook |

(Copies of specifications, standards, drawings, and publications required by contractors in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

## 3. REQUIREMENTS

3.1 **Preproduction sample.–** Prior to beginning quantity production, preproduction samples shall be subjected to preproduction testing. (See 4.2.1 and 6.2.)

3.2 **Materials.–** Unless otherwise approved by the procuring activity, materials shall be as specified herein or on the applicable Air Force design drawings. Materials which are not specifically designated shall be of the best commercial quality and suitable for the purpose intended.

3.2.1 **Metals.–** All metals used in the construction of wheels and brakes shall be corrosion resistant unless suitably plated or treated to resist corrosion during stocking and normal service life. The use of dissimilar metals, especially brass, copper, or steel, in contact with aluminum, magnesium, or alloys thereof shall be avoided where practicable. For definition of dissimilar metals refer to Standard MS33586.

3.2.1.1 **Aluminum alloy.–** Aluminum-alloy sand castings shall be in accordance with Specification QQ-A-601. Permanent mold castings shall be class 8 in accordance with Specification QQ-A-596. Aluminum alloys shall be heat treated in accordance with Specification MIL-H-6088.

3.2.1.2 **Magnesium alloys.–** Magnesium-alloy wheel sand castings shall conform to Specification QQ-M-56, alloys AZ-63M1 or AZ-92, condition HT. Brake sand castings shall be alloys AZ-63M1 or AZ-92, condition HT or HTA. Magnesium-alloy castings shall be heat treated in accordance with Specification MIL-M-6857. Magnesium forgings shall conform to Specification QQ-M-40.

3

MIL-W-5013D(ASG)

3.2.2 **Selection of materials.-** Specifications and standards for all materials, parts, and Government certification and approval of processes and equipment, which are not specifically designated herein and which are necessary for the execution of this specification, shall be selected in accordance with ANA Bulletin No. 143, except as provided in the following paragraph.

3.2.2.1 **Standard parts.-** Standard parts (MS, AN, or JAN) shall be used wherever they are suitable for the purpose, and shall be identified on the drawing by their part numbers. Commercial utility parts such as screws, bolts, nuts, cotter pins, etc, may be used, provided they possess suitable properties and are replaceable by the standard parts (MS, AN, or JAN) without alteration, and provided the corresponding standard part numbers are referenced in the parts list and, if practicable, on the contractor's drawings. In the event there is no suitable corresponding standard part in effect on date of invitation for bids, commercial parts may be used provided they conform to all requirements of this specification.

3.3 **Design and construction.-**

3.3.1 **Braking capacity.-** The kinetic energy absorption capacity of the brakes of an airplane shall be adequate to accomplish the number of dynamometer stops shown in table I, under the various airplane conditions indicated, without replacement of brake linings or other parts, except as noted. The capacity of an individual brake shall be determined from the landing gear configuration, based on the number of braked wheels and the dynamic loading of each wheel.

3.3.1.1 **Braking capacity calculations.-** The brakes, in conjunction with authorized auxiliary braking devices, shall be able to stop the airplane under the conditions shown in table I. Either of the following methods may be used to determine the energy capacity required of the airplane braking system.

3.3.1.1.1 **Method I.-** The following formula may be used:

$$\text{Kinetic Energy} = CWV^2 \text{ ft lb, in which:}$$

$C = 0.032$ for nose or bicycle gear airplanes and for all helicopters.

$C = 0.026$ for tail wheel airplanes.

$W = $ Weight of the aircraft in pounds under the loading condition being considered.

$V = $ Power-off stalling speed of the aircraft in mph 1/ at the weight W under consideration. A speed of 40 mph shall be used for helicopters, unless otherwise specified by the procuring activity.

1/ If speed is given in knots, convert to mph by multiplying knots by 1.15.

3.3.1.1.2 **Method II.-** Braking capacity required may be calculated by means of a mathematical and graphical analysis based on commonly accepted principles of motion and aerodynamics. The exact presentation may vary with different aircraft, but the following factors should generally be considered, with curves or tables to indicate their effects at various aircraft weights:

4

MIL-W-5013D(ASG)

TABLE I

Wheel brake capacity requirements

| Type of aircraft | Number of dynamometer stops | Rate of deceleration of airplane ft/s/s 1/ | Aircraft weight condition | Energy credit | |
|---|---|---|---|---|---|
| | | | | Reversed propellers | Drag parachute 2/ |
| **Land based:** Bomber Fighter or interceptor Reconnaissance Tankers (refueling) | 45 5 4/ 1 | 10 8 6 | Normal landing gross 0.9 Max alternate gross Max alternate gross | Yes 3/ No No | No Yes Yes |
| **Carrier based:** Fighter Attack | 5/ 100 | 10 | Landing design gross | No | No |
| **Land based:** Patrol or antisubmarine Minelayer | 5/ 100 | 10 | Landing design gross | No | Yes |
| Cargo or transport Ground support | 100 4/ 1 | 10 6 | Normal landing gross Max alternate gross | Yes 3/ No | No Yes |
| Trainer Liaison | 100 1 | 10 6 | Normal landing gross Max alternate gross | Yes 3/ No | No Yes |
| Helicopter | 20 | 6 | Max alternate gross | Not applicable | Not applicable |
| Research and other types not listed | As specified by the procuring activity | | | | |

1/ To be used in connection with method I. If method II is used, airplane deceleration and dynamometer deceleration shall be consistent with computations submitted.
2/ The amount of energy credit shall be specified by the procuring activity in each instance.
3/ If reversed propellers are used in standard landing procedure.
4/ New friction materials may be used for this test, if necessary.
5/ One lining change is permitted for this test.

5

MIL-W-5013D(ASG)

(a) Actual energy of the mass of the airplane at instant of touchdown.

(b) An integration of the kinetic energy added to the airplane by thrust of the airplane's propulsion system during the stop.

(c) An integration of kinetic energy absorbed by aerodynamic drag of the airplane during the stop.

(d) An integration of the kinetic energy absorbed by auxiliary braking devices such as reversible propellers or deceleration parachutes, during the applicable portion of the stop.

(e) An integration of the kinetic energy to be absorbed by wheel brakes during the stop.

(f) Effect of wing lift in reducing the wheel load during the stop, thereby decreasing the torque which can be developed without skidding the tires.

(g) Distribution of load and brake capacity among the various wheels.

(h) Total stopping distance.

(i) Static force available for holding airplane stationary while running up engines.

(j) Appropriate ground winds, airport altitudes, and ambient atmospheric conditions.

3.3.1.1.2.1 · When method II is used, the airplane manufacturer will be required to submit an appropriate analysis acceptable to the procuring activity to obtain approval of the proposed system.

3.3.1.2 Dynamic braking torque.- In the design of brakes, consideration should be given to the maximum torque which can be applied to the brakes, at each instant of the stopping period, without danger of skidding the tires. This torque is a function of airplane speed and wing lift at the pertinent instant, together with the coefficient of friction which can be developed by the tire against the runway surface.

3.3.2 Wheel capacity.- The rated load capacity of each landing wheel or auxiliary wheel on an airplane shall be the maximum static load that the wheel will be subjected to at maximum takeoff weight of the airplane. In cases where auxiliary wheels do not normally support static loads (as in wingtip protection wheels) the wheel capacity will be determined by the procuring activity, based on appropriate dynamic loading calculations.

3.3.3 Detail design.- Wheels and brakes shall conform to the detail requirements of the applicable specifications specified herein and to the applicable drawings. The design of all new wheels shall be of the demountable flange type or of the divided type, to facilitate changing the tire. For demountable flange-type wheels, the demountable flange may be on either the outboard or inboard side of the wheel. All demountable flanges shall be locked to the wheel in a manner that will prevent the removable flange and its retaining device from leaving the wheel in case a flat tire occurs while the wheel is rolling. Every attempt should be made to so design wheels and brakes that they cannot be improperly assembled or improperly installed on the airplane. Brakes shall be so designed, when possible, that the cylinders and mounting bolt holes may be bushed to correct for wear or corrosion of the basic material.

3.3.3.1 Hydraulic fluid.- Brakes shall be designed for use with the hydraulic fluid specified by the procuring activity for the particular application.

6

3.3.3.2   Bearings.- Unless otherwise specified by the procuring activity, the bearings shall be of the tapered roller type, Timken or equivalent, conforming to grade IV of Specification FF-B-186.

3.3.3.2.1   Bearing seats.- The design of all new wheels shall be such that steel bearing seats may be incorporated if found necessary.

3.3.3.3   Lubricant and lubricant retainers.- Suitable retainers shall be provided to prevent lubricant from reaching the braking surface and to prevent foreign matter from entering the bearings.  The retainers shall be removable to allow for cleaning and greasing of bearings.  Applicable requirements of Specification MIL-L-6880 and ANA Bulletin No. 275 shall be observed.  Grease conforming to Specification MIL-L-3545, shall be used to lubricate wheel bearings.  When felt grease seals are used, they shall be lubricated with No. 10 light machine oil conforming to Specification MIL-L-7870 prior to shipment, to prevent absorption of water and consequent corrosion of mating parts.

3.3.3.4   Lubrication fittings.- Except as otherwise provided herein for amphibian application and beaching-gear application, wheels shall not be fitted with pressure-type lubrication fittings.

3.3.3.5   Inlet and bleeder fittings.- Brake inlet fittings, threads, and bosses shall be in accordance with Specification MIL-H-5440.  Brake bleeder valves shall conform to Drawing AN6204, installed in a boss in accordance with Drawing AND10067.  Provisions for self-sealing couplings conforming to Specification MIL-C-5502 shall be made on all brakes which must be removed before the wheel can be removed.  However, unless otherwise specified, the self-sealing couplings shall not be furnished as part of the brake assembly.  A typical brake inlet and bleeder installation is shown in figure 1.  In suitable designs, a bolt incorporating the bleeder valve may be used in lieu of an AN775 bolt, provided that the bolt used is interchangeable with an AN775 bolt in all other respects.  Whenever possible in aluminum or magnesium brakes, the inlet boss shall be provided with a steel thread insert to prevent damage to the threads in the softer metal.

3.3.3.6   Fairing.- Wheels and brakes shall be suitably formed to provide external contours as smooth and free from projections as is practicable.  Unless specifically stated by the procuring activity, wheels shall be furnished without fairings or provisions for fairings.  Brakes may also be furnished without dust covers, except in cases where the brake design is such that covers or fairings are necessary to prevent entrance of dirt or stones that may adversely affect brake operation or service life.  Where fairings are used, the means of attachment shall be such as to permit rapid removal and shall involve no loose parts.  An access hole with cover shall be provided at the valve stem where more than six fasteners are employed in attaching an outer wheel fairing.  Fairings shall be preferable recessed into the wheel contour to provide minimum overall width for wheel and fairing assembly.

3.3.3.7   Operating temperatures.- Wheel and brake assemblies shall be designed for satisfactory operation at all ambient temperatures in the range from -65° to +160°F (-54° to +71°C).

3.3.3.8   Rim contours.- The wheel rim contour shall conform to the AND rim contour drawing for the particular casing listed in Specification MIL-C-5041.  In cases where AND drawings do not exist, the rim contour shall conform to the Air Force design drawing or to the one recommended by the Tire and Rim Association.  If the wheel is for use with a conventional casing and tube or both casing and tube and tubeless tire, the valve hole location and dimension shall conform to the requirements of the applicable AND rim contour drawing; or the Air Force design drawing; or as recommended by the Tire and Rim Association.  Valve hole chamfer or radius shall conform to Drawing AND10598.  If the wheel is for use with only a tubeless tire, the valve installation shall form a part of the wheel assembly.  It shall use a standard core and cap and shall be conveniently usable with standard inflating and gaging chucks.  The location of the inlet

7

MIL-W-5013D(ASG)

into the tire shall be : shown on the applicable AND rim contour drawing, or the Air Force design drawing, or is recommended by the Tire and Rim Association. If the wheel is for use with both a casing and tube and a tubeless tire, the wheel manufacturer shall provide and make available a valve suitable for use with a tubeless tire. When practicable, an AN valve shall be used. Whether or not this valve is furnished with each wheel, shall be as specified by the procuring activity.

3.3.3.9 _Knurling._- Unless otherwise specified, rim flanges of all wheels, except type VII and those mounting tubeless tires, shall be knurled to prevent tire slippage, in accordance with Drawing AND10599 or the applicable Air Force design drawing.

3.3.3.10 _Static balance._- Wheel assemblies shall be statically balanced within the limits specified in figure 2 to the nearest whole ounce-inch. The method of balancing shall be such that the limits of the assembly unbalance will not be exceeded by changing major portions of the rotating assembly, such as brake drums or demountable flanges. Split wheels shall be balanced in a manner to prevent unbalancing beyond the specified limits, by assembling the two wheel halves in alternate positions or by assembling halves of different wheels. Balance weights shall be securely attached in such a manner that wheel performance will not be impaired. Balance for wheels mounting tubeless tires shall be checked with the valve removed.

3.3.3.11 _Brake release._- The brake release mechanism shall be designed to provide clearance between braking surfaces at a pressure not less than 110 percent of the maximum back pressure at the brake inlet on the airplane.

3.3.3.12 _Design for amphibious aircraft._-

3.3.3.12.1 _Watertight sealing._- Provision shall be made to seal the wheels of amphibious aircraft to prevent entrance of water to the wheel bearings or other portions of the wheel or brake, where the presence of water might be detrimental. Unsealed wheel and brake assemblies will be permitted if all exposed materials therein are corrosion resisting and the design is such that brake action and service life will not be impaired by the presence of sea water or fresh water.

3.3.3.12.2 _Lubricant and lubricant retainers._- Suitable retainers shall be provided to prevent lubricant from reaching the braking surface. Excess lubricant will be permitted to enter the hub cavity between the bearings, or the hub cavity between the bearings may be completely filled with water-resistant grease in accordance with Specification MIL-L-3545, in order to exclude the water.

3.3.3.13 _Design for beaching-gear application._-

3.3.3.13.1 _Watertight sealing._- Provisions shall be made to seal beaching-gear wheels to prevent entrance of water to the wheel bearings or other portions of the wheel or brake where the presence of water might be detrimental. Unsealed brake assemblies will be permitted if all exposed materials therein are corrosion resisting and the design is such that brake action and service life will not be impaired by the presence of sea water or fresh water.

3.3.3.13.2 _Removal and storage._- Provision shall be made for the removal and storage of the wheel and the brake assemblies as an integral unit. Self-sealing couplings conforming to Specification MIL-C-5502, shall be used for the hydraulic brake line connections.

3.3.3.13.3 _Lubricant and lubricant retainers._- Suitable retainers shall be provided to prevent lubricant from reaching the braking surface. Excess lubricant will be permitted to enter the hub cavity between the bearings, or the hub cavity between the bearings may be completely filled with water-resistant grease in accordance with Specification MIL-L-3545, in order to exclude the water.

8

MIL-W-5013D(ASG)



FIGURE 1. Hydraulic brake inlet and bleeder fitting

MIL-W-5013D(ASG)



FIGURE 2.    Allowable static unbalance

3.3.3.13.4   Lubrication fittings.- Pressure-type lubrication fittings may be used for greasing the wheel bearings, filling the cavity between the bearings, or filling a seal to prevent water from entering the brake.

3.4   Drawings.- The manufacturer shall submit design drawings to the procuring activity for approval, prior to fabrication. The drawings shall contain or be accompanied by the following information as applicable, labeled "actual" or "estimated":

    (a)  Wheel weight.
    (b)  Brake weight.
    (c)  A curve of brake pressure versus displacement showing the following:

        (1)  Initial pressure to start brake movement.
        (2)  Initial pressure to cause contact between braking surfaces.
        (3)  Displacement versus pressure for new brake and for worn brake at approximately 70°F.
        (4)  Displacement versus pressure for new brake and for worn brake, after heating, by means of a full-energy brake application.
        (5)  Normal operating pressure, normal parking pressure, and maximum operating pressure, as defined in 6.3.

3.5   Protective treatment.-

3.5.1   Steel parts.- Unless otherwise specifically authorized by the procuring activity, all steel parts shall be cadmium-plated in accordance with Specification QQ-P-416, or zinc-plated in accordance with Specification QQ-Z-325, except that:

    (a)  Corrosion-resisting steel parts need not be plated.
    (b)  Brake disks or brakedrums shall not be cadmium- or zinc-plated. Such surfaces shall be thoroughly cleaned and protected by one coat of zinc-chromate primer, in accordance with Specification MIL-P-6889, or other surface treatments subject to the approval of the procuring activity.
    (c)  Other parts which, in service, reach temperatures detrimental to plating, need not be plated. Zinc plating shall not be used on parts the temperature of which may reach 600°F or more in service.
    (d)  Springs and other parts on which plating is not practicable need not be plated.
    (e)  Chromium plating in accordance with Specification QQ-C-320, may be used where such a surface is necessary for or beneficial to the functioning of the part.

When plating cannot be applied, the surface shall be thoroughly cleaned and protected by at least one coat of zinc-chromate primer conforming to Specification MIL-P-6889. Insofar as practicable, the primer shall be applied prior to assembly. Paint shall not be applied to brake-lining material or bearing race surfaces, to parts which are constantly immersed in or covered with oil, or to surfaces where paint would impair proper functioning.

3.5.2   Aluminum and aluminum-alloy parts.- All aluminum and aluminum-alloy parts, except pistons, shall be anodised in accordance with the requirements of Specification MIL-A-8625. Pistons shall be hard anodised (Alumilite 226, MHC, or equivalent) to reduce galling. In addition, the exterior surfaces shall be protected with one coat of zinc-chromate primer in accordance with Specification MIL-P-6889, a minimum of one coat of enamel in accordance with Specification MIL-E-5557 or MIL-E-7729, or one coat of aluminised varnish in accordance with Specification TT-V-119 or MIL-V-6894, or two coats of lacquer in accordance with Specification MIL-L-7178. The color of the topcoats

MIL-W-5013D(ASG)

shall be aluminum. Paint shall not be applied to parts which are constantly immersed in oil or covered with oil. During the surface treatment, each protective coating shall be sufficiently dried before application of the succeeding coating. Paint need not be applied to surfaces where it would affect proper functioning. Alternate treatment may be used when authorized by the procuring activity.

3.5.3    Magnesium-alloy parts.- Magnesium-alloy parts shall receive surface treatment in accordance with Specification MIL-M-3171, type II, III, or IV. Where the surface treatment on magnesium-alloy parts is damaged during assembly, it shall be touched up in accordance with Specification MIL-M-3171, type I. In addition, all magnesium-alloy surfaces shall be finished with two coats of zinc-chromate primer in accordance with Specification MIL-P-6889, as well as a minimum of one coat of enamel in accordance with Specification MIL-E-5557 or MIL-E-7729, or one coat of aluminized varnish in accordance with Specification TT-V-119 or MIL-V-6894, or two coats of lacquer in accordance with Specification MIL-L-7178. The color of the topcoats shall be aluminum. The first coat of primer shall be applied to magnesium-alloy parts which are free of dust and corrosion. Paint need not be applied to parts which are constantly immersed in oil or covered with oil. Each protective coating shall be sufficiently dried before application of the succeeding coating. Paint need not be applied to surfaces where it would impair proper functioning. For demountable flange-type wheels, the portion of the hub on which the demountable flange rests, and the inner surfaces of the demountable flange, shall be primed but need not be painted. Alternate treatment may be used when authorized by the procuring activity.

3.5.4    Bearings and braking surfaces.- The bearings and braking surfaces shall be protected during the application of finish to the wheels and brakes.

3.5.5    Operating cylinders.- Prior to Acceptance tests, the cylinders shall be suitably cleaned to remove all metal particles and other foreign matter. All Acceptance testing shall be done using oil conforming to Specification MIL-O-6083 in the cylinders. Alternate oils may be used upon written authorization of the procuring activity. Upon completion of the tests, the excess oil shall be drained, but a protective film of that oil shall be allowed to remain in the cylinders. The cylinders shall then be suitably capped to prevent leakage of the preservative oil.

3.5.6    Insulation of dissimilar metals.- Components of dissimilar metals in contact shall be insulated by the application of at least one primer coat to one of the components prior to assembly. Zinc-chromate primer paste of suitable consistency may be substituted for the zinc-chromate primer. Dissimilar metals are defined by Standard MS33586. Primer need not be applied to bearing cups or bearing cup seats, before cup installation, to parts which are constantly immersed in or covered with oil, or to surfaces where primer would impair proper functioning.

3.6    Performance.- The wheels and brakes shall satisfy the material, dimensional, and performance requirements specified in section 4, when subjected to the applicable tests.

3.7    Special tools.- The design shall be such that special or unusual tools shall not be required for installation or removal, or for normal maintenance and inspection of the wheels and brakes. The design shall provide to the greatest possible extent for the disassembly, reassembly, and service maintenance by means of those tools and items of maintenance equipment which are normally available as commercial standard. Designs requiring specially designed items of maintenance tools and equipment shall be kept to a minimum.

3.8    Identification of product.-

3.8.1    Wheel marking.- Wheels shall be stamped, or shall carry a nameplate or cast lettering to provide the following information:

12

MIL-W-5013D(ASG)

(a) Size and type.
(b) Serial No.
(c) Manufacturer's name and Drawing No.
(d) Date of manufacture (which may be combined with serial number).
(e) Divided-type wheels shall carry a caution note, to require deflation of the tire before loosening of the wheel tie bolts.
(f) Divided-type wheels shall carry a suitable note, to clearly describe the method and torque values used in tightening the wheel tie bolts. Where dry threads are intended, the note should read 'Torque tie bolts to _____ pound feet.' Where lubrication is required, the note should read, 'Lubtork to _____ pound feet.' Where Lubtork is used, it shall mean that the bolt threads, and bearing surfaces of the nut, bolt head, and washers shall be lubricated with Specification MIL-T-5544 antiseize compound, with relubrication for each subsequent torque application. The Lubtork method is preferred.

3.8.2  Brake marking.- Brakes shall be stamped or carry a nameplate or cast lettering to provide the following information:

(a) Manufacturer's name and Drawing No.
(b) Date of manufacture (which may be combined with serial number).
(c) Serial No.
(d) Brakes which cannot be used interchangeably shall be marked left-hand, right-hand, inboard, or outboard, as applicable

3.8.3  Location of marking.- At least the manufacturer's part numbers shall appear on wheels and brakes to be read directly, except with designs incorporating an internal brake where no part of the brake is exposed, in which case the marking of both wheel and brake shall be submitted to the procuring activity for approval. When practicable, the drawing number shall be so located as to be readable after assembly of the part in the complete unit.

3.8.4  Part and subassembly marking.- Each part and subassembly except the following shall be marked with the appropriate part or subassembly drawing numbers.

(a) Those which are permanently assembled by welding, brazing, soldering, or riveting. These shall carry the subassembly drawing number.
(b) Those which do not have suitable or sufficient surface for the drawing number.

3.8.5  Type of marking.- Markings shall be of such character that they will not be obliterated or effaced as a result of service usage.

3.8.6  Other marking.- The Services may specify or permit other markings required for identification or instruction.

3.9  Workmanship.- Workmanship and finish shall be in accordance with high-grade aircraft wheel and brake manufacturing practice.

3.9.1  Castings.- Castings shall be of high quality, clean, sound, and free from blowholes, porosity, or surface defects caused by slag inclusions, except that loose sand or entrapped gases may be allowed when the serviceability of the castings has not been impaired and the Inspector is convinced that the defects are due to the character and form of the casting, and not to improper foundry control.

3.9.2  X-ray control.- Aluminum- and magnesium-alloy castings shall have X-ray control in accordance with the applicable material specification when a new foundry source is established, when new size or shape castings are made, when a change is made in foundry technique, or when otherwise considered necessary by the Inspector.

13

MIL-W-5013D(ASG)

3.9.3  Rim surfaces.- The surface of the rim between bead seats shall be free from defects or casting protrusions which will be injurious to the inner tube. Acceptable depressions in rim or bead seats which might injure the tube or casing shall be filled with a hard-surface filler before the primer coat is applied. No holes which extend entirely through the casting shall be filled in this manner, but shall be drilled out and filled with a flush plug, subject to the approval of the Inspector.

3.9.4  Rivets.- When rivets are used, they shall be well headed over and evenly spaced, and rivets coming in contact with the casing or tube shall be flush with the rim surface.

3.9.5  Smoothness of surfaces.- Machined surfaces, prior to application of surface coatings, shall have the following surface finish:

| Part of wheel | Surface roughness microinch rms max |
|---|---|
| (a)  Radii between rim flanges and bead seats | 20 |
| (b)  Radii between knurling and outside diameter of flange | 100 |
| (c)  Bead seats | 40 |
| (d)  Rim surface between bead seats | 250 |
| (e)  Recesses for bearing cups (preferably burnished) | 40 |
| (f)  Lock ring grooves and similarly stress radii | 20 |

In lieu of the surface finish specified, alternate processing methods may be used in the areas noted, subject to the approval of the procuring activity. Except as specified above, surfaces of nonmachined sections of the wheel, such as spokes, ribs, and rims between bead seats, shall be of reasonably fine-grained appearance and free from coarse or rough spots. Burrs and fins shall be removed by filing or grinding.

4.  QUALITY ASSURANCE PROVISIONS

4.1  Classification of tests.- The inspection and testing of wheel and brake assemblies shall be classified as follows:

(a)  Preproduction tests  (see 4.2).

(b)  Acceptance tests  (see 4.3).

4.2  Preproduction tests.-

4.2.1  Sampling instructions.- The Preproduction samples representative of the production assembly shall be as specified by the activity responsible for testing. Samples shall be tested in a place and manner designated in the contract, purchase order, or invitation for bids.  (See 6.2 (e).)

14

4.2.2    Tests.- Preproduction tests shall consist of all the tests of this specification, as described under "Test methods." In the event Preproduction tests are authorized to be conducted by the contractor or by a commercial laboratory having suitable equipment, complete test reports, as witnessed and validated by the Government Inspector, shall be submitted for the approval of the activity responsible for granting preproduction approval or of the airplane manufacturer, as applicable. One copy of the test report shall also be forwarded to the Navy Bureau of Aeronautics when the wheel and brake are designed for use on Navy aircraft.

4.2.2.1    Test fittings.- Test wheel and brake assemblies shall be equipped with necessary inlet fittings and adapters, and with chromel-alumel thermocouple leads for measuring temperatures of critical portions of the wheel and brake.

4.3    Acceptance tests.-

4.3.1    Tests of materials and parts.- Materials and parts used in the manufacture of wheels and brakes shall be subjected to the following tests, as described under "Test methods":

        (a)  Examination of product.
        (b)  Materials test.
        (c)  Castings inspection.

4.3.2    Test of wheel assemblies.- Each completed wheel assembly shall be subjected to Examination of product, and sample wheels selected at random as specified in 4.4.4, shall be inspected for runout as described in the following test under "Test methods":

        (a)  Radial and lateral runout.

4.3.3    Tests of brake assemblies.- Each completed brake shall be subjected to the following tests, as described under "Test methods":

        (a)  Examination of product.
        (b)  Leakage test.
        (c)  Functional test.

4.3.4    Rejection and retest.- Wheel and brake assemblies which have been rejected may be reworked or replaced to correct the defects and resubmitted for acceptance. Before resubmitting, full particulars concerning previous rejection and the action taken to correct the defects found in the original shall be furnished the Inspector. Units rejected after retest shall not be resubmitted without specific approval of the procuring activity.

4.4    Test methods.-

4.4.1    Examination of product.- Each wheel and brake shall be carefully examined to determine conformance with this specification with respect to material, workmanship, finish, dimensions, construction, surface conditions, and marking. This examination shall cover all requirements not specifically covered by other tests specified herein.

4.4.2    Materials test.- Samples of materials used in the manufacture of wheels and brakes shall be selected in the manner and quantity, and subjected to the tests, as specified in the detail material specification.

MIL-W-5013D(ASG)

4.4.3  Castings inspection.- Inspection shall be conducted after machining and filing and prior to application of any surface, primer, or protective coating. All castings shall be carefully examined for cracks, particularly about the internal reinforcing webs, using a good light and magnifying glass, where possible. A suitable production test shall be accomplished on all wheel castings intended for use with tube-less tires, to demonstrate their adequacy to retain rated operating tire pressures.

4.4.4  Radial and lateral runout.- The radial runout of bead seats, and the lateral runout of the rim flanges shall not exceed the following values:

    (a)  Bead seat runout (radial) shall not exceed 0.005 inch +0.0005 inch per inch of bead seat diameter.

    (b)  Lateral runout of the rim flanges shall not exceed 0.002 inch +0.001 inch per inch of bead seat diameter.

Indicator readings shall be taken on the fixed flange, or flanges, and as close to the flange knurl as possible. Readings shall be taken with bearing cups installed, and with cones of the same part number as shown on the original approved drawing or on the applicable Air Force design drawing. The number of sample wheels shall be selected in accordance with the procedure outlined in Standard MIL-STD-105 using Inspection Level III and an Acceptable Quality Level of 1.2 to 2.2. For purposes of applying the acceptance-rejection features of Standard MIL-STD-105, a defective is a wheel having any one runout reading in excess of the above specified limits.

4.4.5  Magnetic inspection.- All magnetizable, highly stressed parts of wheel and brake assemblies shall be subjected to magnetic inspection in accordance with Specification MIL-I-6868.

4.4.6  Radial load test.- The Radial load test shall be performed by applying the load to the wheel through a tire filled with air or water under the inflation pressure specified in Specification MIL-C-5041. If the tire is filled with water, the water shall be bled off during loading to maintain the same tire deflection that would result if air inflation were used. The load shall be applied equally on both sides of the wheel hub to a straight axle passing through the hub. The tire shall be loaded directly against a flat, nondeflecting surface. During this test, the bearing cups and cones may by replaced by solid bushings if desired. When testing a wheel that is mounting a tube-less tire, there shall be no evidence of leakage through the wheel or past the wheel seal during the test. Deflections and permanent set readings shall be taken at a suitable point on the wheel to indicate deflections of the wheel rim at the bead seat. The use of strain gages or special coatings to indicate regions of high stress is desirable. There shall be no evidence of failure under these conditions. The required radial load shall be determined as follows:

    (a)  Air Force wheels: As specified on applicable Air Force design drawings. For helicopter wheels, the wheel shall support the design yield radial load specified by the procuring activity. The design yield radial load on one wheel equals the critical limit radial load on a wheel at the maximum design gross weight.

        The load shall then be increased to the design ultimate radial load, which is 150 percent of the design limit load.

MIL-W-5013D(ASG)

(b) Navy wheels: The wheel shall support the design yield radial load specified by the airplane contractor. The design yield radial load on one wheel equals 1.15 times the critical limit radial load on a wheel at the landing design gross weight or the takeoff gross weight during catapulting, whichever is more critical, as determined by Specification MIL-A-8629 and Handbook ANC-2. Successive loadings shall not cause radial permanent set increments of increasing magnitude, and the permanent set increments caused by the third loading shall not exceed 5 percent of the total deflection under that load. The load shall then be increased to the design ultimate radial load (150 percent of the design limit load). This load shall be supported for not less than 10 seconds without failure of the wheel.

4.4.7 Side load test.- The side load shall be applied to each side and in a direction parallel to the axis of the hub, by means of a block to the side of the tire, with the tire inflated with air or water to a pressure high enough to prevent movement of the tire beads under the load. The load shall be applied uniformly to the block which may cover an arc of not more than 60 degrees and whose centroid falls on a point midway between the rim flange outside diameter and the maximum inflated tire outside diameter specified in Specification MIL-C-5041. Indicators shall be suitably placed to measure the deflection of the wheel under the load, and the deflection 180 degrees from the load. During this test, the bearing cups and cones may be replaced with solid bushings if desired. There shall be no evidence of failure. A conventional tire may be used when testing a tubeless wheel only when it has been demonstrated that pressure will be lost due to the inability of a tire bead to remain properly positioned when under load. Under these circumstances, the necessary valve hole may be added to the test article. When the tubeless tire is used for this test, there shall be no evidence of leakage through the wheel or past the wheel seal. The side loads to be applied shall be determined as follows:

(a) Air Force wheels: As specified on the applicable Air Force design drawings, or as specified by the procuring activity.

(b) Navy wheels: Side load tests for Navy wheels are not required.

4.4.7.1 Combined radial-side load tests for Navy wheels.- The method of load application shall be as approved by the Bureau of Aeronautics. Loads shall be applied in both inboard and outboard directions and at an angle and magnitude determined by the airplane contractor to demonstrate compliance with paragraphs titled "Ultimate strength for rolled attitude landings" and "Ultimate strength for drift landings" of Specification MIL-A-8629 (airplane wheels) or paragraph titled "Landing" of Specification MIL-S-8698 and Handbook ANC-2 (helicopter wheels). The same requirements for the number of load applications, permanent set, leakage or evidence of failure as specified in Radial load test (4.4.6), shall apply. The bearing cups and cones may be replaced by solid bushings during the conduct of this test if desired.

4.4.8 Burst test.- The Burst test load shall be applied to the wheel by means of hydrostatic pressure in the tire. A conventional tire may be used when testing a tube-less tire wheel by adding the necessary valve hole to the test article. Airplane wheels shall be tested to a burst pressure of 3.5 times the rated tire pressure at the rated static load of the wheel. Helicopter wheels shall be tested to a burst pressure producing not less than three times the axial load which results from the tire pressure required for the static wheel load at the design gross takeoff weight. NOTE: this requirement is intended to permit allowance for tire growth at the high burst test pressures.

17

MIL-W-5013D(ASG)

4.4.9   Roll test.- The Roll test shall consist of a series of landings or a continuous roll of the tire and wheel assembly against a rotating flywheel. There shall be no cracks or evidence of failure as a result of this test. Tubeless tires shall be used when testing tubeless wheels. Tires shall be inflated, as necessary, to maintain a static deflection on the flywheel equal to the nominal deflections noted in tables I through VI of Specification MIL-C-5041. The test conditions shall be as follows:

    (a)  Air Force wheels: Specified on applicable Air Force design drawing.
    (b)  Navy wheels: 1,000 miles under a load not less than the airplane basic takeoff design gross weight divided by the number of main landing gear wheels. Roll test of beaching-gear wheels is not required.
    (c)  All helicopter wheels shall be rolled 250 miles under a load not less than the static wheel reaction based on the helicopter design gross takeoff weight.

4.4.10   (Not applicable to Navy.) When the static test loads specified in the specification or applicable drawing are not consistent with imposed loads on the airplane, alternate loads and test procedures may be worked out to the satisfaction of the procuring activity.

4.4.11   Dynamic torque test.- The Dynamic torque test shall be conducted on an Inertia Brake Testing Machine at the Wright Air Development Center, Mechanical Test Laboratory, Wright-Patterson Air Force Base, Ohio, or on similar approved equipment at the option of the procuring activity. The Dynamic torque test shall be in accordance with the conditions outlined on the applicable specification drawing or in the procurement specifications. Unless otherwise specified, the number of stops, and rates of deceleration, will be computed as outlined in section 3. The wheel and brake shall satisfactorily complete the prescribed test without failure or replacement of any parts, except as noted in table I. Tubeless tires shall be used when testing tubeless wheels. The Dynamic torque test shall be in accordance with the following procedure:

    (a)  Proper kinetic energy values shall be determined from the applicable specification drawing or procurement specification, or from appropriate calculations in accordance with section 3.
    (b)  A flywheel weight that will give an inertia equivalent approximately equal to, but not less than, the weight of airplane per brake shall be selected. (The inertia equivalent weight at the periphery of any flywheel is assumed equal to the weight of the flywheel multiplied by the square of its radius of gyration, and divided by the square of the flywheel radius.)
    (c)  The flywheel speed at application of brake shall be determined as that peripheral speed which, under the chosen flywheel weight, will give the required kinetic energy.
    (d)  The time in seconds allowed for the brake to bring the flywheel from the above condition to rest is determined by dividing the airplane landing velocity (in feet per second) by the specified rate of deceleration (in feet per second per second). For tail-wheel type airplanes, the landing speed is assumed equal to the stalling speed. For nose-wheel airplanes, the landing speed is assumed to be 10 percent above the stalling speed. The airplane stalling speed in each case shall be with power off, and flaps and landing gear down.

18

MIL-W-5013D(ASG)

(e) During the course of the Dynamic torque test, the brake pressures required to develop static torque corresponding with the maximum wheel load at 0.55 ground coefficient shall be determined under the following temperature conditions:

(1) With brake at room temperature, approximately 70°F.
(2) With brake heated by a full energy stop, and with static torque test applied as soon as possible after completion of that stop.

(This test may be conducted by applying a tangential force at the rolling radius of the tire.)

(f) During the course of the Dynamic torque test, the following data shall be recorded:

(1) Weight and description of wheel, brake, casing, and inner tube used.
(2) Flywheel diameter, inertia equivalent, speeds, and kinetic energies.
(3) Description of cooling method and cooling time.
(4) Wheel load.
(5) Brake operating pressure (or force) for each stop.
(6) Average dynamic torque for each stop.
(7) Stopping time for each stop.
(8) Temperature of operating parts, when available.
(9) Static torque information.
(10) Fluid displacement for new brake and for brake worn to maximum allowable clearance at room temperature, and with brake heated to maximum operating temperature, for each wear condition.
(11) Temperature of hydraulic fluid in pressure cavities.
(12) Tangential force at circumference of tire required to rotate wheel, with brake pressure released, after completion of every fifth stop. This reading may be omitted where no noticeable brake drag is present.
(13) Time for wheel, brake, and tire assembly, landed against flywheel, required to stop flywheel from an initial landing speed of 30 mph. This observation should be made after every fifth stop, except that it may be omitted when no noticeable brake drag is present.
(14) Brake operating clearance prior to test and at least four times during the test.
(15) Thickness of linings at beginning and at end of test.
(16) Ability of tubeless tire wheels to retain air satisfactorily under braking conditions.
(17) Any other information that will be of assistance to ultimate users of the wheel and brake assembly.

4.4.12 Structural torque test.- The brake shall be actuated at twice the normal operating pressure, or force, in the case of a mechanical brake, or the maximum safe operating pressure, whichever is higher. Tangential load shall then be applied at the rolling radius of the tire until the wheel slips, or until the applied tangential load equals 1.2 times the maximum rated static load of the wheel, whichever occurs first. Should the wheel slip first, the friction surfaces of the brake may be bolted or clamped together or otherwise restrained to withstand the required tangential load of 1.2 times the maximum rated static load of the wheel. The wheel and brake shall withstand the Structural torque test without failure.

19

MIL-W-5013D(ASG)

4.4.13  Leakage test.- The brake shall be parked for a period of 5 minutes with an applied operating pressure equal to 1-1/2 times the maximum operating pressure. The brake shall then be parked for a period of 5 minutes with an applied pressure of 5 psi. There shall be no evidence of leakage or permanent set during these tests. When performed as a Preproduction test, the brake shall be filled with the hydraulic fluid for which the brake was designed. When this test is used for acceptance, the brake shall be filled with oil conforming to Specification MIL-O-6083. Alternate Acceptance test processes, using air pressure on assemblies submerged in water may be used upon written authorization of the procuring activity.

4.4.14  Static pressure test.- The brake shall be parked for a period of 5 minutes with an applied operating pressure equal to twice the maximum operating pressure. The test shall be conducted with linings having a thickness comparable to the maximum permissible wear. There shall be no leakage or failure during this test. Pressure shall then be increased until failure occurs, and the ultimate pressure shall be recorded.

4.4.15  Endurance.- The hydraulic brake shall be subjected to 100,000 cycles of application and release of pressure equal to normal operating pressure, and 5,000 cycles at a pressure equivalent to the maximum operating pressure. This test shall be conducted using a minimum clearance equivalent to the maximum clearance allowable between adjustments. The first portion of the test may be divided into four parts, such that 25,000 cycles may be applied at each of four positions of brake piston travel conforming to 25 percent, 50 percent, 75 percent, and 100 percent travel, respectively. The rate of cycling shall be not greater than 30 cpm. There shall be no evidence of leakage or other malfunctioning during or upon completion of this test. Alternate endurance tests may be used upon written authorization of the procuring activity.

4.4.16  Extreme temperature test.-

4.4.16.1  Aging and heat test.- The brake, filled with operating fluid, shall be subjected to a temperature of 160°F (71°C) in a thermostatically controlled oven for 7 days, with pressure equal to normal parking pressure. Immediately after removal from the oven, while still at elevated temperature, the brake shall be cycled five times at normal operating pressure. There shall be no evidence of leakage. Where warranted, deviation from the aging temperature and the time specified above may be granted upon presentation of substantiating data to the activity responsible for approval.

4.4.16.2  Cold test.- Upon completion of the Aging and heat test (4.4.16.1), the brake, filled with operating fluid under atmospheric pressure, shall be subjected to a temperature of -65°F (-54°C) for a period of 72 hours. There shall be no leakage during this period. At the end of this period, the brake shall be cycled five times at normal parking pressure under such conditions that fluid entering the brake will be at a temperature of -65°F (-54°C). The brake clearance shall be checked between each cycle to insure that the brake releases completely. The time required for the brake to release completely shall be noted. Upon completion of the Cold test, the brake shall satisfactorily pass the Leakage test (4.4.13).

4.4.17  Tubeless wheel pressure test.-

4.4.17.1  Static test.- The tubeless tire and wheel assembly shall be inflated to a pressure of 1.5 times the rated inflation pressure and when immersed in water, shall show no signs of leakage as evidenced by bubbles.

4.4.17.2  Diffusion test.- The tubeless tire and wheel assembly shall hold the normal inflation pressure for 24 hours with no greater pressure drop than 5 percent. This test shall be performed after the tire growth has stabilized in accordance with Specification MIL-C-5041.

20

MIL-W-5013D(ASG)

4.4.17.3   Dynamic pressure test.- The tubeless tire and wheel assembly shall be rolled under the load specified by the Roll test (4.4.9) for 25 miles with no pressure drop greater than 5 percent of 5 psi, whichever is less. Mileage accumulated during this test may be used in computing the total mileage in the Roll test.

4.4.17.4   Wheel preproduction approval limitation.- Wheels designed and preproduction approved for tubeless tire use, when used with conventional tire and tube, shall require no further test except the customary mounting tests.

4.4.18   Brake return pressure.- Tests shall be conducted before and after the Endurance test (4.4.15) to determine the minimum hydraulic pressure, or force, in the case of mechanical brakes, to bring the braking surfaces into contact. Tests shall likewise be conducted to determine the minimum pressure or force at which the braking surfaces disengage on release of pressure. The tests shall be conducted with the brake mounted on the torque flange of a horizontal axle, with the wheel assembled. The braking surfaces shall disengage on release of pressure at all pressures below that specified on the applicable design drawing.

4.4.19   Service test.- The right is reserved to require suitable service tests of wheels or brake prior to granting of preproduction approval. This test will consist of a series of flight tests or taxi tests with the equipment installed on the airplane for which it was designed.

4.4.20   Functional test.- Each completed brake submitted for acceptance under contract shall be subjected to a functional test for which written approval of the procedure has been received from the procuring activity.

5.   PREPARATION FOR DELIVERY

5.1   Application.- The requirements of section 5 apply to direct purchases by or direct shipments to the Government. They shall also apply to shipments to airframe contractors for installation on military aircraft.

5.2   Wheel assemblies.-

5.2.1   Preservation and packaging.-

5.2.1.1   Spare wheel assemblies.- For shipment of spares to Government depots, and for overseas shipment, each wheel assembly, except for bearings and retaining parts, shall be preserved in accordance with method I of Specification MIL-P-116, using compound conforming to Specification MIL-C-11796, class 3, or MIL-C-16173, grade 3, on all exposed metal surfaces which are susceptible to deterioration and which are not otherwise protected in accordance with applicable paragraphs of this specification. The bearing cups, clean and free of moisture and contamination, shall be thoroughly coated with grease conforming to Specification MIL-L-3545.

Bearings and parts which have been received from the manufacturer with an initial protective coating compatible with the lubricating grease, may need only the application of additional grease to comply with the above, and need not be stripped and retreated. When ready for installation in wheels, the cones shall be unwrapped and thoroughly packed with grease conforming to Specification MIL-L-3545, over the protective film to further protect against corrosion while in storage, and to be ready for service without requiring cleaning and regreasing. The cones shall be assembled in place, and securely retained by hub caps or grease retainers. The retaining parts shall be clean and free of moisture.

21

MIL-W-5013D(ASG)

Each assembled bearing shall be covered on both sides to prevent the entrance of moisture or air, by using moisture-impervious closures or seals. Whenever applicable, greaseproof paper conforming to Specification MIL-B-121, grade A, shall be used in contact with the bearing. Where both bearing hubs are joined, in lieu of other interior closures or seals, the entire hub cavity may be filled with cellulosic wadding conforming to Specification PPP-C-843, type III, preferably wrapped or bagged to prevent disintegration, or each end may be adequately packed with the same wadding to prevent the entrance of moisture to the bearings.

The preparation, greasing, assembly, and sealing of the bearings shall be done in succession with minimum delay. Care shall be exercised in handling parts to avoid contamination. Where excessive motion of the cone might break the bearing seal, plywood or fiberboard shall be used to block the retainers, and the blocking and hub caps shall be securely attached to the wheel, using tape conforming to Specification PPP-T-60, type I, class 1, or suitable mechanical means. Each wheel shall be packaged in a fiberboard box in accordance with Specification JAN-P-108 and its appendix, grade 5 or 6, for loads not in excess of 50 pounds, and in grade 2 or 3 for wheels in excess of 50 pounds and not over 90 pounds. Wheels in excess of 90 pounds shall be packed directly in exterior containers other than fiberboard. However, fiberboard may be used as the initial container.

5.2.1.2   Installation wheel assemblies.- Installation assemblies shall be preserved and packaged in the same manner as required for spare wheel assemblies, except that fiberboard boxes when used, shall conform to table II of Specification LLL-B-631 or LLL-B-636 in lieu of boxes in accordance with Specification JAN-P-108, and its appendix. Multiple pack is permitted provided the weight limit as specified in 5.2.2 is not exceeded.

5.2.1.3   Cushioning and blocking.- Wheels shall be adequately cushioned, blocked or braced within the interior and exterior container in accordance with procedures outlined in Specification JAN-P-100 to protect wheel flanges against damage. Protection to be afforded by the use of fiberboard sleeves, prefabricated corner blocking, fiberboards, or other suitable material. Wood or other approved materials shall be used for blocking and cradling wheels within wooden, exterior containers.

5.2.2   Packing.- Unless otherwise specified, all wheels shall be packed for domestic shipment. Insofar as practical, containers shall be uniform in size and shall contain a like number of unit packages and shall be snugly packed. Gross weights shall not exceed approximately 200 pounds for overseas shipment and 500 pounds for domestic shipment, except when the weight of individually packed wheels exceeds these limits.

5.2.2.1   Domestic shipment.-

5.2.2.1.1   Spare wheel assemblies.- Spare wheel assemblies shall be packed in cleated plywood, nailed wood, wirebound, cleated fiberboard or fiberboard boxes, in accordance with Specifications PPP-B-591, PPP-B-621, PPP-B-585, LLL-B-631, LLL-B-636, or PPP-B-601, except when fiberboard containers are used, they shall meet all conditions of the special requirements table of Specification LLL-B-631, or LLL-B-636, as applicable.

5.2.2.1.2   Installation wheel assemblies.- Installation wheel assemblies shall be packed in substantial commercial shipping containers so constructed as to insure acceptance by common or other carrier for safe transportation at the lowest rate to the point of delivery. Containers shall conform to the requirements of the Consolidated Freight Classification Rules in effect at the time of shipment. Wheels, individually packaged in accordance with 5.2.1.2, require no further overpacking, provided the boxes conform with Consolidated Freight Classification Rules.

GPO 807019-2

MIL-W-5013D(ASG)

5.2.2.2  Overseas shipment (spare wheel assemblies only).- Spare wheel assemblies shall be packed in cleated plywood, nailed wood, wirebound, fiberboard, or fiberboard-lined wood boxes in accordance with Specification PPP-B-601, style A or B, using plywood type I or II, class 2, of Specification NN-P-515, or of Specification PPP-B-585, PPP-B-621, MIL-B-138, or JAN-P-108, and the appendix thereto. Boxes containing wheels in fiberboard interior containers shall be provided with case liners conforming to Specification MIL-L-10547, except that this requirement shall not apply to boxes in accordance with Specification JAN-P-108, sealed with tape in accordance with Specification PPP-T-60. Wheels not packaged in interior containers shall be overwrapped with barrier material conforming to Specification JAN-P-125, and completely sealed with adhesive in accordance with Specification MIL-A-140. When fiberboard containers are used, such containers shall be fabricated from fiberboard having a Mullen test of 275 pounds or more. Fiberboard containers shall be converted to type 2 loads by use of an adequate interior packaging (fiberboard sleeves, inserts, die-cuts, etc). For description of load types, refer to Specification JAN-P-100.

5.3  Brake assemblies.-

5.3.1  Preservation and packaging.-

5.3.1.1  Spare brake assemblies.-

(a)  Piston-actuated-type brake assemblies shall be cleaned, preserved, and packaged in accordance with Specification MIL-P-116, Method I. Material shall be wrapped with a neutral barrier paper conforming to Specification MIL-B-121 or MIL-B-130. Each wrapped brake assembly shall be sealed in a bag fabricated from barrier material conforming to type I of Specification MIL-B-131. Brake assemblies shall be individually packaged in boxes conforming to Specification JAN-P-108, type V, or wooden containers specified above.

(b)  Expander-tube-actuated-type brake assemblies shall be individually preserved and packaged in accordance with Specification MIL-P-116, Method III. Compounds conforming to Specifications MIL-C-11796, class 3 or MIL-C-16173 grade 3, shall be applied to all critical exposed metal surfaces which are susceptible to deterioration and which are not otherwise protected in accordance with applicable paragraphs of this specification. The nozzle inlet shall be plugged to prevent entrance of dirt or water. Whenever contact preservation or lubricants are present on the assembly, the applicable areas, or the entire brake, shall be wrapped with grease-proof paper conforming to Specification MIL-B-121, grade A.

5.3.1.2  Installation brake assemblies.- Installation brake assemblies shall be cleaned, preserved, wrapped, and packaged as described in 5.3.1.1, except that fiber-board boxes, when used, may be in accordance with Specifications LLL-B-631 and LLL-B-636 in lieu of boxes in accordance with Specification JAN-P-108. Multiple pack is permitted provided the weight limit as prescribed in 5.2.2 is not exceeded.

5.3.1.3  Cushioning.- All brake assemblies shall be adequately cushioned, blocked, or braced within the interior and exterior container to prevent damage to the assembly or rupture to the barrier material. Cushioning methods and materials required to effect this protection shall conform to the requirements outlined in Specification JAN-P-100. Fiberboard liners, prefabricated corner blocking, and fiberboard die-cut pads shall be used wherever practicable. Wood or other approved materials shall be used for blocking and cradling when brake assemblies are directly packed in exterior containers. In lieu of blocking and cradling within wooden containers, when used, brake assemblies may be secured to the base of the exterior container by the use of bolts, nuts, and lockwashers.

MIL-W-5013D(ASG)

5.3.2  Packing.- Unless otherwise specified, all brakes shall be packed for domestic shipment. Insofar as practical, containers shall be uniform in size and shall contain a like number of unit packages and shall be snugly packed. Gross weights shall not exceed approximately 200 pounds for overseas shipment and 500 pounds for domestic shipment, except when the weight of individually packed brakes exceeds these limits.

5.3.2.1  Domestic shipment.-

5.3.2.1.1  Spare brake assemblies.- Spare brake assemblies shall be packed in cleated plywood, nailed wood, wirebound, cleated fiberboard, or fiberboard boxes in accordance with Specifications PPP-B-591, PPP-B-621, PPP-B-585, LLL-B-631, LLL-B-636, or PPP-B-601. Fiberboard, when used, shall have a minimum dry burst strength (Mullen or Cady type) of 275 pounds. Fiberboard boxes shall not be used for brakes weight in excess of 90 pounds. For brakes individually packaged in accordance with 5.3.1.1, no further overpacking is required.

5.3.2.1.2  Installation brake assemblies.- Installation brake assemblies shall be packed in substantial shipping containers so constructed as to insure acceptance by common or other carrier for safe transportation at the lowest rate to the point of delivery. Containers shall conform to the requirements of the Consolidated Freight Classification Rules in effect at the time of shipment. Brakes individually packaged in accordance with 5.3.1.2 require no further overpacking, provided the boxes conform with Consolidated Freight Classification Rules.

5.3.2.2  Overseas shipment (spare brake assemblies only).- Spare brake assemblies preserved and packaged in accordance with 5.3.1.1 (a) shall be packed in cleated plywood, nailed wood, wirebound, or fiberboard-lined wood boxes in accordance with Specification PPP-B-601, style A or B, using plywood, type I or II, class 2, of Specification NN-P-515, or of Specifications MIL-B-107, PPP-B-621, or MIL-B-138, respectively.

5.4  Marking of shipments.- Interior packages and exterior shipping containers shall be marked in accordance with Standard MIL-STD-129. The identification shall be composed of the following information listed in the order shown:

        Stock No. or other identification number as specified in the
          purchase document *
        WHEEL ASSEMBLY OR BRAKE ASSEMBLY (as applicable)
        Specification MIL-W-5013D
        Manufacturer's Drawing No.
        Contract or Order No.
        Name of manufacturer
        Name of contractor (if different from manufacturer)
        Date and method of preservation (if applicable)

      * NOTE: The contractor shall enter the Federal Stock No. specified
        in the purchase document or as furnished by the procuring activity.
        When the Federal Stock No. is not provided or available from the
        procuring activity, leave space therefor and enter the Stock No.
        or other identification when provided by the procuring activity.

24

MIL-W-5013D(ASG)

5.4.1  Special marking.- Interior packages and exterior shipping containers used for direct shipment of installation wheel and brake assemblies shall have an additional marking as follows:

"NO PRESERVATION - FOR IMMEDIATE USE"

5.4.2  Additional marking on exterior shipping containers.- In addition to the above, exterior containers shall be marked to indicate whether packed for domestic or overseas shipment. Where the brake is securely fastened to the bottom of the container, two sides of the container shall be marked durably and legibly with an arrow pointing upward and the word "TOP," in not less than 1-inch letters, located on the upper edge.

6.  NOTES

6.1  Intended use.- This specification is intended for use by wheel and brake manufacturers in the design, fabrication, and testing of wheels and brakes for military aircraft.

6.2  Ordering data.- Procurement documents should specify the following:

(a)  Title, number, and date of this specification.
(b)  Part numbers, size, and materials of wheels and brakes to be furnished.
(c)  Whether for amphibious or beaching gear.
(d)  Kind of packing desired, and whether for domestic or overseas shipment.
(e)  The number and specific assembly(s) comprising the Preproduction test samples and where they should be sent, the activity responsible for testing, and instructions concerning the submittal of the test reports. (See 4.2.)

6.2.1  Conformance with test samples.- It is to be understood that wheel or brake assemblies supplied under contract will be identical to, or completely interchangeable with, samples tested and found satisfactory, except that:

(a)  Minor changes in drawings, parts, or materials may be made without prior approval of the procuring activity provided they do not adversely affect the strength, performance, interchangeability, weight, or material physical properties of the part or assembly. Notice of such changes should be submitted to the Government Inspector for information. The right is reserved to disapprove any such changes which are considered to adversely affect the above-mentioned characteristics.

(b)  Other changes for preproduction samples should not be made without prior approval of the procuring activity.

6.3  Definitions.-

6.3.1  Design drawings.- The terms "Air Force design drawing" or "applicable design drawing" referred to in this specification will be interpreted as meaning the design drawing prepared by the Air Force for the particular wheel. These drawings are available from the Commander, Wright Air Development Center, Wright-Patterson Air Force Base, Ohio, Attention: Aircraft Laboratory.

MIL-W-5013D(ASG)

6.3.2   Normal operating pressure.- Normal operating pressure will be interpreted as meaning that pressure or mechanical force (in the case of mechanical brakes) required to produce an average airplane deceleration of 10 feet per second per second at the inertia equivalent specified on the applicable design drawing, as determined by an average of pressure measured in the tests required by the Dynamic torque test (4.4.11).

6.3.3   Normal parking pressure.- Normal parking pressure will be interpreted as meaning that pressure or mechanical force (in the case of mechanical brakes) required to lock the wheel, at a load equal to the rated static load specified for the wheel on the applicable design drawing, assuming a coefficient of friction of 0.31 between the tire and the ground.

6.3.4   Maximum operating pressure.- Maximum operating pressure will be interpreted as meaning that pressure or mechanical force (in the case of mechanical brakes) required to lock the wheel, at a load equal to the rated static load specified on the applicable design drawing, assuming a coefficient of friction of 0.55 between the tire and the ground, or the maximum pressure required to conduct the specified Dynamic torque test, whichever is greater.

6.3.5   Weights.- The weight conditions specified in table I are defined in Specifications MIL-S-5700 series and MIL-A-8629.

NOTICE: When Government drawings, specifications, or other data are used for any prupose other than in connection with a definitely related Government procurement operation, the United States Government thereby incurs no responsibility nor any obligation whatsoever; and the fact that the Government may have formulated, furnished, or in any way supplied the said drawings, specifications, or other data is not to be regarded by implication or otherwise as in any manner licensing the holder or any other person or corporation, or conveying any rights or permission to manufacture, use, or sell any patented invention that may in any way be related thereto.

Custodians:
Navy - Bureau of Aeronautics
Air Force

Preparing activity:
Air Force

26

MIL-STD-129E

<u>20 APRIL 1970</u>
SUPERSEDING
MIL-STD-129D
28 December 1964

# MILITARY STANDARD

# MARKING FOR SHIPMENT AND STORAGE



FSC PACK

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01625976
Not for Resale,2007/3/1 17:56:10 GMT

CONTENTS

|  |  | Page |
|---|---|---|
| | List of figures | iv-v |
| | Index | vi-xv |
| 1. | Scope ------------------------------------------------- | 1 |
| 2. | Reference documents ----------------------------------- | 5 |
| 3. | Definitions ------------------------------------------- | 10 |
| 4. | General requirements ---------------------------------- | 10 |
| 4.1 | Abbreviations ----------------------------------------- | 12 |
| 4.2 | Marking and marking material -------------------------- | 13 |
| 5. | Detailed requirements --------------------------------- | 13 |
| 5.1 | Method of marking and size of markings ---------------- | 13 |
| 5.2 | Interior package marking (including unpackaged items) ----- | 16 |
| 5.3 | Standard exterior markings for shipment or storage (shipping containers, palletized unit loads and unpacked items)---- | 20 |
| 5.4 | Marking of international logistics and disaster relief shipments ------------------------------------------- | 29 |
| 5.5 | Special marking on containers or unboxed supplies and equipment ------------------------------------------- | 31 |
| 5.6 | Standard exterior marking procedures for boxes and crates-- | 41 |
| 5.7 | Standard marking procedures for bales ----------------- | 43 |
| 5.8 | Standard marking procedures for cloth covered bundles ----- | 44 |
| 5.9 | Standard marking procedures for shipping sacks and bags --- | 45 |
| 5.10 | Standard marking procedures for barrels, drums, and cylindrical containers ------------------------------- | 47 |
| 5.11 | Standard marking procedures for miscellaneous packs (loose or unpacked items, small containers, rods, coils, reels, etc.) ------------------------------------------- | 48 |
| 5.12 | Standard marking procedures for unpacked vehicles (with or without engine or motor, including carts, trailers, and similar items) ----------------------------------- | 49 |
| 5.13 | Standard marking procedures for palletized unit loads ----- | 51 |
| 5.14 | Container marking for petroleum, unfabricated steel products and household goods ------------------------------- | 51 |
| 5.15 | Standard marking procedures for subsistence items --------- | 51 |
| | Appendix A--Commodity Category Marking Requirements ------- | 61 |
| | Appendix B--FSC Commodity Identification ------------------ | 64 |
| | Appendix C--Additional FSN and Item Description Marking --- | 70a |

iii

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01625976
Not for Resale,2007/3/1 17:56:10 GMT

MIL-STD-129E
4 September 1970

LIST OF FIGURES

Figure

1. Marking for unit and intermediate packages.
2. Precautionary label (method II).
3. Typical markings – (handling and special).
4. International logistics label.
5. Basic markings for box under 10 cubic feet.
6. Basic markings for box 10 cubic feet and over.
7. Oversea address marking.
7A. Alternate oversea address marking.
8. Domestic shipment address marking.
9. Domestic shipment address marking (first destination).
10. Intra CONUS parcel post marking.
11. APO and FPO parcel post marking.
12. Foreign military sales oversea address marking.
13. Basic marking for unsheathed crates under 10 cubic feet.
14. Basic marking for unsheathed crates 10 cubic feet and over.
15. Alternate method of marking unsheathed crates utilizing marking boards.
16. Basic marking for bales.
17. Basic markings for cloth covered bundles.
18. Basic markings for shipping sacks and bags.
19. Basic markings for drums, metal or fiber.
20. Basic markings for wooden barrels and kegs other than subsistence.
21. Basic markings for miscellaneous packs.
22. Method A markings for palletized unit loads.
23. Method B markings for palletized unit loads.
24. Method C markings for palletized unit loads.
25. Method D markings for palletized unit loads.
26. Fragile label.
27. Subsistence marking for paper shipping sacks – export.
28. Marking for shipping bags (textile and laminated textile) subsistence.
29. Crescent symbol for subsistence items.
30. Marking of shipping container for nonperishable subsistence for issue.
31. Marking of shipping container for nonperishable subsistence for resale.
32. Marking of shipping container for perishable subsistence for resale or issue.
33. Caution label for magnetic equipment suitable for air shipment.
34. Caution label for magnetic equipment not suitable for air shipment.
35. Marking panel for unpacked vehicles.
36. Military shipment label – DD Form 1387.
37. Military shipping tag – DD Form 1387-1.
38. Special handling data/certification – DD Form 1387-2.
39. Frozen medical material shipment form.
40. Chilled medical material shipment form.

iv

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01625978
Not for Resale,2007/3/1 17:56:10 GMT

Case 1:08-cv-00051-GMS    Document 18-7    Filed 07/25/2008    Page 4 of 10

MIL-STD-129E
23 December 1970

## LIST OF FIGURES--Continued

Figure

41. Limited unrefrigerated medical material shipment form.
42. Priority shipment label and tag.
43. Expedited handling shipment label (code 999).
44. Serviceable label and tag.
45. Unserviceable label and tag.
46. Unserviceable condemned label and tag.
47. Suspended label and tag.
48. Test/modification label and tag.
49. Packing list – DD Form 1750.
50. Additional identification markings.
51. Symbol labels background colors.
52. Color marking rectangular shipping containers.
53. Color marking cylindrical containers.
54. Color marking irregularly shaped containers (bags, bales).
55. Color marking loose unpacked items.
56. Color marking palletized load, single commodity.
57. Color marking consolidated containers of mixed commodities.

v

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to PAPER TRAILS HISTORICAL, 01625978
Not for Resale,2007/3/1 17:56:10 GMT

MIL-STD-129E
21 May 1971

1. SCOPE

1.1 Scope. This standard provides the requirements for the uniform marking of military supplies and equipment for shipment and storage. It accommodates the requirements for coded and in the clear data and forms required by Military Standard Requisitioning and Issue Procedures (MILSTRIP) and Military Standard Transportation and Movement Procedures (MILSTAMP) for movement processing.

1.2 Application.

1.2.1 Marking for shipment and storage of petroleum products shall be as specified in paragraph 5.14.1 herein.

1.2.2 Marking for shipment and storage of unfabricated steel mill products shall be as specified in paragraph 5.14.2 herein.

1.2.3 Marking for household goods shall be as specified in paragraph 5.14.3 herein.

1.2.4 Marking for shipment and storage of subsistence items shall be as specified in paragraph 5.15 herein.

1.2.5 Marking of radioactive material shall be as specified in paragraphs 5.2.2.4 and 5.5.15.9 herein.

1.2.6 Marking of ammunition, explosives, and explosive components shall be as specified in paragraphs 5.5.15.12 and 5.13.5 herein.

1.2.7 Marking of magnetic equipment for shipment via military aircraft shall be as specified in paragraphs 5.2.2.11 and 5.5.15.8 herein.

2. REFERENCE DOCUMENTS

2.1 The issues of the following documents in effect on the date of invitation for bids or request for proposal form a part of this standard to the extent specified herein.

SPECIFICATIONS

Federal

L-T-90 – Tape, Pressure-Sensitive, Adhesive (Cellophane and Cellulose Acetate)

NN-P-530 – Plywood, Flat Panel

TT-E-489 – Enamel, Alkyd, Gloss (For Exterior and Interior Surfaces)

TT-E-515 – Enamel, Alkyd, Lusterless, Quick Drying

1



Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01625976
Not for Resale,2007/3/1 17:56:10 GMT

Case 1:08-cv-00251-GMS    Document 18-7    Filed 07/29/2008    Page 6 of 10

MIL-STD-129E
21 May 1971

TT-I-558 – Ink, Marking, Stencil, Opaque, for Nonporous
Surfaces (Metal, Glass, etc.).

TT-I-559 – Ink, Marking, Stencil, Opaque, for Porous Surfaces
(Wood Boxes, Fiber Cartons, etc.).

TT-L-20 – Lacquer, Camouflage.

TT-L-40 – Lacquer, Lusterless, Obliterating.

TT-V-121 – Varnish, Spar, Water-Resisting.

UU-T-81 – Tags, Shipping and Stock.

UU-T-106 – Tape, Pressure-Sensitive, Adhesive, Masking, Paper.

MMM-A-105 – Adhesive and Sealing Compounds, Cellulose Nitrate
Base, Solvent Type.

MMM-A-178 – Adhesive, Paper Label, Water-Resistant.

MMM-A-179 – Adhesive:  Paper Label, Water-Resistant, Water
Emulsion Type.

PPP-B-26 – Bag, Plastic, Polyethylene.

PPP-E-540 – Envelope:  Water-Resistant, for Packing Lists and
Shipping Documents.

PPP-F-320 – Fiberboard; Corrugated and Solid, Sheet Stock
(Container Grade), and Cut Shapes.

PPP-P-700 – Protector, Packing List.

PPP-T-60 – Tape, Pressure-Sensitive, Adhesive, Waterproof, for
Packaging.

Military

MIL-P-116 – Preservation, Methods of.

MIL-S-4473 – Shielding of Magnetron Tubes and Magnets for
Air Shipment.

2

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to PAPER TRAILS HISTORICAL, 01625976
Not for Resale,2007/3/1 17:56:10 GMT

MIL-STD-129
21 May 1971

MIL-P-13983 – Paint, Temporary, Lusterless, Gasoline
                     Removable.

MIL-C-17504 – Coating Compound, Acrylic, Clear.

MIL-M-19590 – Marking of Commodities and Containers to Indicate
                     Radioactive Material.

MIL-P-52108 – Paint, Water Emulsion Type (for Stenciling and
                     Obliterating).

2a

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to PAPER TRAILS HISTORICAL, 01625976
Not for Resale,2007/3/1 17:56:10 GMT

MIL-STD-129E
21 May 1971

STANDARDS

Federal

Federal Standard No. 75 - Glossary of Packaging Terms.

Federal Standard No. 595 - Color.

Military

MIL-STD-163 - Steel Mill Products Preparation for Shipment
and Storage.

MIL-STD-212 - Preparation of Household Goods for Shipment
and Storage and Related Services.

MIL-STD-290 - Packaging, Packing and Marking of Petroleum
and Related Products.

MIL-STD-444 - Nomenclature and Definitions in the Ammunition
Area.

MIL-STD-709 - Ammunition Color Coding.

MIL-STD-1341 - Symbols For Packages and Containers For
Hazardous Industrial Chemicals and Materials.

(Copies of specifications, standards, drawings, and publications re-
quired by contractors in connection with specific procurement functions
should be obtained from the procuring agency or as directed by the con-
tracting officer.)

2.2  Other publications.  The following documents from a part of this
standard to the extent specified herein.  Unless otherwise indicated, the
issues in effect on date of invitation for bids or request for proposal
shall apply.

GOVERNMENTAL

Civil Aeronautics Board Publications.
Department of Transportation Regulations.
Federal Aviation Agency Regulations.
Federal Hazardous Substances Act, Public Law 86-613.
Maritime Administration Regulations.

U.S. Postal Manual.  (Chapter 1, Section 137)

(Application for copies should be addressed to the Superintendent of
Documents, Government Printing Office, Washington, D.C.  20402.)

3

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01625976
Not for Resale,2007/3/1 17:56:10 GMT

MIL-STD-129E
20 April 1970

JOINT MILITARY

Packaging and Handling of Dangerous Materials for Transportation
by Military Aircraft (DSAM 4145.3, AFM 71-4, TM 38-250,
NAVAIR 15-03-500, and MCO P4030.19).

Military Standard Requisitioning and Issue Procedure (DOD
4140-17M).

(Application for copies should be addressed to the Superintendent of
Documents, Government Printing Office, Washington, D.C. 20402).

Military Standard Transportation and Movement Procedures
(DOD 4500.32-R).

(Distribution is handled exclusively through Service/Agency distribution
points.)

U.S. COAST GUARD REGULATIONS

Code of Federal Regulations, Shipping, Title 46 (Part 146 and
147).

Transportation Title 49 (Part 71 through 79).

(Application for copies should be addressed to the Superintendent of
Documents, Washington, D.C. 20402).

INTERSTATE COMMERCE COMMISSION REGULATIONS

(Application for copies should be addressed to the Superintendent of
Documents, Government Printing Office, Washington, D.C. 20402).

NONGOVERNMENTAL

Manufacturing Chemists Association

Manual L-1, Guide to Precautionary Labeling of Hazardous
Chemicals.

(Application for copies should be addressed to the Manufacturing Chemists
Association, 1825 Connecticut Avenue, N.W. Washington, D.C. 20000.)

National Fire Protection Association International
Fire Protection Guide on Hazardous Materials.

4

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01625976
Not for Resale,2007/3/1 17:56:10 GMT

Case 1:06-cv-00051-GMS    Document 16-7    Filed 07/25/2006    Page 10 of 10

MIL-STD-129E
21 May 1971

The applicable icing and time data are to be inserted on the labels at time of shipment. In addition, "ARROW" and "FRAGILE" markings shall be applied to containers of frozen medical items. A completed DD Form 1387-2, Special Handling Data Certification Form, is required and shall be applied to the address side of the container when shipment is via military air transportation (see 5.5.15.1.1).

5.5.13  Chilled Medical Material Shipments (DD Form 1502-1). Containers packed with perishable medical refrigerated items (constant temperatures must be maintained between 35° and 46°F.) shall have completed PERISHABLE - KEEP CHILLED labels (DD Form 1502-1) applied to the address side and the opposite side of each container (fig 40). The applicable icing and time data are to be inserted on the labels at time of shipment. In addition, "ARROW" and "FRAGILE" markings shall be applied to containers of chilled medical items. A completed DD Form 1387-2 is required and shall be applied to the address side of the container when shipment is via military air transportation (see 5.5.15.1.1).

5.5.14  Limited Unrefrigerated Medical Material Shipments (DD Form 1502-2). Containers packed with perishable medical items out of refrigeration (when receipt of shipment by consignee is assured within a specified number of days) shall have completed PERISHABLE labels (DD Form 1502-2) applied to the address side and the opposite side of each container (fig 41). The data applicable to time of removal from refrigeration are to be inserted on the label at time of shipment. In addition, "ARROW" AND "FRAGILE" markings shall be applied to containers of perishable medical items. A completed DD Form 1387-2 is required and shall be applied to the address side of the container when shipment is via military air transportation (see 5.5.15.1.1).

5.5.15  Handling markings.

5.5.15.1  Precautionary regulations and statute markings. Special handling instructions, marking, and warnings shall be shown as required by the Hazardous Materials Regulations of the Department of Transportation; Maritime Administration Regulations; U.S. Coast Guard Regulations; Federal Aviation Agency and Civil Aeronautics Board Regulations; Federal, Food, Drug, and Cosmetic Act and General Regulations for Its Enforcements; Joint Military Publication, Packaging and Handling of Dangerous Materials for Transportation by Military Aircraft, and by statute, regardless of destination of shipment.

5.5.15.1.1  DD Form 1387-2. All shipments scheduled for transportation by military aircraft (including LOGAIR and QUICKTRANS) containing dangerous and hazardous material, biologicals, classified materiel, materiel moving in bond and any other materiel requiring special handling shall be labeled with a DD Form 1387-2 (fig 38). The DD Form 1387-2 shall be used to comply with Rule 7, Official Air Transport Restricted Articles Tariff 6 CAB #82 for shipment via commercial airlines. Detailed instructions for the required copies and preparation of DD Form 1387-2 labels are given

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:PAPER TRAILS HISTORICAL, 01625976
Not for Resale,2007/3/1 17:56:10 GMT

# PART I

## MANUAL L-1—A GUIDE FOR THE PREPARATION OF WARNING LABELS FOR HAZARDOUS CHEMICALS

### Adopted 1945

### Revised April 1946

The development of new chemical products and the introduction of chemical processes into ever-widening fields has accentuated the need for furnishing appropriate information in those cases where special precautions are necessary. Many chemicals present no hazards in normal handling and storage and for these products no precautionary labels are necessary.

The education of employees regarding chemical hazards is, and must remain, the direct responsibility of their employers. However, such hazards are not confined to employees alone, and information concerning them should, so far as practicable, reach every person using, transporting, or storing chemicals. The most practical means for the seller to disseminate this information appears to be by labels affixed to containers of hazardous chemicals; bearing appropriate precautionary statements and instructions stated as simply and briefly as circumstances permit.

In the interest of uniformity and more adequate labeling of chemical products, the Manufacturing Chemists' Association has prepared this Manual for the benefit and guidance of its members. A series of definitions is included in Schedule 1 in order that the terms used may be clearly understood. In addition to the general recommendations contained herein, the MCA has prepared suggested labels for specific products. These have been printed as Manual L-2, which will be supplemented from time to time as additional recommended labels are developed.

A precautionary label does not take the place of safety equipment such as suitable goggles, airline respirators, gas masks, clothing, shoes, etc.

Individual statutes, regulations or ordinances may require that particular information be included on a label or that a specific label be affixed to a container. In each case, the requirements of these laws should also be studied. *The warning labels suggested in this Manual should be used in addition to, or in combination with, any label required by law.*[*]

---

[*] Federal statutes include:

Interstate Commerce Commission Regulations for Transportation of Explosives and Other Dangerous Articles: Supt. of Documents, Govt. Printing Office, Washington, D. C.

Federal Caustic Poison Act and regulations: Food and Drug Administration, Federal Security Agency, Washington, D. C.

Federal Insecticide Act of 1910 and regulations: Agricultural Marketing Administration, U. S. Department of Agriculture, Washington, D. C.

Federal Food, Drug and Cosmetic Act and regulations: Food and Drug Administration, Federal Security Agency, Washington, D. C.

Related statutes of the 48 States and the District of Columbia include Caustic Acid, Pharmacy, Poison, and Insecticide Acts.

Manufacturing Chemists' Association of the United States

## GENERAL PRINCIPLES

In the preparation of any precautionary label the following principles should first be considered:

1) Each chemical product (including mixtures) presents a distinct problem and must be treated individually, in the light of its own characteristics.

2) Extreme care should be exercised in the choice of terminology. Statements should be brief and simple.

3) On labels for different products, uniformity in language to indicate the same hazards is most desirable in order to gain greater understanding through standardization.

4) Precautionary statements must be accurate, selectively chosen, and expressed in clearly defined terms. To be effective they should be used only when and to the extent necessary. Labeling of a relatively harmless product so as to indicate that it is hazardous, as well as the failure to give adequate notice of a hazard, will develop a disregard for labels and defeat their purpose.

For example, if the word "POISON" is to retain its usefulness on a label, it should be applied exclusively to those products (1) which are poisons according to a definite toxicity standard*, or (2) with which it is associated through common usage, or (3) for which its use is prescribed by law. In all other cases the relative degree of the hazard can be better indicated by the use of signal words such as: "DANGER" to cover extremely serious hazards; "WARNING" to cover less serious hazards; and "CAUTION" to cover minor hazards, together with a descriptive statement of the hazard.

5) Chemical names should be those recommended by the American Chemical Society.

6) The use of a non-descriptive code designation or trade name as the only identification of a hazardous chemical should be avoided. If for any reason, it is undesirable to show the chemical name, or if the chemical name is so complex as to be meaningless except to the trained chemist, the label should state the type of chemical, e.g., "corrosive acid," "lead compound."

7) The following subject matter should be considered for inclusion on a precautionary label:

1. Chemical name
2. "Signal word" (DANGER-WARNING-CAUTION) designating degree of hazard (Column A, Schedule 3)
3. Affirmative statement of "hazard" (Column B, Schedule 3)
4. "Precautionary measures" covering actions to be followed or avoided (Column C, Schedule 3)
5. "Instructions in case of accident," where advisable (Column D, Schedule 3)

8) Warning labels should be printed in easily legible type, which is in contrast by typography, layout, or color with any other printed matter on the label and should be placed conspicuously on containers. Legibility may be preserved with a suitable protective coating.

---

* To provide a practical working standard for labeling purposes "POISON" is defined in Schedule 1 of this Manual to include only chemicals capable of causing acute effects by ingestion and inhalation, the principal modes of entry into the body. This definition excludes chemicals capable of causing injuries as a result of skin absorption or of chronic exposure by inhalation, because the variable actions and effects of chemicals with these characteristics preclude a practical means of measuring their hazards.

# PREPARATION OF PRECAUTIONARY LABELS

The basic considerations in the preparation of a precautionary label for any chemical product (including mixtures) are:

1) Determination of the hazards present in the particular chemical product.

2) Selection of appropriate statements for each significant hazard inherent in the product.

3) Arrangement of statements in the order of emphasis desired.

The most frequently encountered hazards have been classified by the MCA into 10 types as listed in Schedule 2. Set opposite each class are statements illustrating characteristic precautions usually required for that type of hazard.

Many chemical products will have more than one type of hazard, in which case appropriate statements for each significant type should be included on the label. Most chemical products contain impurities. When these are present in harmful quantities, appropriate warnings and precautionary measures should be included on the labels.

As each chemical product must be treated individually, there will be many instances in which the illustrative statements will not be applicable either because they do not accurately express the degree of hazard or because they fail to cover the particular characteristics. In such cases, suitable statements should be selected from Schedule 3. This Schedule presents a more comprehensive list of statements arranged in columnar form, and grouped as follows:

| A | B | C | D |
|---|---|---|---|
| Signal Word | Hazards | Precautionary Measures | Instructions in Case of Accident |

Column A—The degree of hazard can be expressed only in relative terms. The purpose is two-fold: to indicate to the reader the comparative seriousness of the danger involved in handling a given product and to call attention to the precautionary instructions which should immediately follow. The "signal words" recommended are, in the order of diminishing severity of hazard, (1) DANGER; (2) WARNING; (3) CAUTION.

Example: WARNING!

Column B—From this column should be selected the phrase (or phrases) that most accurately describes the principal hazard. This is placed on the same line as the "signal word."

Example: WARNING! FLAMMABLE

If other significant hazards are present, they should be tabulated under the principal hazard.

Column C—The appropriate statement of "precautionary measures" should be chosen from Column C and should follow on subsequent lines.

Example: WARNING! FLAMMABLE

Keep away from heat and open flame.

Keep container closed.

Use with adequate ventilation.

Avoid prolonged breathing of vapor.

Avoid prolonged or repeated contact with skin.

Manual
L-1

Column D—When it is advisable to include instructions in case of accident, the appropriate statements may be selected from this column. Instructions in case of accident to individuals are valuable but should be limited to recognized first aid procedures based upon simple methods and commonly available materials. Instructions for strictly medical treatment should be omitted except when specifically required by law. Because of the serious and lasting effects that may result from eye injuries, a recommendation to obtain medical attention should accompany any specific instruction directed to the treatment of the eyes. If the statements from Schedule 3 fail to meet the exact needs, they should be modified to suit. In the example shown, toluene, no phrase from this column appears to be necessary.

While every compound carries some hazard, if improperly used, it is impractical to cover every possible contingency on a label. Efforts should be directed toward naming the serious hazards, and warning against such abuses and accidents as are likely to be encountered under normal conditions. There are scarcely any means of measuring in absolute terms the relative seriousness of hazards, and the recommendations in Schedule 3 only contemplate their division into two or three degrees of intensity. It follows that of two compounds one may be less hazardous than the other and yet may carry the same warnings and cautions.

Instructions for handling and storage of containers should be included where conditions indicate their need. These instructions should take into consideration both the characteristics of the chemical product and the limitations of the type or types of container in which it is packed.

Schedule 4 presents suggested labels for samples of experimental products for which full data regarding hazards are not yet known.

Schedule 5 illustrates the application of caution statements to three specific products. In the case of toluene, the statements used are similar to those given in Schedule 2 for a compound or mixture having hazards in classifications I-B and IV. The second example, aqueous hydrofluoric acid, represents a very special case where the particular hazards require modification of the standard statements. The third example is that of a label for a proprietary compound or mixture.

4

Manual
L-1

## Schedule 2
## CLASSIFICATION OF HAZARDS

| Class | Typical Label |
|---|---|
| I. Flammable Liquids and Oxidizing Agents which Support Combustion. (Flash points for liquids are determined by Tagliabue's Open-Cup Method). | |
| A. Flash point 20° F. or below. | **DANGER! EXTREMELY FLAMMABLE** Keep away from heat and open flame. Keep container closed. |
| B. Flash point above 20° to 80° F. inclusive. | **WARNING! FLAMMABLE.** Keep away from heat and open flame. Keep container closed. |
| II. Flammable Solids and Oxidizing Agents as Classified by the ICC. | **CAUTION! EXPOSURE MAY CAUSE FIRE OR CREATE FIRE HAZARD** Keep away from heat and open flame. Keep container closed. In case of contact, immediately flush with plenty of water; remove and wash clothing before re-use. |
| III. Vapors Immediately Toxic or Extremely Irritating Even on Exposure for a Short Time or to Low Concentrations. | **DANGER! VAPOR EXTREMELY HAZARDOUS** Do not breathe vapor. Do not get on skin. Do not get in eyes. Keep container closed and away from heat. Keep away from feed or food products. Have air line respirator or gas mask approved by U. S. Bureau of Mines specifically for (name of chemical) available for emergency. |
| IV. Vapors Hazardous from Prolonged or Repeated Exposures, or Exposure to Higher Concentrations. | **WARNING! VAPOR HARMFUL** Use only with adequate ventilation. Avoid prolonged or repeated breathing of vapor. Keep container closed and away from heat. |

6

Manufacturing Chemists' Association of the United States

Manual
1-1

| V. Gases and Vapors Physiologically Inert. | CAUTION! VAPOR REDUCES OXYGEN AVAILABLE FOR BREATHING<br><br>Use with adequate ventilation.<br>Keep container closed. |
|---|---|
| VI. Harmful Dusts. | CAUTION! HARMFUL DUST<br>Avoid repeated breathing or skin contact.<br>Wash thoroughly before eating or smoking.<br>Keep away from feed or food products. |
| VII. Skin Irritants—Corrosive. | DANGER! CAUSES SEVERE BURNS<br>Do not get in eyes.<br>Do not get on skin.<br>Do not get on clothing.<br>In case of contact, immediately flush skin or eyes with plenty of water; for eyes, get medical attention. Remove and wash clothing before re-use. |
| VIII. Materials Causing Skin Irritations after Repeated or Continued Contact. | CAUTION! MAY CAUSE SKIN IRRITATION<br>Avoid prolonged or repeated contact. |
| IX. Materials Toxic through Vapor Inhalations or Skin Absorption. | WARNING! ABSORBED THROUGH SKIN VAPOR HAZARDOUS<br>Avoid contact with skin or clothing.<br>Avoid breathing vapor.<br>In case of exposure, remove to fresh air. Immediately wash with soap and plenty of water. Remove and wash clothing before re-use. |
| X. Toxic If Taken Internally. Applies to materials covered by statutory definition of poison "liable to be destructive of human adults in doses of 60 grains or less (4 gms.)" or to any material toxic in amounts likely to be taken internally through easily anticipated errors. | POISON<br>If not covered by regulation or definition (see General Principles 4) a typical label might read:<br>DANGER! MAY BE FATAL IF SWALLOWED<br>Do not take internally. |

7

Manufacturing Chemists' Association of the United States

Manual
L-1

## Schedule 3
## RECOMMENDED LABEL CAUTIONS

| A.  Signal Words | B.  Hazards | C.  Precautionary Measures | D.  Instructions in Case of Accident |
|---|---|---|---|
| | **Flammability** | | |
| | a. Extremely Flammable (flash point 20° F. or below.) b. Flammable (flash point above 20° to 80° F. inclusive). c. Exposure May Cause Fire or Create Fire Hazard. | a. Keep away from heat (sparks) and open flame. b. Keep container closed (and away from heat). | |
| | **Volatility** | | |
| | a. Highly Volatile. b. Volatile (Solvent or Liquid). | a. Keep out of sun and away from heat. b. Keep container closed (and away from heat). | |
| | **Inhalation** | | |
| a. DANGER! b. WARNING! c. CAUTION! | a. Vapor Extremely Hazardous. b. May be Fatal if Inhaled. c. Vapor Harmful. d. Vapor Reduces Oxygen Available for Breathing. e. Harmful Dust. f. Causes Irritation to Eyes, Nose and Throat. | a. Do not breathe vapor (or) Avoid breathing vapor. b. Avoid prolonged or repeated breathing of vapor. c. Use (only) with adequate ventilation. d. Avoid prolonged breathing of dust. | a. In case of exposure remove to fresh air. b. Have air-line respirator or gas mask approved by U. S. Bureau of Mines specifically for (name of chemical) available for emergency. |
| | **Contact** | | |
| | a. Corrosive Liquid. b. Causes (Severe) Burns. c. Dangerous Because (Rapidly) Absorbed Through Skin. d. Causes Skin Irritation. e. May Cause Skin Irritation. | a. Do not get (1) in eyes, (2) on skin, (3) on clothing. b. Avoid contact with (1) eyes, (2) skin, (3) clothing. c. Wash thoroughly before eating or smoking. | a. In case of contact: (1) Immediately flush (skin or eyes) with plenty of water (for at least 15 minutes). (For eyes, get medical attention.) (2) Immediately wash with soap and plenty of water. (3) Remove and wash clothing before re-use. |
| | **Ingestion** | | |
| | a. Poison (skull & crossbones). b. May be Fatal if Swallowed | a. Do not take internally. | |
| | **General** | | |
| | a. Strong Oxidant. b. Contact with Combustible Material May Cause Fire. | a. Keep away from food or food products. b. Keep dry. c. Store in cool place. d. Keep away from combustible materials. | a. Get medical attention. b. In case of spillage, flush with plenty of water. c. In case of spillage, absorb with sand, ashes or earth. |

The use of any warning or other statement listed above is not necessarily limited to the hazard under which it is grouped. The grouping merely indicates the type of hazard to which given statements must frequently apply.

The small letters are not intended to indicate a correlation between similarly lettered statements in adjacent columns but are for identification only.

The parenthetical words indicate optional statements.

Manual
L-1

Product Requiring
Modified Cautions
and First Aid.

HYDROFLUORIC ACID, AQUEOUS

DANGER!   CORROSIVE LIQUID
          VAPOR HAZARDOUS
          CAUSES SEVERE BURNS WHICH MAY NOT BE
          IMMEDIATELY PAINFUL OR VISIBLE

Do not breathe vapor.

Do not get in eyes, on skin, on clothing.

In case of contact or suspicion of contact:
Immediately flush skin with plenty of water until whiteness disappears, paying particular attention to skin under nails. Soak affected areas with crushed ice in 70% ethyl alcohol until physician arrives. Flush eyes with plenty of water for at least 15 minutes. In all cases get medical attention. Remove and wash clothing before re-use. Avoid use of greasy ointments.

Proprietary Product
(e.g., containing fluorine salts)

(PROPRIETARY NAME)

Contains Fluorine Compounds.

WARNING! POISONOUS IF TAKEN
          INTERNALLY

Avoid breathing dust.

Flush spillage to sewer with water.

Manufacturing Chemists' Association of the United States

Manual
L-1

## Schedule 1

## DEFINITIONS

*Flammable Liquid* [1]—An inflammable [1] liquid is any liquid which gives off inflammable vapors (as determined by flash point from Tagliabue's open-cup tester, as used for test of burning oils) at or below a temperature of 80° F.

*Extremely Flammable Liquid* [1]—An extremely flammable liquid is a liquid which gives off flammable vapors (as determined by flash point from Tagliabue's open-cup tester, as used for test of burning oils) at or below a temperature of 20° F.

*Corrosive* [2]—(Physiological)—A corrosive is an agent which in contact with living tissue will cause more or less severe destruction of tissue by chemical action.

*Irritant* [2]—(Physiological)—An irritant is an agent which in contact with living tissue will induce either immediately or after prolonged or repeated contact a more or less severe local tissue reaction not leading directly to destruction of tissue.

*Sensitizer* [2]—(Physiological)—A sensitizer is a material which as ordinarily handled does not necessarily cause any discernible reaction in living tissue but which after initial or repeated contact with the tissue of some individuals may, at a later date, produce a prompt inflammatory reaction on contact, even in minute amounts, with the tissue of the same individuals.

*Dusts* [3]—Solid particles generated by handling, crushing, grinding, rapid impact, detonation and decrepitation of organic or inorganic materials such as rock, ore, metal, coal, wood, grain, etc. Dusts do not tend to flocculate except under electrostatic forces; they do not diffuse in air but settle under the influence of gravity.

*Fumes* [3]—Solid particles generated by condensation from the gaseous state, generally after volatilization from molten metals, etc., and often accompanied by a chemical reaction such as oxidation. Fumes flocculate and sometimes coalesce.

*Mists* [3]—Suspended liquid droplets generated by condensation from the gaseous to the liquid state or by breaking up a liquid into a dispersed state, such as by splashing, foaming, and atomizing.

*Gases* [3]—Normally formless fluids which occupy the space of enclosure and which can be changed to the liquid or solid state only by the combined effect of increased pressure and decreased temperature. Gases diffuse.

*Vapors* [3]—The gaseous form of substances which are normally in the solid or liquid state and which can be changed to these states either by increasing the pressure or decreasing the temperature alone. Vapors diffuse.

*Poison* [2]—Poison means a substance which, when taken by mouth in amounts of 60 grains (4 grams) or less, or when inhaled in concentrations of less than 200 parts per million by volume in the air, rapidly (within 5 or 10 minutes) jeopardizes life by other than mechanical or physical action.

> Note: This definition of "Poison" is based on practical considerations only, as an aid in determining, generally, when the word "Poison" should be included on a warning label. See General Principles 4.

*Mixture* [2]—A physical commingling of two or more substances which may or may not bear a fixed proportion to one another and which have not reacted chemically with one another.

---

[1] ICC definition. While the term "inflammable" is used by the ICC, the preferred form "flammable" is used in this Manual.

[2] MCA definition.

[3] As defined in Chapter II "Engineering Control of the Air Contamination of the Working Environment" (Allen D. Brandt, D.Sc.) page 128, "Manual of Industrial Hygiene." USPHS.

Manufacturing Chemists' Association of the United States

Manual
L-1

## Schedule 4

## LABELS FOR EXPERIMENTAL SAMPLES

The labeling of experimental samples of new products presents unusual problems. All of the properties or possible uses of a product are seldom known. The following safeguards are therefore recommended:

1. Samples of a product already on the market should carry the same warning label as a commercial shipment.

2. The following label is suggested for samples of any material that has never been in commercial production unless (1) the material is known to be wholly innocuous, or (2) the dangers are limited to known hazards and appropriate cautions are submitted.

---

### SAMPLE

( _____ )
Name or Description of Product

### FOR EXPERIMENTAL USE ONLY

CAUTION! The chemical, physical and toxicological properties of this product have not been fully investigated and its handling or use may be hazardous. Exercise due care.

---

3. The identity of the sample, indicated in parentheses above, should be as clear as possible. Wherever feasible, it should be the name of the compound or mixture, and in any case it should be the best possible identification to aid the user in knowing with what he is concerned.

4. Where there are significant known hazards they should be so indicated.

5. The above label may be used in the case of old products being considered for new uses.

## Schedule 5

## SPECIMEN PRODUCT LABELS

The following specimen labels illustrate the application to specific products of the principles set forth in this Manual:

Product Combining Hazards of Class I-B and IV (Schedule 2) Chemicals.

---

### TOLUENE

WARNING! FLAMMABLE.

Keep away from heat and open flame.

Use with adequate ventilation.

Avoid prolonged breathing of vapor.

Avoid prolonged or repeated contact with skin.

---

5700. 8

DEPARTMENT OF THE NAVY
Office of the Secretary
Washington 25, D. C.

SECNAV 6150.7
BUMED-7231-bar
24 September 1956

SECNAV INSTRUCTION 6150.8

From:  Secretary of the Navy
To:    Chief of Naval Material
       Chief of Naval Operations
       Chief of Naval Personnel
       Chief of Naval Research
       Chief, Bureau of Aeronautics
       Chief, Bureau of Medicine and Surgery
       Chief, Bureau of Ordnance
       Chief, Bureau of Ships
       Chief, Bureau of Supplies and Accounts
       Chief, Bureau of Yards and Docks
       Commandant, U. S. Marine Corps
       Commander, Military Sea Transportation Service

Subj:  Uniform labeling program for hazardous industrial chemicals
       and materials

Encl:  (1)  Markings and Designs of Labels
       (2)  Tentative Label Classification Guide
       (3)  Elements of a Labeling Program

1. **Purpose.** The purpose of this Instruction is to standardize
on labeling requirements for hazardous chemical products during
the usage stage, and to provide selective labels which will con-
tain pertinent information designed to warn users of the poten-
tial dangers involved.

2. **Scope.** This Instruction applies to the labeling of all
hazardous materials throughout the Naval Establishment wherever
distribution of hazardous chemicals and materials is made to the
actual consumer (shop, office, or unit). It applies to materials
received from any supply source, provided the material is intended
for ultimate use at the local activity. In this regard it refers
to labeling of the original container as well as any other con-
tainer to which the material may subsequently be transferred.
This Instruction is not intended to govern:

   a. The type of labels to be affixed by the manufacturer.
(These are governed by State and Federal laws and regulations
depending on the nature of the material and whether the shipment
is interstate or intrastate. In addition, most major manufacturers
of chemicals abide by the "Warning Labels Guide" published by the
Manufacturing Chemists' Association.)

DEPOSITION
EXHIBIT
DRUCKER #20
10/19/05  SM

5100.8

OFFICE OF THE SECRETARY

SECNAVINST 6160?J
24 September 1956

d. Safety Precautions Board. The Safety Precautions Board shall:

(1) Publish in Safety Precautions (OPNAV 34-P1) a "Label Classification Guide" listing the classification of hazardous chemicals and materials currently in use as determined by the appropriate technical bureau or office.

(2) Revise the "Label Classification Guide" in accordance with information recurringly provided by the responsible technical bureaus and offices relative to the use of new chemicals and proprietary materials, deletions, and changes in classifications.

e. Bureaus, Offices, and Marine Corps. The bureaus, offices, and Marine Corps, shall initiate implementing instructions for use by activities under their management control upon completion of action required by paragraphs 4a, 4b, 4c, and 4d(1), above. Enclosure (3) is an outline of the "Elements of a Labeling Program" for guidance.

P. A. Fogler

R. H. FOGLER
Assistant Secretary of the Navy (Material)

3

## DECLARATION OF BARRY I. CASTLEMAN

I, Barry I. Castleman, declare the following under penalty of perjury:

1.      I live at 4406 Oxford Rd., Garrett Park, Maryland 20896. My education consists of a Bachelor's Degree in Chemical Engineering from Johns Hopkins University 1968. I have a Master's Degree in Environmental Engineering, which was mainly in areas related to air pollution control from Johns Hopkins University, 1972. I have a Doctor of Science Degree in Health Policy from Johns Hopkins School of Hygiene and Public Health, 1985.

2.      My professional experience goes back over 30 years in the area of asbestos and other occupational and environmental health problems. My field is occupational and environmental health policy, which is a branch of Public Health, mainly oriented towards the recognition of risk factors and the prevention of disease from industrial activities.

3.      The Doctoral degree was awarded for two years of course work, various examinations, and the writing of a doctoral dissertation. The course work was mainly in the areas of toxicology, epidemiology, biostatistics, physiology, and public health policy. These are the tools that are used to understand how the body works and can be damaged by toxic substances, how these effects can be identified by means of various studies of people, studies of animals experimentally exposed and so on.

4.      My Doctoral thesis was, Asbestos: An Historical Case Study of Corporate Response to an Industrial Health Hazard, and is largely identical to a book published in 1984 by Prentice Hall Law and Business called *Asbestos: Medical and Legal Aspects* (now in its 5th Edition, 2005). The doctoral thesis is an historical review of the asbestos problem as a public health problem in society worldwide, but mainly in the United States. It encompasses a comprehensive review of medical literature of all kinds, as well as other literature available in libraries and published sources such as government publications, safety magazines, engineering journals, trade magazines, insurance publications, encyclopedias, popular magazines, and newspapers. The doctoral thesis also involved research based on unpublished government records. The government records included workers' compensation claims files where claims had been made by individuals alleging that they had asbestos-related diseases of the lungs, claims against various companies that were their employers, some of which companies were also manufacturers of asbestos insulation products these individuals has used in the course of their work.

5.      In addition to published information of all kinds, I examined files, unpublished information available from the U.S. government archives, the archives of scientists and the archives of institutions that had worked for and with asbestos companies. I also looked at unpublished information which was obtained in legal discovery. This included trade association minutes, corporate documents, and testimony of corporate officials who were associated with asbestos hazards over the years - doctors, plant managers, executives, and other people who were aware of events that transpired.

6.    In addition to published information and corporate knowledge that came out of mainly legal discovery, I have also interviewed many elder statesmen in the field of industrial medicine and hygiene. They included physicians who were active in the field of occupational medicine, such as Harold Stewart, who first published on asbestosis in 1931, and Alfred Angrist, who first published on asbestos and lung cancer in 1942. They are both pathologists. Another, Dr. Wilhelm Hueper, was a leading United States authority in the field of occupational cancer and first director of the environmental cancer section of the National Cancer Institute. Dr. Irving J. Selikoff was the leading epidemiologist and asbestos authority in the US. Dr. Hueper, Dr. Harriet Hardy, Dr. Thomas Mancuso, Dr. Gerrit Schepers, Dr. Richard Doll, Dr. Morris Greenberg, and others I have interviewed were involved in the area of asbestos and health over the past decades.

7.    My textbook *Asbestos: Medical and Legal Aspects* (5th ed.) contains a section on 38 companies and/or industry groups that were involved with the manufacture, sale or use of asbestos-containing materials. I have reviewed industry documents and testimony regarding all of these entities as well as many additional companies involved in the asbestos industry. I have never seen any document that discusses or suggests that the United States military prohibited any manufacturer or seller from warning about asbestos or that the United States military interfered, in any way, with a company's decision regarding whether to issue such warnings.

8.    I have also studied and written about the historical use of asbestos warnings on products and in product manuals. Once companies began to issue asbestos warnings to product users, there is no evidence that the United States military required the removal or alteration of such warnings for products sold to the military. In 1964, Johns-Manville ("J-M") was among the first companies to provide warnings with its asbestos-containing products, namely its asbestos insulation. During and after this time frame, J-M sold asbestos insulation to the United States military. In my extensive review of J-M documents, which have included visits to the J-M archives in Denver, Colorado, I have never seen any evidence that J-M removed or altered the warning labels that appeared on its asbestos insulation for sales to the United States military. Nor have I seen any evidence that the United States military ever requested that J-M or any other company do so.

I declare under penalty of perjury that the foregoing is true and correct.

July 18, 2008.

Barry L. Castleman

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DAVID H. FORTIER and GAIL FORTIER,　　　：
　　　　　　　　　　　　　　　　　　　　　：
　　　　Plaintiffs,　　　　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　　：
v.　　　　　　　　　　　　　　　　　　　　：　　3:07-cv-00005 (WWE)
　　　　　　　　　　　　　　　　　　　　　：
AMPCO-PITTSBURGH CORP., individually　　：　　consolidated with:
BUFFALO AIR HANDLING, individually and as :　　3:07-cv-00014
successor to Buffalo Forge Co.,　　　　　　：　　3:07-cv-00019
BUFFALO PUMPS, INC.,　　　　　　　　　　：
FOSTER WHEELER L.L.C. (survivor to a　　 ：
merger with Foster Wheeler Corporation)　　：
GENERAL ELECTRIC COMPANY,　　　　　　：
PHELPS DODGE INDUSTRIES, INC.[1],　　　：
VIAD CORP., f/k/a The Dial Corporation,　　 ：
individually and as successor in interest to　 ：
Griscom Russell Company,　　　　　　　　 ：
Defendants.　　　　　　　　　　　　　　　：

## RULING ON MOTION TO REMAND

This action arises from plaintiffs David H. Fortier and Gail Fortier's claims that

defendants AMPCO-Pittsburgh Corp., Buffalo Air Handling, Buffalo Pumps, Inc., Foster

Wheeler L.L.C., General Electric Company and Viad Corp. ("defendants") supplied or

manufactured asbestos or asbestos-containing products that injured David Fortier

("Fortier") during his service as a machinist's mate in the United States Navy from 1968

to 1972.  Plaintiffs assert that this exposure to asbestos caused him to contract

malignant mesothelioma, the diagnosis of which was rendered on October 5, 2006.

Mesothelioma is a fatal disease for which asbestos exposure is the only known cause.

---

[1]Defendant Phelps Dodge Industries, Inc. was dismissed by stipulation dated
February 1, 2007 [Doc. #24].

## BACKGROUND

On November 28, 2006, plaintiffs filed an asbestos personal injury action in the

Connecticut Superior Court, Judicial District of Fairfield at Bridgeport against over 130

defendants, alleging that Fortier was injured as a result of exposure to asbestos while

working in Connecticut as a machinist's mate in the Navy during the years 1968 to1972.

On December 1, 2006, plaintiffs filed a second action in the same state court against

the seven defendants originally parties to the instant matter (No. 06-5005848-S).[2]  In

January 2007, defendants removed this case to federal court pursuant to the Federal

Officer Removal statute, codified at 28 U.S.C. § 1442, which permits removal of state

actions brought against an officer or agency of the United States, or an individual acting

under the auspices of a federal officer.[3]  28 U.S.C. § 1442(a)(1).[4]  Mesa v. California,

489 U.S. 121, 125, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989).  Plaintiffs now move to

remand this case to state court, arguing that this Court lacks subject matter jurisdiction

over their claim of failure to warn.

_____

[2]The original seven defendants included Phelps Dodge, which, as stated above, has since been dismissed.

[3]These cases were docketed in federal court as 3:07-cv-00005, 3:07-cv-00014 and 3:07-cv-00019. They were transferred to this Court and have been consolidated for the purpose of this motion. Fortier v. AMPCO-Pittsburgh Corp., et al., 3:07-cv-00005.

[4]28 U.S.C. § 1442(a) provides in relevant part: "A civil action or criminal prosecution commenced in a State court against any of the following persons may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending: . . .1) Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue. . . ."

## DISCUSSION

A party may remove a case from state court to federal court only if the action is one over which the federal court has jurisdiction. 28 U.S.C. § 1441(a). In order to demonstrate that removal is proper, the movant bears the burden of showing the existence of federal jurisdiction. The rules regarding removal are strictly construed. In re: Methyl Tertiary Butyl Ether Products Liability Litigation, 342 F.Supp.2d 147, 151 (S.D.N.Y. 2004).

Removal is proper if a state law claim is completely preempted by federal law. If a federal statute preempts a state law, then a claim which falls under the penumbra of that statute, even if pled as a state law claim, is properly removed to federal court pursuant to 28 U.S.C. § 1441(b). See Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 8, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003) (reversing remand based on applicability of National Bank Act, 12 U.S.C. § 85). Actions brought against federal officers may be removed "despite the nonfederal cast of the complaint;" if the defense depends on federal law, the federal question requirement is met. Jefferson County v. Acker, 527 U.S. 423, 431, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999). _____

Defendants rely upon the federal officer removal provision, 28 U.S.C. § 1442(a)(1), for their claim that removal is proper. In order to satisfy the requirements of the statute, defendants must satisfy three elements: 1) that they have a colorable federal defense to plaintiff's claims; 2) that they acted under the direction of a federal agency or officer; and 3) that there is a causal nexus between the conduct in question and the federal authority asserted. Mesa v. California, 489 U.S. 121 at 124 -131. The

3

federal officer removal statute is construed broadly and "should not be frustrated by a narrow, grudging interpretation." Arizona v. Manypenny, 451 U.S. 232, 242, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981). Defendants need not show that they will prevail in federal court; they need only demonstrate that section 1442(a)(1) is applicable to the instant matter. Willingham v. Morgan, 395 U.S. 402, 407, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969).

In order to satisfy the requirement that defendants show that they were acting under the color of a federal agency or officer, defendants must demonstrate that there was direct and specific control on the part of a federal agency or office over defendants' work and that defendants performed the work pursuant to this control. Mesa v. California, 489 U.S. at 131-32.

In this case, defendants must demonstrate that the Navy had complete control over all aspects of their work regarding the manufacture and sale of defendants' equipment to the Navy, that the Navy had the sole authority to dictate the warnings affixed to or provided with the equipment and that defendants complied with these specifications. Plaintiffs must show that defendants did not perform their work only under the auspices of the Navy and that there was some autonomy on the part of defendants as to their fulfillment of the federal contract.

Plaintiffs allege that defendants cannot invoke the Federal Officer Removal Statute as a defense because the federal government did not exercise complete control over defendants' ability to include warnings regarding the presence of asbestos in the turbines. The Court agrees with plaintiffs.

Plaintiffs assert that the Navy, while setting forth explicit requirements regarding

4

warnings that it, as a federal agency, demands, did not preclude defendants from including other warnings of their own as dictated by state law and regulations. Plaintiffs have provided military specifications ("milspecs") issued by the Navy that specify that its "instruction apply[ing] to the labeling of all hazardous materials throughout the Naval Establishment wherever distribution of hazardous chemicals and materials is made to the actual consumer . . . is not intended to govern: a) The type of labels to be affixed by the manufacturer. These are governed by State and Federal Law and regulations. . . ." Plaintiffs' Ex. F.  Defendants, therefore, were free to include warnings not dictated by the Navy.  Whether they chose to do so or not is the subject of this lawsuit.  It appropriately should be resolved in state court.

## CONCLUSION

For the foregoing reasons, the Court GRANTS plaintiffs' motion to remand [Doc. # 8].  The Clerk is instructed to remand this case to state superior court.


Dated this 5th day of March, 2007 at Bridgeport, Connecticut.


_____/s/_____
            Warren W. Eginton
            Senior United States District Judge

6

**EFiled: Jun 25 2008 11:58AM EDT**
**Transaction ID 20395136**
**Case No. MC 77C-ASB-2**

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

IN RE : ASBESTOS LITIGATION          :          C.A. No. : 77C-ASB-2

## MASTER TRIAL SCHEDULING ORDER
## AND TABLE OF TRIAL SCHEDULE ABSTRACTS
### (Amended on : June 26, 2008)

**AND NOW TO WIT**, on this 26th day of June, 2008, in order to clarify the record and avoid confusion with regard to those cases assigned trial dates and to avoid confusion and disputes in the future;

**IT IS HEREBY ORDERED THAT:**

(1)     This Order lists all asbestos litigation matters set for trial as of the date of its issue and shall be known as the "Master Trial Scheduling Order".  Amended versions of this Order shall be filed from time to time as the trial dates set herein pass and as new trial dates and trial groupings are established.  Any amendments to this Order required as a result of changes made pursuant to the provisions of Paragraph 2 hereof shall also result in the filing of an amended version of this Order.  All amended versions of this Order shall clearly indicate the date of the amendment in the caption hereof.

(2)     Informal and/or oral requests for any changes to the provision of this Order will not be entertained.

(3)     Any party seeking to add any matter to an existing trial grouping, re-align trial groupings, delete a matter from a trial grouping, move or assign any particular matter to or from a particular trial date, create trial groupings in addition to or in place of those groupings

established by this Order, or otherwise alter the provisions of this Order shall follow the following procedures:

(a)    Any plaintiff wishing to alter the provisions of this Order shall advise Loreto P. Rufo, Esq., as Defense Coordinating Counsel of the changes requested and the reasons therefore. Defense Coordinating Counsel shall communicate with all defense counsel and shall advise plaintiff of its position, the position of defendants as a group, and any specific or individual defendant issues with regard to such changes within five (5) business days of the date of notification of requested changes. In the event no objections are raised to the requested changes, Defense Coordinating Counsel shall prepare and file an amended version of this Order which shall be entered by the Court. In the event agreement can not be reached with regard to the requested changes, plaintiff shall file a formal motion seeking such changes. Such motion shall be captioned as a "Motion to Alter Master Trial Scheduling Order As Amended On ___" and shall be filed in the general civil action number: 77C-ASB-2 as well as in the civil action number corresponding to any particular matter directly affected by the changes requested. All parties shall be noticed and served with any such Motion. Loreto P. Rufo, Esq., as Defense Coordinating Counsel., shall be served with a copy of such Motion. The form of Order submitted with any such Motion will indicate, with particularity and specificity, the changes to this Order requested. Within five (5) business days of this Court's ruling on any such Motion, defense Coordinating Counsel shall prepare and file an amended version of this Order which shall reflect the changes made and which shall be entered by the Court.

(b)    Any defendant wishing to alter the provisions of this Order shall advise plaintiffs' counsel and Loreto P. Rufo, Esq., as Defense Coordinating Counsel of the changes requested and the reasons therefore. Defense Coordinating Counsel shall communicate with

other defense counsel and with plaintiffs' counsel and shall advise the requesting defendant of its position, the position of other defendants, and the position of plaintiffs' counsel with regard to such changes within five (5) business days of the date of notification of requested changes.  In the event no objections are raised to the requested changes, Defense Coordinating Counsel shall prepare and file an amended version of this Order which shall be entered by the Court.  In the event agreement can not be reached with regard to the requested changes, the requesting defendant shall file a formal motion seeking such changes.  Such motion shall be captioned as a "Motion to Alter Master Trial Scheduling Order As Amended On ___"  and shall be filed  in the general civil action number: 77C-ASB-2 as well as in the civil action number corresponding to any particular matter directly affected by the changes requested.   All parties shall be noticed and served with any such Motion.  Loreto P. Rufo, Esq., as Defense Coordinating Counsel., shall be served with a copy of such Motion.  The form of Order submitted with any such Motion will indicate, with particularity and specificity, the changes to this Order requested.  Within five (5) business days of this Court's ruling on any such Motion, Defense Coordinating Counsel shall prepare and file an amended version of this Order which shall reflect the changes made and which shall be entered by the Court.

(2)     The following is a compilation of trial groupings currently in place and a Table of Trial Schedule Abstracts for each trial setting.  The dates set on the Table of Trial Schedule Abstracts may be altered upon agreement by and between counsel.  Defense Coordinating Counsel shall be notified of any such accommodations or agreements reached by and between counsel.  In the event a formal motion to alter pretrial deadline dates is required, the requesting party shall file a formal motion seeking such changes.  Such motion shall be captioned as a "Motion to Alter Master Trial Scheduling Order As Amended On ___"  and it shall be filed  in

the general civil action number: 77C-ASB-2 as well as in the civil action number corresponding to any particular matter directly affected by the changes requested.   All parties shall be noticed and served with any such Motion.  Loreto P. Rufo, Esq., as Defense Coordinating Counsel., shall be served with a copy of such Motion.  Within five (5) business days of this Court's ruling on any such Motion, defense Coordinating Counsel shall prepare and file an amended version of this Order which shall reflect the changes made and which shall be entered by the Court.

**TRIAL DATE**                   :        **July 30, 2008**
**PLAINTIFFS' COUNSEL**          :        **Weiss & Saville,  Jacobs & Crumplar,**
                                          **and Bifferato Gentilotti, Cases**

*Weiss & Saville*

| | | |
|---|---|---|
| *DARDI TRIAL GROUP* | Louis Dardi | C.A. No. : 05C-09-282 |
| | Rufus Barnes | C.A. No. : 06C-02-096 |
| | Fred Crews | C.A. No. : 06C-03-026 |
| | William Gray | C.A. No. : 05C-10-087 |
| | Val Gene Landis | C.A. No. : 05C-09-018 |
| | James McCarthy | C.A. No. : 06C-12-137 |
| | Albert Wilson | C.A. No. : 06C-07-031 |
| | Louis Winter | C.A. No. : 06C-04-154 |

*************************************************************************

*Jacobs & Crumplar*

| | | |
|---|---|---|
| *KOSCHING TRIAL GROUP* | Julius Kosching | C.A. No. : 04C-12-176 |
| | Charles Aiken | C.A. No. : 04C-10-143 |
| | John Head | C.A. No. : 04C-12-248 |
| | Joseph Poniecki | C.A. No. : 03C-06-233 |
| | Evelyn Smith | C.A. No. : 04C-10-117 |

*************************************************************************

*Bifferato Gentilotti*

| | | |
|---|---|---|
| *HUDDLESTON TRIAL GROUP* | James Mattox | C.A. No. : 07C-01-402 |
| | Rebecca Miller | C.A. No. : 07C-02-173 |
| | Tony Pino | C.A. No. : 07C-02-166 |
| | Samuel Reynolds | C.A. No. : 07C-01-167 |
| | Jennifer Simons | C.A. No. : 07C-01-281 |

**TRIAL DATE**            **:**        **September 10, 2008**
**PLAINTIFFS' COUNSEL**    **:**        **Weiss & Saville, Bifferato Gentilotti, Joseph**
                                      **Rhoades, Ciconte & Wasserman, Jacobs &**
                                      **Crumplar, and Peter G. Angelos Cases**

*Weiss & Saville*

      *ROULLARD TRIAL GROUP*    Larry Roullard    C.A. No. : 06C-11-184
                                    Roswell Edgecomb  C.A. No. : 06C-12-136
                                    John Kasianowicz  C.A. No. : 07C-01-257
                                    Stanley Libby     C.A. No. : 05C-08-259

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Bifferato Gentilotti*

        *WACKER TRIAL GROUP*    John Wacker      C.A. No. : 07C-02-285
                                      Theodore Ward   C.A. No. : 07C-02-284
                                      Max Welton      C.A. No. : 06C-10-321
                                      Henry Wheeler   C.A. No. : 06C-11-195
                                      Grace Brown     C.A. No. : 07C-01-168
                                      Janice Gloudemans C.A. No. : 06C-12-251
                                      James Hooper    C.A. No. : 07C-02-045
                                      Melvin Turner   C.A. No. : 06C-12-139
                                      Sammy Walling   C.A. No. : 06C-08-304
                                      Charles Weyher  C.A. No. : 07C-03-176
                                      Eugene Gross    C.A. No. : 07C-02-199

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Ciconte & Wasserman*

      *EARNEST TRIAL GROUP*    Herschel Earnest  C.A. No. :  06C-12-047
                                    Charles Butts     C.A. No. :  06C-10-221
                                    Albert Kenett    C.A. No. :  06C-11-245
                                    Gerard Hartigan  C.A. No. :  06C-11-163

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Joseph Rhoades*

      *GROEN TRIAL GROUP*     John Groen       C.A. No. :  07C-09-219

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Jacobs & Crumplar*

| | | |
|---|---|---|
| *FAVILLE TRIAL GROUP* | Walter Bailey | C.A. No. : 05C-06-291 |
| | Douglas Faville | C.A. No. : 06C-02-097 |
| | William Harmon | C.A. No. : 05C-07-320 |
| | John Stanley | C.A. No. : 05C-06-116 |
| | Richard Tansley | C.A. No. : 05C-02-096 |
| | Guy Widdowson | C.A. No. : 05C-01-083 |

**TRIAL DATE**                     :     **October 22, 2008**
**PLAINTIFFS' COUNSEL**      :     **Bifferato Gentilotti and Weiss & Saville Cases**

*Weiss & Saville*
    *MORISSETTE TRIAL GROUP*

| Name | C.A. No. |
|------|----------|
| Gerald Allen | C.A. No. : 06C-09-248 |
| George Barra | C.A. No : 06C-10-130 |
| Donald Bowlin | C.A. No. : 06C-09-197 |
| Reginald Campbell | C.A. No. : 05C-10-061 |
| Cheryl Clement | C.A. No. : 05C-09-237 |
| John Daly | C.A. No. : 07C-02-106 |
| Gladys Jean DeMars | C.A. No. : 06C-11-189 |
| Lee Roy Green | C.A. No. : 05C-06-296 |
| Robert Lindsay | C.A. No. : 05C-09-177 |
| John Lower | C.A. No. : 05C-11-073 |
| Katherine Montemayor | C.A. No. : 06C-05-175 |
| Billy Seymour | C.A. No. : 05C-07-160 |
| Charles Thompson | C.A. No. : 05C-10-155 |
| John Gerlach | C.A. No. : 05C-09-179 |
| June Rose Holmes | C.A. No. : 05C-09-095 |
| Harold Switzer | C.A. No. : 05C-08-039 |
| Chester Szwed | C.A. No. : 06C-08-175 |
| Richard Fincher | C.A. No. : 05C-07-204 |
| Richard Grasso | C.A. No. : 05C-08-313 |
| Homer Cornett | C.A. No. : 05C-09-119 |
| Steven Swearingen | C.A. No. : 06C-08-303 |
| Kathy McCarty | C.A. No. : 07C-07-211 |
| Galen Deutsch | C.A. No. : 05C-08-023 |

*************************************************************************

*Bifferato Gentilotti*
    *KERSEY TRIAL GROUP*

| Name | C.A. No. |
|------|----------|
| Reginald Kersey | C.A. No. : 07C-01-137 |
| Theresa Denton | C.A. No. : 06C-10-320 |
| John DiMattio | C.A. No. : 06C-09-217 |
| Ernest Jones | C.A. No. : 07C-02-047 |
| Frank Notto | C.A. No. : 07C-02-172 |
| Henry Parker | C.A. No. : 07C-01-128 |
| Richard Ross | C.A. No. : 07C-02-044 |
| Pauline Roten | C.A. No. : 07C-02-244 |
| John Rolfes, Sr. | C.A. No. : 07C-05-012 |
| Carol Englert | C.A. No. : 07C-06-338 |
| David Anderson | C.A. No. : 07C-07-252 |
| Howard Patterson | C.A. No. : 07C-07-257 |
| David Lickwar | C.A. No. : 07C-07-267 |
| Barbara Pfenning | C.A. No. : 07C-09-235 |

**TRIAL DATE**        **:**     **December 3, 2008**
**PLAINTIFFS' COUNSEL**    **:**     **Jacobs & Crumplar, Bifferato Gentilotti, and**
                                             **Weiss & Saville Cases**

*Jacobs & Crumplar*

       *PERSINGER TRIAL GROUP*

| | |
|---|---|
| Jacqueline Persinger | C.A. No. : 04C-11-241 |
| Clinton Atkins | C.A. No. : 06C-01-040 |
| Millard Baird | C.A. No. : 05C-09-058 |
| Theodore Benson | C.A. No. : 06C-01-111 |
| William R. Brown | C.A. No. : 05C-11-258 |
| Raymond Bunting | C.A. No. : 05C-11-255 |
| William Davis | C.A. No. : 06C-02-060 |
| Richard Harris | C.A. No. : 05C-08-165 |
| Walter Janusz | C.A. No. : 04C-08-074 |
| John Kendra | C.A. No. : 05C-12-168 |
| Harry Lewis | C.A. No. : 05C-01-035 |
| John Linton | C.A. No. : 05C-10-049 |
| Louis Orsini | C.A. No. : 05C-05-286 |
| William Rogers | C.A. No. : 05C-09-057 |
| Angelo Trapanotto | C.A. No. : 05C-10-086 |
| William White | C.A. No. : 05C-02-148 |
| Mark McGrellis | C.A. No. : 04C-08-267 |
| Joseph Schmitt | C.A. No. : 04C-08-271 |
| Mary Jane Vilone | C.A. No. : 03C-06-039 |
| Lester Ward | C.A. No. : 04C-07-287 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Weiss & Saville*

       *LAUBENSTEIN TRIAL GROUP*

| | |
|---|---|
| Raymond Laubenstein | C.A. No. : 06C-09-214 |
| Florence Lane | C.A. No. : 06C-11-186 |
| Charles Leslie | C.A. No. : 05C-09-044 |
| Travis McNair | C.A. No. : 06C-12-072 |
| Maynard Schmidt | C.A. No. : 05C-09-178 |
| Raymond Williams | C.A. No. : 05C-08-312 |
| Frank Allen Carter | C.A. No. : 05C-11-126 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Bifferato Gentilotti*

| | | |
|---|---|---|
| *OSER TRIAL GROUP* | Clara Oser | C.A. No. : 07C-01-282 |
| | John Anderson | C.A. No. : 07C-03-178 |
| | Charles Bianchi | C.A. No. : 07C-02-259 |
| | Rex Buzzard | C.A. No. : 07C-03-177 |
| | Clara Copenhagen | C.A. No. : 07C-03-283 |
| | Ernest Cziraky | C.A. No. : 07C-01-219 |
| | Johnny Dennis | C.A. No. : 06C-09-293 |
| | Edwin Erath | C.A. No. : 06C-12-189 |
| | William Farrell | C.A. No. : 07C-03-315 |
| | Michael Kelly | C.A. No. : 07C-02-144 |
| | William Minyard | C.A. No. : 07C-02-043 |
| | Ernest Stroik | C.A. No. : 06C-09-295 |
| | William Huddleston | C.A. No. : 07C-01-191 |
| | Manuel Sylvia | C.A. No. : 07C-10-258 |
| | James Secatello | C.A. No. : 07C-12-187 |
| | Robert Hazelgrove | C.A. No. : 07C-11-125 |
| | Russell Higby | C.A. No. : 08C-01-189 |

**TRIAL DATE**                    :     **January 21, 2009**
**PLAINTIFFS' COUNSEL**      :     **Weiss & Saville, Bifferato Gentilotti, Ciconte &**
                                              **Wasserman, Joseph Rhoades, and Peter**
                                              **G. Angelos Cases**

*Weiss & Saville*

| | | |
|---|---|---|
| *SWITA TRIAL GROUP* | Garry Swita | C.A. No. : 06C-02-087 |
| | Paul Autocunas | C.A. No. : 07C-02-170 |
| | Paul Chapman | C.A. No. : 05C-09-030 |
| | John Cole | C.A. No. : 07C-01-235 |
| | Thomas Dunlap | C.A. No. : 06C-11-236 |
| | Preston Farrar | C.A. No. : 05C-12-046 |
| | James Holmberg | C.A. No. : 05C-10-188 |
| | Ernest Jones | C.A. No. : 06C-11-188 |
| | William Kennedy | C.A. No. : 07C-02-025 |
| | Roy Morissette | C.A. No. : 06C-12-140 |
| | John Rankin | C.A. No. : 05C-08-185 |
| | John Devlin | C.A. No. : 05C-09-281 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Bifferato Gentilotti*

| | | |
|---|---|---|
| *LANEY TRIAL GROUP* | Loren Laney | C.A. No. :  07C-02-260 |
| | James Lynam | C.A. No. :  07C-01-019 |
| | James Ryan | C.A. No. :  07C-02-046 |
| | Larry Dolney | C.A. No. :  08C-02-461 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Ciconte & Wasserman*

| | | |
|---|---|---|
| *RANDALL TRIAL GROUP* | Paul Randall | C.A. No. :  06C-10-188 |
| | Stanley Esposito | C.A. No. :  06C-11-009 |
| | John Castronova | C.A. No. :  07C-05-248 |
| | Edward Barber | C.A. No. :  07C-03-175 |
| | Roberto Murua | C.A. No. :  07C-03-028 |
| | Alvin Binns | C.A. No. :  05C-12-153 |
| | Paul Williams | C.A. No. :  08C-01-238 |
| | John Marini | C.A. No. :  07C-07-065 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Joseph Rhoades*

| | | |
|---|---|---|
| *PARESE TRIAL GROUP* | Joseph Parese | C.A. No. :  07C-11-106 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Peter G. Angelos

| | KOSSEK TRIAL GROUP | Clarence Bailey | C.A. No. : 03C-06-245 |
| | | Francis Strab | C.A. No. : 04C-06-256 |
| | | Robert A. Foraker | C.A. No. : 02C-09-163 |
| | | Joseph Kossek | C.A. No. : 03C-10-278 |
| | | Charles Campbell | C.A. No. : 01C-12-136 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Peter G. Angelos

*A Stay on all proceedings in these cases remains in place until further Order of the Court. The Stay will be revisited upon Motion of any party after the Supreme Court resolves pending premises liability appeals.*

*PGA CONTROL GROUP I*

| Melvin Drake | C.A. No. : 04C-06-183 |
| Walter Sczubelek | C.A. No. : 03C-08-149 |
| Donald Hazewski | C.A. No. : 03C-08-137 |
| Lawrence Whiteside | C.A. No. : 04C-06-306 |
| Gary Sylvestro | C.A. No. : 03C-01-001 |
| Thomas Morganstern | C.A. No. : 03C-09-001 |
| Margaret Wilfong | C.A. No. : 03C-09-002 |
| Kenneth Fanning | C.A. No. : 03C-12-043 |
| Robert Magaw | C.A. No. : 03C-12-093 |
| David Granger | C.A. No. : 03C-11-045 |
| John McDermott | C.A. No. : 04C-01-176 |
| Clifford Morris | C.A. No. : 04C-02-174 |
| Alfred Angeline | C.A. No. : 04C-03-196 |
| David McGinness | C.A. No. : 04C-01-229 |
| Samuel Moore | C.A. No. : 04C-02-310 |
| Mary Patten | C.A. No. : 02C-02-206 |
| Theodore Pankowski | C.A. No. : 02C-06-225 |
| Richard Ferguson, II | C.A. No. : 02C-08-016 |
| Eugene Thompson, Jr. | C.A. No. : 02C-02-011 |
| Charles Brower | C.A. No. : 02C-08-299 |
| Rocco DiOssi | C.A. No. : 02C-08-291 |
| James Kossek | C.A. No. : 02C-08-067 |
| Charles Hannagan | C.A. No. : 02C-09-003 |
| Monte Tabor | C.A. No. : 03C-01-250 |
| James Parker | C.A. No. : 03C-03-160 |

| | |
|---|---|
| John Hopkins | C.A. No. : 03C-01-123 |
| Gerald Penoza | C.A. No. : 02C-10-020 |

*PGA CONTROL GROUP II*

| | |
|---|---|
| Wooleyhan, James F | C.A. No. : 00C-08-150 |
| Ryan, James W | C.A. No : 01C-12-172 |
| Betley, John F | C.A. No. : 02C-01-041 |
| Waters, Eutice | C.A. No. : 02C-01-251 |
| Scott, Charleston J | C.A. No. : 02C-02-012 |
| Montgomery, Paige | C.A. No. : 02C-02-207 |
| Justis, Stanley | C.A. No. : 02C-03-005 |
| Todd, Joseph | C.A. No. : 02C-03-193 |
| Biddle, Drexel | C.A. No. : 02C-03-194 |
| Choma, Francis G | C.A. No. : 02C-03-195 |
| Jones, Larre M | C.A. No. : 02C-04-075 |
| | C.A. No. : 03C-12-034 |
| Booth, John A | C.A. No. : 02C-04-108 |
| Pierce, Dewey | C.A. No. : 02C-04-128 |
| Bachman, Daniel E | C.A. No. : 02C-04-280 |
| Holleran, David | C.A. No. : 02C-04-281 |
| Bove, Michael | C.A. No. : 02C-06-074 |
| Boetcher, Forrest | C.A. No. : 02C-06-075 |
| Kilby, Delmar T Sr | C.A. No. : 02C-06-110 |
| Healy, John J | C.A. No. : 02C-07-264 |
| Slavin, Edward A | C.A. No. : 02C-08-042 |
| Heinhold, Conrad G | C.A. No. : 02C-08-095 |
| Good, Mary E | C.A. No. : 02C-08-239 |
| Nacchia, Columbus | C.A. No. : 02C-08-240 |
| Nyce, Benjamin F | C.A. No. : 02C-08-241 |
| Zgleszewsk, Stanley | C.A. No. : 02C-08-293 |
| Lesniczak, Edward A | C.A. No. : 02C-08-294 |
| Fisher, Harvey | C.A. No. : 02C-08-296 |
| Watson, John | C.A. No. : 02C-08-297 |
| Hackendorn, Francis | C.A. No. : 02C-08-300 |
| Newman, Richard | C.A. No. : 02C-09-001 |
| Hudson, Earl L | C.A. No. : 02C-09-002 |
| Sweetman, Clarence | C.A. No. : 02C-09-005 |
| Shannon, Paul | C.A. No. : 02C-09-006 |
| Slavin, Diana L | C.A. No. : 02C-09-243 |
| Rozenko, Robert | C.A. No. : 02C-11-100 |
| Gibson, Carl T | C.A. No. : 02C-11-156 |
| Federowicz, Michael | C.A. No. : 02C-12-014 |
| Porter, William | C.A. No. : 02C-12-093 |

*PGA CONTROL GROUP III*

| | |
|---|---|
| Sigmund Stanczak | C.A. No. : 04C-01-130 |
| Frank Igo | C.A. No. : 04C-03-354 |
| Norman Robison | C.A. No. : 04C-06-305 |
| Barry Bogart | C.A. No. : 04C-03-352 |
| Joseph Forrest, Jr. | C.A. No. : 04C-06-304 |
| Samuel Field | C.A. No. : 03C-07-028 |
| Francis Ciliberti | C.A. No. : 04C-08-089 |
| Melvin Tjaden | C.A. No. : 04C-03-353 |
| Robert Reynolds | C.A. No. : 04C-03-125 |
| Samuel Reed | C.A. No. : 04C-08-251 |
| Patrick Lattis | C.A. No. : 03C-03-298 |
| George Schmidt | C.A. No. : 03C-11-125 |
| George Ramsey | C.A. No. : 03C-08-150 |
| Harry Congo | C.A. No. : 04C-05-196 |
| Paul Loughrey | C.A. No. : 04C-03-365 |
| Stephen Dundon | C.A. No. : 04C-06-307 |
| Paul Casey | C.A. No. : 04C-09-012 |
| Everette Deakyne | C.A. No. : 04C-05-197 |
| Larry Blevins | C.A. No. : 04C-08-219 |

**TRIAL DATE**              :      **March 11, 2009**
**PLAINTIFFS' COUNSEL**     :      **Bifferato Gentilotti, Jacobs & Crumplar, and**
                                   **Peter G. Angelos Cases**

*Bifferato Gentilotti*

| | | |
|---|---|---|
| *CHERECK  TRIAL GROUP* | Arthur Chereck | C.A. No. : 07C-05-100 |
| | Ralph Brown | C.A. No. : 07C-06-337 |
| | Jerry Stiverson | C.A. No. : 07C-09-231 |
| | Robert DiPasquale | C.A. No. : 07C-09-261 |
| | Laurie Kristinick | C.A. No. : 07C-10-117 |
| | William Glover | C.A. No. : 07C-04-330 |
| | Daniel Meissner | C.A. No. : 07C-05-015 |
| | Wayne Leslie | C.A. No. : 07C-05-027 |
| | Winfred Signore | C.A. No. : 07C-05-099 |
| | Robert Coulthart | C.A. No. : 07C-05-178 |
| | Leroy Walck | C.A. No. : 07C-05-179 |
| | Lewis Ferguson | C.A. No. : 07C-05-190 |
| | James Music | C.A. No. : 07C-05-191 |
| | James Lee | C.A. No. : 08C-02-480 |
| | Rosetta Mallet | C.A. No. : 08C-01-333 |

**********************************************************************************

*Jacobs & Crumplar*

| | | |
|---|---|---|
| *GILES TRIAL GROUP* | Ada Jean Giles | C.A. No. :  06C-05-259 |
| | Phyllis Bailey | C.A. No. :  06C-03-294 |
| | Pauline Kline | C.A. No. :  06C-04-217 |
| | Derrick Bailey | C.A. No. :  06C-05-174 |
| | Nicholas Caruso | C.A. No. :  06C-05-329 |
| | Ernest Bernhardt | C.A. No. :  06C-06-307 |
| | David Janney | C.A. No. :  06C-08-008 |
| | Randolph Colosimo | C.A. No. :  07C-07-188 |
| | Mitchell Fawcett | C.A. No. :  05C-10-322 |
| | Austin Burke | C.A. No. :  03C-07-136 |

(The Burke case is listed for control
 purposes only.  The Stay placed on that
 case will remain in force until the Supreme
 Court resolves the pending appeals on
 premises liability issues and upon Motion
 of any party)

*************************************************************************

*Peter G. Angelos*

**TRIAL DATE**            :    **April 29, 2009**
**PLAINTIFFS' COUNSEL**   :    **Bifferato Gentilotti, Weiss & Saville, and Joseph**
                               **Rhoades cases**

*Bifferato Gentilotti*

|   | *UTLEY TRIAL GROUP* | Howard Utley | C.A. No. : 07C-04-331 |
|---|---|---|---|
|   |   | John Trotter | C.A. No.: 07C-04-442 |
|   |   | Fredrick Brandt | C.A. No. : 07C-04-443 |
|   |   | Harry Sorenson | C.A. No. : 07C-04-568 |
|   |   | William Jupin | C.A. No. : 07C-05-250 |
|   |   | Thomas Warren | C.A. No. : 07C-05-259 |
|   |   | Larry Casillas | C.A. No. : 07C-07-208 |
|   |   | Donald Abbott | C.A. No. : 07C-07-215 |
|   |   | Robert Sherman | C.A. No. : 07C-05-283 |
|   |   | Diana Passiatore | C.A. No. : 07C-07-226 |
|   |   | Len McLure | C.A. No. : 08C-01-208 |
|   |   | Donald Mears | C.A. No. : 08C-01-209 |
|   |   | Beverly Morgan | C.A. No. : 08C-01-189 |

**************************************************************************

*Weiss & Saville*

|   | *GIVAN TRIAL GROUP* | Ralph Givan | C.A. No. : 05C-07-321 |
|---|---|---|---|
|   |   | Ruth Cope | C.A. No. : 05C-04-099 |
|   |   | Richard Hodges | C.A. No. : 05C-05-243 |
|   |   | Thomas Allan Hash | C.A. No. : 05C-06-293 |
|   |   | Aaron Palmer | C.A. No. : 05C-06-294 |
|   |   | Clyde Campbell | C.A. No. : 05C-07-271 |
|   |   | Leon Walls | C.A. No. : 05C-08-010 |
|   |   | Thomas Lee | C.A. No. : 05C-08-022 |
|   |   | Dennis Sandridge | C.A. No. : 06C-03-213 |

**************************************************************************

*Joseph Rhoades*

|   | *HERRON TRIAL GROUP* | Joanne Herron | C.A. No. : 07C-11-042 |
|---|---|---|---|
|   |   | Raymond Rodewig | C.A. No. : 07C-11-085 |
|   |   | Gloria Minesal | C.A. No. : 08C-01-068 |
|   |   | Jimmy Wilkins | C.A. No. : 08C-01-240 |
|   |   | William Check | C.A. No. : 08C-02-177 |
|   |   | Carolyn Marcum | C.A. No. : 08C-02-494 |

**TRIAL DATE**          :     **June 17, 2009**
**PLAINTIFFS' COUNSEL**  :     **Ciconte & Wasserman, Weiss & Saville, Jacobs**
                              **& Crumplar, Joseph Rhoades, and Peter G.**
                              **Angelos cases**

*Ciconte & Wasserman*

| | | | |
|---|---|---|---|
| *SOUSA TRIAL GROUP* | Kenneth Sousa | C.A. No. : | 06C-11-143 |
| | William Harrison | C.A. No. : | 06C-11-145 |
| | Frank Reiss | C.A. No. : | 06C-12-166 |
| | Charles Largent | C.A. No. : | 07C-02-088 |
| | Victor LaDuca | C.A. No. : | 07C-03-106 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Weiss & Saville*

| | | | |
|---|---|---|---|
| *PAIR  TRIAL GROUP* | Alvin Pair | C.A. No. : | 05C-09-066 |
| | Robert Tucker | C.A. No. : | 05C-09-151 |
| | Troy Sibert | C.A. No. : | 05C-09-152 |
| | Leroy Abbott | C.A. No. : | 06C-09-183 |
| | Katherine Hanson | C.A. No. : | 06C-10-189 |
| | Edwin Baxter | C.A. No. : | 06C-11-183 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Jacobs & Crumplar*

| | | | |
|---|---|---|---|
| *BRYSON TRIAL GROUP* | Ronald Bryson | C.A. No. : | 07C-05-067 |
| | Lawrence Alfele | C.A. No. : | 06C-08-268 |
| | Joseph Kaminski | C.A. No. : | 06C-09-018 |
| | George Jones | C.A  No. : | 06C-09-244 |
| | Barry Urian | C.A. No. : | 06C-09-246 |
| | Gregory Fletcher | C.A. No. : | 06C-09-309 |
| | Lewis Fisher | C.A. No. : | 06C-10-232 |
| | James Norem | C.A. No. : | 06C-10-345 |
| | Alton Passwaters | C.A. No. : | 06C-12-011 |
| | Irvin Messick | C.A. No. : | 07C-01-234 |
| | Ralph Moore | C.A. No. : | 07C-03-141 |
| | David Morris | C.A. No. : | 07C-03-394 |
| | Virginia Foley | C.A. No. : | 07C-07-006 |
| | John Pawlowski | C.A. No. : | 06C-08-012 |
| | Ronald Massey | C.A. No. : | 06C-09-017 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Joseph Rhoades*

| *BLOTSKY  TRIAL GROUP* | Norbert Frederick | C.A. No. : 07C-12-118 |
|---|---|---|
| | Raymond Blotsky | C.A. No. : 08C-03-134 |
| | Roy Brown | C.A. No. : 08C-03-090 |
| | Joseph Sweitzer | C.A. No. : 08C-03-181 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Peter G. Angelos*

**TRIAL DATE**          **:**      **August 5, 2009**
**PLAINTIFFS' COUNSEL**    **:**      **Bifferato Gentilotti, Weiss & Saville, and Jacobs**
                                         **& Crumplar (Keahey) cases**

*Bifferato Gentilotti*

| | | |
|---|---|---|
| *MENDOZA TRIAL GROUP* | Eduardo Mendoza | C.A. No. : 07C-05-013 |
| | Orlando Perla | C.A. No. :  07C-05-082 |
| | John Sanderson | C.A. No. :  07C-05-156 |
| | Pearl Burchette | C.A. No. :  07C-05-223 |
| | Adrian Callahan | C.A. No. :  07C-05-249 |
| | Jarold McLean | C.A. No. :  07C-05-282 |
| | Robert Archer | C.A. No. :  07C-06-181 |
| | Sharon Bucksbee | C.A. No. :  07C-06-218 |
| | Luiz Ortiz | C.A. No. :  07C-07-236 |
| | Anthony Valleta | C.A. No. :  07C-07-262 |
| | Dale Zieske | C.A. No. :  07C-09-086 |
| | Ave Julian | C.A. No. :  07C-09-098 |
| | Geoffrey King | C.A. No. :  07C-08-103 |
| | Joe Radford | C.A. No. :  08C-02-140 |
| | Darius Salehi | C.A. No. :  07C-10-294 |
| | Bernhard Setness | C.A. No. :  07C-10-147 |
| | Francis Simonis | C.A. No. :  07C-10-258 |
| | Herbert Stellar | C.A. No. :  07C-12-168 |
| | Larry Starcher | C.A. No. :  07C-11-128 |
| | Ralph Coley | C.A. No. :  07C-11-202 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Weiss & Saville*

| | | |
|---|---|---|
| *COTTON TRIAL GROUP* | Virgil Grant Cotton | C.A. No. :  05C-09-180 |
| | William Womack, Sr. | C.A. No. :  05C-09-202 |
| | Barbara A. Alexander | C.A. No. :  05C-09-269 |
| | Louis E. Wheeler | C.A. No. :  06C-11-187 |
| | Thomas S. Wilson | C.A. No. :  06C-11-235 |
| | William H. Fancher | C.A. No. :  06C-11-237 |
| | Johnny Leedy | C.A. No. :  06C-11-238 |
| | John VanHouten | C.A. No. :  06C-11-239 |
| | Janie Fuller | C.A. No. :  06C-12-141 |

*********************************************************************************

*Jacobs & Crumplar*

| *L'HEUREAUX TRIAL GROUP* | Henry L'Heureaux | C.A. No. : | 07C-11-015 |
|---|---|---|---|
| | Edward Locker | C.A. No. : | 07C-11-014 |
| | Russell Smith | C.A. No. : | 07C-11-244 |
| | William Barnes | C.A. No. : | 08C-03-163 |
| | Walter Golembeski | C.A. No. : | 08C-03-164 |
| | Alyce Riess | C.A. No. : | 08C-04-087 |

**TRIAL DATE**           :    **September 23, 2009**
**PLAINTIFFS' COUNSEL**  :    **Weiss & Saville, Joseph Rhoades, and Jacobs &**
                              **Crumplar cases**

*Weiss & Saville*

    *HAWKS  TRIAL GROUP*

| | | |
|---|---|---|
| Dennis C. Hawks | C.A. No. : | 05C-10-009 |
| Edward M. Schaefer | C.A. No. : | 05C-10-099 |
| Darrell McKinnis | C.A. No. : | 05C-10-007 |
| Henry Kritzer | C.A. No. : | 05C-11-032 |
| James Payne | C.A. No.: | 07C-02-248 |
| Robert Hallam | C.A. No. : | 07C-02-286 |
| James Cunningham | C.A. No. : | 07C-03-144 |
| Robert Kowalczyk | C.A. No. : | 07C-03-145 |
| Joe E. Gasca | C.A. No. : | 07C-03-241 |
| Robert Lee Poe, Jr. | C.A. No. : | 07C-03-241 |
| Lawrence Knapp | C.A. No. : | 07C-03-264 |
| Robert Schamp | C.A. No. : | 05C-11-150 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Jacobs & Crumplar*

    *TARBUTTON TRIAL GROUP*

| | | |
|---|---|---|
| Florence Smith | C.A. No. : | 07C-07-212 |
| Frederick Smith | C.A. No. : | 07C-07-213 |
| Roland Tarbutton | C.A. No. : | 07C-08-010 |
| Frederick Ramsey | C.A. No. : | 07C-08-279 |
| David Curlett | C.A. No. : | 07C-08-280 |
| Michael Villaneuva | C.A. No. : | 07C-09-233 |
| Donald Altemeyer | C.A. No. : | 07C-10-295 |
| Manuel Lluerma | C.A. No. : | 04C-09-122 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Rhoades Cases*

    *SURFIELD TRIAL GROUP*

| | | |
|---|---|---|
| Frederick Seitz | C.A. No. : | 08C-04-287 |
| Wilma Webster | C.A. No. : | 08C-04-041 |
| Ray Surfield | C.A. No. : | 08C-02-495 |
| Mary Irving | C.A. No. : | 08C-04-240 |

**TRIAL DATE**          :    **November 11, 2009**
**PLAINTIFFS' COUNSEL**  :    **Ciconte & Wasserman, Weiss & Saville,**
                              **Bifferato Gentilotti, and Peter G. Angelos cases**


*Ciconte & Wasserman*

    *GETHICKER TRIAL GROUP*    Gerald Gethicker      C.A. No. :  07C-06-236
                                               Rudolfo Santayana     C.A. No. :  07C-06-336
                                               Frederick Balk        C.A. No. :  07C-07-187
                                               Achille Kourouklis    C.A. No. :  07C-08-179
                                               J.C. McLlewain        C.A. No. :  07C-09-248


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Weiss & Saville*

    *DUMSTORFF TRIAL GROUP*    Kenneth Harrison      C.A. No. :  06C-12-142
                                               Leon Dumstorff        C.A. No. :  06C-12-146
                                               Joanne Bagienski      C.A. No. :  06C-12-252
                                               James William Prag    C.A. No. :  05C-11-174
                                               Dale Joseph Woods     C.A. No. :  05C-11-190
                                               Lloyd Fay Morris      C.A. No. :  05C-12-026
                                               Clayton Richardson    C.A. No. :  05C-12-186
                                               Robert Curtis Allen   C.A. No. :  05C-11-161


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Bifferato Gentilotti*

    *COFFMAN TRIAL GROUP*    Eugene Koon          C.A. No. :  07C-07-261
                                             Virginia Coffman     C.A. No. :  07C-07-264
                                             Joseph Skipkoski     C.A. No. :  07C-08-094
                                             Samuel Scott         C.A. No. :  07C-09-026
                                             Joseph Thibeault     C.A. No. :  07C-09-057
                                             Thomas Shade         C.A. No. :  07C-09-058
                                             Kenneth Mallow       C.A. No. :  07C-09-150
                                             J.C. Masoner         C.A. No. :  07C-09-217
                                             Franklin Poper       C.A. No. :  07C-09-218
                                             Linda Mascari        C.A. No. :  07C-09-232
                                             Mabel Lavely         C.A. No. :  07C-09-234
                                             George Harper        C.A. No. :  08C-02-037
                                             Jean Turpin          C.A. No. :  07C-12-158
                                             Paul Piepkow         C.A. No. :  07C-12-186
                                             Paula Kerr           C.A. No. :  08C-02-038
                                             Richard Cannon       C.A. No. :  08C-02-041

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Peter G. Angelos*

## TABLE OF TRIAL SCHEDULE ABSTRACTS

| General Scheduling Order No. 1 Item And Pretrial Scheduling Order Item | JULY 2008 W&S | JULY 2008 BG | JULY 2008 J&C | SEPT 2008 W&S BG C&W JR J&C |
|---|---|---|---|---|
| Date to notice discovery deficiencies | Passed | Passed | Passed | 01/25/08 |
| Date for plaintiff to file motion seeking to establish the substantive law applicable to the matter | Passed | Passed | Passed | 01/25/08 |
| Date to correct discovery deficiencies noticed | Passed | Passed | Passed | 01/25/08 |
| Date to file Rule 12 Motions | Passed | Passed | Passed | 02/01/08 |
| Date to file motion to correct discovery deficiencies noticed but not corrected | Passed | Passed | Passed | 02/04/08 |
| Date for defendants' responses to plaintiffs' motion for establishment for substantive law | Passed | Passed | Passed | 02/01/08 |
| Date to file answers to Rule 12 motions | Passed | Passed | Passed | 02/01/08 |
| Date for plaintiffs to file initial Witness & Exhibit Lists (Factual, Medical, and Expert) | Passed | Passed | Passed | 02/08/08 |
| Date for plaintiffs to update production of medical and diagnostic materials produced in accordance with Standing Order No. 1 | Passed | Passed | Passed | 02/08/08 |
| Date to update and supplement prior discovery responses | Passed | Passed | Passed | 02/08/08 |
| Date for plaintiffs to produce all expert reports and disclosures (factual and medical) and update any expert reports or disclosures previously produced | Passed | Passed | Passed | 02/15/08 |
| Date to have completed the depositions of all plaintiffs alleging exposure | 02/15/08 | 02/15/08 | 02/15/08 | 03/14/08 |
| Date to initiate Alternative Dispute Resolution | 02/15/08 | 02/15/08 | 02/15/08 | 03/24/08 |
| Date for defendants' joint medical Witness and Exhibit list and defendants' joint medical expert reports | 02/15/08 | 02/15/08 | 02/15/08 | 03/21/08 |
| Date for Commissioner's Discovery Conference | 02/21/08 | 02/21/08 | 02/21/08 | 04/10/08 |
| Date to complete Alternative Dispute Resolution and report to Commissioner | 03/07/08 | 03/07/08 | 03/07/08 | 04/11/08 |
| Date to have completed the depositions of all coworker, product identification, and other exposure testimony witnesses | 03/21/08 | 03/21/08 | 04/11/08 | 04/25/08 |
| Date for final discovery requests | 03/21/08 | 03/21/08 | 03/21/08 | 04/25/08 |

| General Scheduling Order No. 1 Item And Pretrial Scheduling Order Item | JULY 2008 W&S | JULY 2008 BG | JULY 2008 J&C | SEPT 2008 W&S BG C&W JR J&C |
|---|---|---|---|---|
| Date for objections to final discovery requests | 03/26/08 | 03/26/08 | 03/26/08 | 05/02/08 |
| Date for filing of motions to compel any final discovery requests | 03/31/08 | 03/31/08 | 03/31/08 | 05/06/08 |
| Date for opening brief and motion for summary judgment | 03/28/08 | 03/28/08 | 04/18/08 | 05/19/08 |
| Date for individual defendants' Witness and Exhibit Lists (Factual, Medical, and Expert) | 03/28/08 | 03/28/08 | 04/18/08 | 05/19/08 |
| Date for responsive brief or written notice not to oppose summary judgment | 04/11/08 | 04/18/08 | 05/12/08 | 06/02/08 |
| Date for reply brief in support of motion for summary judgment | 04/17/08 | 04/25/08 | 05/28/08 | 06/10/08 |
| Date for Defendants to file all (factual and medical) expert reports and disclosures | 04/21/08 | 04/29/08 | 06/10/08 | 06/10/08 |
| Date for all defendants to submit to Defense Coordinating Counsel a listing of all fact and expert witnesses for trial and, as to each, provide dates, times, and addresses when they will be available for deposition. Dates to fall after 04/30/08 but before 06/25/08 – W&S July 2008 cases Dates to fall after 05/06/08 but before 06/25/08 – BG July 2008 cases Dates to fall after 06/20/08 but before 07/10/08 – J&C July 2008 cases Dates to fall after 06/20/08 but before 08/06/08 – September 2008 cases | 04/21/08 | 04/29/08 | 06/10/08 | 06/10/08 |
| Date for plaintiffs to provide Defense Coordinating Counsel with dates, times, and addresses for the depositions of plaintiffs' expert witnesses. Dates to fall after 04/30/08 but before 06/25/08 – W&S July 2008 cases Dates to fall after 05/06/08 but before 06/25/08 – BG July 2008 cases Dates to fall after 06/20/08 but before 07/10/08 – J&C July 2008 cases Dates to fall after 06/20/08 but before 08/06/08 – September 2008 cases | 04/21/08 | 04/29/08 | 06/10/08 | 06/10/08 |
| Date for Defense Coordinating Counsel to coordinate defendants' witness listings and tenders, resolve conflicts, and present final coordinated and complete defense witness for depositions offer to plaintiff. | 04/23/08 | 05/01/08 | 06/12/08 | 06/12/08 |
| Date for Defense Coordinating Counsel to coordinate plaintiffs' expert witness listings and tenders and to produce same to defendants | 04/23/08 | 05/01/08 | 06/12/08 | 06/12/08 |
| Date for Defense Coordinating Counsel to advise plaintiffs which expert tenders are accepted and which are declined | 04/25/08 | 05/02/08 | 06/16/08 | 06/16/08 |
| Date for Plaintiffs to advise Defense Coordinating Counsel which defense witness tenders are accepted and which are declined | 04/25/08 | 05/02/08 | 06/16/08 | 06/16/08 |
| Date for completion of depositions of all defense fact and expert witnesses and of all plaintiff expert witnesses | 06/25/08 | 06/25/08 | 07/18/08 | 08/04/08 |
| Date for completion of **ALL** discovery | 06/25/08 | 06/25/08 | 07/18/08 | 08/04/08 |
| Date to finalize **ALL** witness and exhibit lists | 06/25/08 | 06/25/08 | 07/18/08 | 08/04/08 |

| General Scheduling Order No. 1 Item And Pretrial Scheduling Order Item | JULY 2008 W&S | JULY 2008 BG | JULY 2008 J&C | SEPT 2008 W&S BG C&W JR J&C |
|---|---|---|---|---|
| Date for Commissioner's Pretrial Conference | 05/29/08 | 05/29/08 | 05/29/08 | 07/10/08 |
| Date for filing of motions in limine | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date for filing answers to motions in limine | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date For Plaintiffs' written settlement demands | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date For Defendants' written responses to settlement demands | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date for lines and pages designations | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date for lines and pages counter designations | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Plaintiffs' Pretrial Memorandum provided to Defense Coordinating Counsel and circulated to all defense counsel | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Defendants individual Pretrial Stipulations submitted to Defense Coordinating Counsel | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Defendants' combined Pretrial Stipulation submitted to Plaintiffs | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Pretrial Stipulation signed and filed with Court with hard copy delivered to Court | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Prospective Witness Lists and Lists of First Week Witnesses filed with Filing ID Nos. provided to Commissioner | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date by which Defendants to contact Plaintiffs to schedule mandatory Settlement Conference/Mediation | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date by which all Motions, Briefs, and Appendices/Exhibits for Summary Judgment to be provided to Defense Coordinating Counsel | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date for delivery of index to and hard copies of all pending Motions, Briefs, and Appendices/Exhibits for Summary Judgment to the Court | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Oral arguments on Motions for Summary Judgment | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Final Pretrial Conference and In Limine hearings | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Trial Date | 07/30/08 | 07/30/08 | 07/30/08 | 09/10/08 |

| General Scheduling Order No. 1 Item And Pretrial Scheduling Order Item | OCT 2008 W&S BG | DEC 2008 J&C BG W&S |
|---|---|---|
| Date to notice discovery deficiencies | 02/01/08 | 02/08/08 |
| Date for plaintiff to file motion seeking to establish the substantive law applicable to the matter | 02/01/08 | 02/08/08 |
| Date to correct discovery deficiencies noticed | 02/08/08 | 02/15/08 |
| Date to file Rule 12 Motions | 02/08/08 | 02/15/08 |
| Date to file motion to correct discovery deficiencies noticed but not corrected | 02/12/08 | 02/22/08 |
| Date for defendants' responses to plaintiffs' motion for establishment for substantive law | 02/08/08 | 02/22/08 |
| Date to file answers to Rule 12 motions | 02/08/08 | 02/22/08 |
| Date for plaintiffs to file initial Witness & Exhibit Lists (Factual, Medical, and Expert) | 03/21/08 | 04/04/08 |
| Date for plaintiffs to update production of medical and diagnostic materials produced in accordance with Standing Order No. 1 | 03/21/08 | 04/04/08 |
| Date to update and supplement prior discovery responses | 03/21/08 | 04/04/08 |
| Date for plaintiffs to produce all expert reports and disclosures (factual and medical) and update any expert reports or disclosures previously produced | 03/21/08 | 04/11/08 |
| Date to have completed the depositions of all plaintiffs alleging exposure | 04/30/08 | 05/16/08 |
| Date to initiate Alternative Dispute Resolution | 05/12/08 | 05/23/08 |
| Date for defendants' joint medical Witness and Exhibit list and defendants' joint medical expert reports | 05/16/08 | 07/11/08 |
| Date for Commissioner's Discovery Conference | 05/29/08 | 06/26/08 |
| Date to complete Alternative Dispute Resolution and report to Commissioner | 06/06/08 | 06/27/08 |
| Date to have completed the depositions of all coworker, product identification, and other exposure testimony witnesses | 05/09/08 | 07/18/08 |
| Date for final discovery requests | 05/09/08 | 07/18/08 |
| Date for objections to final discovery requests | 05/16/08 | 07/23/08 |
| Date for filing of motions to compel any final discovery requests | 05/20/08 | 07/25/08 |
| Date for opening brief and motion for summary judgment | 06/02/08 | 08/04/08 |
| Date for individual defendants' Witness and Exhibit Lists (Factual, Medical, and Expert) | 06/02/08 | 08/04/08 |
| Date for responsive brief or written notice not to oppose summary judgment | 06/16/08 | 08/22/08 |

| General Scheduling Order No. 1 Item<br>And<br>Pretrial Scheduling Order Item | OCT<br>2008<br><br>W&S<br>BG | DEC<br>2008<br><br>J&C<br>BG<br>W&S |
|---|---|---|
| Date for reply brief in support of motion for summary judgment | 06/23/08 | 08/29/08 |
| Date for Defendants to file all (factual and medical) expert reports and disclosures | 06/23/08 | 08/29/08 |
| Date for all defendants to submit to Defense Coordinating Counsel a listing of all fact and expert witnesses for trial and, as to each, provide dates, times, and addresses when they will be available for deposition.<br>Dates to fall after 07/07/08 but before 09/19/08 – October 2008 cases<br>Dates to fall after 09/03/08 but before 10/06/08 – December 2008 cases | 06/23/08 | 08/29/08 |
| Date for all defendants to submit to Defense Coordinating Counsel a listing of all fact and expert witnesses for trial and, as to each, provide dates, times, and addresses when they will be available for deposition.<br>Dates to fall after 07/07/08 but before 09/19/08 – October 2008 cases<br>Dates to fall after 09/03/08 but before 10/06/08 – December 2008 cases | 06/23/08 | 08/29/08 |
| Date for Defense Coordinating Counsel to coordinate defendants' witness listings and tenders, resolve conflicts, and present final coordinated and complete defense witness for depositions offer to plaintiffs | 06/25/08 | 09/01/08 |
| Date for Defense Coordinating Counsel to coordinate plaintiffs' expert witness listings and tenders and to produce same to defendants | 06/25/08 | 09/01/08 |
| Date for Defense Coordinating Counsel to advise plaintiffs which expert tenders are accepted and which are declined | 06/30/08 | 09/03/08 |
| Date for Plaintiffs to advise Defense Coordinating Counsel which defense witness tenders are accepted and which are declined | 06/30/08 | 09/03/08 |
| Date for completion of depositions of all defense fact and expert witnesses and of all plaintiff expert witnesses | 09/19/08 | 10/06/08 |
| Date for completion of **ALL** discovery | 09/19/08 | 10/06/08 |
| Date to finalize **ALL** witness and exhibit lists | 09/19/08 | 10/17/08 |
| Date for Commissioner's Pretrial Conference | 08/21/08 | 10/16/08 |
| Date for filing of motions in limine | PT Sched<br>Order Item | PT Sched<br>Order Item |
| Date for filing answers to motions in limine | PT Sched<br>Order Item | PT Sched<br>Order Item |
| Date For Plaintiffs' written settlement demands | PT Sched<br>Order Item | PT Sched<br>Order Item |
| Date For Defendants' written responses to settlement demands | PT Sched<br>Order Item | PT Sched<br>Order Item |
| Date for lines and pages designations | PT Sched<br>Order Item | PT Sched<br>Order Item |
| Date for lines and pages counter designations | PT Sched<br>Order Item | PT Sched<br>Order Item |
| Plaintiffs' Pretrial Memorandum provided to Defense Coordinating Counsel and circulated to all defense counsel | PT Sched<br>Order Item | PT Sched<br>Order Item |
| Defendants individual Pretrial Stipulations submitted to Defense Coordinating Counsel | PT Sched<br>Order Item | PT Sched<br>Order Item |

| General Scheduling Order No. 1 Item<br>And<br>Pretrial Scheduling Order Item | OCT<br>2008<br><br>W&S<br>BG | DEC<br>2008<br><br>J&C<br>BG<br>W&S |
|---|---|---|
| Defendants' combined Pretrial Stipulation submitted to Plaintiffs | PT Sched<br>Order Item | PT Sched<br>Order Item |
| Pretrial Stipulation signed and filed with Court with hard copy delivered to Court | PT Sched<br>Order Item | PT Sched<br>Order Item |
| Prospective Witness Lists and Lists of First Week Witnesses filed with Filing ID Nos. provided to Commissioner | PT Sched<br>Order Item | PT Sched<br>Order Item |
| Date by which Defendants to contact Plaintiffs to schedule mandatory Settlement Conference/Mediation | PT Sched<br>Order Item | PT Sched<br>Order Item |
| Date by which all Motions, Briefs, and Appendices/Exhibits for Summary Judgment to be provided to Defense Coordinating Counsel | PT Sched<br>Order Item | PT Sched<br>Order Item |
| Date for delivery of index to and hard copies of all pending Motions, Briefs, and Appendices/Exhibits for Summary Judgment to the Court | PT Sched<br>Order Item | PT Sched<br>Order Item |
| Oral arguments on Motions for Summary Judgment | PT Sched<br>Order Item | PT Sched<br>Order Item |
| Final Pretrial Conference and In Limine hearings | PT Sched<br>Order Item | PT Sched<br>Order Item |
| Trial Date | **10/22/08** | **12/03/08** |

| EVENT | JAN 2009 W&S BG C&W JR PGA | MAR 2009 BG J&C PGA | APRIL 2009 BG W&S JR | JUNE 2009 C&W W&S J&C JR PGA |
|---|---|---|---|---|
| Date to notice discovery deficiencies | 05/27/08 | 05/27/08 | 05/27/08 | 06/11/08 |
| Date for plaintiff to file motion seeking to establish the substantive law applicable to the matter | 05/27/08 | 05/27/08 | 05/27/08 | 07/01/08 |
| Date to correct discovery deficiencies noticed | 06/06/08 | 06/06/08 | 06/06/08 | 07/11/08 |
| Date to file Rule 12 Motions | 06/06/08 | 06/06/08 | 06/06/08 | 07/11/08 |
| Date to file motion to correct discovery deficiencies noticed but not corrected | 06/13/08 | 06/13/08 | 06/13/08 | 07/18/08 |
| Date for defendants' responses to plaintiffs' motion for establishment for substantive law | 06/20/08 | 06/20/08 | 06/20/08 | 07/25/08 |
| Date to file answers to Rule 12 motions | 06/30/08 | 06/30/08 | 06/30/08 | 08/05/08 |
| Date for plaintiffs to file initial Witness & Exhibit Lists (Factual, Medical, and Expert) | 05/30/08 | 05/30/08 | 07/31/08 | 08/15/08 |
| Date for plaintiffs to update production of medical and diagnostic materials produced in accordance with Standing Order No. 1 | 05/30/08 | 05/30/08 | 07/31/08 | 08/15/08 |
| Date to update and supplement prior discovery responses | 05/30/08 | 05/30/08 | 07/31/08 | 08/15/08 |
| Date for plaintiffs to produce all expert reports and disclosures (factual and medical) and update any expert reports or disclosures previously produced | 05/30/08 | 05/30/08 | 07/31/08 | 08/15/08 |
| Date to have completed the depositions of all plaintiffs alleging exposure | 06/20/08 | 06/20/08 | 08/20/08 | 09/04/08 |
| Date for defendants' joint medical Witness and Exhibit list and defendants' joint medical expert reports | 08/01/08 | 08/20/08 | 09/26/08 | 11/04/08 |
| Date to initiate Alternative Dispute Resolution | 08/01/08 | 08/20/08 | 10/17/08 | 11/14/08 |
| Date for final discovery requests | 08/01/08 | 08/20/08 | 10/13/08 | 11/14/08 |
| Date for objections to final discovery requests | 08/06/08 | 08/26/08 | 10/17/08 | 11/25/08 |
| Date to have completed the depositions of all coworker, product identification, and other exposure testimony witnesses | 08/15/08 | 09/26/08 | 11/07/08 | 12/05/08 |
| Date for filing of motions to compel any final discovery requests | 08/11/08 | 09/26/08 | 10/31/08 | 12/16/08 |
| Date for opening brief and motion for summary judgment | 08/22/08 | 10/06/06 | 11/21/08 | 12/16/08 |
| Date for responsive brief or written notice not to oppose summary judgment | 09/12/08 | 10/30/08 | 12/12/08 | 01/05/09 |
| Date for reply brief in support of motion for summary judgment | 09/19/08 | 11/07/08 | 12/24/08 | 01/15/09 |
| Date for Commissioner's Discovery Conference | 09/18/08 | 10/30/08 | 12/18/08 | 01/15/09 |
| Date to complete Alternative Dispute Resolution and report to Commissioner | 10/10/08 | 11/28/08 | 01/23/09 | 02/13/09 |
| Date for individual defendants' Witness and Exhibit Lists (Factual, Medical, and Expert) | 10/17/08 | 12/08/08 | 01/30/09 | 02/20/09 |
| Date for Defendants to file all (factual and medical) expert reports and disclosures | 10/17/08 | 12/08/08 | 01/30/09 | 02/20/09 |

| EVENT | JAN 2009 W&S BG C&W JR PGA | MAR 2009 BG J&C PGA | APRIL 2009 BG W&S JR | JUNE 2009 C&W W&S J&C JR PGA |
|---|---|---|---|---|
| Date for plaintiffs to provide Defense Coordinating Counsel with dates, times, and addresses for the depositions of plaintiffs' expert witnesses.<br>Dates to fall after 10/27/08 but before 12/08/08 – January 2009 cases<br>Dates to fall after 12/17/08 but before 02/06/09 – March 2009 cases (no depositions to be scheduled 12/24/08 through 12/26/08)<br>Dates to fall after 02/17/09 but before 03/20/09 – April 2009 cases<br>Dates to fall after 03/02/09 but before 04/27/09 – June 2009 cases | 10/17/08 | 12/08/08 | 01/30/09 | 02/20/09 |
| Date for plaintiffs to provide Defense Coordinating Counsel with dates, times, and addresses for the depositions of plaintiffs' expert witnesses.<br>Dates to fall after 10/27/08 but before 12/08/08 – January 2009 cases<br>Dates to fall after 12/17/08 but before 02/06/09 – March 2009 cases (no depositions to be scheduled 12/24/08 through 12/26/08)<br>Dates to fall after 02/17/09 but before 03/20/09 – April 2009 cases<br>Dates to fall after 03/02/09 but before 04/27/09 – June 2009 cases | 10/17/08 | 12/08/08 | 01/30/09 | 02/20/09 |
| Date for Defense Coordinating Counsel to coordinate defendants' witness listings and tenders, resolve conflicts, and present final coordinated and complete defense witness for depositions offer to plaintiff. | 10/20/08 | 12/10/08 | 02/03/09 | 02/25/09 |
| Date for Defense Coordinating Counsel to coordinate plaintiffs' expert witness listings and tenders and to produce same to defendants | 10/20/08 | 12/10/08 | 02/03/09 | 02/25/09 |
| Date for Defense Coordinating Counsel to advise plaintiffs which expert tenders are accepted and which are declined | 10/22/08 | 12/12/08 | 02/05/09 | 02/27/09 |
| Date for Plaintiffs to advise Defense Coordinating Counsel which defense witness tenders are accepted and which are declined | 10/22/08 | 12/12/08 | 02/05/09 | 02/27/09 |
| Date for completion of depositions of all defense fact and expert witnesses and of all plaintiff expert witnesses | 12/08/08 | 02/06/09 | 03/20/09 | 04/27/09 |
| Date for completion of **ALL** discovery | 12/08/08 | 02/06/09 | 03/20/09 | 04/27/09 |
| Date to finalize **ALL** witness and exhibit lists | 12/08/08 | 02/06/09 | 03/20/09 | 04/27/09 |
| Date for Commissioner's Pretrial Conference | 11/20/08 | 01/15/09 | 02/26/09 | 04/16/09 |
| Date for filing of motions in limine | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date for filing answers to motions in limine | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date For Plaintiffs' written settlement demands | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date For Defendants' written responses to settlement demands | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date for lines and pages designations | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date for lines and pages counter designations | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Plaintiffs' Pretrial Memorandum provided to Defense Coordinating Counsel and circulated to all defense counsel | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Defendants individual Pretrial Stipulations submitted to Defense Coordinating Counsel | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |

| EVENT | JAN 2009 W&S BG C&W JR PGA | MAR 2009 BG J&C PGA | APRIL 2009 BG W&S JR | JUNE 2009 C&W W&S J&C JR PGA |
|---|---|---|---|---|
| Defendants' combined Pretrial Stipulation submitted to Plaintiffs | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Pretrial Stipulation signed and filed with Court with hard copy delivered to Court | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Prospective Witness Lists and Lists of First Week Witnesses filed with Filing ID Nos. provided to Commissioner | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date by which Defendants to contact Plaintiffs to schedule mandatory Settlement Conference/Mediation | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date by which all Motions, Briefs, and Appendices/Exhibits for Summary Judgment to be provided to Defense Coordinating Counsel | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date for delivery of index to and hard copies of all pending Motions, Briefs, and Appendices/Exhibits for Summary Judgment to the Court | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Oral arguments on Motions for Summary Judgment | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Final Pretrial Conference and In Limine hearings | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| TRIAL DATE | 01/21/09 | 03/11/09 | 04/29/09 | 06/16/09 |

| EVENT | AUG 2009<br><br>BG W&S J&C | SEP 2009<br><br>W&S J&C JR | NOV 2009<br><br>C&W W&S BG PGA |
|---|---|---|---|
| Date to notice discovery deficiencies | 08/06/08 | 09/17/08 | 11/05/08 |
| Date for plaintiff to file motion seeking to establish the substantive law applicable to the matter | 08/26/08 | 10/07/08 | 11/25/08 |
| Date to correct discovery deficiencies noticed | 09/05/08 | 10/17/08 | 12/05/08 |
| Date to file Rule 12 Motions | 09/05/08 | 10/17/08 | 12/05/08 |
| Date to file motion to correct discovery deficiencies noticed but not corrected | 09/11/08 | 10/24/08 | 12/12/08 |
| Date for defendants' responses to plaintiffs' motion for establishment for substantive law | 09/16/08 | 10/31/08 | 12/19/08 |
| Date to file answers to Rule 12 motions | 09/26/08 | 11/10/08 | 12/29/08 |
| Date for plaintiffs to file initial Witness & Exhibit Lists (Factual, Medical, and Expert) | 10/07/08 | 11/20/08 | 01/08/09 |
| Date for plaintiffs to update production of medical and diagnostic materials produced in accordance with Standing Order No. 1 | 10/07/08 | 11/20/08 | 01/08/09 |
| Date to update and supplement prior discovery responses | 10/07/08 | 11/20/08 | 01/08/09 |
| Date for plaintiffs to produce all expert reports and disclosures (factual and medical) and update any expert reports or disclosures previously produced | 10/07/08 | 11/20/08 | 01/08/09 |
| Date to have completed the depositions of all plaintiffs alleging exposure | 10/27/08 | 12/10/08 | 01/28/09 |
| Date for defendants' joint medical Witness and Exhibit list and defendants' joint medical expert reports | 12/29/08 | 02/10/09 | 03/27/09 |
| Date to initiate Alternative Dispute Resolution | 01/05/09 | 02/20/09 | 04/06/09 |
| Date for final discovery requests | 01/05/09 | 02/20/09 | 04/06/09 |
| Date for objections to final discovery requests | 01/13/09 | 03/03/09 | 04/17/09 |
| Date to have completed the depositions of all coworker, product identification, and other exposure testimony witnesses | 01/23/09 | 03/13/09 | 04/29/09 |
| Date for filing of motions to compel any final discovery requests | 02/03/09 | 03/24/09 | 05/08/09 |
| Date for opening brief and motion for summary judgment | 02/03/09 | 03/24/09 | 05/08/09 |
| Date for responsive brief or written notice not to oppose summary judgment | 02/23/09 | 04/13/09 | 05/29/09 |
| Date for  reply brief in support of motion for summary judgment | 03/05/09 | 04/23/09 | 06/10/09 |
| Date  for Commissioner's Discovery Conference | 03/05/09 | 04/23/09 | 06/10/09 |
| Date to complete Alternative Dispute Resolution and report to Commissioner | 04/03/09 | 05/21/09 | 07/10/09 |
| Date for individual defendants' Witness and Exhibit Lists (Factual, Medical, and Expert) | 04/10/09 | 05/29/09 | 07/15/09 |
| Date for Defendants to file all (factual and medical) expert reports and disclosures | 04/10/09 | 05/29/09 | 07/15/09 |

| EVENT | AUG 2009 BG W&S J&C | SEP 2009 W&S J&C JR | NOV 2009 C&W W&S BG PGA |
|---|---|---|---|
| Date for all defendants to submit to Defense Coordinating Counsel a listing of all fact and expert witnesses for trial and, as to each, provide dates, times, and addresses when they will be available for deposition.<br>Dates to be after 04/17/09 but before 06/15/09 – August 2009 cases<br>Dates to be after 06/05/09 but before 08/03/09 – September 2009 cases<br>Dates to be after 07/24/09 but before 09/21/09 – November 2009 cases | 04/10/09 | 05/29/09 | 07/15/09 |
| Date for plaintiffs to provide Defense Coordinating Counsel with dates, times, and addresses for the depositions of plaintiffs' expert witnesses.<br>Dates to be after 04/17/09 but before 06/15/09 – August 2009 cases<br>Dates to be after 06/05/09 but before 08/03/09 – September 2009 cases<br>Dates to be after 07/24/09 but before 09/21/09 – November 2009 cases | 04/10/09 | 05/29/09 | 07/15/09 |
| Date for Defense Coordinating Counsel to coordinate defendants' witness listings and tenders, resolve conflicts, and present final coordinated and complete defense witness for depositions offer to plaintiff. | 04/13/09 | 06/01/09 | 07/17/09 |
| Date for Defense Coordinating Counsel to coordinate plaintiffs' expert witness listings and tenders and to produce same to defendants | 04/13/09 | 06/01/09 | 07/17/09 |
| Date for Defense Coordinating Counsel to advise plaintiffs which expert tenders are accepted and which are declined | 04/15/09 | 06/03/09 | 07/21/09 |
| Date for Plaintiffs to advise Defense Coordinating Counsel which defense witness tenders are accepted and which are declined | 04/15/09 | 06/03/09 | 07/21/09 |
| Date for completion of depositions of all defense fact and expert witnesses and of all plaintiff expert witnesses | 06/15/09 | 08/03/09 | 09/21/09 |
| Date for completion of **ALL** discovery | 06/15/09 | 08/03/09 | 09/21/09 |
| Date to finalize **ALL** witness and exhibit lists | 06/15/09 | 08/03/09 | 09/21/09 |
| Date for Commissioner's Pretrial Conference | 06/04/09 | 07/23/09 | 09/17/09 |
| Date for filing of motions in limine | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date for filing answers to motions in limine | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date For Plaintiffs' written settlement demands | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date For Defendants' written responses to settlement demands | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date for lines and pages designations | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date for lines and pages counter designations | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Plaintiffs' Pretrial Memorandum provided to Defense Coordinating Counsel and circulated to all defense counsel | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Defendants individual Pretrial Stipulations submitted to Defense Coordinating Counsel | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Defendants' combined Pretrial Stipulation submitted to Plaintiffs | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Pretrial Stipulation signed and filed with Court with hard copy delivered to Court | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |

| EVENT | AUG 2009<br><br>BG<br>W&S<br>J&C | SEP 2009<br><br>W&S<br>J&C<br>JR | NOV 2009<br><br>C&W<br>W&S<br>BG<br>PGA |
|---|---|---|---|
| Prospective Witness Lists and Lists of First Week Witnesses filed with Filing ID Nos. provided to Commissioner | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date by which Defendants to contact Plaintiffs to schedule mandatory Settlement Conference/Mediation | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date by which all Motions, Briefs, and Appendices/Exhibits for Summary Judgment to be provided to Defense Coordinating Counsel | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Date for delivery of index to and hard copies of all pending Motions, Briefs, and Appendices/Exhibits for Summary Judgment to the Court | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Oral arguments on Motions for Summary Judgment | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| Final Pretrial Conference and In Limine hearings | PT Sched Order Item | PT Sched Order Item | PT Sched Order Item |
| TRIAL DATE | 08/05/09 | 09/23/09 | 11/11/09 |

Matthew F. Boyer
Special Master

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X
IN RE: ASBESTOS LITIGATION:               :
                                          :
FREDERICK SEITZ and                       :
MARY LOUISE SEITZ, his wife               :        C.A. No. 08-CV-0351 GMS
                                          :        C.A. No. 08-CV-0353 GMS
            Plaintiffs,                   :
                                          :
            v.                            :
                                          :
ADEL WIGGINS GROUP, et al.,               :
                                          :
            Defendants.                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## **ORDER**

Upon consideration of Plaintiffs' Motion to Remand, it is hereby ordered on this _____

day of _____, 2008 that this case is remanded to the Superior Court of the State of

Delaware in and for New Castle County.

_____
J.

{00121675.DOC}