**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| FREDERICK SEITZ and | : | C.A. No.: 08-CV-0351 GMS |
| MARY LOUISE SEITZ, his wife | : | |
| | : | |
| Plaintiffs, | : | Jury of Twelve Demanded |
| | : | |
| v. | : | |
| | : | |
| ADEL WIGGINS GROUP, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**OPPOSITION OF DEFENDANT BELL HELICOPTER TEXTRON INC. TO
PLAINTIFFS' MOTION TO REMAND**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES………………………………………………………………...ii

INTRODUCTION…………………………………………………………………………...1

ARGUMENT…………………………………………………………………………...6

     I.      Plaintiffs Cannot Amend the Complaint to Defeat Jurisdiction or Waive Bell's
           Affirmative Defenses……………………………………………………………...3

     II.     Bell Acted Pursuant to Federal Direction  ……………………………………5

     III.    There is a Causal Nexus between Plaintiffs' Claims and Bell's Acts under the
           Direct and Detailed Control of the Government  …………………………………8

     IV.    Bell has a Colorable Federal Contractor Defense………………………………..12

CONCLUSION…………………………………………………………………………..15

# **TABLE OF AUTHORITIES**

## **Cases**

*Akin v. Big Three Indus. Inc.*, 851 F. Supp. 819 (E.D. Tex. 1994) ……………………………..9

*Albright v. R.J. Reynolds Tobacco Co.,* 531 F.2d 132 (3d Cir. 1976) ……………………………3

*Angus v. Shiley, Inc.*, 989 F.2d 142, 145 (3d Cir. 1993) ………………………………………….3

*Brewster v. A.W. Chesteron Company*, 2007 WL 1056774 (N.D. Cal.) ………………………2

*Brown v. Southwestern Bell*, 901 F.2d 1250, 1254 (5th Cir.1990) ……………………………….4

*Boyle v. United Technologies, Inc.*, 487 U.S. 500 (1988) …………………………………………12

*Cavallini v. State Farm Mut. Auto. Ins. Co.*, 44 F.3d 256 (5th Cir. 1995) ……………………..3

*Cervantez v. Bexar County Civil Service Comm'n*, 99 F.3d 730 (5th Cir. 1996)………………….........................................................................................4

*Ching v. Mitre Corp.*, 921 F.2d 11 (1st Cir. 1990)…………………………………………………..4

*Fung v. Abex Corp.*, 816 F. Supp. 569 (N.D. Cal. 1992)……………………………………….6, 12

*Gulati v. Zuckerman*, 723 F. Supp. 353 (E.D. Pa. 1989) …………………………………………...6

*Hammond v. Terminal R.R. Ass'n of St. Louis*, 848 F.2d 95, 97 (7th Cir. 1988) ………………...4

*Hilbert v. Aeroquip, Inc.*, 486 F.Supp.2d 135 (D. Mass. 2007) ……………………………..........11

*Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp.2d 187 (D. Mass. 2008) ……………2, 11-12

*Holland / Blue Streak v. Barthelemy*, 849 F.2d 987, 989 (5th Cir.1988)…………………………4

*Husing Group of Cos. v. Auction 123, Inc.*, 2008 U.S. Dist. LEXIS 2983 (W.D. Pa. 2008)  3-4, 9

*Jefferson County v. Acker*, 527 U.S. 423 (1999) ………………………………………………12

*Madden v. Able Supply Co.*, 205 F.Supp.2d 695 (S.D. Tex. 2002) ……………………………....13

*Maryland v. Soper (No. 1)*, 270 U.S. 9 (1926) ……………………………………………………9

*Matthews v. Key Bank U.S.A. Nat'l Ass'n*, 1999 U.S. Dist. LEXIS 9099 (E.D. Pa. 1999) ………3

*Mercante v. Preston Trucking Co.*, 1997 U.S. Dist. LEXIS 6120…………………………………..4

*Mesa v. California*, 489 U.S. 121 (1989) ……………………………………………...9, 12

*New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492 (3d Cir. 1996)………………………………………………………………………………4

*Nguyen v. Allied Signal, Inc.*, 1998 U.S. Dist. LEXIS 15517 (N.D. Cal. 1998)……………..11-12

*Pullman Co. v. Jenkins*, 305 U.S. 534, 537-38 (1939)………………………………………3

*Robinson v. Quality Ins. Co.*, 633 F. Supp. 572 (S.D. Ala. 1986)………………………….4

*St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 293-94 (1938)…………………..3

*Westmoreland Hosp. Ass'n v. Blue Cross of W. Penn.*, 605 F.2d 119 (3d Cir. 1979) …………3

## **Statutes and Regulations**

28 U.S.C. § 1442(a)(1)………………………………………………………...………12

**INTRODUCTION**

Plaintiffs, Frederick and Mary Louise Seitz, initiated the instant asbestos litigation against thirty defendants on April 25, 2008, in the Superior Court of the State of Delaware for New Castle County, alleging that the defendants, including Bell Helicopter Textron Inc. ("Bell") specified, manufactured, distributed, sold, licensed, leased, installed, removed, developed, or used asbestos-containing products. *See* Plaintiffs' Complaint, at ¶ 36 (Ex. A). In their complaint, plaintiffs specifically asserted theories of liability including product design and manufacturing defect, state law failure to warn, and further complained of the use of asbestos in the design and manufacturing processes. *See* Ex. A at ¶¶ 45, 49, 53-54. On June 11, 2008, Bell removed this matter to the United States District Court for the District of Delaware on the basis of federal office removal jurisdiction. *See* Ex. B.

Thereafter, both Bell and codefendant Northrop Grumman ("Grumman") filed separate Notices of Tag-Along Action with the Panel on Multidistrict Litigation, seeking to transfer this matter for consolidation and coordination of pretrial proceedings to the MDL to become part of the *In re Products Liability Litigation*, Docket No. MDL-875 ("MDL-875") currently pending in the Eastern District of Pennsylvania before the Honorable James T. Giles. *See* Ex. C. In the interest of avoiding duplicative or conflicting rulings on pretrial issues in this case, Grumman filed a motion for stay of the proceedings in this matter pending a decision on transfer by the Judicial Panel on Multidistrict Litigation to the MDL-875. *See* Ex. D. On June 26, 2007, plaintiffs filed a Brief in Opposition to Grumman's Motion for Stay of the Proceedings, challenging the requested stay of the proceedings on the grounds that removal of this action was improper and that a stay would be prejudicial to plaintiff Mr. Seitz. *See* Ex. E. Of significance,

nowhere in plaintiffs' Opposition do they make any mention of the intended withdrawal of any of the claims against the defendants, particularly those of design and manufacturing defect.

Curiously, although plaintiffs had every opportunity to do so prior to service with Grumman's Reply Brief in Support of its Motion for Stay of the Proceedings, plaintiffs did not choose to withdraw any of the claims asserted against the defendants until three days after Grumman filed same. *See* Ex. F. Plaintiffs' timing as to their waiver of these claims is significant, as Grumman's Reply Brief distinguished as factually inapplicable the *Hilbert v. Aeroquip, Inc.*, 486 F.Supp.2d 135 (D. Mass. 2007) and *Brewster v. A.W. Chesteron Co.*, 2007 WL 1056774 (N.D. Cal.), cases which plaintiffs relied upon heavily in support of their argument against stay of the proceedings and for remand of the matter to State court. *See* Ex. E, at p. 2, 5-7. In particular, Grumman distinguished these cases by noting that both *Hilbert* and *Brewster* expressly limited their rulings to the facts of the particular case, wherein the claims alleged against the defendants were based solely on theories of state law failure-to-warn. *Id*. at 2. Significantly, a mere three days after Grumman filed its Reply Brief explaining that the *Hilbert* and *Brewster* cases were factually inapplicable in that the holdings therein only applied to sole state law failure to warn cases, plaintiffs filed a Waiver of Claims with this Court, waiving all claims asserted against the defendants other than state law failure to warn. *See* Ex. G. Thereafter, on July 29, 2008, plaintiffs filed a Motion to Remand the instant matter back to state court, this time asserting that since the only claim alleged thereby is one based on state law failure to warn, remand is proper because defendants do not meet the criteria for federal officer removal jurisdiction.

I.    **Plaintiff Cannot Amend the Complaint to Defeat Jurisdiction or Waive Bell's Affirmative Defenses**

In filing their Waiver of Claims a mere three days after it became evident that the main cases plaintiffs relied upon in support of their motion for remand apply only to cases solely alleging failure to warn causes of action, plaintiffs are now attempting to manipulate the federal removal system to wrongfully defeat jurisdiction.  In considering the propriety of removal, federal courts will base their review upon "the facts and circumstances as they existed at the time the notice of removal was filed." *Husing Group of Cos. v. Auction 123, Inc*., 2008 U.S. Dist. LEXIS 2983, at *6-7 (W.D. Pa. 2008) (citing *Pullman Co. v. Jenkins*, 305 U.S. 534, 537-38 (1939); *Angus v. Shiley, Inc.*, 989 F.2d 142, 145 (3d Cir. 1993); *Westmoreland Hosp. Ass'n v. Blue Cross of W. Penn*., 605 F.2d 119, 124 (3d Cir. 1979); *Albright v. R.J. Reynolds Tobacco Co.,* 531 F.2d 132, 135 (3d Cir. 1976)).  Moreover, federal jurisdiction is determined by the state court complaint as it existed at the time of removal.  *See Westmoreland Hosp*., 605 F.2d at 123-24. Courts within this Circuit and others have consistently held that "as a general rule of law, subsequent amendments made to destroy federal jurisdiction do not transform a proper removal into an improper removal."  *Husing Group*, 2008 U.S. Dist. LEXIS 2983, at *6 (holding that there was no question that plaintiff amended complaint for purpose of avoiding federal jurisdiction and therefore plaintiff's amendment, after removal, could not divest federal court of jurisdiction) (citation omitted); *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 293-94 (1938); *Westmoreland Hospital*., 605 F.2d at 123); *Cavallini v. State Farm Mut. Auto. Ins. Co.*, 44 F.3d 256, 265 (5th Cir. 1995) ("Removal jurisdiction should be determined on the basis of the state court complaint at the time of removal, and . . . a plaintiff cannot defeat removal by amending it.").  S*ee also Matthews v. Key Bank U.S.A. Nat'l Ass'n*, 1999 U.S. Dist. LEXIS 9099 (E.D. Pa. 1999) (holding that plaintiffs' attempt to defeat jurisdiction by dropping federal claim

which gave rise to removal jurisdiction did not strip federal court of subject matter jurisdiction); *Robinson v. Quality Ins.,* 633 F. Supp. 572, 577 (S.D. Ala. 1986) ("Action by a plaintiff subsequent to removal cannot deprive this Court of jurisdiction if the removal was proper when filed."); *Brown v. Southwestern Bell*, 901 F.2d 1250, 1254 (5th Cir.1990); *Hammond v. Terminal R.R. Ass'n of St. Louis*, 848 F.2d 95, 97 (7th Cir.1988), *cert. denied*, 489 U.S. 1032 (1989) ("Removal is not defeated by the fact that, after the case is removed, the plaintiff files a new complaint, deleting the federal claim or stating a claim that is not removable."); *Holland / Blue Streak v. Barthelemy*, 849 F.2d 987, 989 (5th Cir. 1988) ("The assertion of a claim under a federal statute alone is sufficient to empower the District Court to assume jurisdiction over the case…") (internal quotation omitted, footnote omitted), *quoted in Cervantez v. Bexar County Civil Service Comm'n*, 99 F.3d 730, 733 (5th Cir.1996); *Ching v. Mitre Corp*., 921 F.2d 11, 13-14 (1st Cir. 1990) ("amendment to complaint after removal designed to eliminate the federal claim will not defeat jurisdiction"). This rule is specifically intended "to prevent strategic manipulation of the federal court's jurisdiction." *Husing Group*, 2008 U.S. Dist. LEXIS 2983, at *6 (citing *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1503-04 (3d Cir. 1996)).  Indeed, with respect to this sort of jurisdictional manipulation, it has been held that plaintiffs are "not entitled to toy with the federal courts for strategic or tactical reasons.  The removal statutes are not to be used, or avoided, for mere tactical reasons." *Mercante v. Preston Trucking Co.*, 1997 U.S. Dist. LEXIS 6120, at *13 (quoting *Robinson v. Quality Ins. Co.*, 633 F. Supp. 572, 577 (S.D. Ala. 1986)).

Looking to the facts of this case, it is evident that plaintiffs' waiver of each and every federal claim they initially set forth in their Complaint, a mere three days after learning that the cases upon which they based their remand arguments applied solely to failure to warn causes of

action, is an attempt by the plaintiffs to manipulate the federal courts in order to improperly defeat jurisdiction.  Indeed, plaintiffs' initial fifty-seven paragraph complaint set forth in detail four distinct counts asserted against the defendants herein, which included claims of strict product liability, loss of consortium, willful and wanton conduct, negligence, and, within those, claims based upon alleged manufacturing and design defect.  *See* Ex. A.  Although plaintiffs had every opportunity to amend their complaint since the initial filing date of April 25, 2008, plaintiffs chose to wait over two months to do so, and thereafter curiously chose to waive all claims except the state law failure to warn claim which codefendant Grumman established  was the only situation upon which the cases cited by plaintiff would have any application. Accordingly, looking to the facts and circumstances as they existed at the time the notice of removal was filed, it is clear that removal was properly effected and that subject matter jurisdiction existed on the basis of federal officer jurisdiction.  Accordingly, as plaintiffs were clearly attempting to "toy with the federal courts for strategic or tactical reasons" in order to defeat jurisdiction, removal of this matter was proper and plaintiffs' amendment of its complaint, essentially seeking to waive the government contractor affirmative defense to which Bell is rightfully entitled, should not stand to limit this action to a sole state law failure-to-warn case.

## II.    Bell Acted Pursuant to Federal Direction

Contrary to plaintiffs' unfounded assertion in their Motion to Remand that defendant Bell has "not demonstrated that [it] was acting at the direction of an officer of the United States" such as to satisfy a necessary element of federal officer removal jurisdiction, Bell has in fact provided ample evidence in support of its contention that it was acting at the direction of the federal government in contracting to design and manufacture the military helicopters which plaintiff Mr. Seitz piloted and worked on or around and that allegedly may have exposed him to asbestos

containing components which were incorporated into these aircraft at the direction of the government. Indeed, as described more fully in Bell's Notice of Removal, during all times mentioned by plaintiff when he was allegedly exposed to asbestos containing products while serving in the military as a mechanic, electrician apprentice, and helicopter pilot, the only Bell products which Mr. Seitz would have encountered – the Bell UH-1 (Huey) and AH-1 (Cobra) – were products manufactured and delivered via contract with the United States government and pursuant to precise military specifications over which the United States, and its officer and employees, had control. Those specifications called out every design detail and controlled the design and manufacture of those military products. Indeed, Bell "delivered any helicopter and part to the US Army pursuant to a Government contract requiring Bell to adhere to detailed Government-approved design, production, marking and shipping specifications." *See* Declaration of William T. Wilson (former Director of Helicopter Contracts for Bell and employed by Bell in contract administration for thirty-two years) (Ex. H).

A party is said to be "acting under" the direction of a federal officer such as to warrant removal jurisdiction on this basis, where the federal officer has "direct and detailed control" over the party. *See Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992). The "direct control" requirement is established by showing a "'strong government intervention and the threat that a defendant will be sued in state court 'based upon actions taken pursuant to federal direction.'" *Id.* (quoting *Gulati v. Zuckerman*, 723 F. Supp. 353, 358 (E.D. Pa. 1989)).

Since 1951, defendant Bell has contracted for and supplied thousands of helicopters to the United States Government for use in the military, including H-13, UH-1, and AH-1 series aircrafts. *See* Declaration of Owen Kaiser, at ¶ 3 (thirty-eight year employee of Bell in the Power Plant Design Group and former Chief of Power Plant Design at Bell in Hurst, Texas) (Ex. I). Bell had to

follow "specific Government-approved procedures, regulations, laws and standards for the design,

materials, marking, production, and delivery of these helicopters" during this time. *Id.* Moreover,

as explained in detail by Wilson:

> The U.S. Government actively participated in the development of the UH-1 and AH-1 series helicopters. To facilitate the Government's review and approval of the design and production specifications and engineering drawings, the Government maintained a staff of military and civilian representatives at Bell's plant. From the 1960's to the present, the Government has maintained scores of personnel at Bell's plant to ensure the helicopters were built in accordance with the Detail Specifications . . . They were charged with reviewing and approving engineering drawings, assuring adherence to military specifications and requirements, assisting Bell's employees in achieving full compliance with military contract requirements, approving manufacturing and assembly processes and products, and accepting helicopters and supplies on behalf of the Government after determining they met every contract requirement.

Ex. H, at ¶ 10. In addition, the Government was "directly and intimately involved with the

development of the Bell UH-1 helicopter and controlled the details of the design of every aspect of

the manufactured helicopters, including, without limitation, the types of materials (such as

asbestos) used in the helicopters and their component parts." Ex. I, at ¶ 14. Representatives of the

government monitored and reviewed the work of the helicopter manufacturers at "every step in the

design and manufacturing process, and Government evaluation and approval had to occur at every

step." Ex. H, at ¶ 14.

Furthermore, with respect to the other helicopters supplied by Bell for military use to the

United States Government, including the H-13, UH-1, and AH-1 series aircrafts, Bell "had to

follow specific Government-approved procedures, regulations, laws and standards for the design,

materials, marking, production, and delivery of these helicopters." *Id.*, at ¶ 3. In addition, the

original flight and maintenance manuals which were used in the UH-1 and AH-1 series helicopters

"were developed and written at the specific direction of the military as to content.  The military reviewed and independently considered each draft of the manuals" and the Government "controlled both the original content and any subsequent revisions to the manuals."  *Id.*, at ¶ 24. Bell not only had to strictly comply with all government specifications for the military helicopters it manufactured, it "had <u>little or no leeway</u> in determining the required design of the helicopters, including materials for the component parts and their <u>paintings and markings</u>."  *Id.*, at ¶ 22. Indeed, Bell executed the helicopter contracts "in accordance with the requirements of the Detail Specification prepared at the direction of the Government, approved by the Government, and incorporated by reference in the contracts."  *Id.*, at ¶ 15.  These specifications incorporated a large and lengthy list of military specifications, known as "mil specs," which required compliance therewith and which described "the characteristics for helicopter parts containing asbestos as required by the Detail Specifications."  *Id.*  Significantly, the seals and gaskets which a Bell production employee might have been exposed to were exactly these sorts of parts.  *Id.* Moreover, every helicopter or helicopter component part which the Government accepted from Bell was done so "only after the Government confirmed the aircraft or part conformed to the contract specifications."  *Id.*, at ¶ 26.  Furthermore, the subject helicopters and component parts for which the government mandated the use of asbestos and which had to conform to precise contract specifications set forth by the government were designed by Bell specifically for the U.S. Military.  *See* Ex. I, at ¶ 4. Indeed, as explained in the Declaration of Owen Kaiser, "there were no predecessor civilian counterparts to either the UH-1 helicopter or the Lycoming T53 engine" and further that they were both "originally designed for military use."  *Id.*

Moreover, contrary to plaintiffs' assertions that the government did not require the use of asbestos, as explained in the Declaration of William T. Wilson, the military did in fact mandate the use of asbestos in the products designed and manufactured by Bell. Specifically, Wilson explains that the United States Air Force established certain specifications for the production of the XH-40 aircraft, a predecessor to the UH-1 and UH-1H series helicopters, which required "the use of asbestos in certain seals and gaskets on the stainless steel enclosure the government mandated for the engine compartment." Ex. I, at ¶ 5. The use of asbestos was required by the government for the purpose of "prevent[ing] the spread of fire from the engine compartment to the passenger compartment." *Id*. Indeed, the government not only mandated the use of asbestos by Bell in the manufacture of the helicopters to which Mr. Seitz may have been exposed during his lifetime, but also provided Bell with "no discretion in its use of asbestos in the helicopters." *Id.*, at ¶ 27. What is more, had Bell refused to follow this performance requirement mandating the use of asbestos, Bell "would have been subject to numerous civil and criminal penalties" as a result of this refusal. *Id.* Consequently, it is clear that Bell was "acting under" an officer of the United States when its companies designed and manufactured the military products in question. Therefore, those actions of Bell are inseparable from the pervasive government specifications, regulations, and oversight, and a clear nexus exists between their alleged actions at the direction of the government and plaintiffs' claims for relief in the removed action.

**III.    There is a Causal Nexus between Plaintiffs' Claims and Bell's acts under the Direct and Detailed Control of the Government**

Plaintiffs further assert in their Motion to Remand that Bell failed to establish the existence of a causal connection between the charged conduct and the government authority under which Bell asserts it acted. *See* Pls.' Br., at p. 13. Although plaintiffs limit their argument to what a defendant must show in a failure to warn case to establish this causal nexus, as

discussed above, plaintiffs may not manipulate the removal process by amending their complaint to waive federal claims against the defendant after a case has been properly removed to federal court, simply to defeat federal jurisdiction. Therefore, the instant causal nexus analysis will focus on plaintiffs' claims as initially set forth in the complaint and as they existed at the time of removal, including those claims based upon the use of asbestos in the design and manufacturing processes of the Bell helicopters and component parts in question. *See Husing Group*, 2008 U.S. Dist. LEXIS 2983, at *6-7.

In order to show the existence of a causal nexus between the plaintiffs' claims and the acts undertaken under federal authority and direction, a defendant must show that state court action "has arisen out of the acts done by [it] under color of federal authority and in enforcement of federal law, and [it] must by direct averment exclude the possibility that it was based on acts or conduct of his not justified by his federal duty." *Mesa*, 489 U.S. at 131-32 (quoting *Maryland v. Soper (No. 1)*, 270 U.S. 9, 33 (1926)). Moreover, "when a government contractor builds a product pursuant to Air Force specifications and is late sued upon because compliance with those specifications allegedly causes personal injuries, the nexus requirement is satisfied." *Akin v. Big Three Indus. Inc.*, 851 F. Supp. 819, 823-24 (E.D. Tex. 1994).

Here, plaintiffs have brought this asbestos personal injury action against Bell and other defendants on the basis of alleged asbestos exposure from Mr. Seitz's work with Bell helicopters and component parts manufactured by Bell for the federal government and under the government's direct authority and control. Bell has clearly provided evidence establishing that plaintiffs' state court action arose out of acts done by Bell under color of federal authority, sufficient to establish the causal nexus requirement of federal officer removal jurisdiction. As provided in the Declaration of William T. Wilson, Bell was required to strictly comply with

government specifications for all of the military helicopters manufactured thereby, and "had <u>little or no leeway</u> in determining the required design of the helicopters, including <u>materials for the component parts and their paintings and markings</u>."  Ex. H at ¶ 22.  As explained by Wilson, the Untied States Air Force specifically required "the use of asbestos in certain seals and gaskets on the stainless steel enclosure that the Government mandated for the engine compartment", for the purpose of preventing fire which may arise in the engine compartment from spreading into the passenger compartment.  *Id.*, at ¶ 5.

With respect to plaintiffs' failure to warn claims, Wilson's Declaration further explains that Bell had to follow "Government-evaluated and -approved Detail Specifications concerning the design, materials, paintings and markings for those helicopters and their component parts" during "every step in the development and production" of the UH-1 and A-1 series helicopters. *Id.*, at ¶ 25.  As such, since none of the Government Specifications provided for asbestos warnings to be placed on any of the UH-1 or A-1 series helicopters manufactured by Bell, Bell therefore had no authority or discretion to deviate from these specifications and place any such warnings on these products.  This is particularly true in light of the fact that Bell had no knowledge "of the dangers, if any, concerning the design, materials, painting, and markings for those helicopters and their component parts which Government was not already aware of."  *Id*. at ¶ 25.  Therefore, if the Government had knowledge of the alleged danger of using asbestos in these helicopters and their components, and nonetheless did not specifically and explicitly provide for such markings to be placed on the products, Bell had no discretion to do so, and in fact would have been subject to "a variety of penalties under US law, including civil and criminal sanctions," had it failed to manufacture the military helicopters "in strict compliance with Government specifications."  *Id*. at ¶ 13.  Indeed, Bell was not permitted to change these

specifications "in any way without the express authorization of the Government." *Id.* Moreover, even the original flight and maintenance manuals for the UH-1 and AH-1 series helicopters were "developed and written at the specific direction of the military as to content." *Id.* at ¶ 24. Each draft was reviewed and considered on an independent basis by the military, and the Government controlled both the original content of the manuals as well as any subsequent revisions thereto. *See id.* at ¶ 24.

Plaintiffs cite to a number of cases, including *Hilbert v. McDonnell Douglas Corp.*, 529 F.Supp.2d 187 (D. Mass. 2008) and *Nguyen v. Allied Signal, Inc.*, 1998 U.S. Dist. LEXIS 15517 (N.D. Cal. 1998), in support of the argument that Bell failed to show the existence of a causal connection between its conduct and the color of federal office. *See* Pls.' Br., at 13-16. Of significance, however, the vast majority of the cases cited by plaintiffs in support of this proposition are factually distinguishable and inapplicable to the matter at hand, and in all but one of those cases the plaintiffs' sole theory of liability and the court's basis for remand was a state law failure to warn claim. *See* Pls.' Br., at 13-17 (citing *Weese v. Union Carbide Corp.*, 2007 U.S. Dist. LEXIS 73970 (S.D. Ill. 2007); *Westmiller v. IMO Indus., Inc.*, 2005 U.S. Dist. LEXIS 29371 (W.D. Wash. 2005); *Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp. 2d 187); *Faulk v. Owens-Corning Fiberglass Corp.*, 48 F. Supp. 2d 653 (E.D. Tex. 1999); *Vanouwerkerk v. Owens-Corning Fiberglass Corp.*, 1999 WL 335960 (E.D. Tex. 1999); *Nguyen*, 1998 U.S. Dist. LEXIS 15517; *Freiberg v. Swinterton & Walberg Prop. Servs., Inc.*, 245 F. Supp. 2d 1144 (D. Colo. 2002)).[1] Moreover, unlike the facts of the instant matter, there was no evidence presented in either *Hilbert* or *Nguyen* to suggest that plaintiffs attempted to manipulate the federal removal

---

[1] Although the plaintiffs in *Freiberg* allege more than just a claim for state law failure to warn, the case is nonetheless factually distinct from the matter at hand because all of plaintiffs' theories of liability alleged therein are state law claims (i.e. negligence, conspiracy, and failure to warn), and none of these claims allege any sort of design or manufacturing product defect as alleged by the Seitz plaintiffs herein.

process following a proper removal of the case, by withdrawing federal claims asserted against the defendants in order to defeat federal jurisdiction. *See Nguyen*, 1998 U.S. Dist. LEXIS 15517; *Hilbert*, 529 F. Supp. 2d 187. Indeed, the *Hilbert* court acknowledged that removal based upon the federal contractor defense is applicable to design defect or manufacturing defect claims, and even recognizes that the law remains generally unsettled as to the applicability of the federal contractor defense to failure to warn cases. *See Hilbert*, 529 F. Supp. 2d at 191-92.

**IV.**    **Bell has a Colorable Federal Contractor Defense**

As articulated in *Boyle v. United Technologies, Inc*, 487 U.S. 500 (1988), Bell has clearly shown that it has a colorable federal defense such as to warrant removal under § 1442(a)(1) on the grounds of federal officer jurisdiction. In *Boyle*, the Supreme Court held that:

> Liability for design defects in military equipment cannot be imposed pursuant to state law, when (1) the United Stats approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Boyle*, 487 U.S. at 412. The removing party "need not show for the purposes of removal that the defense is meritorious, but only whether there is a colorable claim to such a defense." *Mesa v. California*, 489 U.S. 121, 128-29 (1989); *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992). Indeed, the Supreme Court has held that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court," therefore, the officer is not required "virtually to win his case before he can have it removed" or to have "an airtight case on the merits." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). Removal is appropriate, and defendant satisfies this final requirement for removal under § 1442(a)(1), where he asserts "government contractor immunity as a colorable federal defense." *Fung*, 816 F. Supp. at 572.

Bell was not an asbestos products manufacturer, but rather was a manufacturer of helicopters and helicopter component parts, and therefore had no greater opportunity to know of the dangers of asbestos than did the Government. Indeed, as Owen Kaiser explained in his Declaration, "any knowledge possessed by the manufacturers of the UH-1 helicopter models and their components was conveyed to the Government. It is my belief that the manufacturers of the UH-1 helicopters and their component parts had no knowledge of any danger in the use of the UH-1 helicopter model components that was not known to the Government." Ex. I, at ¶ 19. Similarly, William T. Wilson set forth in his Declaration that "Bell had no actual knowledge of any danger in the use of asbestos in helicopter components that was not known to the US Government." Ex. H, at ¶ 23. Nor did Bell possess any knowledge "of the dangers, if any, concerning the design, materials, painting, and markings for those helicopter and their component parts which Government was not already of." *Id*., at ¶ 25. Therefore, Bell did not owe a duty to warn the Government of any asbestos hazards. As set forth in *Madden v. Able Supply Co.*, 205 F. Supp. 2d 695, 702 (S.D. Tex. 2002), "plaintiff's claims against [the defendant] pertain to the design, construction and installation of [the products] on U.S. navy vessels and to the warnings (or the lack thereof) affixed to these products. These [products] were constructed pursuant to stringent Naval specifications. Moreover, any warnings promulgated (or not promulgated) with respect to the [products] were governed by Navy guidelines. Thus the causal nexus is axiomatic. Accordingly, because all three prongs of the *Mesa* test are satisfied in this case, Plaintiff's motion to remand is hereby denied . . . ." *Madden*, 204 F. Supp. 2d at 701-702.

Similar to *Madden*, plaintiffs' claims against the defendants in the instant matter pertain to the design, manufacture, construction, use, and installation of the helicopters and their

component parts. Despite the fact that certain parts of plaintiffs' complaint assert failure-to-warn theories of liability, the complaint also set forth theories of liability based on manufacturing and design defect, and complains of the use of asbestos in the design and manufacturing processes. *See* Ex. A, at ¶¶ 45, 49, 53-54. As discussed previously, although plaintiffs' utterly transparent decision to waive all but state law failure to warn claims is an attempt to manipulate the judicial system and obtain a favorable decision on a motion to remand, plaintiffs may not waive the valid affirmative defenses of Bell which it is fully entitled to raise. Therefore, the federal contractor defense nonetheless applies to the matter at hand and has been adequately set forth by Bell such as to warrant removal on the grounds of federal officer jurisdiction. Indeed, as discussed further above and as noted in Bell's Notice of Removal, the United States Government provided precise specifications for the helicopters built by Bell and required the use of asbestos containing components in those helicopters. Bell had no discretion in whether or not to use asbestos, and in fact would be subject to civil and criminal penalties if it steered away from the specifications set forth by the Government. *See* Ex. H, at ¶ 13. Therefore, any warnings disseminated or not disseminated with respect to the helicopters and their parts were governed by Government guidelines. *Id.*, at ¶ 25.

As described above, Bell has set forth evidence that the United States Government provided detailed and precise specifications for the helicopter and helicopter components manufactured by Bell, required that the use of asbestos in these helicopters, and gave Bell no discretion in using asbestos therein. *Id.*, at ¶ 5, 15-16, 19; Ex. I, at ¶ 14, 15, 18. Additionally, Bell has submitted evidence that the UH-1 helicopters were created exclusively for military use and were not based on any preexisting helicopter models or predecessor civilian counterparts. *See* Ex. I, at ¶ 4. Bell has further established that numerous government personnel were

stationed at Bell's plant since the Vietnam war, to make sure that each helicopter was built in strict compliance with the precise specifications and designs approved and reviewed by the Government each year.  *See* Ex. H, at ¶ 10; Ex. I, at ¶ 13.   Moreover, Bell has submitted evidence that it was not a manufacturer of asbestos containing products and "possessed no knowledge of the dangers, if any, concerning the design, materials, painting and markings for those helicopters and their component parts which Government was not already aware of."  Ex. H, at ¶ 25; Ex, I, at ¶ 19.  Accordingly, Bell has clearly set forth sufficient evidence, supported by the Declarations of both William T. Wilson and Owen Kaiser, to adequately assert a colorable federal defense in order to warrant federal officer removal jurisdiction.

**V.**     **Conclusion**

Contrary to plaintiffs' baseless claims in their motion for remand, there has been no abuse of the federal officer removal statute and remand of this matter is therefore not appropriate.  For the foregoing reasons, defendant Bell has met its burden of showing (1) that it acted under the direction of a federal officer; (2) that it has a colorable federal defense to the plaintiffs' claims; and (3) that a causal nexus exists between the plaintiffs' claims and the acts performed by Bell under the color of federal office and the Government's direct and detailed control of the design and manufacture of the Bell helicopters and component parts to which plaintiff Mr. Seitz would have worked with and around during his military career.

Accordingly, defendant Bell respectfully request that this court deny plaintiffs' motion to remand.

SMITH, KATZENSTEIN & FURLOW LLP

*Of counsel*:
M. Douglas Eisler

  /s/  *Robert K. Beste*                    .
Robert K. Beste, III (No. 3931)

Wilson, Elser, Moskowitz,
800 Delaware Avenue, Suite 1000
Edelman & Dicker LLP
Wilmington, Delaware 19801
Independence Square West
(302) 652-8400
The Curtis Center, Suite 1130 East
(302) 652-8405 (facsimile)
Philadelphia, PA  19106
rkb@sfkdelaware.com
(215) 627-6900
(215) 627-2665 (facsimile)

August 12, 2008

.

# EXHIBIT "A"

EFiled: Apr 25 2008  4:06PM EDT
Transaction ID 19576189
Case No. 08C-04-247 ASB

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

- - - - - - - - - - - - - - - - - - - - - - - - - - X

IN RE: ASBESTOS LITIGATION:                          :

FREDERICK SEITZ and                                  :    C.A. No.
MARY LOUISE SEITZ, his wife                          :
                                                     :    COMPLAINT
        Plaintiffs,                                  :
                                                     :    ASBESTOS
             v.                                      :
                                                     :    JURY TRIAL DEMANDED
ADEL WIGGINS GROUP;                                  :

AEROJET-GENERAL CORPORATION;                         :

AIR COOLED MOTORS;                                   :

BELL HELICOPTER TEXTRON INC.;                        :

THE BOEING COMPANY;                                  :

CBS CORPORATION (f/k/a Viacom Inc.,                  :
successor by merger to CBS Corporation,              :
f/k/a Westinghouse Electric Corporation);            :

CESSNA AIRCRAFT RHODE ISLAND                         :
INC.;                                                :

CURTISS-WRIGHT CORPORATION;                          :

FLETCHAIR, INC.;                                     :

FRANKLIN AIRCRAFT ENGINES, INC.;                     :

GARLOCK SEALING TECHNOLOGIES                         :
LLC (successor by merger to Garlock, Inc.);          :

GENERAL ELECTRIC COMPANY;                            :

GENERAL MOTORS CORPORATION;                          :

GOODRICH CORPORATION, A NEW                          :
YORK CORPORATION (f/k/a B.F.                         :
Goodrich Company);                                   :

THE GOODYEAR TIRE & RUBBER                           :

{00115286.DOC}

COMPANY;                                    :

HAWKER BEECHCRAFT, INC.                     :
(f/k/a Raytheon Aircraft Company);          :

HONEYWELL INTERNATIONAL INC.                :
(f/k/a Alliedsignal, Inc., as successor-in-  :
interest to The Bendix Corporation);        :

IMO INDUSTRIES INC.;                        :
                                            :
LYCOMING ENGINES;                           :
                                            :
NORTHROP GRUMMAN                            :
CORPORATION;                                :
                                            :
PARKER-HANNIFIN CORPORATION;                :
                                            :
PRATT & WHITNEY                             :
ROCKETDYNE, INC. (f/k/a Pratt &             :
Whitney Aircraft Company);                  :
                                            :
RAYTHEON COMPANY;                           :
                                            :
ROLLS-ROYCE NORTH AMERICA INC; :
                                            :
SIKORSKY AIRCRAFT CORPORATION; :
                                            :
TELEDYNE CONTINENTAL MOTORS,                :
INC.,                                       :
                                            :
TEXTRON INC.;                               :
                                            :
UNION CARBIDE CORPORATION;                  :
                                            :
UNITED TECHNOLOGIES                         :
CORPORATION;                                :
                                            :
VOUGHT AIRCRAFT                             :
INDUSTRIES, INC.;                           :
                                            :
        Defendants.                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

{00115286.DOC}

## COMPLAINT

Come now Plaintiffs, FREDERICK SEITZ and MARY LOUISE SEITZ, by and through

their attorneys, THE LAW OFFICE OF JOSEPH J. RHOADES and LEVY PHILLIPS &

KONIGSBERG LLP, and in support of their claims against the Defendants, state as follows:

1.    Plaintiff FREDERICK SEITZ's full name is FREDERICK HENRY SEITZ.  He

was born on May 20, 1929 and his Social Security number is 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.

2.    Plaintiff FREDERICK SEITZ and his wife MARY LOUISE SEITZ have resided

at 2815 Sage Street, Colorado Springs, Colorado 80907 since approximately 1985. FREDERICK

SEITZ's former residences include but are not limited to: 15190 E. Coachman, Colorado

Springs, Colorado from approximately 1977 to 1985; in or around Fargo, North Dakota in

approximately 1975; in or around Jamestown, North Dakota from approximately 1974 to 1975;

306 Lake Shore Drive, Lakeville, Minnesota from approximately 1969 to 1974; in or around

Kansas City, Missouri from approximately 1967 to 1969; Palo Circle, Arbutus, Maryland from

approximately 1966 to 1967; Marine Corps Air Base, New River, North Carolina in

approximately 1965; Marine Corps Air Base, Cherry Point, North Carolina from approximately

1961 to 1964; in or around Quantico, Virginia in approximately 1961; Wellham Avenue, Glen

Burnie, Maryland from approximately 1960 to 1961; Marine Corps Air Base, New River, North

Carolina from approximately 1957 to 1959; Ellyson Field, Florida in approximately 1957;

Marine Corps Air Base, Cherry Point, North Carolina from approximately 1955 to 1957; in or

around Pensacola, Florida from approximately 1952 to 1955; 239 Meadow Road, Baltimore,

Maryland from approximately 1951 to 1952; Marine Corps Air Base, Cherry Point, North

Carolina from approximately 1950 to 1951; in or around Pensacola, Florida from approximately

1949 to 1950; Marine Corps Air Base, Cherry Point, North Carolina from approximately 1947 to

{00115286.DOC}

1948; in or around Woodbridge, Virginia from approximately 1946 to 1947; in or around Paris Island, South Carolina in approximately 1946; 317 Edison Street, Brooklyn Park, Maryland from approximately 1936 to 1946; in or around Brooklyn, Maryland from approximately 1934 to 1936; East of Patterson Park, Baltimore, Maryland from approximately 1931 to 1934; and Bradley Alley, Baltimore, Maryland from approximately 1929 to 1931. Additionally, FREDERICK SEITZ was deployed to various locations overseas during the Korean and Vietnam wars.

3.       FREDERICK SEITZ was employed at Central Arizona Aviation, located at Falcon Field, Mesa, Arizona, as a Supervisor and Manager from approximately 1986 to 1988; at IDS, located at 2345 N. Academy, Colorado Springs, Colorado, as an Investment Advisor from approximately 1977 to 1981; at Dakota Bake and Serve, located in Jamestown, North Dakota, as an Executive Staff Chief Pilot, Aircraft Maintenance and Support from approximately 1974 to 1976; at Imperial Airways, located in St. Paul, Minnesota as an Executive Vice President from approximately 1969 to 1973; at Bell Helicopter, located in Kansas City, Missouri as a Commercial Regional Marketing Manager, from approximately 1967 to 1969; in the United States Marine Corps, at the various previously listed locations, as a Mechanic and Pilot, from approximately 1946 to 1967; and in the United States Coast Guard, located at the Curtis Bay Coast Guard Station, Baltimore, Maryland as an Electrician Apprentice in approximately 1944.

4.       Plaintiff FREDERICK SEITZ attended Aviation Mechanical School training program, Quantico, Virginia in approximately 1946. Plaintiff's Aviation and Mechanical training included complete maintenance and repair of United States Marine Corps aircrafts, including but not limited to replacing and repairing brakes, gaskets, wiring, engines and fire sleeving.

{00115286.DOC}

5.    One or more defendants are citizens of the State of Delaware, and this action is not properly removable on any jurisdictional basis.

6.    Defendant Adel Wiggins Group is a foreign business entity doing business in the State of Delaware and subject to service of process pursuant to 10 <u>Del</u>. <u>C</u>. § 3104(c) by service upon the Secretary of State of the State of Delaware.  Adel Wiggins Group's address for receipt of process is Attn: Officer/Agent, 5000 Triggs Street, Los Angeles, CA 90022.

7.    Defendant Aerojet – General Corporation is a foreign business entity doing business in the State of Delaware.  Its registered agent for service of process within the State of Delaware is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

8.    Defendant Air Cooled Motors is a foreign business entity doing business in the State of Delaware and subject to service of process pursuant to 10 <u>Del</u>. <u>C</u>. § 3104(c) by service upon the Secretary of State of the State of Delaware.  Air Cooled Motor's address for receipt of process is 94 Hale Drive, Walterboro, SC 29488.

9.    Defendant Bell Helicopter Textron Inc., is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

10.    Defendant The Boeing Company is a Delaware corporation whose registered agent for service of process is Corporation Service Company located at 2711 Centerville Road Suite 400, Wilmington, DE 19808.

11.    Defendant CBS Corporation (f/k/a Viacom Inc., successor by merger to CBS Corporation, f/k/a Westinghouse Electric Corporation) is a Delaware corporation whose

registered agent for service of process is Corporation Service Company located at 2711 Centerville Road Suite 400, Wilmington, DE 19808.

12.     Defendant Cessna Aircraft Rhode Island Inc., is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

13.     Defendant Curtiss-Wright Corporation a Delaware Corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

14.     Defendant FletchAir, Inc., is a foreign business entity doing business in the State of Delaware and subject to service of process pursuant to 10 Del. C. § 3104(c) by service upon the Secretary of State of the State of Delaware. FletchAir, Inc.'s address for receipt of process is Attn: Officer/Agent, 118 FM 1621, Comfort, TX 78013-3425.

15.     Defendant Franklin Aircraft Engines, Inc. is a foreign business entity doing business in the State of Delaware and subject to service of process pursuant to 10 Del. C. § 3104(c) by service upon the Secretary of State of the State of Delaware. Franklin Aircraft Engines, Inc.'s address for receipt of process is Attn: Officer/Agent, Ft. Collins, CO 80524.

16.     Defendant Garlock Sealing Technologies LLC (successor by merger to Garlock, Inc.) is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

17.     Defendant General Electric Company is a foreign business entity doing business in the State of Delaware. Its registered agent for service of process within the State of Delaware

{00115286.DOC}

is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

18.    Defendant General Motors Corporation is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

19.    Defendant Goodrich Corporation, A New York Corporation, (f/k/a B.F. Goodrich Company) is a foreign business entity doing business in the State of Delaware. Its registered agent for service of process within the State of Delaware is Corporation Service Company located at 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

20.    Defendant The Goodyear Tire & Rubber Company is a foreign business entity doing business in the State of Delaware.  Its registered agent for service of process within the State of Delaware is Corporation Service Company located at 2711 Centerville Road Suite 400, Wilmington, DE 19808.

21.    Defendant Hawker Beechcraft, Inc. (f/k/a Raytheon Aircraft Company) is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

22.    Defendant Honeywell International Inc. (f/k/a Alliedsignal, Inc., as successor-in-interest to The Bendix Corporation) is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

23.    Defendant IMO Industries Inc., is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

{00115286.DOC}

24.    Defendant Lycoming Engines is a foreign business entity doing business in the State of Delaware and subject to service of process pursuant to 10 Del. C. § 3104(c) by service upon the Secretary of State of the State of Delaware. Lycoming Engines' address for receipt of process is Attn: Officer/Agent, 652 Oliver Street, Williamsport, PA 17701.

25.    Defendant Northrop Grumman Corporation is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

26.    Defendant Parker-Hannifin Corporation is a foreign business entity doing business in the State of Delaware. Its registered agent for service of process within the State of Delaware The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

27.    Defendant Pratt & Whitney RocketDyne, Inc. (f/k/a Pratt & Whitney Aircraft Company) is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

28.    Defendant Raytheon Company is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

29.    Defendant Rolls-Royce North America Inc. is a Delaware Corporation whose registered agent for service of process is Corporation Service Company located at 2711 Centerville Road Suite 400, Wilmington, DE 19808.

30.     Defendant Sikorsky Aircraft Corporation is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

31.     Defendant Teledyne Continental Motors, Inc. is a Delaware corporation whose registered agent for service of process is National Corporate Research, Ltd. located at 615 South DuPont Highway, Dover, DE 19901.

32.     Defendant Textron Inc., is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

33.     Defendant Union Carbide Corporation is a foreign business entity doing business in the State of Delaware. Its registered agent for service of process within the State of Delaware is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

34.     Defendant United Technologies Corporation is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

35.     Defendant Vought Aircraft Industries, Inc. is a Delaware corporation whose registered agent for service of process is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

36.     All Defendants herein were at all times pertinent, directly or indirectly engaged in the specification, mining, manufacturing, distribution, sales, licensing, leasing, installation, removal or use of asbestos and asbestos-containing products.[1]  They were also engaged in the

---

[1] Throughout this Complaint, Plaintiff's references to "asbestos containing products" includes asbestos, asbestos-

development, manufacture, distribution, sales, licensing or leasing of equipment, procedures, or technology necessary to mine, manufacture, sell, distribute, install, remove and use asbestos and asbestos-containing products.

37.    FREDERICK SEITZ was wrongfully exposed to and inhaled, ingested or otherwise absorbed asbestos fibers, an inherently dangerous toxic substance, emanating from certain products he was working with and around, as described below:

a. FREDERICK SEITZ was exposed to asbestos occupationally in the course of his employment as an electrician apprentice, mechanic, and a pilot at the above listed locations from approximately 1944 to 1970. He was exposed to asbestos from a variety of aircraft mechanical asbestos containing products including but not limited to: brakes, clamps, engines and engine parts, and gaskets.

b. FREDERICK SEITZ was exposed to asbestos non-occupationally (i.e. household exposure) while performing maintenance and repair work on his own personal aircrafts throughout his life. He was exposed to asbestos from a variety of aircraft mechanical asbestos containing products including but not limited to: brakes, clamps, engines and engine parts, and gaskets.

c. FREDERICK SEITZ may have been further exposed to asbestos in such a manner as further investigation and/or discovery may uncover.

FREDERICK SEITZ was exposed to asbestos and asbestos-containing products which were manufactured, sold, distributed, or installed by the Defendants: ADEL WIGGINS GROUP; AEROJET-GENERAL CORPORATION; AIR COOLED MOTORS; BELL HELICOPTER TEXTRON INC.; THE BOEING COMPANY; CBS CORPORATION (f/k/a Viacom Inc., successor by merger to CBS Corporation, f/k/a Westinghouse Electric Corporation); CESSNA AIRCRAFT RHODE ISLAND INC.; CURTISS-WRIGHT CORPORATION; FLETCHAIR, INC.; FRANKLIN AIRCRAFT ENGINES, INC.; GARLOCK SEALING TECHNOLOGIES LLC (successor by merger to Garlock, Inc.); GENERAL ELECTRIC COMPANY; GENERAL

---

containing products, products designed to be used with asbestos-containing products, and/or products that it was foreseeable would be used with asbestos-containing products.

{00115286.DOC}

MOTORS CORPORATION; GENUINE PARTS COMPANY; GOODRICH CORPORATION,

A NEW YORK CORPORATION (f/k/a B.F. Goodrich Company); THE GOODYEAR TIRE &

RUBBER COMPANY; HAWKER BEECHCRAFT, INC. (f/k/a Raytheon Aircraft Company);

HONEYWELL INTERNATIONAL INC. (f/k/a Alliedsignal, Inc., as successor-in-interest to

The Bendix Corporation); IMO INDUSTRIES INC.; LYCOMING ENGINES; NORTHROP

GRUMMAN CORPORATION; PARKER-HANNIFIN CORPORATION; PRATT &

WHITNEY ROCKETDYNE, INC. (f/k/a Pratt & Whitney Aircraft Company); RAYTHEON

COMPANY; ROLLS-ROYCE NORTH AMERICA INC; SIKORSKY AIRCRAFT

CORPORATION; TELEDYNE CONTINENTAL MOTORS, INC.; TEXTRON INC.; UNION

CARBIDE CORPORATION; UNITED TECHNOLOGIES CORPORATION; and VOUGHT

AIRCRAFT INDUSTRIES, INC.

38.    At all times herein set forth, the Defendants' products were being employed in the

manner and for the purposes for which they were intended.

39.    FREDERICK SEITZ's exposure to and inhalation, ingestion or absorption of

asbestos fibers emanating from the use of the above-mentioned products was completely

foreseeable and could or should have been anticipated by the Defendants.

40.    The Defendants knew or should have known that the asbestos fibers contained in

their products and/or the products with which their products were designed to be used had a

toxic, poisonous, and highly deleterious effect upon the health of persons inhaling, ingesting or

otherwise absorbing them.

41.    FREDERICK SEITZ suffers from an asbestos-related disease(s), including but

not limited to mesothelioma. FREDERICK SEITZ first became aware that he suffered from said

disease(s) in approximately March of 2008 and subsequently thereto, became aware that the

{00115286.DOC}

same was wrongfully caused. As a result of developing mesothelioma, FREDERICK SEITZ has endured and continues to endure great physical pain and suffering, mental anguish and emotional pain and suffering. Further, as a result of Defendants' wrongful conduct, FREDERICK SEITZ is required to receive and receives medical treatment to mitigate his asbestos related disease, incurring reasonable and necessary costs for medical care, diagnosis and treatment.

**COUNT I**

**NEGLIGENCE**

42.    The allegations in paragraphs One (1) through Forty One (41) above are realleged and incorporated by reference within this Count. Plaintiffs' recovery herein is predicated upon the substantive law of the State of North Carolina or such law as the Court holds to be applicable.

43.    At all times herein relevant, the Defendants had a duty to exercise reasonable care and caution for the safety of FREDERICK SEITZ and others working with and around the Defendants' asbestos containing products.

44.    The Defendants knew or should have known that the asbestos fibers contained in their products had a toxic, poisonous, and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them.

45.    The Defendants were negligent in that they failed to exercise ordinary care and caution for the safety of FREDERICK SEITZ in one or more of the following respects:

   a.    Included asbestos in their products, even though it was completely foreseeable and could or should have been anticipated that persons such as FREDERICK SEITZ, working with and around them would inhale, ingest or otherwise absorb asbestos;

   b.    Included asbestos in their products when the Defendants knew or should have known that said asbestos would have a toxic, poisonous and highly

{00115286.DOC}

deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them;

c.   Included asbestos in their products when adequate substitutes for the asbestos in them were available;

d.   Failed to provide any or adequate warnings to persons working with and around their products of the dangers of inhaling, ingesting or otherwise absorbing the asbestos fibers contained in them;

e.   Failed to provide any or adequate instructions concerning the safe methods of working with and around the products, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers in them;

f.   Failed to conduct tests on the asbestos containing products manufactured, sold, delivered or installed by the Defendants in order to determine the hazards to which persons such as FREDERICK SEITZ might be exposed while working with or around the products; and,

g.   Designed, manufactured and sold equipment, vehicles, machinery, technologies and systems that included asbestos-containing components and required and/or specified the use of asbestos-containing replacement components.

46.   As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions on the part of the Defendants, FREDERICK SEITZ was exposed to and inhaled, ingested or otherwise absorbed asbestos fibers causing FREDERICK SEITZ to develop the asbestos disease aforesaid, which has disabled and disfigured FREDERICK SEITZ; FREDERICK SEITZ has in the past and will in the future be compelled to expend and become liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of his asbestos-induced disease and conditions; and FREDERICK SEITZ has in the past and will in the future experience great physical pain and mental anguish as a result of his asbestos-induced disease and conditions.

{00115286.DOC}

## COUNT II

## WILLFUL AND WANTON CONDUCT

47.     The allegations in paragraphs One (1) through Forty Six (46) above are realleged and incorporated by reference within this Count. Plaintiffs' recovery herein is predicated upon the substantive law of the State of North Carolina or such law as the Court holds to be applicable.

48.     The Defendants had a duty to refrain from willful and wanton acts or omissions which would harm FREDERICK SEITZ.

49.     Defendants are guilty of one or more of the following acts or omissions amounting to willful and wanton misconduct:

      a.      Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, included asbestos in their products, even though it was completely foreseeable and could or should have been anticipated that persons such as FREDERICK SEITZ working with or around their products, would inhale, ingest or otherwise absorb asbestos;

      b.      Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, included asbestos in their products when the Defendants knew or should have known that said asbestos fibers would have a toxic, poisonous and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them;

      c.      Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, included asbestos in their products when adequate substitutes for the asbestos in them was available;

      d.      Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, failed to provide any or adequate warnings to persons working with and around their products of the dangers of inhaling, ingesting or otherwise absorbing asbestos fibers in them;

      e.      Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, failed to provide any or adequate instructions concerning the safe methods of working with and around their products, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers in them;

f.      Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, failed to conduct tests on the asbestos-containing products manufactured, sold, delivered or installed by the Defendants in order to determine the hazards to which persons such as FREDERICK SEITZ might be exposed while working with and around the products;

g.      Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, failed to adequately label, warn, package, market, distribute, install, remove, or use asbestos in a reasonable manner which would minimize or eliminate the escape of asbestos dust fibers, therefore adding to the exposure of FREDERICK SEITZ and others similarly situated;

h.      Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, failed to take adequate steps to remedy the above failures, including but not limited to (1) failure to recall or require removal of asbestos and asbestos products, coupled with (2) ongoing failure to conduct research as to how to cure or minimize asbestos injuries and how to use, install, or distribute asbestos so as to render it safe, and (3) failure to promptly and safely remove the asbestos now in place; and,

i.      Intentionally or with reckless disregard for the safety of FREDERICK SEITZ, designed, manufactured and sold equipment, vehicles, machinery, technologies and systems that included asbestos-containing components and required and/or specified the use of asbestos-containing replacement components.

50.     As a direct and proximate result of one or more of the foregoing actions and/or omissions of Defendants, FREDERICK SEITZ was exposed to asbestos and was injured as described herein.

51.     In addition to compensatory damages, an award of punitive damages is appropriate and necessary in order to punish Defendants for their willful, wanton, intentional and/or reckless misconduct and to deter each Defendant and others similarly situated from engaging in like misconduct in the future.

{00115286.DOC}

## COUNT III

## STRICT PRODUCT LIABILITY

52.     The allegations in paragraphs One (1) through Fifty One (51) above are realleged and incorporated by reference within this Count.  Plaintiffs' recovery herein is predicated upon the substantive law of the State of North Carolina or such law as the Court holds to be applicable.

53.     The Defendants placed their asbestos and asbestos-containing products on the market and knew or should have known they would be used without inspection for defects.

54.     When their asbestos and asbestos-containing products left the Defendants' possession and were placed on the market they were defective in that, when used in the intended or reasonably foreseeable manner, they were not reasonably safe for their intended use, they failed to perform as safely as would be expected by an ordinary user or consumer and/or created a risk of harm beyond that which would be contemplated by the ordinary user or consumer.

55.     As a direct and proximate result of using Defendants' asbestos and asbestos containing products for the general purpose for which they were designed and intended, FREDERICK SEITZ was exposed to asbestos and was injured as described herein.

## COUNT IV

## LOSS OF CONSORTIUM

56.     The allegations in paragraphs One (1) through Fifty Five (55) above are realleged and incorporated by reference within this Count.  Plaintiffs' recovery herein is predicated upon the substantive law of the State of North Carolina or such law as the Court holds to be applicable.

{00115286.DOC}

57.     Plaintiff FREDERICK SEITZ is married to Plaintiff MARY LOUISE SEITZ.  As a result of Defendants' wrongful conduct which caused her husband's above stated asbestos-related disease and problems, Plaintiff MARY LOUISE SEITZ has suffered and will continue in the future to suffer a loss of the support, consortium and society of her husband, together with related mental anguish and pain and suffering.

**WHEREFORE,** Plaintiffs FREDERICK SEITZ and MARY LOUISE SEITZ pray this Court to enter judgment against Defendants and to award: compensatory damages in an amount to be proved at trial, but believed to exceed $100,000; and punitive damages in an amount sufficient to punish Defendants for their misconduct and to deter similarly situated parties from committing like acts of misconduct in the future; and for such other and further relief that this Court deems appropriate.

Respectfully submitted,

LAW OFFICE OF JOSEPH J. RHOADES

By: /s/ A. Dale Bowers
Joseph J. Rhoades, Esquire (I.D. 2064)
A. Dale Bowers, Esquire (I.D. 3932)
1225 North King Street, 12th Floor
Wilmington, Delaware 19801
302-427-9500
Attorneys for Plaintiff

-and-

LEVY PHILLIPS & KONIGSBERG, LLP
Jerome H. Block, Esq. (NY Id. No.3997145)
Sharon Zinns, Esq. (CA Id. No. 241476)
Amber R. Long, Esq. (NY Id. No.4397188)
800 Third Avenue, 13th Floor
New York, NY 10022
Phone: (212) 605-6200
Fax: (212) 605-6290

Dated: April 25, 2008

{00115286.DOC}

# EXHIBIT "B"

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| FREDERICK SEITZ and | : | |
| MARY LOUISE SEITZ, his wife | : | C.A. No. |
| | : | |
| Plaintiffs, | : | Jury of Twelve Demanded |
| | : | |
| v. | : | State Court No.: 08C-04-247 ASB |
| | : | |
| ADEL WIGGINS GROUP; AEROJET- | : | |
| GENERAL CORPORATION; AIR COOLED | : | |
| MOTORS; BELL HELICOPTER TEXTRON | : | |
| INC.; THE BOEING COMPANY; CBS | : | |
| CORPORATION (f/k/a Viacom Inc., Successor by | : | |
| merger to CBS Corporation, f/k/a Westinghouse | : | |
| Electric Corporation); CESSNA AIRCRAFT | : | |
| RHODE ISLAND INC.; CURTISS-WRIGHT | : | |
| CORPORATION; FLETCHAIR, INC.; | : | |
| FRANKLIN AIRCRAFT ENGINES, INC.; | : | |
| GARLOCK SEALING TECHNOLOGIES LLC | : | |
| (successor by merger to Garlock, Inc.); GENERAL | : | |
| ELECTRIC COMPANY; GENERAL MOTORS | : | |
| CORPORATION; GOODRICH CORPORATION, | : | |
| A NEW YORK CORPORATION (f/k/a B.F. | : | |
| Goodrich Company); THE GOODYEAR TIRE & | : | |
| RUBBER COMPANY; HAWKER | : | |
| BEECHCRAFT, INC. (f/k/a Raytheon Aircraft | : | |
| Company); HONEYWELL INTERNATIONAL | : | |
| INC. (f/k/a Alliedsignal, Inc., as successor-in- | : | |
| Interest to The Bendix Corporation); IMO | : | |
| INDUSTRIES INC.; LYCOMING ENGINES; | : | |
| NORTHROP GRUMMAN CORPORATION; | : | |
| PARKER-HANNIFIN CORPORATION; PRATT | : | |
| & WHITNEY ROCKETDYNE, INC. (f/k/a Pratt &: | | |
| Whitney Aircraft Company); RAYTHEON | : | |
| COMPANY; ROLLS-ROYCE NORTH | : | |
| AMERICA, INC.; SIKORSKY AIRCRAFT | : | |
| CORPORATION; TELEDYNE CONTINENTAL | : | |
| MOTORS INC., TEXTRON INC.; UNION | : | |
| CARBIDE CORPORATION; UNITED | : | |
| TECHNOLOGIES CORPORATION; VOUGHT | : | |
| AIRCRAFT INDUSTRIES, INC., | : | |
| | : | |
| Defendants. | : | |

### NOTICE OF REMOVAL

Bell Helicopter Textron Inc. ("Bell") hereby removes the above captioned matter to this Court and states the following in support thereof:

1.      Plaintiffs commenced this action by filing a complaint in the Superior Court of the State of Delaware on April 25, 2008. Ex. A. In accordance with 28 U.S.C. § 1446(a), a copy of the process served upon Bell is attached as Exhibit B. A copy of the only pleading served upon Bell in the state court is attached as Exhibit C.

2.      In the state court, the sheriff served Bell through its registered agent on May 13, 2008. This removal is timely under 28 U.S.C. § 1446(b) because Bell removed the action within thirty days of that service of process. *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350-51 (1999).

3.      Venue is proper pursuant to 28 U.S.C. § 1442(a) because the District of Delaware embraces all state courts within Delaware, including the Superior Court.

4.      In the complaint, Frederick Seitz alleges asbestos exposure and consequential disease (mesothelioma). His wife brings a derivative loss of consortium claim. Plaintiffs allege that Mr. Seitz's disease is attributable to thirty defendants, and that defendants specified, manufactured, distributed, sold, licensed, leased, installed, removed, or used asbestos and asbestos-containing products. Ex. A at ¶ 36. Plaintiffs also allege that defendants developed, manufactured, distributed, sold, licensed, or leased equipment, procedures, or technology necessary to mine, manufacture, sell, distribute, install, remove, and use asbestos and asbestos-containing products. *Id.* at ¶ 36. Plaintiffs assert that Mr. Seitz worked with, inhaled, ingested, or otherwise absorbed asbestos fibers during the course of his employment, including as an electrician apprentice, a mechanic, and a pilot. *Id.*

at ¶ 37.  Plaintiffs further allege non-occupational asbestos exposure during maintenance and repair work on personal aircraft.  *Id.*

5.      Mr. Seitz's purported occupational asbestos exposure, some of which plaintiffs attribute to Bell, relates to his employment at Central Arizona Aviation, IDS, Dakota Bake and Serve, Imperial Airways, the United States Marine Corps, the United States Coast Guard, and Bell Helicopter.  *Id.* at ¶ 3.  Plaintiffs also assert that Mr. Seitz attended an aviation mechanical school training program in Quantico, Virginia in 1946.  *Id.* at ¶ 4.

6.      All of Bell's products that could have been a source of Mr. Seitz's alleged asbestos exposure were manufactured and delivered to the United States pursuant to contracts and specifications mandated by the United States.

7.      The federal officer removal statute permits the "United States or any agency thereof or any officer (or any person acting under that officer) of the Untied States or of any agency thereof, sued in an official or individual capacity for any act under color of such office" to remove an action to federal court.  28 U.S.C. § 1442(a)(1).

8.      Federal officer removal is proper where a defendant can: (1) demonstrate that it is a person within the meaning of the statute; (2) establish that it acted under the direction of a federal agency or officer; (3) raise a colorable federal defense; and (4) demonstrate a causal nexus between the federal direction and the conduct in question.  *Feidt v. Owens Corning Fiberglass Corp.*, 153 F.2d 124, 127 (3d Cir. 1998) (citing *Mesa v. California*, 489 U.S. 121, 129 (1989)).

9.      Bell can remove this action pursuant to 28 U.S.C. § 1442 because, at all times and for all events relevant, it acted under an officer of the United States under color of such office.  *See Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998), *cert. denied*, 526 U.S. 1034

-3-

(1999); *Magnin v. Teledyne Cont'l Motors,* 91 F.3d 1424 (11th Cir. 1996); *Lopez v. Three Rivers Elec. Co-op,* 166 F.R.D. 411, 412 (E.D. Mo. 1996); *Jones v. Three Rivers Elec. Coop.*, 166 F.R.D. 413, 414 (E.D. Mo. 1996). Furthermore, Section 1442(a) authorizes removal without the consent of any other defendants. *See Elv Valley Mines, Inc. v. Hartford Accident & Indem. Co.*, 64 F.2d 1310, 1315 (9th Cir. 1981) ("federal officer . . . can remove without other defendants joining in the petition, and the entire case is removed to the federal court.")

10.     Bell is a "person[]" within the meaning of § 1442(a)(1). *Willingham v. Morgan,* 395 U.S. 402, 406 (1969). The statute's "color of office" requirement is neither "limited" or "narrow," and the Court should afford the statute a broad reading to avoid frustrating the statute's underlying rationale. *Murray v. Murray,* 621 F.2d 103, 107 (5th Cir. 1980). The right to remove arises when there is a single "federal interest in the matter." *Willingham*, 395 U.S. at 406. *See also Mesa v. California,* 489 U.S. 121, 129 (1989) ("'Nor is it any objection that questions are involved which are not all of a Federal character. If one of the latter exist, if there be a single such ingredient in the mass, it is sufficient. *That element is decisive upon the subject of jurisdiction.*") (quoting *The Mayor v. Cooper,* 73 U.S. 247, 253 (1867) (emphasis in original)). Further, a federal defense allowing removal must only be plausible—its ultimate validity is not to be determined at the time of removal. *Mesa,* 489 U.S. at 129.

11.     During all of Mr. Seitz's alleged asbestos exposure while serving in the military (as a mechanic and helicopter pilot), the only Bell products which he would have worked or flown on—the Bell UH-1 (Huey) and AH-1 (Cobra)—were manufactured and delivered under contracts with the United States pursuant to precise military specifications controlled by the United States. Those specifications called out every design detail and controlled the design and manufacture of

-4-

those military products. *See Teague v. Bell Helicopter Srvs., Inc.*, 2003 WL 21135481, at *1-4 (N.D. Tex. 2003) (holding, based on a declaration by William T. Wilson detailing extensive interaction between the government and Bell in carrying out contracts for helicopters (including the UH-1 and AH-1 series), that Bell acted pursuant to directions by the United States in contracting to design and manufacture military helicopters, and that a causal nexus existed between Bell's actions (under color of federal office) and the plaintiffs' claims); *see also Dewey v. Asbestos Defs.*, No. C-04-4645 MMC (N. D. Cal. Jan. 3, 2005) (holding, based on a declaration by William T. Wilson attesting that the United States had direct control over the design and production of UH-1 helicopters (and later variants) and that Bell helicopters were built according to government specifications, that Bell demonstrated that it acted under the direction of a federal officer in manufacturing UH-1 helicopters, and that a causal nexus sufficient for removal existed under 28 U.S.C. § 1442(a)(1)) (Ex. D). Consequently, Bell "act[ed] under" an officer of the United States when its companies designed and manufactured the military products in question. Bell's actions, therefore, are inseparable from the associated, and pervasive, government specification, regulation, and oversight. Thus, a sufficient nexus exists between the alleged actions, all at government direction, and plaintiffs' claims for relief in this matter.

12.    Bell's answer to the complaint sets out the "government contractor defense" articulated by the United States Supreme Court in *Boyle v. United Technologies, Inc.*, 487 U.S. 500 (1988), and followed by *Kerstetter v. Pacific Scientific Co.*, 210 F.3d 431 (5th Cir. 2000), *Tate v. Boeing Helicopters*, 55 F.3d 1150 (6th Cir. 1995), *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311 (11th Cir. 1989), and *Ramey v. Martin Baker Aircraft Co.*, 874 F.2d 946 (4th Cir. 1989). Ex. E at p. 10. The defense is based on the fact that the United States controlled and approved the

design of the military products at issue. *See Teague*, 2003 WL 21135481, at *1-4, and Ex. D (recognizing right to remove where Bell submitted evidence that the United States set forth detailed specifications for helicopters built by Bell mandating the use of asbestos and giving Bell no discretion in its use of asbestos in the helicopters, and that UH-1 helicopters were made exclusively for military use and Bell possessed no knowledge of the dangers concerning design, materials, painting, and markings for helicopters and component parts which the Unites States was not already aware). Accordingly, Bell raised a "colorable" defense under federal law that it is immune to civil prosecution for actions taken at the direction of the United States.

13.    28 U.S.C. § 1442(a) authorizes removal without the consent of any other defendant and the entire case is removed to federal court. *Fowler v. S. Bell Tel. & Tel. Co.,* 343 F.2d 150, 152 (5th Cir. 1965).

14.    Removal is authorized by sections (a) and (b) of 28 U.S.C. §§ 1441, because the federal courts would have original, federal question jurisdiction over the case pursuant to 28 U.S.C. § 1331. Federal question jurisdiction exists because the United States has so completely preempted the field of aircraft design, maintenance, operation, and safety, that the regulation and standard of care appropriate for the entire field of military and civilian aviation is preempted by, and governed by, federal law, and because plaintiffs' claims against Bell are necessarily federal in nature.

15.    28 U.S.C. § 1441(c) permits removal of the entire cause of action when jurisdiction is conferred by 28 U.S.C. § 1331. The consent of the other defendants is not required where removal is sought pursuant to 28 U.S.C. § 1441.

16.    Bell will give notice of the removal in state court, as required by 28 U.S.C. § 1446(d), and request that the state court proceed no further unless and until this Court remands the case.

-6-

WHEREFORE, Bell Helicopter Textron Inc. hereby removes the above-captioned action from the state court and to the United States District Court for the District of Delaware.

|  | SMITH, KATZENSTEIN & FURLOW LLP |
|---|---|
| *Of counsel:* | |
| M. Douglas Eisler | _/s/  *Robert K. Beste*_____ |
| Ryan Lane Leonard | Robert K. Beste, III (No. 3931) |
| Wilson Elser Moskowitz | Post Office Box 410 |
|   Edelman & Dicker LLP | Wilmington, Delaware 19899 |
| Independence Square West | (302) 652-8400 |
| The Curtis Center, Suite 1130 East | (302) 652-8405 (facsimile) |
| Philadelphia, Pennsylvania 19106-3308 | rkb@skfdelaware.com |
| (215) 627-6900 | |
| (215) 627-2665 (facsimile) | |

June 11, 2008

EXHIBIT "C"

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FREDERICK SEITZ and<br>MARY LOUISE SEITZ, his wife<br><br>Plaintiffs,<br><br>v.<br><br>ADEL WIGGINS GROUP; AEROJET-<br>GENERAL CORPORATION; AIR COOLED<br>MOTORS; BELL HELICOPTER TEXTRON<br>INC.; THE BOEING COMPANY; CBS<br>CORPORATION (f/k/a Viacom Inc., Successor by<br>merger to CBS Corporation, f/k/a Westinghouse<br>Electric Corporation); CESSNA AIRCRAFT<br>RHODE ISLAND INC.; CURTISS-WRIGHT<br>CORPORATION; FLETCHAIR, INC.;<br>FRANKLIN AIRCRAFT ENGINES, INC.;<br>GARLOCK SEALING TECHNOLOGIES LLC<br>(successor by merger to Garlock, Inc.); GENERAL<br>ELECTRIC COMPANY; GENERAL MOTORS<br>CORPORATION; GOODRICH CORPORATION,<br>A NEW YORK CORPORATION (f/k/a B.F.<br>Goodrich Company); THE GOODYEAR TIRE &<br>RUBBER COMPANY; HAWKER<br>BEECHCRAFT, INC. (f/k/a Raytheon Aircraft<br>Company); HONEYWELL INTERNATIONAL<br>INC. (f/k/a Alliedsignal, Inc., as successor-in-<br>Interest to The Bendix Corporation); IMO<br>INDUSTRIES INC.; LYCOMING ENGINES;<br>NORTHROP GRUMMAN CORPORATION;<br>PARKER-HANNIFIN CORPORATION; PRATT<br>& WHITNEY ROCKETDYNE, INC. (f/k/a Pratt &<br>Whitney Aircraft Company); RAYTHEON<br>COMPANY; ROLLS-ROYCE NORTH<br>AMERICA, INC.; SIKORSKY AIRCRAFT<br>CORPORATION; TELEDYNE CONTINENTAL<br>MOTORS INC., TEXTRON INC.; UNION<br>CARBIDE CORPORATION; UNITED<br>TECHNOLOGIES CORPORATION; VOUGHT<br>AIRCRAFT INDUSTRIES, INC.,<br><br>Defendants. | C.A. No.<br><br>Jury of Twelve Demanded<br><br>State Court No.: 08C-04-247 ASB |

081644NTS/1004580.WPD

*NOTICE OF TAG-ALONG ACTION*

On July 29, 1991, the Judicial Panel on Multidistrict Litigation (the "Panel") entered an order transferring all asbestos cases pending in the federal courts to the Eastern District of Pennsylvania for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407 (the "MDL Transfer Order"). The MDL Transfer Order also applies to "tag-along actions" pending in federal district courts and involving common questions of fact with actions previously transferred under Section 1407.

<table>
<tr><td>

*Of counsel:*
M. Douglas Eisler
Ryan Lane Leonard
Wilson Elser Moskowitz
  Edelman & Dicker LLP
Independence Square West
The Curtis Center, Suite 1130 East
Philadelphia, Pennsylvania 19106-3308
(215) 627-6900
(215) 627-2665 (facsimile)

June 11, 2008

</td><td>

SMITH, KATZENSTEIN & FURLOW LLP

  /s/  *Robert K. Beste*
Robert K. Beste, III (No. 3931)
Post Office Box 410
Wilmington, Delaware 19899
(302) 652-8400
(302) 652-8405 (facsimile)
rkb@skfdelaware.com

</td></tr>
</table>

# EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE:  ASBESTOS LITIGATION: | ) | |
| | ) | |
| FREDERICK SEITZ and MARY | ) | |
| LOUISE SEITZ, his wife | ) | |
| | ) | |
| Plaintiffs | ) | C.A. No. 08-353 |
| | ) | |
| -vs.- | ) | |
| | ) | |
| ADEL WIGGINS GROUP, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

**DEFENDANT NORTHROP GRUMMAN CORPORATION' S MOTION
FOR STAY OF PROCEEDINGS AND FOR EXTENSION OF TIME
<u>TO ANSWER OR OTHERWISE PLEAD</u>**

Defendant Northrop Grumman Corporation ("Northrop Grumman"), through its

attorneys, respectfully moves this Honorable Court to stay all proceedings in this case pending a

ruling by the Judicial Panel on Multidistrict Litigation on transfer of the above-captioned matter

to the Eastern District of Pennsylvania as part of the *In re Asbestos Products Liability Litigation*,

Docket No. MDL-875 ("MDL-875.  Northrop Grumman has concurrently asked the Judicial

Panel on Multidistrict Litigation to transfer the action herein to the Eastern District of

Pennsylvania as part of MDL-875.  As set forth more fully in the accompanying supporting

Memorandum, transfer of this matter to MDL-875 is likely because this matter concerns

allegations of asbestos-related disease or injury stemming from exposure to asbestos products

and inhalation of the products' asbestos fibers and because it shares many other common

procedural and substantive issues with the actions pending in MDL-875.

Accordingly, principles of expediency, efficiency, comity, and avoidance of the waste of this Court's time, energy, and resources, dictate that all proceedings before this Court in this matter should be stayed pending transfer to MDL-875. Similarly, and pursuant to Federal Rule of Civil Procedure 6(b), Northrop Grumman respectfully moves this Court for an order extending the time Northrop Grumman has to answer or otherwise plead so that pretrial motions and answers related to the Complaint can be filed with and according to the established procedures of MDL-875.

**WHEREFORE**, for the reasons stated above and more fully set forth in the accompanying Memorandum, Defendant Northrop Grumman Corporation respectfully moves this Court for an order staying all proceedings in this case pending a decision on transfer to MDL-875 from the MDL Panel.

ELZUFON AUSTIN REARDON TARLOV &
MONDELL, P.A.

/s/ *Penelope B. O'Connell*

Penelope B. O'Connell (DE #4898)
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, Delaware 19899
(302) 428-3181

Nancy Shane Rappaport (DE #3428)
DLA PIPER US LLP
1650 Market Street, Suite 4900
Philadelphia, PA 19103
(215) 656-3357

Attorneys for Defendant
Northrop Grumman Corporation

Date: June 12, 2008

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: ASBESTOS LITIGATION: ) | |
| ) | |
| FREDERICK SEITZ and MARY ) | |
| LOUISE SEITZ, his wife ) | |
| ) | |
| Plaintiffs ) | C.A. No. 08-353 |
| ) | |
| -vs.- ) | |
| ) | |
| ADEL WIGGINS GROUP, et al., ) | |
| ) | |
| Defendants. ) | |

---

## MEMORANDUM IN SUPPORT OF DEFENDANT NORTHROP GRUMMAN CORPORATION'S MOTION FOR STAY OF PROCEEDINGS AND FOR EXTENSION OF TIME TO ANSWER OR OTHERWISE PLEAD

Defendant Northrop Grumman Corporation ("Northrop Grumman ") has asked the Judicial Panel on Multidistrict Litigation ("MDL Panel") to transfer this action to the Eastern District of Pennsylvania as part of *In re Asbestos Products Liability Litigation*, Docket No. MDL-875 ("MDL-875"). (*See* Notice of Tag Along Action attached as **Exhibit 1**). Accordingly, Northrop Grumman respectfully moves that this Court stay all proceedings in this case pending the imminent transfer of this action to MDL-875, for the reasons discussed below. Additionally, pursuant to Federal Rule of Civil Procedure 6(b), Northrop Grumman moves this Court for an extension of time to answer or otherwise plead until seven (7) days after this case is transferred to MDL-875.

## I. INTRODUCTION

Because many of the procedural and substantive issues in this action are identical to issues pending before the Honorable Judge James T. Giles of the United States District Court for

the Eastern District of Pennsylvania in MDL-875, Northrop Grumman expects that the MDL

Panel shortly will issue a transfer order mandating that this action become part of MDL-875 as a

tag-along case.  Given that the facts and issues between this action and MDL-875 are virtually

identical, any ruling made by this Court in the interim period before transfer risks duplication

and inconsistency with the parallel multidistrict proceeding that has been operating efficiently for

the last fifteen (15) years.  Therefore, as numerous judges of this and other courts have held, a

stay of proceedings here pending transfer would be most appropriate.

## II.  BACKGROUND OF MDL-875: *IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION*

The background of the asbestos-related litigation pending in MDL-875 is now well-

established.  In the early-1990's, members of the bench and trial bar agreed that asbestos-related

litigation "reached a magnitude, not contemplated . . . , that threatens the administration of

justice and . . . requires a new streamlined approach." *In re Asbestos Prods. Liab. Litig. (VI)*, 771

F. Supp. 415, 418 (J.P.M.L. 1991).  In recognition that individual cases could no longer be

administered effectively by individual judges in separate federal cases, the MDL Panel

concluded that "centralization of all federal asbestos personal injury/wrongful death actions, in

the words of 28 U.S.C. § 1407(a), 'will be for the convenience of the parties and witnesses and

will promote the just and efficient conduct of such actions.'"  *Id.*  Specifically, pursuant to 28

U.S.C. § 1407, on July 29, 1991, the MDL Panel transferred to MDL-875 over 20,000 actions

that involved common questions of fact relating to injuries or wrongful death allegedly caused by

exposure to asbestos or asbestos-containing products.  *Id.*  The actions were transferred to the

Eastern District of Pennsylvania before the Honorable Charles R. Weiner for coordinated or

consolidated pretrial proceedings.

Since that time, barring exceptional circumstances not present here, any cases pending in federal courts for claims of injury or wrongful death from asbestos are transferred to the Eastern District of Pennsylvania for pretrial proceedings before Judge Giles, the judge presiding over MDL-875, as a matter of course. Indeed, according to the Judicial Panel's docket page, there are currently 34,383 actions pending in MDL-875, and there have been 112,229 total actions transferred to MDL-875 since 1991. (*See* J.P.M.L. Docket attached as **Exhibit 2**).

### III. THE *SEITZ* ACTION WILL BE TRANSFERRED TO MDL-875 AS A TAG-ALONG ACTION

Northrop Grumman filed a Notice of Tag-Along Action with the MDL Panel informing it that this action is a tag-along action to MDL-875 pursuant to R.J.P.M.L 7.2(i), 7.3(a), 7.4 and 7.5(e) (*See* **Exhibit 1**). The MDL Panel may now enter a conditional transfer order transferring this action to MDL-875. Almost without exception, the MDL Panel issues transfer orders in asbestos-litigation when "the Panel finds that [the tag-along actions] involve common questions of fact with actions in this litigation previously transferred to the Eastern District of Pennsylvania for inclusion in the coordinated or consolidated pretrial proceedings occurring in that district" because transfer will "serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation." *In re Asbestos Prods. Liab. Litig. (VI)*, 170 F. Supp. 2d 1348 (J.P.M.L. 2001).

Indeed, numerous asbestos cases have been transferred without exception, underscoring the fact that transfer of a federal action for asbestos-related injury or wrongful death to MDL-875 is almost automatic regardless of the objection. *See, e.g., In re Asbestos Prods. Liab. Litig. (No. VI)*, 170 F. Supp. 2d 1348 (granting transfer over objection that cases involving punitive damages should be excluded from MDL-875); *In re Asbestos Prods. Liab. Litig. (No. VI),* Nos. 875, C02-0194PJH, 2002 WL 1128268 (J.P.M.L. Apr. 3, 2002) (granting conditional transfer

3

order and noting that since the formation of MDL-875, more than 72,201 actions have been transferred to MDL-875) (attached as **Exhibit 3**); *In re Asbestos Prods. Liab. Litig. (No. VI)*, Nos. 875, 3:01-540, 3:10-1627, 1:00-1454, 2001 WL 1042562 (J.P.M.L. Aug. 29, 2001) (ordering transfer of cases to MDL-875 over objections that unique facts warranted exclusion from the MDL proceedings) (attached as **Exhibit 4**); *In re Asbestos Prods. Liab. Litig. (No. VI)*, No. 875, 1996 WL 143826 (J.P.M.L. Feb. 16, 1996) (same) (attached as **Exhibit 5**). Indeed, the MDL Panel has rejected oppositions to transfer regardless of the pendency of motions or other matters before the transferor court, the uniqueness of a party's status, the type of defendant, the docket condition of any specific federal district, the stage of pretrial proceedings, the presence of unique claims or additional claims not related to asbestos-related injury or death, and/or the unanimity of opposition to transfer by the parties to an action. *In re Asbestos Prods. Liab. Litig. (No. VI)*, 170 F. Supp. 2d at 1349.

The policy favoring the transfers of asbestos cases is widely accepted. The MDL Panel also has found that transfer is necessary to avoid duplication of effort with unnecessary expenses by the parties, witnesses, and their counsel, to prevent inconsistent decisions in all pending federal personal injury or wrongful death asbestos actions not yet in trial, and for the just and efficient conduct of the litigation. *In re Asbestos Prods. Liab. Litig.*, 771 F. Supp. at 421-22; and *In re Asbestos Prods. Liab. Litig.*, 1996 WL 143826, at * 1 (*See* **Exhibit 5**).

> It is against this backdrop that the Panel's decision enrolled in this litigation must be understood. First of all, our decision to order transfer is not unmindful of the fact that the impact of asbestos litigation varies from district to district, and that in some courts asbestos personal injury actions are being resolved in a fashion indistinguishable from other civil actions. It is not surprising, therefore, that parties and courts involved in such actions might urge that inclusion of their actions in multidistrict proceedings is inappropriate. The Panel, however, must weigh the interest of all of the plaintiffs and all of the defendants, and must consider

multiple litigation as a whole in the light of the purposes of the law.

*In re Asbestos Prods. Liab. Litig.*, 771 F. Supp. at 420.

*Seitz* is related to the other actions in MDL-875 in a number of respects. First and most importantly, the Seitzes' causes of action are based on the same factual predicates as other actions in MDL-875—namely, whether Frederick and Mary Louise Seitz suffered asbestos-related injuries stemming from exposure to asbestos from products and premises or inhalation of asbestos fibers. Second, based on these allegations, the Seitzes assert the same causes of action as the plaintiffs in MDL-875, including negligence and strict liability. Third, like the plaintiffs in MDL-875, the Seitzes seek to recover compensatory and punitive damages for asbestos-related disease or injury. Under these circumstances, permitting Judge Giles (with his learned experience in handling thousands of such cases) to decide such issues would promote judicial efficiency and avoid duplicative litigation efforts and the potential for inconsistent results. *See, e.g., In re Ivy*, 901 F.2d 7 (2d Cir. 1990); *In re Air Crash Disaster at Fla. Everglades*, 368 F. Supp. 812 (J.P.M.L. 1973).

Until the MDL Panel transfers this action to the Eastern District of Pennsylvania, this Court should follow the lead of numerous other judges in this and other courts and grant Northrop Grumman's request for a stay of all proceedings.

## IV. A STAY IS APPROPRIATE UNDER THE CIRCUMSTANCES OF THIS CASE

The power to stay is well recognized. It is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). *See also 7 B.C. Wright, A. Miller and M. Kane*, FEDERAL PRACTICE AND PROCEDURE § 1792, at 293 (2d ed. 1986) ("[W]hen similar actions, either class or individual, are proceeding before several

courts, one or more of the tribunals may stay the proceeding before it pending the outcome of the other action."); and MANUAL FOR COMPLEX LITIGATION § 31.14 3d ed. 1995 ("[I]n appropriate cases, a judge may order an action stayed pending resolution of a related case in a federal court.").

A stay is particularly appropriate in the context of a multidistrict proceeding. Cases asserting redundant claims may be transferred by the MDL Panel to a single district for coordinated pretrial proceedings. 28 U.S.C. § 1407(a). Coordination furthers judicial economy and eliminates the potential for conflicting pretrial rulings. *See, e.g., In re New York City Mun. Sec. Litig.*, 572 F.2d 49, 51-52 (2d Cir. 1978); *In re Air Crash Disaster off Long Island, N.Y.*, 965 F. Supp. 5, 7 (S.D.N.Y. 1997). These benefits would be lost if individual cases proceeded pending the MDL Panel's transfer of the cases to a single judge. Indeed, "a majority of courts have concluded that it is often appropriate to stay preliminary pretrial proceedings while a motion to transfer and consolidate is pending with the MDL Panel because of the judicial resources that are curbed." *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1362 (C.D. Cal. 1997). Relying on similar reasons, numerous courts throughout the country have entered a stay of all proceedings pending a decision on transfer to an MDL proceeding. *See, e.g., Aikins v. Microsoft Corp.*, Civ. A. No. 00-0242, 2000 WL 310391 (E.D. La. Mar. 24, 2000) (attached as **Exhibit 6**); *Falgoust v. Microsoft Corp.*, No. 00-0779, 2000 WL 462919 (E.D. La. Apr. 19, 2000) (attached as **Exhibit 7**); *Pacific Life Ins. Co. v. J.P. Morgan Chase & Co.,* No. Sa CV 03-813GLT(ANX), 2003 WL 22025158 (C.D. Cal. June 30, 2003) (attached as **Exhibit 8**); *Cantrell v. Wyeth*, No. 303CV1659G, 2003 WL 22251079 (N.D. Tex. Sept. 19, 2003) (attached as **Exhibit 9**); *Boudreaux v. Metropolitan Life Ins. Co.*, No. 95-138, 1995 WL 83788 (E.D. La. Feb. 24, 1995) (attached at **Exhibit 10**); *Johnson v. AMR Corp.,* Nos. 95 C 7659-95 C 7664, 1996 WL

164415, at * 4 (N.D. Ill. Apr. 3, 1996) (noting that the best course is grant a stay and let the MDL judge rule on the pending motions) (attached as **Exhibit 11**), *Tench v. Jackson Nat'l Life Ins. Co.*, No. 99-C-5182, 1999 WL 1044923, *1-2 (N.D. Ill. Nov. 12, 1999) (stating that "stays are frequently granted to avoid duplicative efforts and preserve valuable judicial resources") (attached as **Exhibit 12**)

Where notice of a potential transfer has been filed with the MDL Panel, courts generally review three factors to decide whether to stay pending proceedings in the district court until the MDL Panel can rule. These factors are 1) hardship to the moving party if the stay is not granted; 2) potential prejudice to the nonmoving party; and 3) the judicial resources that can be saved by avoiding duplicative litigation if the cases are consolidated. *See, e.g., Rivers*, 980 F. Supp. at 1360. "Even where a nonmoving party claims that a stay will cause delay and prejudice, there are considerations of judicial economy and hardship to defendants that are compelling enough to warrant such a delay." *Arthur Magna, Inc. v. Del-Val Fin. Corp.*, Civ. A. No. 90-4378, 1991 WL 13725, at *1 (D. N.J. Feb. 1, 1991) (attached as **Exhibit 13**).

Without question, a stay is warranted here. A stay followed by multidistrict litigation would allow the MDL court to decide core jurisdictional objections possibly subject to repetition and reviewed at the appellate level in due course. Consistency as well as economy are thus served. *Ivy*, 901 F.2d at 9. Indeed, numerous highly effective and efficient procedures already are in place in MDL-875 to handle this case. *In re Asbestos Prods. Liab. Litig.*, Civ. No. MDL 875, 1996 WL 539589 at *1 (E.D. Pa. Sept. 19, 1996) (attached at **Exhibit 14**).

In contrast, any minor prejudice to plaintiff is far outweighed by the balance of interests favoring multidistrict treatment of asbestos litigation. Indeed, if this case is not stayed and is ultimately transferred to the multidistrict proceeding, "this Court will have needlessly expended

its energies familiarizing itself with the intricacies of a case that would be heard by another judge." *Rivers*, 98 F. Supp. at 1360. Additionally, "any efforts on behalf of this Court concerning case management will most likely have to be replicated by the judge that is assigned to handle the consolidated litigation." *Id.* at 1360-61. Finally, the Court may issue rulings that conflict with those of the MDL court. *See Amer. Seafood, Inc. v. Magnolia Processing, Inc.*, Civ. A. Nos. 92-1030, 92-1086, 1992 WL 102762, at *2 (E.D. Pa. May 7, 1992) (attached as **Exhibit 15**). Simply put, this case will be transferred to MDL-875, just as the thousands of predecessor cases that have related to the same common issues of asbestos-related injury have been. In the brief interim prior to transfer, it is a waste of the parties', and imminently worse, the Court's time and resources to continue litigating before this Court, prior to transfer. Accordingly, a stay of all proceedings is warranted under such circumstances.

## V. NORTHROP GRUMMAN SHOULD BE GRANTED AN EXTENSION OF TIME TO ANSWER OR OTHERWISE PLEAD

For efficiency and other reasons stated above, and pursuant to Federal Rule of Civil Procedure 6(b), Northrop Grumman moves this Court for an enlargement of time to answer or otherwise plead so that pretrial motions and answers related to the Complaint can be filed according to established procedures of MDL-875.

## CONCLUSION

For the foregoing reasons, Northrop Grumman respectfully requests that this Court stay all proceedings in this matter pending transfer of this action by the J.P.M.L. to MDL-875 in the Eastern District of Pennsylvania, and that it grant Northrop Grumman an extension of time to answer or otherwise plead through and including seven (7) days after this case is transferred to MDL-875.

ELZUFON AUSTIN REARDON TARLOV &
MONDELL, P.A.

/s/ *Penelope B. O'Connell*

_____
Penelope B. O'Connell (DE #4898)
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, Delaware 19899
(302) 428-3181

Nancy Shane Rappaport (DE #3428)
DLA PIPER US LLP
1650 Market Street, Suite 4900
Philadelphia, PA 19103
(215) 656-3357

Attorneys for Defendant
Northrop Grumman Corporation

Date:  June 12, 2008

# EXHIBIT "E"

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X
    IN RE: ASBESTOS LITIGATION:              :
                                             :
    FREDERICK SEITZ and                      :
    MARY LOUISE SEITZ, his wife              :
                                             :      C.A. No. 08-CV-0353 GMS
         Plaintiffs,                         :
                                             :
             v.                              :
                                             :
    ADEL WIGGINS GROUP, et al.,              :
                                             :
         Defendants.                         :
                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - -X
```

## PLAINTIFFS' OPPOSITION TO DEFENDANT NORTHRUP GRUMMAN CORPORATION'S MOTION FOR STAY OF PROCEEDINGS

Plaintiffs Frederick and Mary Louise Seitz oppose Defendant Northrup Grumman Corporation's Motion for Stay of Proceedings. By its motion, Defendant Northrup Grumman Corporation ("Northrup Grumman") seeks to avoid the fundamental and crucial question of whether federal subject matter jurisdiction exists in this Court. Until and unless this Court decides this fundamental question, a stay of proceedings and transfer to the Eastern District of Pennsylvania as part of the *In Re Asbestos Products Liability Litigation* Docket No. 875 ("MDL-875") would only further delay and complicate the resolution of this case. Applicable law and fundamental notions of fairness not only permit but require this Court to deny Northrup Grumman's Motion for a Stay of Proceedings and to hear Plaintiff's forthcoming Motion to Remand.

This Court has the power to determine the threshold issue of federal jurisdiction prior to transferring this case to MDL-875. *See* Judicial Panel on Multidistrict Litigation Rule 1.5, 181

F.R.D. 1, 3 (1998). Indeed, "the power to grant a stay is subject to an important limitation: the existence of subject matter jurisdiction." *Commonwealth of Pennsylvania v. TAP Pharmaceutical Products, Inc.*, 415 F.Supp.2d 516, 521 (E.D.Pa. 2005).

Importantly, Northrup Grumman's strategic maneuver of filing a Motion to Stay immediately after filing a Notice of Removal has been criticized by several District Courts and even called an abuse of the removal process. *See Brewster v. A.W. Chesterton Company, et al.*, 2007 WL 1056774 at *4 (N.D.Cal.); *Hilbert v. Aeroquip, Inc. et al*, 486 F.Supp.2d 135 (D.Mass. 2007). Mr. Seitz is dying of malignant mesothelioma, an invariably terminal cancer. *See* Exhibit A. Any delay caused by transfer of this case to MDL-875 for determination of the threshold issue of federal jurisdiction would result in irreparable harm to Plaintiffs, all but guaranteeing that Mr. Seitz will not live to have his day in Court. That is apparently the motive behind Northrup Grumman's dubious motion.

Plaintiffs respectfully urge this Court to deny Northrup Grumman's Motion for a Stay of Proceedings and to hear Plaintiffs' forthcoming Motion to Remand.

## I.     PROCEDURAL POSTURE

Plaintiffs filed their Complaint in the New Castle County, Delaware, Superior Court on April 25, 2008 seeking damages from various asbestos manufacturers for their failure to warn Mr. Seitz of the hazards of asbestos.

On June 12, 2008, Northrup Grumman filed a Notice of Removal based on their alleged federal officer defense, opening case 08-CV-0353 in this Court. Immediately thereafter, on June 13, 2008, Northrup Grumman filed its Motion for Stay of Proceedings.[1]

---

[1] Similarly, on June 11, 2008, Defendant Bell Helicopter Textron, Inc. filed a Notice of Removal, opening case 08-CV-0351 in this Court. As of the date of this Opposition, Bell Helicopter has not filed a Motion for Stay of Proceedings.

Plaintiffs strongly contest federal court jurisdiction in this case and will file a Motion to

Remand to Delaware State Court as soon as possible.[2]

## II.    THIS COURT MUST DECIDE THE THRESHOLD QUESTION OF FEDERAL JURISDICTION, WHICH WILL BE BROUGHT BEFORE THE COURT IN PLAINTIFFS' FORTHCOMING MOTION TO REMAND, BEFORE IT CAN GRANT A MOTION TO STAY.

Before a District Court can adjudicate any pretrial matters, including a Motion to Stay,

the Court must determine whether it has subject matter jurisdiction over the case because "[t]he

power to grant a stay is subject to an important limitation: the existence of subject matter

jurisdiction." *Commonwealth of Pennsylvania v. Tap Pharmaceutical Products, Inc.*, 415

F.Supp.2d at 521; *See also Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct.

1003, 140 L.Ed.2d 210 (1998) (*citing Ex parte McCardle,* 7 Wall. 506, 74 U.S. 506, 514, 19

L.Ed. 264 (1868): "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction

is power to declare the law, and when it ceases to exist, the only function remaining to the court

is that of announcing the fact and dismissing the cause."); *Clark v. Pfizer Inc.*, 2004 WL

1970138 at 2 (E.D.Pa. 2004)(applying the above rule to resolve jurisdictional question before

deciding Motion to Stay). "The requirement that jurisdiction be established as a threshold

matter…is inflexible and without exception." *Steel Co.,* 523 U.S. at 94 (*citing Mansfield, C. &

L.M.R. Co. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 511 (1884)).

In the case at hand, Plaintiffs contest federal subject matter jurisdiction and accordingly

will file a Motion to Remand forthwith. The question of federal jurisdiction must be resolved

---

[2] Pursuant to Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware Rule 7.1.2(b) and Fed.R.Civ.P 6(a), Plaintiffs must file their opposition to the instant Motion to Stay within ten business days. Pursuant to 28 U.S.C. § 1447(c), a motion to remand based on lack of subject matter jurisdiction may be made at any time after removal. Therefore, Plaintiffs must file this Opposition before Plaintiffs' are reasonably able to file their Motion to Remand.

before the Court can take any other action, including adjudicating this meritless pending Motion to Stay.

**III.    THIS COURT RETAINS AUTHORITY TO AND SHOULD DECIDE THE THRESHOLD QUESTION OF FEDERAL JURISDICTION EVEN IF A TRANSFER TO MDL-875 IS PENDING.**

This Court has the authority to determine the threshold question of subject matter jurisdiction in this case and, according to case law and guidance from the Judicial Panel on Multidtrict Litigation ("JPML"), should do so. A stay would serve no purpose but to delay this crucial determination.

Northrup Grumman incorrectly argues that its letter to the JPML declaring this case a "Tag Along Action" (Exhibit 1 to Northrup Grumman's Motion) requires this Court to stay all proceedings pending a conditional transfer order ("CTO") and transfer to MDL-875. However, Northrup Grumman's argument ignores significant applicable law. Significantly, no CTO is pending at this time. Moreover, even if a CTO were pending, Northrup Grumman's argument would be incorrect. At any stage of this case, this Court is permitted to and should make an individual determination of subject matter jurisdiction.

Contrary to Northrup Grumman's assertions, even if a CTO were pending, the existence of a CTO would "not affect or suspend orders and pretrial proceedings in the district court in which the action is pending and does not in any way limit the pretrial jurisdiction of that court." JPML Rule 1.5, 181 F.R.D. 1, 3 (1998); *accord*, *Steel Workers Pension Trust v. Citigroup, Inc.*, 295 B.R. 747, 749 (E.D.Pa. 2003) (applying Panel Rule 1.5 in determining District Court's jurisdiction to hear Motion to Remand); *Vanouwerker v. Owens-Corning Fiberglass Corp.*, 1999 WL 335960, *1, n.2,  (E.D.Tex. 1999) (appying Panel Rule 1.5 and proceeding to remand asbestos case to state court improperly removed on federal officer grounds).

Accordingly, Courts have consistently held that the District Court to which the action is removed *should* rule on the Motion to Remand prior to considering the propriety of a transfer to MDL-875. *See e.g. Hilbert v. Aeroquip, Inc. et al*, 486 F.Supp.2d at 135 (remanding an asbestos case removed by Defendant Northrup Grumman prior to transfer to MDL-875); *Freiberg v. Swinterton & Walberg Property Services, Inc. et al.*, 245 F.Supp.2d 1144, 1149 (D.Colo. 2002) (remanding five asbestos actions prior to transfer to MDL-875); *Vanouwerker*, 1999 WL 335960 at *13 (remanding asbestos case to state court improperly removed on federal officer grounds).

Indeed, the MDL-875 Court itself has specifically instructed at least one District Court to decide the remand issue while a CTO is pending. *Freiberg*, 245 F.Supp.2d at 1155-56 (where plaintiff's opposition to transfer was scheduled to be considered before MDL-875, Court stated: "In the interim, the Panel has instructed me to proceed in these cases and, in particular, address any pending motions to remand.").

Northrup Grumman also incorrectly argues that this Court's determination of a Motion to Remand would be a waste of judicial resources because MDL-875 is familiar with the issues relating to asbestos litigation. Motion at 7. Northrup Grumman's argument fails to recognize that either this Court or MDL-875 must make an independent assessment of jurisdiction, requiring the same judicial effort and resources. *See Commonwealth of Pennsylvania v. Tap Pharmaceutical Products, Inc.*, 415 F.Supp.2d at 521, which held:

> [G]ranting a stay solely based on the existence of a factually-related MDL proceeding, without undertaking an individualized analysis of subject matter jurisdiction, would run counter to established case law, congressional intent, and JPML Rule 1.5, all of which contemplate a district court will act to resolve threshold jurisdictional concerns. [Footnote omitted] Defendants' judicial efficiency and uniformity arguments overlook this critical point. Here, either this Court or [the MDL] must make an independent review of the notice of removal, the Amended Complaint, and the motion to remand to determine whether a federal question is present. The same degree of judicial resources

> must be expended here or in the [MDL] to make an assessment of
> which party should prevail. Therefore, the existence of subject matter
> jurisdiction cannot be resolved more efficiently or uniformly in [the
> MDL] because it is undisputed that one federal court must make an
> individualized assessment of the jurisdictional issues in this case.
> Multi-district litigation undoubtedly conserves judicial resources in
> many respects, but, in determining the threshold issue of jurisdiction,
> this Court concludes such an inquiry is fundamental to its purpose.

*Id. See also Hilbert*, 486 F.Supp.2d at 142 (denying Northrup Grumman's Motion to Stay

because, among other reasons, the district court "is as qualified to evaluate the factors

establishing federal jurisdiction as any other federal court" and because "[t]he issue is whether

Northrup Grumman has met its burden of proving the elements of federal officer jurisdiction, not

whether all manufacturers of products containing asbestos who sold such products to the Navy

are entitled to invoke this Court's jurisdiction."). The fact that Northrup Grumman made the

same motion just last year in the *Hilbert* case, which the District Court rejected, makes the

motive behind this motion, as well as its timing, suspect. Plaintiffs should not be forced to suffer

irreparable prejudice by having the issue of remand delayed when it is clear this Court has the

authority and ability to expeditiously decide the issue of jurisdiction prior to transfer to MDL-

875.

## IV.    THE INTERESTS OF JUSTICE REQUIRE THIS COURT TO HEAR PLAINTIFFS' MOTION TO REMAND.

In addition to the authority granted by Panel Rule 1.5 and the requirement to undertake an

independent assessment of jurisdiction, several courts have held that fundamental issues of

fairness weigh against requiring a plaintiff, who is dying from mesothelioma, to litigate a CTO in

MDL-875 before obtaining a determination as to threshold jurisdictional question. *See Hilbert*,

486 F.Supp.2d at 142 ("[T]his court finds no reason to require the plaintiffs to suffer the

undeniable delays inherent in all MDL cases unless there is federal jurisdiction.  To undergo

such a lengthy process to find out that there is no federal jurisdiction would be a travesty of justice given Mr. Hilbert's medical condition."); *see also Brewster v. A.W. Chesterton Company, et al.*, 2007 WL 1056774 at *4 (where a defendant in an asbestos case "removed th[e] action and almost immediately sought a stay of proceedings," the Court stated that it "will not abide such abuse of the removal process," given that defendant "did this with full knowledge that a stay of almost any length would eviscerate Mr. Brewster's chance at having his day before a jury.").

The strategic procedure chastised in the *Brewster* case is exactly what Northrup Grumman has done in this case: removed the case and sought a Stay of Proceedings before Plaintiffs can reasonably file their Motion to Remand.[3] Granting Northrup Grumman's Motion to Stay would only encourage and endorse Northrup Grumman's abuse of the removal process and cause undue prejudice to Plaintiffs, requiring Plaintiffs to litigate the transfer to MDL-875 before a determination of federal jurisdiction is made. Such a delay would undoubtedly eviscerate Mr. Seitz's chance of having his day before a jury.

## V.     CONCLUSION

This Court has the authority and the responsibility to undertake an independent determination of federal jurisdiction prior to transfer to MDL-875. Failure to do so would result in irreparable harm to Plaintiffs. Therefore, Plaintiffs respectfully request that this Court deny Defendant Northrup Grumman's Motion to Stay proceedings in its entirety and request that the Court exercise its authority to hear Plaintiff's forthcoming Motion to Remand.

[*Signature on the following page*]

---

[3] As noted above, Northrup Grumman's Motion to Stay was filed on June 13, 2008, only one day after Northrup Grumman filed its Notice of Removal.

Respectfully submitted,

LAW OFFICE OF JOSEPH J. RHOADES

/s/   A. Dale Bowers

Joseph J. Rhoades, Esquire (I.D. 2064)
A. Dale Bowers, Esquire (I.D. 3932)
1225 King Street, 12th Floor
Wilmington, Delaware 19801
302-427-9500
Attorneys for Plaintiffs

-and-

LEVY PHILLIPS & KONIGSBERG, LLP
Jerome H. Block, Esq. (NY Id. No. 3997245)
Sharon J. Zinns, Esq. (CA Id. No. 241476)
Amber R. Long, Esq. (NY Id. No. 4397188)
800 Third Avenue, 13th Floor
New York, New York 10022
Phone: (212) 605-6200
Fax: (212) 605-6290

Dated: June 26, 2008

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
IN RE: ASBESTOS LITIGATION:                    :
                                               :
FREDERICK SEITZ and                            :
MARY LOUISE SEITZ, his wife                    :
                                               :      C.A. No. 08-CV-0353 GMS
        Plaintiffs,                            :
                                               :
             v.                                :
                                               :
ADEL WIGGINS GROUP, et al.,                    :
                                               :
        Defendants.                            :
                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
```

## ORDER

Having considered defendant Northrup Grumman Corporation's Motion for Stay of Proceedings, it is hereby ordered this _____ day of _____ 2008 that said motion is DENIED.

_____

The Honorable Gregory M. Sleet

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2008, I caused service of a copy of the foregoing

Plaintiffs' Opposition to Defendant Northrup Grumman Corporation's Motion for Stay of

Proceedings on the following counsel of record and parties in the corresponding state court

action, by U.S. Mail and/or e-file:

Christian J. Singewald, Esquire  (E-FILE)
White & Williams
824 Market Street, Suite 902
Wilmington, Delaware 19801-4938

Beth Valocchi, Esquire (U.S. MAIL)
Swartz Campbell LLC
300 Delaware Avenue, Suite 1130
Wilmington, Delaware 19801

Loreto P. Rufo, Esquire (U.S. MAIL)
Rufo Associates, P.A.
7217 Lancaster Pike, Suite 4
Hockessin, Delaware 19701

Gary H. Kaplan, Esquire (E-FILE)
Armand J. Della Porta, Esquire
Ana Marina McCann, Esquire
Marshall Dennehey Warner
Coleman & Goggin
1220 North Market Street, 5th Floor
Post Office Box 8888
Wilmington, Delaware 19899-8888

Lynne M. Parker, Esquire  (E-FILE)
Holistein, Keating, Cattell,
Johnson & Goldstein
One Commerce Center, Suite 730
1201 North Orange Street
Wilmington, Delaware 19801

Daniel M. Silver, Esquire (E-FILE)
Noriss E. Cosgrove, Esquire
McCarter & English, LLP
405 North King Street, 8th Floor

Post Office Box 111
Wilmington, Delaware 19899

J. Michael Johnson, Esquire (U.S. MAIL)
Rawle & Henderson LLP
300 Delaware Avenue, Suite 1015
Post Office Box 588
Wilmington, Delaware 19899-0588

Jeffrey S. Marlin, Esquire (E-FILE)
Megan T. Mantzavinos, Esquire
Marks O'Neill O'Brien & Courtney, P.C.
913 North Market Street, Suite 800
Wilmington, Delaware 19801

Penelope B. O'Connell, Esquire (E-FILE)
Elzufon Austin Reardon Tarlov
& Mondell, P.A.
300 Delaware Avenue, Suite 1700
Post Office Box 1630
Wilmington, Delaware 19899-1630

Robert K. Beste, III, Esquire (E-FILE)
Smith, Katzenstein & Furlow
P.O. Box 410
Wilmington, DE  19899

Air Cooled Motors (U.S. MAIL)
94 Hale Dr.
Walterboro, SC  29488

CURTIS-Wright Corporation (U.S. MAIL)
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801

Goodrich Corporation. (U.S. MAIL)
c/o Corporation Service Company
2711 Centerville Road, Suite
Wilmington, Delaware 19808

Paul A. Bradley, Esquire (E-FILE)
Maron Marvel Bradley & Anderson, P.A.
1201 North Market Street, Suite 900
Post Office Box 288
Wilmington, Delaware 19899

Adel Wiggins Group (U.S. MAIL)
Attn: Officer/Agent
5000 Triggs Street
Los Angeles, California 90022

Aerojet General Corporation (U.S. MAIL)
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801

Fletch Air, Inc. (U.S. MAIL)
118 FM 1621
Comfort, TX  78013-3425

Franklin Aircraft Engines, Inc. (U.S. MAIL)
136 Racquette Dr.
Ft. Collis, CO  80524

Rolls Royce North America, Inc. (U.S. MAIL)
c/o Corporation Service Co.
2711 Centerville Rd., Suite 400
Wilmington, DE  19808

/s/A. Dale Bowers
_____
Joseph J. Rhoades, Esquire (Bar ID No. 2064)
A. Dale Bowers, Esquire (Bar ID No. 3932)
1225 King Street, 12th Flr.
P.O. Box 874
Wilmington, DE  19899
302-427-9500
Attorneys for Plaintiff

LEVY PHILLIPS & KONIGSBERG, LLP
Jerome H. Block, Esquire (NY ID No. 3997246)
Sharon J. Zinns, Esquire (CA ID No. 241476)
Amber R. Long, Esquire (NY ID No. 4397188)
800 Third Ave., 13th Flr.
New York, NY  10022

EXHIBIT "F"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: ASBESTOS LITIGATION: | ) |
| | ) |
| FREDERICK SEITZ and MARY | ) |
| LOUISE SEITZ, his wife, | ) |
| | ) |
| | ) |
| Plaintiffs, | )    Case No. 1:08-cv-353 GMS |
| | ) |
| -vs.- | ) |
| | ) |
| ADEL WIGGINS GROUP, et al., | ) |
| | ) |
| Defendants. | ) |

---

## DEFENDANT NORTHROP GRUMMAN CORPORATION'S REPLY IN SUPPORT OF ITS MOTION FOR STAY OF PROCEEDINGS

---

Defendant Northrop Grumman Corporation (hereinafter "Northrop Grumman") hereby replies in support of its Motion For Stay of Proceedings and in response to plaintiffs Opposition to the same as follows:

## I.    INTRODUCTION

It is ironic that plaintiffs would call Northrop Grumman's Motion "suspect" due to the District of Massachusetts ruling in *Hilbert v. Aeroquip, Inc.*, 486 F.Supp.2d 135 (D.Mass. 2007). Indeed, the *Hilbert* ruling, as well as the ruling in *Brewster v. A.W. Chesterton Company*, 2007 WL 1056774 (N.D. Cal.), also heavily relied upon by plaintiffs in their brief, are not only distinguishable from the case at bar, but actually *support* Northrop Grumman's position on removal in this case. Therefore, it is incorrect for the plaintiffs to cite to these cases as support for their claim that Northrop Grumman has "abused the removal process." Moreover, plaintiffs

cannot claim prejudice as a result of any delay caused by Northrop Grumman, where Mr. Seitz

testified on June 10, 2008, at a video trial deposition conducted by his counsel, that he knew the

reason for the expedited testimony was because he would not survive to trial – and this was

before any defendants sought removal.    Therefore, Northrop Grumman's actions are not

responsible for "eviscerat[ing] Mr. Seitz's chance of having his day before a jury."    Finally, this

Court not only has the authority to transfer this case to the MDL prior to ruling on any Motion to

Remand, but has done so as recently as last year in a case similar to this.

## II.    THE *HILBERT* AND *BREWSTER* RULINGS SUPPORT NORTHROP GRUMMAN'S POSITION

Plaintiffs' reliance on the District of Massachusetts ruling in *Hilbert*, which is, of course,

not binding on this Court, is misguided because (1) it intertwines its ruling on defendant's

motion to stay with plaintiffs' motion to remand; and (2) expressly bases its remand ruling on

facts wholly distinguishable from this case. *See Hilbert*, 486 F.Supp.2d at 142.    *Hilbert*

expressly distinguishes itself from cases that are indisputably removable based on the Federal

Officer Removal Statute, 28 U.S.C. 1442(a)(1), by noting that "[t]he claims against Northrop are

limited to claims for failure to warn."    Indeed, the *Hilbert* Complaint expressly waived any

theories of defective design regarding Navy vessels, limiting their theory to failure to warn. *Id.*

at 138.  The Court essentially concedes that removal is appropriate in an action alleging defective

design or manufacture where the product was allegedly designed and/or manufactured for the

United States Government pursuant to government specifications.    The Court also concedes the

law is unsettled as to whether the federal contractor defense has any application in a case based

on a failure to warn. *Id.* at 143-44. Because the District of Massachusetts decided the defense

2

should not apply to a sole failure to warn claim, it denied the Motion to Stay and granted the Motion to Remand.

In stark contrast to *Hilbert*, Mr. and Mrs. Seitz do assert causes of action based on the design and manufacture of Northrop Grumman aircraft produced for the United States Government. *See* Complaint at ¶ 45 (Exh. A). Moreover, plaintiffs cannot now defeat removal by simply amending the Complaint. *Hilbert*, 486 F.Supp.2d at 138, fn. 1 (citing *Faul v. Owens-Corning Fiberglass Corp.,* 48 F.Supp.2d 653, 658 (E.D. Tex. 1999). Thus, under the facts of *this* case, even the *Hilbert* court would likely rule in Northrop Grumman's favor.

Plaintiffs' reliance on the Northern District of California's ruling in *Brewster* is similarly misguided. While remand was granted, this was because the very basis for removal was undermined by plaintiffs' express waiver of any liability based on exposure to a product the removing defendant produced for the government:

> ***First, it is true that had plaintiffs sought to recover for any injury caused by marine turbines manufactured by GE at the Navy's direction, the applicability of the defense would be plausible. In such a situation, GE could assert the defense that it built the marine turbines at the Navy's direction and therefore, that GE should not be liable. That is not the case at bar.*** Plaintiffs have waived expressly long ago any liability claim based on any exposure to a GE marine turbine. GE, therefore, does not assert the federal-officer defense because of any claim made by plaintiffs. Rather GE contends it is a "defense" to co-defendant's attempt to allocate fault to GE . . ."

*Brewster*, 2007 WL 1056774 at *2. Thus, under the facts of *this* case, once again, even the *Brewster* court would rule in Northrop Grumman's favor.

## III.    NORTHROP GRUMMAN'S DELAY WILL NOT PREJUDICE MR. SEITZ

Though plaintiffs also cite to *Brewster* to support their claim that a stay would prejudice plaintiff, the ruling in that case relied upon a California statute that would have limited plaintiff's damages if he were not to survive to trial. Here, plaintiff has all but conceded he will not survive to trial, regardless of whether the case remains in State court, is removed to federal court or is stayed for the limited time necessary to effectuate the transfer of this action to the MDL. Plaintiff testified on June 10, 2008, at his video trial deposition[1] that he knew the reason his counsel were conducting this deposition at this early juncture and on video was because he was unlikely to survive to trial. Mr. Seitz provided this testimony before the case was removed to federal court.

## IV.    A RULING ON JURISDICTION IS APPROPRIATE FOR THE MDL

Ironically, the *Hilbert* ruling is an ideal example of why this case should be stayed. While the *Hilbert* Court ruled on the remand issue, it conceded the law was unsettled as to the application of the federal officer removal defense in an asbestos case dealing with a government specified product involving the issue of failure to warn. The very purpose behind the MDL Panel is to avoid duplication of effort with unnecessary expenses by the parties, witnesses, and their counsel and *to prevent inconsistent decisions* in all pending federal personal injury or wrongful death asbestos actions not yet in trial, and for the just and efficient conduct of the litigation. *In re Asbestos Prods. Liab. Litig.*, 771 F. Supp. at 415, 421-22 (J.P.M.L. 1991). As further set forth in Northrop Grumman's Motion to Stay, coordination eliminates the potential

---

[1] A transcript for this deposition has not yet been published. Northrop Grumman will, however, supplement this Reply with cites to the transcript, once it is published, at the request of the Court.

for conflicting pretrial rulings. *See, e.g., In re New York City Mun. Sec. Litig.*, 572 F.2d 49, 51-52 (2d Cir. 1978); *In re Air Crash Disaster off Long Island, N.Y.*, 965 F. Supp. 5, 7 (S.D.N.Y. 1997). And, thus, a majority of courts have concluded that it is appropriate to stay preliminary pretrial proceedings while a motion to transfer and consolidate is pending with the MDL Panel because of the judicial resources that are curbed." *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1362 (C.D. Cal. 1997).

## V.    THIS COURT HAS SUSPENDED ACTION UNDER IDENTICAL CIRCUMSTANCES

It is not only proper for the Court to permit this case to be transferred to the MDL before any rulings are made on jurisdiction, but this Court has done so as recently as last year in the *Harwood v. Bondex International*, C.A. No. 1:06-673, case. Northrop Grumman removed the *Harwood* case to the District of Delaware on the same grounds on November 2, 2006, immediately sought to transfer it to the MDL and filed a Motion to Stay the Proceedings, just as is it has in this case. *See* Harwood Docket (Exh. B). Despite plaintiffs' oppositions, the District of Delaware opted not to rule on matters and permitted its transfer to the MDL for further handling. *See id.;* Order of the MDL Panel (Exh. C).

## I.    CONCLUSION

For the reasons set forth in Northrop Grumman's Motion for Stay of the Proceedings and its Reply herein, and for the reasons set forth by numerous courts throughout the country that have entered a stay of all proceedings pending a decision on transfer to an MDL proceeding (*see* Exhibits 6-12 of Northrop Grumman's Motion), Northrop Grumman respectfully requests that this Court stay all proceedings in this matter pending transfer of this action by the J.P.M.L. to MDL-875 in the Eastern District of Pennsylvania.

ELZUFON AUSTIN REARDON TARLOV &
MONDELL, P.A.

/s/ *Penelope B. O'Connell*

Penelope B. O'Connell (DE #4898)
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, Delaware 19899
(302) 428-3181

Nancy Shane Rappaport (DE #3428)
DLA Piper US LLP
1650 Market Street, Suite 4900
Philadelphia, PA 19103
(215) 656-3357

Attorneys for Defendant
Northrop Grumman Corporation

Date:  June 30, 2008

# EXHIBIT "G"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - - - - - - - - - - - -X
IN RE: ASBESTOS LITIGATION:              :
                                         :
FREDERICK SEITZ and                      :
MARY LOUISE SEITZ, his wife              :
                                         :      C.A. No. 08-CV-0351 GMS
      Plaintiffs,                        :      C.A. No. 08-CV-0353 GMS
                                         :
         v.                              :
                                         :
ADEL WIGGINS GROUP, et al.,              :
                                         :
      Defendants.                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - -X
```

## WAIVER OF CLAIMS

Plaintiffs Frederick and Mary Louise Seitz filed their Complaint in Delaware State Court, New Castle County, on April 25, 2008. Plaintiffs alleged the following: Count I – Negligence; Count II – Willful And Wanton Conduct; Count II – Strict Product Liability; and Count IV – Loss of Consortium. Within the negligence and strict liability counts are claims for failure to warn, design defect, and manufacturing defect.

Plaintiffs waive all negligence and strict product liability claims against all defendants except for a state law failure to warn claim. Plaintiffs specifically waive any other claims of design defect or manufacturing defect.

Respectfully submitted,

LAW OFFICE OF JOSEPH J. RHOADES

/s/   A. Dale Bowers
Joseph J. Rhoades, Esquire (I.D. 2064)
A. Dale Bowers, Esquire (I.D. 3932)
1225 King Street, 12th Floor
Wilmington, Delaware 19801

{00121596.DOC}

302-427-9500
Attorneys for Plaintiffs

-and-

LEVY PHILLIPS & KONIGSBERG, LLP
Jerome H. Block, Esq. (NY Id. No. 3997245)
Sharon J. Zinns, Esq. (CA Id. No. 241476)
Amber R. Long, Esq. (NY Id. No. 4397188)
800 Third Avenue, 13th Floor
New York, New York 10022
Phone: (212) 605-6200
Fax: (212) 605-6290

Dated: July 2, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2008, I caused service of a copy of the foregoing Waiver

of Claims on the following counsel of record and parties in the corresponding state court action,

by U.S. Mail and/or e-file:

Christian J. Singewald, Esquire  (E-FILE)
White & Williams
824 Market Street, Suite 902
Wilmington, Delaware 19801-4938

Beth Valocchi, Esquire (U.S. MAIL)
Swartz Campbell LLC
300 Delaware Avenue, Suite 1130
Wilmington, Delaware 19801

Loreto P. Rufo, Esquire (U.S. MAIL)
Rufo Associates, P.A.
7217 Lancaster Pike, Suite 4
Hockessin, Delaware 19701

Gary H. Kaplan, Esquire (E-FILE)
Armand J. Della Porta, Esquire
Ana Marina McCann, Esquire
Marshall Dennehey Warner
Coleman & Goggin
1220 North Market Street, 5th Floor
Post Office Box 8888
Wilmington, Delaware 19899-8888

Lynne M. Parker, Esquire  (E-FILE)
Holistein, Keating, Cattell,
Johnson & Goldstein
One Commerce Center, Suite 730
1201 North Orange Street
Wilmington, Delaware 19801

Daniel M. Silver, Esquire (E-FILE)
Noriss E. Cosgrove, Esquire
McCarter & English, LLP
405 North King Street, 8th Floor
Post Office Box 111
Wilmington, Delaware 19899

{00121596.DOC}

J. Michael Johnson, Esquire (U.S. MAIL)
Rawle & Henderson LLP
300 Delaware Avenue, Suite 1015
Post Office Box 588
Wilmington, Delaware 19899-0588

Jeffrey S. Marlin, Esquire (E-FILE)
Megan T. Mantzavinos, Esquire
Marks O'Neill O'Brien & Courtney, P.C.
913 North Market Street, Suite 800
Wilmington, Delaware 19801

Penelope B. O'Connell, Esquire (E-FILE)
Elzufon Austin Reardon Tarlov
& Mondell, P.A.
300 Delaware Avenue, Suite 1700
Post Office Box 1630
Wilmington, Delaware 19899-1630

Robert K. Beste, III, Esquire (E-FILE)
Smith, Katzenstein & Furlow
P.O. Box 410
Wilmington, DE  19899

Air Cooled Motors (U.S. MAIL)
94 Hale Dr.
Walterboro, SC  29488

CURTIS-Wright Corporation (U.S. MAIL)
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801

Goodrich Corporation. (U.S. MAIL)
c/o Corporation Service Company
2711 Centerville Road, Suite
Wilmington, Delaware 19808

Paul A. Bradley, Esquire (E-FILE)
Maron Marvel Bradley & Anderson, P.A.
1201 North Market Street, Suite 900
Post Office Box 288
Wilmington, Delaware 19899

Adel Wiggins Group (U.S. MAIL)

Attn: Officer/Agent
5000 Triggs Street
Los Angeles, California 90022

Aerojet General Corporation (U.S. MAIL)
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801

Fletch Air, Inc. (U.S. MAIL)
118 FM 1621
Comfort, TX  78013-3425

Franklin Aircraft Engines, Inc. (U.S. MAIL)
136 Racquette Dr.
Ft. Collis, CO  80524

Rolls Royce North America, Inc. (U.S. MAIL)
c/o Corporation Service Co.
2711 Centerville Rd., Suite 400
Wilmington, DE  19808

/s/A. Dale Bowers

Joseph J. Rhoades, Esquire (Bar ID No. 2064)
A. Dale Bowers, Esquire (Bar ID No. 3932)
1225 King Street, 12th Flr.
P.O. Box 874
Wilmington, DE  19899
302-427-9500
Attorneys for Plaintiff

LEVY PHILLIPS & KONIGSBERG, LLP
Jerome H. Block, Esquire (NY ID No. 3997246)
Sharon J. Zinns, Esquire (CA ID No. 241476)
Amber R. Long, Esquire (NY ID No. 4397188)
800 Third Ave., 13th Flr.
New York, NY  10022

{00121596.DOC}

EXHIBIT "H"

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| RHONDA J. TEAGUE, individually and<br>as Personal Representative of the Heirs<br>and Estate of ROBERT WILLIAM<br>HENDERSON, et al.<br><br>PLAINTIFFS,<br><br>vs.<br><br>BELL HELICOPTER SERVICES, INC.,<br>et al.,<br><br>DEFENDANTS. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§    CIVIL ACTION NO. 4:03-CV-004-A |

## DECLARATION OF WILLIAM T. WILSON

1.    My name is William T. Wilson. The facts stated in this affidavit are true and correct and within my personal knowledge.

2.    I worked for Bell Helicopter ("Bell") for more than 32 years before retiring in 2001. I served as the Director of Helicopter Contracts and was in contract administration for my entire 32-year career with Bell. I participated in numerous conferences, discussed below, between Bell and US military representatives dedicated to reviewing design specifications and details of the UH-1 and AH-1 series military helicopters. Before working for Bell, I served as Contracting Officer for the Aeronautical Systems Division of the US Air Force. Through my experience at Bell and the USAF, I am thoroughly familiar with the details of contracting for and developing the UH-1 "Huey" and AH-1 "Cobra" helicopters, including the XH-40, YH-40, HU-1A, HU-1B, UH-1D, UH-1H, AH-1G, AH-1S, and UH-1F variants. The regular process of design approval has remained the same since the inception of the UH-1 and AH-1 programs.

DECLARATION OF WILLIAM T. WILSON



EXHIBIT
A

Page 1

3.      Since 1951, Bell has supplied thousands of helicopters to the US Government for military use, including the H-13, UH-1 and AH-1 series aircraft. Throughout this time, Bell has had to follow specific Government-approved procedures, regulations, laws, and standards for the design, materials, marking, production, and delivery of these helicopters.

4.      In 1954, the USAF put out a request for proposal for medical evacuation helicopters for use by the US Army. At that time, the USAF was designated as having lead responsibility, known as "technical cognizance," for all military aircraft procurement. The request specified a turbo-powered military helicopter to carry two medical attendants and four litters and to operate according to certain specified performance characteristics.

5.      In 1955, the USAF awarded Bell a contract for the production of three prototype aircraft, designated XH-40 aircraft. In the contract, the USAF selected precise specifications Bell had proposed in response to government design criteria. The USAF established those specifications as contractual requirements which Bell had to adhere to in producing the prototypes.  One of the specifications mandated by the USAF in the construction of the aircraft was the use of asbestos in certain seals and gaskets on the stainless steel enclosure the government mandated for the engine compartment.  This performance requirement was imposed by the government to prevent the spread of fire from the engine compartment to the passenger compartment.

6.      The USAF subjected the three original XH-40 aircraft to extensive flight testing at Edwards Air Force Base. Based upon these tests, the USAF established and approved a design for six more helicopters, designated the YH-40. After the USAF tested these aircraft, they approved a design and contract for nine pre-production helicopters designated as HU-1.

**DECLARATION OF WILLIAM T. WILSON**                                    **Page 2**

7.    In 1958, following extensive testing and modification under the USAF contract, and with its participation and supervision, the USAF approved the first production contract for the HU-1A. The following year, in 1958, the first HU-1A became operational. By this time, the military had accumulated extensive experience and knowledge of the Huey's design and operational characteristics. As the military operated the HU-1A under a wide range of conditions, the military accumulated superior experience and knowledge of the helicopter.

8.    The HU-1A evolved into the HU-1B, later redesignated as the UH-1B. The first UH-1B became operational in the early 1960's. As the USAF demanded, the UH-1B was a medium transport helicopter whose primary mission was to transport troops into and out of battle. It was also used in the Vietnam conflict as a gunship.

9.    Military success with the UH-1B as a transport and gunship led to development and production of the UH-1D and UH-1H and a gunship variation designated the AH-1G, which later evolved into the AH-1S. These later transport and gunship variants received the same Government design approval requirements as were the predecessor UH-1 models.

10.    The US Government actively participated in the development of the UH-1 and AH-1 series helicopters. To facilitate the Government's review and approval of the design and production specifications and engineering drawings, the Government maintained a staff of military and civilian representatives at Bell's plant. From the 1960's to the present, the Government has maintained scores of personnel at Bell's plant to ensure the helicopters were built in accordance with the Detail Specifications. Over 200 such Government personnel were present at Bell's plant during the height of the Vietnam conflict. Since the Vietnam conflict ended, the Government has maintained scores of personnel at Bell's plant to ensure that each helicopter was built according to specifications and designs reviewed

**DECLARATION OF WILLIAM T. WILSON**                                        Page 3

and approved by the Government each and every year. These personnel included specialists in engineering, quality control, piloting, contracting, and safety. They were charged with reviewing and approving engineering drawings, assuring adherence to military specifications and requirements, assisting Bell's employees in achieving full compliance with military contract requirements, approving manufacturing and assembly processes and products, and accepting helicopters and supplies on behalf of the Government after determining they met every contract requirement.

11. The US military performed extensive tests on the UH-1 and AH-1 series helicopters to determine their airworthiness in operation. The military maintained detailed records on the helicopters and analyzed the reliability and maintainability of the aircraft in military fleet operations.

12. Bell delivered any helicopter and part to the US Army pursuant to a Government contract requiring Bell to adhere to detailed Government-approved design, production, marking, and shipping specifications. The contracts incorporate by reference the relevant specifications and mandate that all aircraft or parts be manufactured in accordance with the Detail Specifications and that Bell's quality assurance program conform to military specifications.

13. If Bell failed to manufacture military helicopters in strict compliance with Government specifications, Bell was subject to a variety of penalties under US law, including civil and criminal sanctions. Bell was not permitted to change specifications in any way without the express authorization of the Government.

**DECLARATION OF WILLIAM T. WILSON**

Page 4

14.    The Government accepted any helicopter or part from Bell pursuant to a form DD-250 "Materials Inspection and Receiving Report." The Government's authorized signature on the form indicates the helicopter or part "conformed to the contract except as noted herein on supporting documents." This final inspection and acceptance of the aircraft or part was the last step in the exhaustive inspection process the Government implemented throughout the design, manufacture, assembly, and packaging processes.

15.    Bell performed the helicopter contracts in accordance with the requirements of the Detail Specification prepared at the direction of the Government, approved by the Government, and incorporated by reference in the contracts. The Government did not permit Bell to deviate from the Detail Specifications without a contract change authorized by the Government's Contracting Officer. The Detail Specifications dictated the development of Bell's engineering drawings. The Detail Specifications set forth the aircraft's speed, structural maneuver characteristics, crash load factors, landing characteristics, and other performance and operations criteria. The Detail Specifications incorporated a multi-page list of military specifications, known as "mil specs," which had to be followed. The mil specs themselves were often lengthy and detailed documents. The mil specs described the characteristics for helicopter parts containing asbestos as required by the Detail Specification. The seals and gaskets that a production employee at Bell might have come in contact with were such parts.

16.    Government-authored military standards dictate the specification process. Bell used these standards to draft proposed specifications, including proposed painting and marking requirement for helicopters and their spare or repair parts. The proposed specifications were reviewed at initial review conferences attended by 40 to 50 people. Generally, no

**DECLARATION OF WILLIAM T. WILSON**

Page 5

more than six of the attendees were Bell employees, with the balance comprised of Government and military employees and consultants. These conferences sometimes lasted two or three days. During them, the proposed specifications were reviewed line by line, and Government personnel were free to, and often did, request detailed changes.

17.    Bell's engineers then revised the specifications in accordance with the requests and at the direction of the reviewing military agencies. The revised specifications were subjected to further conferences and review by military personnel. Several conferences were often held concerning the revised specifications. Months of Bell revisions and military reviews were often needed before the military accepted the final Detail Specifications. The military's authorized representative had to give final written approval to each specification.

18.    Once the military had approved all the Detail Specifications, the Government sent Bell a proposed contract incorporating them by reference. The form of the contract followed a Government form for military contracts. Bell had very little ability to seek any revisions to the contract's terms.

19.    From the Detail Specifications, Bell produced or revised engineering drawings for each component of the helicopter.  The drawings  incorporate and restate all of the Government specifications and military requirements Bell was obligated to follow under the production contract. Each drawing was submitted for review and approval to civilian engineers employed by the Government and working at Bell's plant.

20.    Each drawing contained a signature block for the required signature of a Government engineer. The signature denoted the Government engineer's review and acceptance of the drawing. Any changes to a drawing are reflected in the upper right corner of the drawing under the title Revisions, which show engineering orders approved

**DECLARATION OF WILLIAM T. WILSON**

Page 6

for the drawings. Each substantive engineering order had to be approved or concurred with by the Government's approval officer.

21.    After Government approval of the drawings, Bell incorporated the drawings into the final helicopter design, which Bell had to strictly adhere to. To deviate from an approved design, Bell had to obtain the general agreement of Government technical personnel in charge, even before submitting an Engineering Change Proposal for consideration. Only half of the Engineering Change Proposals allowed to be submitted were approved by the Army. Implementing an approved engineering change required Bell to obtain a contractual amendment and a written Engineering Order approved by the Government engineer responsible for the drawing to be changed.

22.    In short, in accordance with Government contract requirements, the Government was directly and intimately involved with development and controlled the design of every aspect of the helicopter, including without limitation the types of materials used in the helicopters and their component parts. Government representatives closely monitored Bell's work at every step in the design process, and Government evaluation and approval had to occur at every step. Bell had little or no leeway in determining the required design of the helicopters, including the required materials for the component parts and their painting and marking.

23.    Bell had no actual knowledge of any danger in the use of asbestos in helicopter components that was not known to the US Government.

**DECLARATION OF WILLIAM T. WILSON**                                    Page 7

24.     The original flight and maintenance manuals (excluding Depot Maintenance Work Requirements) for the UH-1 and AH-1 series helicopters were developed and written at the specific direction of the military as to content. The military reviewed and independently considered each draft of the manuals, frequently requiring changes. Bell has never published its own flight or maintenance manuals for these helicopters. The Government controlled both the original content and any subsequent revisions to the manuals. Bell supplied all information at its disposal to the Government regarding the aircraft.

25.     In short, at every step in the development and production of UH-1 and AH-1 series helicopters, Bell had to follow Government-evaluated and -approved Detail Specifications concerning the design, materials, painting, and markings for the those helicopters and their component parts. Every helicopter or component part accepted by the Government from Bell was accepted only after the Government confirmed the aircraft or part conformed to the contract specifications. Bell possessed no knowledge of the dangers, if any, concerning the design, materials, painting, and markings for the those helicopters and their component parts which Government was not already aware of.

27.     In summary, the government mandated the use of asbestos by Bell in the manufacture of helicopters that were made by Bell during the period of time that the decedent Robert William Henderson was employed by Bell. Bell had no discretion in its use of asbestos in the helicopters. Had Bell refused to follow government mandated use of asbestos it would have ben subject to numerous civil and criminal penalties.

Further declarant sayeth not."

# DECLARATION OF WILLIAM T. WILSON

Page 8

I declare under penalty of perjury that the foregoing is true and correct.


WILLIAM T. WILSON

DECLARATION OF WILLIAM T. WILSON                                Page 9

EXHIBIT "I"

1 | Stephen K. Brunk, Esq. (CA Bar No. 53238)
LAW OFFICES OF STEPHEN K. BRUNK
2 | 6098 La Jolla Mesa
La Jolla, California 92037
3 | Telephone: (619) 234-3300
Fax: (619) 234-3331
4

5 | Attorney for defendant AVCO Corporation

6

7

8 | **UNITED STATES DISTRICT COURT**

9 | **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10 | ANNE CROWE, et.al.,                           )   **CASE NO. C 04 3929 TEH**
                                                    )
11 |                 Plaintiffs,                    )   **DECLARATON OF**
                                                    )   **EDWARD OWEN KAISER IN SUPPORT**
12 |                                                )   **OF OPPOSITION BY DEFENDANT AVC**
                                                    )   **CORPORATION TO PLAINTIFFS'**
13 | v.                                             )   **MOTION TO REMAND CASE TO**
                                                    )   **CALIFORNIA SUPERIOR COURT**
14 |                                                )
                                                    )   **Date:  November 8, 2004**
15 | ASBESTOS DEFENDANTS (B◆P)                       )   **Time:  10 a.m.**
                                                    )
16 |                 Defendants.                    )
                                                    )
17 |                                                )
    _____        )
18

19 |         I, Edward Owen Kaiser, declare as follows:

20 |         1)    I worked for Bell Helicopter ("Bell"), now Bell Helicopter Textron Inc., f

21 | February, 1956 to December 1994. From the beginning of my employment at Bell until

22 | retirement, I worked in the Powerplant Design Group (involved with engines and associ

23 | issues for Bell helicopters), and from 1974 to 1994, I was Chief of Powerplant Design a

24 | in Hurst, Texas. During my employment with Bell, I was aware of the process by whicl

25 | United States (the "Government") procured the first in the series of Bell UH-1 n

26 | helicopters, which used Lycoming engines, and I worked closely with Lycoming concernir

27 | UH-1. The Bell UH-1 model helicopter was produced in several different model var

28 | including the United States Air Force HH-1H model, the United States Navy UH-1D and l

1   models, and the United States Army UH-1B, UH-1C, UH-1D, UH-1H, and UH-1M models, all

2   of which used variants of the Lycoming T53 turbine engine.

3        2) Since 1951, Bell has supplied thousands of helicopters to the Government for

4   military use, including the UH-1 "Huey" models and AH-1 "Cobra" models. From the inception

5   of the UH-1 program in about 1954, contractors, including Bell and Lycoming, providing

6   components integrated into the final UH-1 helicopters had to follow specific Government-

7   approved procedures, regulations, laws, and standards for the design, materials, production,

8   and delivery of those helicopters.

9        3) In 1954, the United States Air Force (the "USAF") issued a request for proposal

10   for medical evacuation helicopters for use by the United States Army (the "Army"). At that

11   time, the USAF was designated by the Government as having lead responsibility, known as

12   "technical cognizance," for all military aircraft procured by the Government.

13        4) There were no predecessor civilian counterparts to either the UH-1 helicopter or

14   the Lycoming T53 engine; they were both originally designed for military use.

15        5) Government-authored military standards dictated the specification process for

16   military aircraft, and Bell and its component manufacturers used those standards to draft

17   proposed specifications for the UH-1 and its components. The proposed specifications were

18   considered in great detail at review conferences attended by Bell and the UH-1 component

19   contractors (including Lycoming), the Government, and Military employees and consultants.

20   During those conferences, the proposed specifications for the UH-1 and its components were

21   reviewed line by line, and Government personnel were free to, and often did, request detailed

22   changes as a result of those review conferences.

23        6) The manufacturers' engineers then revised the specifications in accordance with

24   the requests and at the direction of the reviewing Government and Military agencies. The

25   revised specifications were subjected to further conference and review by Government and

26   Military personnel. Months of manufacturer revisions and Military reviews were often needed

27   before the Government accepted the final Detail Specifications. The Detail Specifications

28   incorporated a multi-page list of Military specifications, known as "mil specs," which had to

1   be followed. The mil specs themselves were often lengthy and detailed documents. A

2   Government-authorized representative had to give final written approval to each portion of the

3   Detail Specifications.

4           7) Based on the Government-approved specifications, the manufacturers of the UH-1

5   and its components produced or revised engineering drawings for each component of the

6   helicopter. The drawings incorporated and restated all of the Government specifications and

7   military requirements that the manufacturers were obligated to follow under the eventual

8   production contracts. Each drawing was submitted for detailed review and approval to civilian

9   engineers employed by the Government.

10          8) Each drawing so produced by the manufacturers contained a signature block for

11  the required signature of a Government engineer. The signature denoted the Government

12  engineer's review and acceptance of the drawing. Any changes to a drawing are reflected on

13  the drawing as Revisions, which show engineering orders approved for the drawings. Each

14  substantive engineering order had to be approved or concurred with by the Government's

15  approval officer.

16          9)    After Government approval of the drawings for the UH-1 and its major

17  components, Bell incorporated the drawings into the final helicopter design, which Bell and the

18  manufacturers of various UH-1 components had to strictly adhere to. To deviate from an

19  approved design, the manufacturers had to obtain the agreement of Government technical

20  personnel in charge, even before submitting an Engineering Change Proposal for consideration.

21  Only some of the Engineering Change Proposals allowed to be submitted were approved by the

22  Government. Implementing an approved engineering change required the manufacturer to

23  obtain a contractual amendment and a written Engineering Order approved by the Government

24  engineer responsible for the change.

25          10)   In 1955, as a result of Bell's response to the request for proposal, the USAF

26  awarded Bell a contract for the production of three prototype aircraft, designated as XH-40

27  aircraft.

28  /    /    /

1       11)   The USAF subjected the three original XH-40 prototype aircraft to extensive

2   flight testing at Edwards Air Force Base, and based upon those tests, in 1958 the USAF

3   approved the production of six more helicopters (designated the YH-40) and thereafter nine pre-

4   production helicopters (designated as the HU-1). After the USAF extensively tested those

5   aircraft, it approved the first production contract for the HU-1A (later designated as the UH-1).

6       12)   In addition to its intimate involvement with the formulation of the detailed

7   specifications for and the design of the UH-1 and its components, the Government also

8   approved the technique by which all component parts of the UH-1 helicopter were

9   manufactured, assembled, and installed. Assembly and installation of the component parts into

10   the UH-1 helicopter were accomplished by using installation drawings and instructions,

11   reviewed by the Government, that were prepared in accordance with precise military

12   specifications and requirements. The Government at all times exercised absolute control over

13   the technical material contained in the drawings and instructions. The Aircraft Inspection Log

14   for each UH-1 helicopter manufactured by Bell documented the step-by-step assembly process

15   for the helicopter, which was overseen and approved by Government quality inspectors on site

16   at the time of manufacture.

17       13)   On behalf of the Government, in addition to participating in the formulation of

18   the specifications for and the design of, and its review of the manufacturing processes for, the

19   UH-1 helicopter and its components, the Government actually maintained a complement of its

20   own personnel both at Bell's plant in Hurst, Texas and at Lycoming's plant, in Stratford,

21   Connecticut, to ensure that the UH-1 helicopters and their engines were built in strict

22   accordance with all of the applicable specifications. For instance, although the USAF had

23   ultimate design cognizance over the early versions of the UH-1 helicopter, the Government and

24   the USAF utilized civilian Navy personnel permanently on site at Bell's plants from the late

25   1950s to the mid-1960s, when on-site responsibility was taken over by the Army, which has

26   continuously been the Government's on-site representative at Bell to this day. Those on-site

27   Government personnel, including specialists in engineering and quality control, were charged

28   with the substantive review of engineering drawings and specifications and oversight of the

1  manufacturing process, assured adherence to military specifications and requirements in the

2  production of the UH-1 helicopters, and accepted the helicopters, including their components,

3  on behalf of the Government only after determining that they met every contract requirement.

4       14)  In short, the Government was directly and intimately involved with the

5  development of the Bell UH-1 helicopter and controlled the details of the design of every aspect

6  of the manufactured helicopters, including, without limitation, the types of materials (such as

7  asbestos) used in the helicopters and their component parts. Government representatives

8  monitored the manufacturers' work at every step in the design and manufacturing process, and

9  Government evaluation and approval had to occur at every step.

10       15)  To the extent that asbestos products were used in the Bell UH-1 helicopters, or

11  their Lycoming T53 engines, those products would have been part of the Government's

12  specifications, specifically incorporated into production contracts, from which the

13  manufacturers of those products were not free to deviate. The use of such products, then, was

14  expressly directed by the Government personnel participating in the formulation of those

15  specifications and on-site Government personnel assuring that UH-1 helicopters were produced

16  in exact conformity with the specifications incorporated into the production contracts.

17       16)  At every step in the development and production of UH-1 helicopters, Bell and

18  the manufacturers of the component parts for the UH-1 had to follow Government evaluated

19  and approved specifications concerning the design and materials for those helicopters and their

20  component parts. Every UH-1 helicopter or component part accepted by the Government was

21  accepted only after the Government confirmed that the aircraft and its parts conformed to the

22  contract specifications.

23       17)  Bell performed its UH-1 helicopter production contracts with the Government

24  in accordance with the requirements of the specifications and the design, prepared at the

25  direction of the Government, approved by the Government, and incorporated by reference into

26  the production contracts. The Government did not permit Bell or the component manufacturers

27  for the UH-1 production to deviate from those particulars for the UH-1 without a contract

28  change authorized by the Government's Contracting Office.

1        18)   If the manufacturers of the UH-1 series helicopters and their components failed

2    to manufacture those helicopters and their components in strict compliance with Government

3    requirements, they would have been subject to a variety of penalties, including civil and

4    criminal sanctions. The manufacturers of the UH-1 helicopters and their components were not

5    permitted to change their specifications in any way without the express authorization of the

6    Government. From the commencement of my employment at Bell in 1956 through the mid-

7    1960's, by which time the basic UH-1 design had been finalized and production of various UH-

8    1 models had commenced, the Government's representative at Bell, to whom all the UH-1

9    manufacturers reported and who had to approve all of our actions, was the Navy's Chief

10   Engineer, Mr. Cyrus Gaiser, who was permanently stationed at the Bell plant in Hurst, Texas

11   One of Mr. Gaiser's many functions at Bell on behalf of the Government was to ensure that

12   there were no manufacturing deviations from the Government's specifications governing the

13   configuration of the UH-1 helicopters and their component parts, and in fact the Government

14   had rigorous acceptance procedures to ensure that each UH-1 helicopter delivered to the

15   Government conformed to all the requirements of the production contracts before acceptance

16   by the Government.

17       19)   Any knowledge possessed by the manufacturers of the UH-1 and its major

18   components concerning dangers associated with the use of the UH-1 helicopter models and

19   their components was conveyed to the Government. It is my belief that the manufacturers

20   the UH-1 helicopters and their component parts had no knowledge of any danger in the use

21   the UH-1 helicopter model components that was not known to the Government.

22       Executed this 12 of October, 2004 at Mena, Arkansas.

23       I declare under the penalty of perjury of the laws of the State of California that

24   foregoing is true and correct.

25

26                          Edward Owen Kaiser

27

28